IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-20436

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

     v.

DAVID J. FEINGOLD, JOSEPH B.
BALDASSARRA, STEVEN S.
BALDASSARRA, BROAD STREET
GLOBAL MANAGEMENT, LLC, AND
BROAD STREET INC.,

               Defendants, and

JOSEPHBENJAMIN, INC.,
JUST A NICE DAY, INC.,

               Relief Defendants.

**DEFENDANTS' AND RELIEF DEFENDANTS' OPPOSITION TO SECURITIES AND
EXCHANGE COMMISSION'S
EXPEDITED MOTION FOR TEMPORARY INJUNCTIONS,
<u>ASSET FREEZE, AND OTHER RELIEF</u>**

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ................................................................................. 5

II.   FACTUAL BACKGROUND.................................................................................... 9

III.  ARGUMENT ........................................................................................................ 11

   A.   Legal Standards.................................................................................................. 11

   B.   The SEC Cannot Demonstrate Substantial Likelihood of Success on the Merits ........... 12

      1.   The SEC's Expert Materially Understates Broadstreet's MCA Returns ..................... 14

      2.   BSG Management Did Not Divert Investor Funds........................................................ 16

      3.   BSG Management's Fees Were Disclosed to Fund Investors ....................................... 18

      4.   BSG Fund Investors Are Provided Significant Additional Disclosures About the Fund's Investments and Operations ............................................................ 21

      5.   The SEC's Claims regarding the Qualified Small Business Stock Subseries Are Wrong and Immaterial........................................................................ 23

      6.   The SEC's Delaware Multi-Series LLC Cross-Liability Arguments Are Misplaced and Not Material ........................................................................ 24

      7.   The SEC's Arguments Regarding BSI's Financial Records Are Exaggerated and Defendants Did Not Act Deceptively........................................................ 25

      8.   The SEC Scheme Liability Allegations Are Repetitive............................................... 27

      9.   The SEC Cannot Show a Substantial Likelihood of Proving Scienter ........................ 27

   C.   The SEC Cannot Demonstrate a Likelihood of Irreparable Injury ................................. 28

   D.   The Balance of Equities Favors Defendants ................................................................... 32

   E.   The Relief Sought by the SEC Is Not In The Public Interest ......................................... 35

IV.  CONCLUSION..................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Badillo v. Playboy Entertainment Group, Inc.*,
  2004 WL 1013372 (M.D. Fla. Apr. 16, 2004) ........................................................ 29

*Calliope Cap. Corp. v. Earthfirst Techs., Inc.*,
  No. 8:08-CV-00219, 2008 WL 1995077 (M.D. Fla. May 6, 2008) ........................ 33

*Comic Strip, Inc. v. Fox Television Stations, Inc.*,
  710 F. Supp. 976 (S.D.N.Y. 1989) ........................................................................ 29

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*,
  320 F.3d 1205 (11th Cir. 2003) ............................................................................. 11

*Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*,
  116 F. Supp. 2d 405 (S.D.N.Y. 2000) ................................................................... 29

*Harmonia Holdings Group, LLC v. United States*,
  150 Fed. Cl. 670 (2020) ......................................................................................... 32

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ................................................................................. 12

*Lakedreams v. Taylor*,
  932 F.2d 1103 (5th Cir. 1991) ............................................................................... 32

*Menudo Int'l, LLC v. In Miami Prod., LLC*,
  No. 17-21559-CIV, 2017 WL 4919222 (S.D. Fla. Oct. 31, 2017) ........................ 28

*Miami Beach Federal Sav. & Loan Ass'n v. Callander*,
  256 F.2d 410 (5th Cir. 1958) ................................................................................. 11

*Miller v. Ziegler*,
  582 F. Supp. 3d 640 (W.D. Mo. 2022) .................................................................. 32

*Netsphere, Inc. v. Baron*,
  703 F.3d 296 (5th Cir. 2012) ................................................................................. 33

*Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990) ......................................................................... 28, 29

Pals Group, Inc. v. Quiskeya Trading Corp.,
  2017 WL 532299 (S.D. Fla. Feb. 9, 2017) ............................................................ 29

*Pittman v. Cole*,
  267 F.3d 1269 (11th Cir. 2001) ............................................................................. 12

*Pliteq, Inc. v. Mostafa*,
  2024 WL 4215635 (S.D. Fla. Aug. 30, 2024) ........................................................ 12

*Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................................................................. 29

*Schiavo ex. rel Schindler v. Schiavo,*
    403 F.3d 1223 (11th Cir. 2005) .................................................................................... passim

SEC. *SEC v. Asset Recovery and Mgmt. Trust, S.A.,*
    340 F. Supp. 2d 1305 (M.D. Ala. 2004) ...................................................................... 12, 35

*SEC v. Carriba Air, Inc.,*
    681 F.2d 1318 (11th Cir. 1982) ................................................................................... 27, 28

*SEC v. Chappell,*
    107 F.4th 114 (3d Circuit 2024) ....................................................................................... 12

*SEC v. Complete Business Solutions Group, Inc.,*
    No. 20-CV-81205-RAR, 2020 WL 9209279 (S.D. Fla. Dec. 16, 2020) ................................ 33

*SEC v. Monterosso,*
    756 F.3d 1326 (11th Cir. 2014) ........................................................................................ 28

*SEC v. Morgan Keegan & Co., Inc.,*
    678 F.3d 1233 (11th Cir. 2012) ........................................................................................ 25

*Texas v. U.S. Department of Homeland Security,*
    700 F. Supp. 3d 539, (2023) ............................................................................................ 35

*TracFone Wireless, Inc. v. Clear Choice Connections, Inc.,*
    102 F. Supp. 3d 1321 (S.D. Fla. 2015) .............................................................................. 12

*Trump v.,Int'l Refugee Assist. Project,*
    582 U.S. 571 (2017) ......................................................................................................... 32

*United States v. Lambert,*
    695 F.2d 536 (11th Cir. 1983) ................................................................................... 12, 15

*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016) ................................................................................... 29, 30

## Statutes

IRC Section 1202 ...................................................................................................................... 23

## I.      PRELIMINARY STATEMENT

Simply put, this is not a case that warrants emergency relief. There is no evidence of investor loss, missed payments, destruction of evidence, sudden transfers of funds, or moving funds outside of the jurisdiction of the U.S. courts. There is, however, plenty of evidence that the Defendants have built a viable multi-billion dollar real estate business with material assets and investments that generate significant revenues now and will generate even greater revenues in the coming years.[1] As explained more fully below, among other things, the SEC cannot establish a substantial likelihood of irreparable harm if a TRO, asset freeze, and receiver are not issued or appointed, and it cannot show that a receiver will do no more harm than good. As a result, the extraordinary relief the SEC seeks is not warranted, and the Court should deny its motion.

The pace of the SEC's investigation that preceded the TRO filing was not the typical short, fast-paced investigation that normally precedes a TRO. The SEC initiated this investigation nearly two and a half years ago in or about September 2022.[2] During the investigation, the SEC issued more than ninety (90) document subpoenas to third parties and Broadstreet-related entities and individuals, including Defendants' bank and financial institutions. Defendants produced hundreds of thousands of pages of materials in response.[3] The SEC also took testimony from ten (10) Broadstreet-related witnesses over a span of seventeen (17) months. The SEC's investigation was essentially complete by August 22, 2024, when the Broadstreet Plaintiffs filed the action against

---

[1] For ease of reference, Defendants will adopt the SEC's naming conventions for purposes of its pleadings such as "BSI" for Broadstreet Inc., "BSG Fund" for the Broadstreet Global Fund LLC, and "BSG Management" for Broadstreet Global Management LLC. However, Defendants will refer to "Broadstreet" to include BSI and its affiliated entities including BSG Fund and BSG Management.

[2] Declaration of J. Lee Robinson ("Robinson Decl.") ¶ 4.

[3] The SEC did not pursue any subpoena enforcement actions against the Defendants during its investigation.

the SEC in the Northern District of Texas (the "Texas Action").[4] Since that time, the SEC's

investigation has been on pause for five (5) months while the Texas action was being litigated, and

the Broadstreet parties had not heard from the SEC's Denver Regional Office which was

conducting the investigation until the motion for TRO was filed in this Court.[5]

During the more than two-year period of the SEC's investigation and while under the

SEC's scrutiny, the BSI business lines have grown into a more than billion-dollar enterprise that

includes viable and valuable business lines in real estate infrastructure, crypto mining and data

centers, hotel and lodging, merchant cash advance, and self storage facilities. For the past five

months since the filing of the Texas Action, the SEC's investigation has been inactive and

essentially on hiatus. Significantly, in its papers, the SEC cites no new facts or evidence justifying

its sudden TRO filing. No new evidence of investor losses. No fraudulent transfers of funds. In

fact, the only ongoing conduct cited by the SEC is the fact that Broadstreet was continuing to raise

funds from investors.[6] The SEC has been sitting with the Defendants' financial records in their

possession for years as Broadstreet voluntarily turned over its financial records to the SEC early

in the investigation. Yet, now, apparently without any new facts or evidence even suggesting that

---

[4] *Broadstreet, Inc. et al. v. Securities and Exchange Commission*, Case No. 4:24-cv-00803-O
(N.D. Tx.).

[5] Indeed, the timing of the SEC's filings in this matter strongly appear to be triggered by events in
the Texas Action rather than a desire to halt ongoing misconduct. On January 8, 2025, the court in
Texas Action denied the SEC's motion to stay discovery after the SEC had stated its intention to
file a motion to dismiss. It appears this order caused the SEC to seek expedited authority from the
Commission to file the Motion for TRO. On January 28, 2025, the Texas court set a hearing on
the Broadstreet plaintiffs' motion to compel discovery for February 5, 2025. The very next day
after the Texas court's order, the SEC initiated the filing of the TRO action on January 29, 2025,
and requested that a TRO be entered by February 5, 2025 – the same day as the hearing on the
motion to compel in Texas. Thus, the timing of the SEC's filings in this matter appeared to be
drive by a desire to avoid the jurisdiction of the Texas court.

[6] Robinson Decl. ¶ 235.

a TRO is necessary, the SEC filed this emergency action seeking extraordinary relief that would effectively shut down Broadstreet's business and cause irreparable harm to the fund's investors.

Contrary to the SEC's arguments, the BSG Fund's investors were provided numerous and detailed disclosures regarding BSG Management's discretion and control over fund assets, the management fees charged, the operations of the fund, and the status of the fund's investments. These numerous disclosures appear in several different documents provided to investors including the fund's operating agreement, the private placement memorandum ("PPM"), quarterly reports, a key compliance update provided to investors, and a data room of materials that fund investors were obligated to review. In short, investors see these disclosures dozens of times per year through data room materials.

Many of the SEC's key assertions in the papers are readily rebutted as follows:

- Defendants did not overstate returns with respect to its merchant cash advance ("MCA") portfolios. Rather, the SEC expert's analysis regarding BSI's portfolios is materially flawed. The expert relied on incorrect data inputs in computing BSI's returns on its portfolios, incorrect data on the collectability of the portfolios, and she applied the wrong accounting methodology.

- BSG Management did not divert $880 million of fund assets. To the contrary, the fund manager was simply deploying fund assets to BSI's various business lines as was permitted by the fund's operating agreement, the PPM, and other disclosures. The SEC's own expert report acknowledges investment activity of at least $721 million.

- BSG Management disclosed the amount of its management fees to fund investors. Disclosures contained in the fund data room, series supplements, and a key compliance update, clearly set forth that BSG Management was entitled to a six (6) percent fee

annually over five (5) years for a potential total of thirty (30) percent. The SEC does not allege BSG Management received fees in excess of this amount because they did not.

- Broadstreet's qualified small business stock ("QSBS") subseries is alive and well contrary to the SEC's assertions. All of the corporate and tax paperwork has been filed with the proper authorities and a major U.S. law firm engaged by BSI recently completed a draft Form S-1 registration statement for the QSBS division.

- BSG Management accurately keeps records of each of its subseries through spreadsheets that are updated monthly and track subseries investments and distributions by client for each subseries. It's simply not reasonable to conclude as the SEC does that BSG Management had to create a separate bank account for each of its multiple subseries.

- Disclosures to fund investors only provided that BSG Management would use "commercially reasonable efforts" to prepare financial statements for the fund – audited financials are not promised to investors. The SEC's investigation – not a lack of effort by Defendants – has prevented BSG Management from being able to retain an outside accounting firm to audit the fund's financial statements. Moreover, the consolidated financial statements that were prepared internally for BSI were not widely disseminated to fund investors and investors who received them received qualifying data room disclosures that the financials were not audited and not prepared in compliance with U.S. Generally Accepted Accounting Principles ("GAAP").

- Contrary to the SEC's arguments, fund materials contained numerous disclosures regarding the use of investor funds and how the subseries would operate in relation to

each other. Critically, it was disclosed that in the manager's discretion funds from one subseries or business line could be invested in another subseries or business line if necessary, and that funds associated with a particular subseries or business line could be used to satisfy obligations of another subseries or business line.

- It was disclosed to investors that Broadstreet's real estate projects would not immediately generate cash flows for several years and that real estate related funds could be invested in other subseries, such as MCA, while real estate projects were being developed and prior to generating returns.

- The SEC relies on stale evidence in making its arguments. For example, the SEC states that the infrastructure projects have made zero distributions to Broadstreet as of December 31, 2023, when in 2024 the infrastructure projects distributed over $45 million dollars  to Broadstreet and these projects are expected to distribute at least $75 million to Broadstreet in 2025, with a projected $5 billion in contracts with homebuilders for lot sales that will deliver $500 million in distributions over the next 4-5 years for the benefit of the BSG Fund.

Based on the foregoing, and for reasons stated below, this is not a case that comes close to meeting the high requirements for emergency action like a TRO, and the relief sought by the SEC should be denied in its entirety. At best, the SEC's case against Defendants is a garden variety securities enforcement case that should proceed to discovery and litigation on the merits.

## II.    FACTUAL BACKGROUND

Broadstreet is a leading private equity firm rooted in the Carolinas with its main offices in South Carolina. [*See* Declaration of David Feingold ("Feingold Decl.") ¶ 5.] Broadstreet is the fourth largest private equity infrastructure developer in the USA. [*Id.*] Broadstreet has been

involved in over $5 billion in transactions and currently is involved in over 17,000 acres of land, more than 54 communities/infrastructure projects, over 44,000 expected homesites, 863 hotel room units and over 130 total projects/businesses. [*Id.*] Broadstreet and its affiliated/related entities' office operations have over 100 front office personnel and an estimated 3,000 jobs created from its projects which have an estimated $10 billion economic impact on the Carolinas. [*Id.*]

Broadstreet has fourteen (14) different business lines that include (1) infrastructure (2) home development (3) hotel/lodging (4) land banking (5) restaurants (6) specialty finance/merchant cash advance (7) crypto mining (8) self-storage facilities (9) automobile dealerships (10) data centers (11) broker/dealer (12) family office (13) insurance (14) mortgage conduit trading/securitization. [*Id.* at ¶ 6.] The BSG Fund provides equity capital for many of BSI's business lines and is entitled to receive certain distributions and profits from those business lines. [*Id.*] Each one of those business lines may contain numerous special purpose vehicles ("SPVs") to hold the assets, such as the lands and management companies applicable to the individual land deals. [*Id.*]

Broadstreet's infrastructure business, which is currently the largest business line, is primarily responsible for delivery of forty-four thousand (44,000) homesites to two primary clients, DR Horton, Inc. and Lennar Homes Corp. the first and second largest homebuilders in the U.S., respectively. [*Id*. at 7; *see also* Declaration of Josh Howard ("Howard Decl.") ¶¶ 2-8]. Both are multi-billion dollar publicly-traded companies that have entered into fixed contracts for the delivery of homesites for home building. [*Id.*] Broadstreet provides the infrastructure (roads, sewers, electric, gas, grading, basically all services besides the actual building of the homes). [Feingold Decl. ¶ 7.] Presently, the average lot price is almost $110,000 per lot, accordingly, the infrastructure business will generate nearly $5 billion in lot sales that are expected to generate

approximately $500 million in distributions for the benefit of the BSG Fund. [Feingold Decl. ¶ 7; Howard Decl. ¶ 8.] Broadstreet currently controls approximately $200 million in unencumbered real estate lands independent of its real estate business lines. [Feingold Decl. ¶ 9.; Howard Decl. ¶ 9.; *see also* Def. Ex. M.] *See also* Declaration of Steven Baldassarra (S. Baldassarra Decl.") ¶¶ 4-5, 24-27.

Broadstreet also operates a data center/crypto mining business line that is the largest DOGE coin miner in North America with sixteen thousand (16,000) miners in five (5) data center locations with an additional five (5) more data centers in process of development. [Feingold Decl. ¶ 8.] BSI has nearly 225 million worth in mining machines that consume 100 Megawatts or power or enough energy to power nearly 100,000 homes.  [*Id.*; *see also* Def. Ex. N.; S. Baldassarra Decl. ¶ 28.]

Broadstreet's MCA business line currently holds approximately $180 million in commercial papers. [*Id.* ¶ 10.] Broadstreet's MCA portfolios are syndicated through Samson Funding ("Samson") a company based primarily in New York.

Finally, Broadstreet's other remaining business lines such as hotel and lodging, self-storage facilities, land banking, restaurants, and auto dealerships hold assets of a combined value well in excess of $150 million on a conservative basis. [*Id.* ¶ 11.]

## III.  ARGUMENT

### A.  Legal Standards

The legal standard for granting a temporary restraining order is similar to the standard for granting a preliminary injunction. *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). Either is an "*extraordinary* and *drastic* remedy" that cannot be granted unless the SEC clearly establishes the burden of persuasion for each of the four factors. *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003) (citation omitted) (emphasis added). Indeed, courts generally disfavor injunctions at the preliminary stage of a

proceeding except in "rare instances in which the facts and law are clearly in favor of the moving party." *Miami Beach Federal Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958); *see also United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (granting a preliminary injunction "is the exception rather than the rule"). To obtain a temporary restraining order or preliminary injunction, the SEC must demonstrate that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damaged the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Schiavo*, 403 F.3d at 1231. Courts follow this same factor test in determining whether to grant an asset freeze requested by the SEC. *SEC v. Asset Recovery and Mgmt. Trust, S.A.*, 340 F. Supp. 2d 1305, 1309-11 (M.D. Ala. 2004); *see also SEC v. Chappell*, 107 F.4th 114, 126 (3d Circuit 2024).

### B.   The SEC Cannot Demonstrate Substantial Likelihood of Success on the Merits

The SEC must first establish a *substantial* likelihood of success on the merits. *Schiavo*, 403 F.3d at 1231. To do so, the SEC "must demonstrate a likelihood of success at trial as to both its *prima facie* case and the affirmative defenses asserted by the defendant." *TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1325 (S.D. Fla. 2015). In assessing a substantial likelihood of success on the merits, courts "look to standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quotation marks and citation omitted). Accordingly, courts analyze the elements of each cause of action to assess the likelihood of success. *See Pliteq, Inc. v. Mostafa*, 2024 WL 4215635, at *1 (S.D. Fla. Aug. 30, 2024). And a failure to demonstrate a substantial likelihood of success on the merits is fatal to the SEC's request. *See Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001). If that occurs, the court need not consider the remaining three factors. *Id.*

The SEC's claims under the Securities Act and Exchange Act require the government to prove that Defendants made materially false statements or omissions to investors with respect to the BSG Fund's operations, or that the Defendants engaged in deceptive practices regarding the same (so-called scheme liability). For the most part, the SEC's Advisers Act claims rely on the same or similar allegations. The SEC allegations can essentially be grouped into four separate categories: (1) that Defendants overstated profits with regard to Broadstreet's merchant cash advance ("MCA") portfolios (2) that Defendants failed to strictly follow disclosures related to the Fund's status as a Delaware subseries LLC; (3) that Defendants made false statements regarding the qualified small business stock subseries; and (4) that Defendants engaged in deceptive practices regarding the fund's recordkeeping practices and financial statements (TRO Mtn, p. 2.).

Much of the SEC's purported arguments are based on Broadstreet's past history and PPM and less about Broadstreet's current practices. Since Mr. Feingold restructured the Broadstreet entities starting in June 2022 and when he became BSI's CEO, BSG Management has steadily improved its disclosures and compliance practices including updating its PPM in September 2023, and providing explicit disclosures to investors through a compliance update in July 2023 (which has since been provided to fund investors on an ongoing basis).

The SEC spills considerable ink regarding Broadstreet's MCA business line, arguing that the MCA portfolios were not profitable enough to cover distributions and redemptions to the BSG Fund's investors in earlier years. However, the SEC's analysis is based on a flawed expert report that significantly undervalues the MCA portfolios on a historical basis. Moreover, it was always contemplated that BSI would initially use the MCA portfolios to support the BSG Fund's obligations while BSI's real estate business lines began generating capital. Fund materials disclosed these facts to investors on a consistent basis through quarterly updates and in the data

room. BSI's key to building its real estate business is to not liquidate its real estate holdings every quarter or month to meet investor payments but to let the land values grow. As expected, BSI's real estate business line has grown rapidly to now dwarf the MCA portfolios. As a result, Broadstreet is much less reliant on the MCA portfolios as a source of revenue on a going forward basis.

Stripped down to its core, the SEC's claims essentially take aim at the sufficiency of BSG Management's disclosures and BSI's business practices. While Defendants believe such practices are legitimate, even in the best case scenario for the SEC, its claims are a garden variety SEC enforcement case; one that does not warrant emergency relief.

**1. The SEC's Expert Materially Understates Broadstreet's MCA Returns**

The Defendants' arguments regarding Broadstreet's MCA portfolios are based entirely on the analysis of their forensic accounting expert who attempted to calculate the returns associated with Broadstreet's MCA portfolios for the years at issue. Based on the expert's analysis, the SEC claims that actual returns from the MCA investments were below promised returns and deteriorated over time (TRO Mtn, pp. 9-14). However, the SEC expert's analysis is seriously flawed and understates the MCA's portfolios historical returns and current values.

First, the SEC's expert used incorrect and incomplete data for the calculations associated with Broadstreet's MCA advances.[7] The expert used the wrong data inputs for her calculations and she did not take into account how the portfolios were managed. Second, the SEC's expert used incorrect and incomplete data regarding the performance and post-performance of Broadstreet's MCA portfolios. These are critically important data inputs that are ignored by the expert. As a result, the SEC's expert materially understated the returns on Broadstreet's MCA portfolios.

---

[7] *See* Expert Report of Melissa Davis ("SEC Exp. Rpt.").

Third, the SEC expert mentioned in passing that Broadstreet at times relied on Samson's calculation of Broadstreet's monthly returns for its MCA portfolios of 2.866 percent per month, which was a five-year average. [SEC Exp. Rpt. ¶¶ 210, 211] The expert summarily rejected Samson's calculations without explaining why they were wrong, nor why it was unreasonable for Broadstreet to rely on Samson's analysis of its own data. Because the expert used an entirely different methodology to calculate Broadstreet's monthly returns on its MCA portfolios, it is hardly surprising that she arrived at different amounts than Samson. Further, the expert's criticisms of Broadstreet's reporting in its consolidated financial statements failed to take into account Broadstreet's status as an investor in MCA syndications through Samson and the fact that Broadstreet used the accrual method of accounting; her analysis appears to treat Broadstreet as a direct lender in MCA that reported on a cash basis. *See also* Feingold Decl. ¶¶ 37-39.

Finally, the SEC's expert report is significantly undercut by a recent securitization involving Samson's MCA lending. Basepoint Capital ("Basepoint"), a New York based specialty finance lender, is one of the syndicators who advances funds to merchants along with Broadstreet through Samson. [Feingold Decl. ¶ 40.] When Samson offers an advance to merchants, Broadstreet and Basepoint often act as co-syndicators on the advance each providing a certain percentage of the overall advance. In December 2023, Basepoint completed an offering memorandum for a $100 million asset-backed securitization wherein the underlying assets consisted of MCA portfolios and with approval to upsize to $500 million. [*Id.*; *see also* Def. Ex. O] The offering was underwritten by Guggenheim Securities, LLC, one of the largest investment banks in the U.S. [*Id.*] As part of the due diligence described in the offering memorandum, the underwriter analyzed a statistical pool of merchant cash advances that included approximately $61 million of advances serviced by Samson (which comprised 69.85% of the advances analyzed). [*Id.*] The Samson advances analyzed

by the underwriter included much of the same advances that Broadstreet participated in as a co-syndicator with Basepoint. [*Id.*] The underwriter's analysis of Samson's portfolios showed materially different collection data than what was used by the SEC's expert in this matter. [*Id.*] Moreover, as a result of the underwriter's due diligence and Basepoint's offering materials, DBRS Morningstar rated the Class A and B notes for the securitization (which paid coupon rates of 8.704% and 11.286%, respectively) as investment grade.  [*Id.*; see also Def. Ex. P.] If Samson's MCA advances returned less than 3 percent annually and had the collection issues that the SEC's expert contends, there is no chance the Basepoint securitization would have been rated investment grade under those circumstances.

Defendants will present evidence and testimony on these issues at the February 26, 2025 hearing to demonstrate the defects in the SEC's expert analysis. At best, the actual returns that Broadstreet earned on its MCA portfolios during the period at issue will come down to a battle of the experts during this litigation. At the early stages of this proceeding where Defendants have not yet had the opportunity to retain experts and prepare expert reports, it would be premature for the Court to rely on the SEC expert's questionable analysis as a basis to order the extraordinary relief requested by the SEC.

## 2. BSG Management Did Not Divert Investor Funds

Throughout its pleadings, the SEC suggests that BSG Management diverted approximately $880 million in investor funds (*see e.g.,* SEC Motion for TRO ("TRO Mtn.") pp. 3, 20). This is simply incorrect. Investor funds were not diverted but rather deployed on behalf of the BSG Fund by its manager (as confirmed by the SEC's own expert cash analysis). Under the BSG Fund LLC operating agreement ("Operating Agreement"), BSG Management has broad discretion and control over investor funds. For example, Section 4.01 of the operating agreement outlines in

sixteen (16) subparts the broad powers and discretion provided to BSG management to manage, own and control fund assets. Section 4.01 states in pertinent part:

> The management of the Company and each Series shall be vested exclusively in the Manager. The Manager shall have the authority, on behalf of and in the name of the Company or each Series, to take any action or make any decisions on behalf of the Company and each Series …".

[Def. Ex. B, Section 4.01, emphasis supplied.] The Operating Agreement goes on to further describe BSG Management's discretion and control including to "acquire, hold, sell, transfer, exchange and dispose of Investments, and exercise all rights, power, privileges and other incidents of ownership and possession with respect to such Investments, including without limitation, the voting of Investments, the approval of restructuring of entities in connection with Investments …" [*Id.* at Section 4.01(c), emphasis supplied.] Moreover, Section 4.09 of the Operating Agreement states in relevant part, "[t]he Manager and its Affiliates may purchase an investment that would otherwise be appropriate for the Fund or a Series to own." [*Id.* at Section 4.09, emphasis supplied.][8] The SEC's own expert report acknowledges that Broadstreet's investment activity resulted in the deployment of more than $721 million in funds in BSI's various business lines. [SEC Exp. Rpt., Table 4, pg. 16.]

The BSG Fund's 2023 PPM also contains several disclosures regarding the manager's discretion and control over fund assets. For example:

> A Series may represent a particular industry or vertical but the Investor may not have any ownership interest in the underlying assets of a Series and may only have rights to specific returns or allocations of revenues, profits or such other structures set up in the sole discretion of the Manager.

[Def. Ex. A, pg. 9, emphasis supplied]

---

[8] It should be noted that BSG Fund's 2020 Operating Agreement contains the same disclosures. *See* Robinson Decl., Ex. 4, Sections 4.01 and 4.09.

> While the Manager is accountable to the Fund generally, the Operating Agreement grants the Manager broad discretion as to many matters and limits the Manager's fiduciary duties. By entering into the Operating Agreement and signing the Subscription Agreement, each investor acknowledges and consents to the exercise of such discretion by the Manager, including where the Manager has a conflict of interest.

[*Id.* at pg. 26, emphasis supplied].

> The Manager will have broad discretion to establish additional Series, and the investment strategy and other terms applicable to such Series without notice to or the consent of Members of any other Series. The Operating Agreement provides that the Manager will have complete control of the business of the Fund and that the Members will have no power to take part in the management of the Fund and each Series.

[*Id.* at pg. 43, emphasis supplied].

Accordingly, any suggestion that BSG Management diverted $880 million in funds is patently false. BSG Management simply deployed fund capital pursuant to its authority under the Operating Agreement and PPM. All BSG Fund investors were provided copies of these documents as part of the subscription documents when they initially invested in the BSG Fund. Thus, BSG Management's control and discretion over fund assets was sufficiently disclosed.

### 3.      BSG Management's Fees Were Disclosed to Fund Investors

The SEC also suggests that Defendants impermissibly took fees related to the BSG Fund's activities. This is another false premise. BSG Management provided fee disclosures to fund investors through several different means. The Operating Agreement provides in part that "each Series may pay to the Manager a fee for management and administrative services (the "Management Fee") for such periods and in such amounts as is set forth in the Series Schedule for such Series and if applicable, for each Class within such Series." [Def. Ex. B, Section 4.07.]  The 2023 PPM provides that "Series Supplements" will be created and distributed for each of the fund's series that sets forth the investment objective, investment strategy and terms related to the applicable series. [Def. Ex. A, pg. 1]. There is a Standard Series Supplement that is applicable to

all fund series unless there is a side letter or customized Series Supplement for a particular series. The Standard Series Supplement clearly discloses the amount of BSG Management's management fee as follows:

> Fees including management/administrative - Manager has the right to charge up to <u>six percent per year on the funds received from the investor</u> and with each investment expected to have a duration of five years, <u>the Manager may, at its discretion, receive the prepayment of all fees at once or in any sequence it so desires. Thereby it can receive all of its fees upfront on the initial investment of the investor or in any manner so elected by the Manager</u> and consequently at six percent per year over a five year assumed duration of each investment, <u>the Manager is expected to earn a fee of thirty percent on the total funds received from the investor.</u>

[Def. Ex. D, emphasis supplied]. Accordingly, the Standard Series Supplement clearly discloses to investors that BSG Management can take up to a 30 percent fee upfront if it so desired (although it never did). In addition, the Standard Series Supplement discloses to investors that BSG Management is entitled to any profits on the applicable series instead of taking a carry or performance fee. Thus, investors had no expectation of earning profits on the applicable series, just their fixed return. On this point the Standard Series Supplement states:

> Performance Fee/Incentive Allocation – No performance fee, instead, the Manager is to receive all profits generated by the applicable sub-series venture after all distributions have been made. This fee is in addition to the fees expressed elsewhere in this supplement and/or the private placement materials.

[*Id*.] Additionally, in July 2023, BSG Management issued a Compliance Acknowledge Update ("Compliance Update") to fund investors. The Compliance Update disclosed many items to investor regarding the BSG Fund operations including management fee disclosures. It states in relevant part:

> I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks.

[Def. Ex. I] Following the Compliance Update disclosure in July 2023, it is now provided to all fund investors at the time of their investment. Currently, approximately 99 percent of fund investors have signed and returned the Compliance Update. [*See* Declaration of Ryan Feingold ("R. Feingold Decl.") ¶ 8.d.]

Additionally, the fund PPM provides disclosures that BSG Management could pay some of its management fees to third parties or affiliates (such as Mr. Feingold) at its discretion in numerous places throughout the document. For example:

> The Manager may cause a Series to pay a portion of its Management Fees to third parties and such is left to the absolute discretion of the Manager.

[Def. Ex. A at pg. 9, emphasis supplied.]

> In addition, each Series indirectly bears its pro rata share of all such costs incurred by the investments in which it invests. Such costs may include costs relating to structuring and operating such investments and/or costs and expenses that the Manager and its affiliates incur in providing administrative, support and/or oversight services to investments (which services may vary over time). The effect of such expenses will be reflected in the value of the interests held by a Series in such investments.
>
> The Manager and its affiliates may from time to time incur expenses on behalf of the Fund or a Series, other client accounts of the Manager or its affiliates, and one or more subsequent entities established by the Manager. Although the Manager and its affiliates will attempt to allocate such expenses on a basis that they consider fair and equitable over time, there can be no assurance that such expenses will in all cases be allocated appropriately or equitably.

[*Id.* at pg. 14, emphasis supplied.]

> As a standard business practice, the Manager may cause a Series to pay a portion of its Management Fees to third parties (e.g., brokers, dealers, investment advisers, banks, etc.) that introduce investors to the Series, based on the ownership positions in the Series by such investors. The amount of the fees paid to such third parties will be debited against the capital accounts of the introduced investors and paid by the Series to such third parties.

[*Id.* at 15, emphasis supplied.] The SEC does not argue in its pleadings that Defendants took fees in excess of the amounts disclosed to investors – because they did not. The fees earned by BSG Management and allocated to Mr. Feingold for his efforts are well within the amounts authorized by the Operating Agreement, PPM, Series Supplements, and other data room disclosures.

### 4. BSG Fund Investors Are Provided Significant Additional Disclosures About the Fund's Investments and Operations

In addition to the above disclosures, the BSG Fund investors are provided significant disclosures that undercut that SEC's claims that investors are being defrauded. Importantly, these additional disclosures inform investors regarding how their funds can be used and other critical risk disclosures about the fund's investments. As stated above, the Compliance Update has been signed and acknowledged by 99 percent of the BSG Fund's investors and it is provided to all new investors at the time of investment. [R. Feingold Decl. ¶ 8d.] In addition to the fee disclosures mentioned above, the Compliance Update provides that by signing the document investors confirm they (in sum):

- read the private placement memorandum, series supplements, data room documents, monthly updates and disclosures of Broadstreet, and still consent to all matters contained in those documents;
- are responsible for reviewing the data room on a regular basis and also all updates posted as they may affect deal terms;
- acknowledge that real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow;
- acknowledge that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects;
- acknowledge that until the infrastructure and other real estate investments generate significant cash flow, their investments may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves;
- acknowledge that individual land is titled in SPV's owned, managed and/or controlled by BSG Fund or any of its affiliates (defined to include BSI and BSG Management); and

- make their own investment decisions, and neither Broadstreet nor any of its affiliates act as an investment advisors.

[Def. Ex. I] Critically, the Compliance Update discloses to investors in the real estate subseries that their funds can be deployed in other investments (such as MCA) while the funds are waiting to be deployed on real estate projects. And that investor funds may be used to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves. Also, the Compliance Update discloses that real estate assets may be titled in SPV's controlled the fund's affiliates BSI and BSG Management (as is permitted by the Operating Agreement as detailed above).

BSG Fund investors also receive additional disclosures regarding the status of BSI's subseries investments through quarterly reports that are provided to investors and posted to the data room. In addition to providing detailed information regarding the status of the underlying subseries investments, these quarterly reports also provided additional risk and information disclosures to the fund's investors including the fees charged and the manager's discretion in the use of investor funds.  For example:

> THE FUND OPERATES IN MANY LINES OF BUSINESS AND INDUSTRIES. IN THE EVENT THAT AN INTEREST PAYMENT, RETURN OF CAPITAL OR ANY OTHER FORM OF PAYMENT OR DISTRIBUTION IS BEING MADE TO AN INVESTOR, THE FUND MAY USE ITS REVENUES OR EARNINGS FROM OTHER BUSINESS LINES IN ORDER TO MAKE PAYMENTS TO INVESTORS. FOR EXAMPLE, IN REAL ESTATE DEALS, INVESTORS ARE GENERALLY PROVIDED AN EXPECTED RETURN, HOWEVER, DEPENDING ON THE REAL ESTATE PROJECT AND THE TIMING OF WHEN SUCH A PROJECT BEGINS TO GENERATE REVENUES FROM OPERATIONS, THE FUND MAY MAKE PAYMENTS TO INVESTORS FROM MONIES GENERATED FROM OTHER INVESTMENTS WHICH THE FUND HAS MADE SO THAT POSITIVE INVESTOR RETURNS CAN BE ACHIEVED. WITHOUT SUCH PAYMENTS BEING MADE FROM THE FUND BY ITS OTHER BUSINESS LINES, RETURNS MAY NOT HAVE BEEN ABLE TO HAVE BEEN MADE TO INVESTORS. HENCE, INVESTORS COULD RECEIVE PAYMENTS BY THE FUND FROM INDUSTRIES OTHER THAN THAT WHICH THE INVESTOR INITIALLY INTENDED TO INVEST.

> FOR CERTAIN INVESTMENTS IN EITHER FIXED INCOME OR REAL ESTATE PROJECTS, THE INVESTOR MAY PAY MONIES TO PARTICIPATE IN A TRANSACTION AND THE FUND MAY USE SOME OR ALL OF THE INVESTOR FUNDS TO GENERATE RETURNS THROUGH

INVESTMENTS UNRELATED TO THE INVESTED INDUSTRY IDENTIFIED BY THE INVESTOR. FOR EXAMPLE, INVESTORS IN REAL ESTATE PROJECTS MAY HAVE SOME OR ALL OF THE FUNDS WHICH THEY HAVE PLACED WITH THE FUND ACTUALLY PLACED IN NON REAL ESTATE INVESTMENTS SUCH AS SECURITIES, DERIVATIVE CONTRACTS, DEBT PORTFOLIOS, MERCHANT CASH ADVANCE OR FIXED INCOME PRODUCTS IN ORDER TO GENERATE RETURNS TO PAY INVESTORS WHILE THE REAL ESTATE PROJECTS ARE BEING DEVELOPED AND NOT YET OPERATIONAL. THE FUND MANAGER IS SPECIFICALLY GIVEN THE AUTHORITY TO USE SUCH FUNDS IN SUCH MANNER AS IT DEEMS APPROPRIATE IN ORDER TO GENERATE RETURNS FOR THE BENEFIT OF INVESTORS.

[Def. Exs. F.1-7, emphasis supplied]. These same disclosures (plus additional disclosures not highlighted here) are shown to fund investors every time they access the data room. Accordingly, much of what the SEC complains about regarding the operation of the BSG Fund and its investments was and is directly being disclosed to fund investors.

### 5. The SEC's Claims regarding the Qualified Small Business Stock Subseries Are Wrong and Immaterial

The SEC claims that the BSG Fund's qualified small business stock ("QSBS") subseries never was implemented and that BSG Management made misrepresentations regarding the status of the subseries (TRO Mtn., pp. 22-23). First, and more importantly, it is simply incorrect that BSG Management has not taken any steps to implement this subseries. In fact, the QSBS subseries is alive and well. Broadstreet's QSBS entity, Broad Street Global Development Corp. was founded on June 17, 2021, it has been incorporated in Delaware, and registered with state and federal tax authorities. [Def. Ex. Y.] In October 2024, the QSBS entity was rebranded under the name TCVI Group, Inc., and a major national law firm recently completed a draft Form S-1 registration statement for the rebranded QSBS entity. [Def. Ex. W.] There has been some uncertainty in the last several years as politicians suggested potential changes to the tax code related to QSBS. [S. Baldassarra Decl. ¶ 37.] These political winds coupled with the SEC investigation have impacted the progress related to the QSBS subseries. However, the SEC's assertion that BSG Management has not moved the ball forward is completely inaccurate. Moreover, under the IRS statutes and

rules, QSBS stock has a 5-year holding period before tax benefits can be secured. *See* IRC Section 1202 and related guidance. Second, this subseries involves $6 million in investor funds which is an immaterial amount to the BSG Fund's overall subseries investments. The fact that the SEC included allegations regarding Broadstreet's QSBS subseries which currently involves only $6 million investor funds is telling – it signals the weakness in the SEC's overall case. *See also* Feingold Decl. ¶ 43.

6. **The SEC's Delaware Multi-Series LLC Cross-Liability Arguments Are Misplaced and Not Material**

The SEC makes arguments that BSG Management failed to operate the fund consistent with disclosures related to the fund's status as a Delaware multi-series LLC and that the fund's sub-series were subjected to cross liability issues as a result. (TRO Mtn., pp. 17-20). These arguments are exaggerated and misplaced. BSG Management maintained monthly spreadsheets that historically tracked each fund subseries by accounting for each client's holdings for each subseries, the monthly client investments into each subseries, and the distributions paid or re-invested by each client in each subseries. [R. Feingold Decl. ¶ 7.; S. Baldassarra Decl. 15] These spreadsheets were updated each month and provide detailed tracking of the fund subseries contrary to the SEC's assertions. Because this separate accounting was maintained on an ongoing basis, the fact that BSG Management did not set up multiple bank accounts for each fund subseries is immaterial and overblown by the SEC.

Additionally, as indicated above, disclosures in the Compliance Update, data room, and quarterly reports informed fund investors that funds associated with one subseries could be used to make required payments regarding another subseries. Moreover, the PPM disclosed that subseries' cash may be commingled by stating "cash assets pertaining to various class of Interests (but not assets pertaining to multiple Series) may be commingled and not held separately." [Def.

Ex. A, pg. 9.] Thus, it should be clear to Fund investors that subseries funds were not separately segregated. Finally, there is no evidence supporting whether a reasonable investor would consider the Fund's status as a Delaware multi-series LLC to be material. The test for determining whether an omission is material is whether there is a substantial likelihood that the disclosure of an omitted fact would have been viewed by a reasonable investor as having substantially altered the total mix of information made available. *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245-46 (11th Cir. 2012). The SEC did not submit any evidence on this point as no investor affidavits were submitted with the TRO filing. In fact, it is equally likely that investors paid little to no attention to the legal structure of the Fund when making their investments.

The SEC cites to the Durham Homes bankruptcy proceeding when making its arguments about potential cross liability issues (TRO Mtn. pg. 19). Once again the SEC misses the mark. To date, BSG Management has met all required investor payments related to fund investments in Durham Homes, and it has even made these payments out of its own management fees. [S. Baldassarra Decl. ¶ 32.]

**7.     The SEC's Arguments Regarding BSI's Financial Records Are Exaggerated and Defendants Did Not Act Deceptively**

The SEC complains that BSG Management did not generate financial statements for the fund that were prepared and audited pursuant to GAAP. From the outset, the SEC fails to acknowledge the difficulty a target of an SEC investigation has when trying to engage an independent auditing firm while under investigation. It is virtually impossible. As stated above, the BSG Fund has been under SEC investigation since September 2022, and thus, the funds' financial statements for 2022, 2023 and 2024 have been impacted by BSG Management's inability to retain an outside independent accounting firm that could conduct GAAP compliant audits. [Feingold Decl. ¶ 22; S. Baldassarra Decl. ¶ 62.; *see also* Declaration of Edward Fass ("Fass

Decl.") ¶¶ 14-15.] Moreover, BSG Management only disclosed to investors that it would use "commercially reasonable efforts" to deliver financial statements to investors. These disclosures appeared in both the fund Operating Agreement and the PPM. [Def. Ex. B, Section 9.03; Def. Ex. A , pg. 45.; Fass Decl. ¶¶ 14-19; Feingold Decl. ¶ 46.] Again, in the face of an SEC investigation it was not reasonable to expect BSG Management to be able to obtain audited financial statements. The PPM also stated that the "[f]inancial information contained in all reports to the Members will be prepared on an accrual basis of accounting . . . The Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion employing such firms and professionals at its discretion." [Def. Ex. A, pg. 45.] Given these many disclosures, the SEC arguments on this issue are unavailing.

BSI did prepare and maintain consolidated financial statements for the Broadstreet entities primarily for internal use. These consolidated financial statements were prepared with assistance by an outside CPA. The consolidated financials were not widely disseminated to investors and generally only accessible by institutional investors through a separate data room. [R. Feingold Decl., ¶ 8.a.] To date, the consolidated financials were only viewed by 284 persons. [*Id.*] Additionally, when an investor requests to see the financial statements, the data room includes a specific acknowledgment by the investor that the financials are not audited and not prepared in compliance with GAAP. [Fass Decl., ¶ 12.] Investors must also sign a Non-Disclosure Agreement to prevent dissemination. [*Id.*] Finally, it is not as if BSG Fund investors were kept in the dark about the fund investments. As indicated above, BSI provided detailed quarterly updates to investors regarding the status of the various BSI business lines where fund capital was deployed. [Def. Exs. F.1-7.]

Finally, the SEC incorrectly asserts that BSG Management provided false account statements to fund investors focusing again on MCA returns (TRO Mtn. pg. 28). However, the PPM specifically states that the investments will all be held at cost. [Def. Ex. A, pg. 25.] The MCA portfolio was held at cost as provided on the account statements and required by the PPM. The PPM further advised that there was no guarantee that holding investments at cost would represent the fair market value of the investments. [*Id.*] The BSG Fund's investors are all sophisticated accredited investors who would understand these disclosures.  In any event, the SEC's entire argument here appears to be based on the false premise that Broadstreet's MCA returns were overstated. For reasons stated above and as will be shown at the February 26, 2025 hearing, the SEC's arguments are based on a faulty expert report.

### 8.      The SEC Scheme Liability Allegations Are Repetitive

The SEC argues for scheme liability against Defendants based on essentially the same acts and practices addressed in previous sections. For example, the SEC primarily argues, among other things, that Defendants engaged in a scheme by offering alleged inflated returns on BSI's MCA portfolios, by allegedly causing cross liability issues with respect to the fund's status as a Delaware multi-series LLC, by putting funds assets in the ownership of Broadstreet affiliates, and by allegedly disseminating financial statements that were not audited under GAAP. For reasons discussed throughout, these alleged acts were not deceptive, and the SEC cannot show a substantial likelihood of success on the merits for scheme liability under the Securities and Exchange Acts.

### 9.      The SEC Cannot Show a Substantial Likelihood of Proving Scienter

The SEC is required to prove scienter with respect to its claims under Securities Act Section 17(a)(a), Exchange Act Section 10(b) and Rule 10b-5 thereunder, and under Advisers Act Section 206(1). In order to prove scienter, the SEC must put on evidence that establishes a showing of "knowing misconduct or severe recklessness." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th

- 27 -

Cir. 1982). To show recklessness, the SEC must demonstrate "that the defendant's conduct was an extreme departure of the standard of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014) quoting *Carriba Air, Inc.*, 681 F.2d at 1324. For reasons argued above, the SEC cannot show a substantial likelihood of success on the merits in proving that the Defendants acted with scienter.

Additionally, much of the SEC's allegations against Defendants involve the alleged overstated MCA returns. Because the SEC expert's analysis and methodologies are flawed, they cannot be relied upon by this Court. Additionally, much if not all of the conduct complained about by the SEC is neutralized by disclosures made to investors in the fund Operating Agreement, the PPM, the Compliance Update, quarterly reports and data room information as described above. All fund materials were posted to the data room which was reviewed by Broadstreet's outside counsel on a quarterly basis prior to the start of the SEC investigation. [S. Baldassarra Decl., ¶ 21.] Because of these factual defenses, at this stage, the SEC cannot show a reasonable likelihood of success in proving scienter against the Defendants. Absent a showing of scienter, a TRO, asset freeze and appointment of a receiver is not warranted.

### C.    The SEC Cannot Demonstrate a Likelihood of Irreparable Injury

Under the legal test to obtain a TRO, the SEC has the high burden to demonstrate irreparable harm in the absence of issuing the TRO. *Schiavo*, 403 F.3d at 1231.  Irreparable harm is the "sine qua non of injunctive relief." *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Even if the SEC can show substantial likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Menudo Int'l, LLC v. In Miami Prod.*, LLC, No. 17-21559-CIV, 2017 WL 4919222, at *3 (S.D. Fla. Oct.

31, 2017); *see also City of Jacksonville*, 896 F.2d at 1285 (failure to show irreparable injury merited denial of a preliminary injunction).

The alleged irreparable injury must be "neither remote nor speculative, but actual and imminent." *Id.* at 1285. (citation omitted). And any "irreparable" injury is one that cannot be undue through monetary remedies. *Id.* "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 88 (1974).

A delay in seeking a preliminary injunction "even only a few months . . . militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). "[T]he very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* "Courts (both in and outside the Eleventh Circuit) have held that unexplained delays of a few months negate any claim of irreparable harm on a preliminary injunction motion." *Pals Group, Inc. v. Quiskeya Trading Corp.*, No. 16-23905, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017); *see also, e.g.*, *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (denying a preliminary injunction where plaintiff learned of alleged infringement approximately seven months before bringing suit); *Badillo v. Playboy Entertainment Group, Inc.*, 2004 WL 1013372, at *2 (M.D. Fla. Apr. 16, 2004) (finding plaintiffs' nine month delay in seeking a preliminary injunction after discovery of the alleged cause of action was "fatal" to claims of irreparable harm); *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*, 116 F. Supp. 2d 405, 408-09 (S.D.N.Y. 2000) (denying preliminary injunction because of a four-month delay).

The SEC cannot put forth sufficient evidence to establish the likelihood of irreparable harm. The SEC has not identified any evidence of investor losses. In fact, there were no investor

affidavits attached to its TRO motion. This is not surprising. BSG Management has not missed

any investor payments related to any of its fund subseries. [S. Baldassarra Decl. ¶ 8.] Similarly,

BSG Management has met all investor redemption requests for its subseries. [*Id.*] The SEC also

has not provided evidence of recent fraudulent transfers or misuse of funds because there are none.

Moreover, as indicated above, the fund's investors were provided with updated disclosures in July

2023 through the Compliance Update that addressed many of the SEC's concerns raised during

the investigation, such as the management fees being charged and how investor funds were being

deployed. As indicated above, nearly all (99 %) of the BSG Fund's investors executed the

Compliance Update acknowledging that they were aware and consented to the disclosures at issue.

Since then and throughout the BSG Fund's history, it has received no material investor complaints

related to the issues purportedly implicated by the SEC's investigation and TRO filing. [R.

Feingold Decl., ¶ 8.e.]

The SEC's delay in bringing its TRO action strongly mitigates against the SEC being able

to establish irreparable harm. *Wreal, LLC*, 840 F.3d at 1248. The SEC's investigation progressed

over a two-and-a-half-year period. The SEC issued ninety (90) document subpoenas and took

dozens of days of investigative testimony. They subpoenaed the Defendants' financial records

from banks and Samson. They have been in possession of those records for numerous months

(years in some instances) and presumably have been analyzing them for the same amount of time.

The Defendants produced hundreds of thousands of pages of materials to the SEC. During the past

five months, after the Defendants filed the Texas Action, the SEC investigation has been at a virtual

standstill. No subpoena enforcement actions were instituted. The SEC can point to no recent events

that necessitated the TRO filing. The 5-month delay in the SEC's investigation and the fact they

did not file their motion *ex parte* strongly signals a lack of irreparable harm. If there was real harm, *the SEC should have filed their TRO months ago*.

What's more, during the last several years, BSI has built a viable business enterprise with significant revenues currently and is expected to generate even more revenues in the coming years. BSI is currently the fifth largest private equity infrastructure developer in the U.S., currently responsible for the delivery of 44,000 homesites in the Southeastern U.S. to major homebuilders such as D.R. Horton, Inc. and Lennar Corporation. [Feingold Decl., ¶¶ 4-7; S. Baldassarra Decl., ¶¶ 24-27 ; *see also* Declaration of Josh Howard ("Howard Decl.") ¶¶ 7-8.] Generally speaking, the BSG Fund contributes equity capital for the land infrastructure projects and third-party lenders provide the balance of capital necessary to develop the land.  BSI and its related entities own interests in unencumbered real estate lands worth approximately $200 million.  [Feingold Decl., ¶ 9; S. Baldassarra Decl., ¶ 26; Def. Ex. M.] Currently, there are 54 ongoing infrastructure projects and dozens of projects in the pipeline. BSI currently oversees infrastructure projects with existing contracts that are projected to generate approximately $5 billion in lot sales over the next 5 years that will generate approximately $500 million in distributions for the benefit of BSG Fund investors. [Feingold Decl., ¶ 7; Howard Decl. ¶ 8.]

BSI's crypto mining business line have grown exponentially in recent years. It operates five (5) data centers in the Carolinas with another five (5) data center in process of being established. [Feingold Decl., ¶ 8; S. Baldassarra Decl., ¶ 28.] BSI's crypto mining business presently operates more than 16,000 machines making it the largest DOGE coin mining operation in the USA. [*Id.*] BSI plans to add another 14,000 machines which would generate 100 megawatts of energy or enough energy to power over 100,000 homes.  [*Id.*]  BSI currently has more than $225 million in crypto mining machines. [*Id.*]

The BSG Fund currently has approximately $180 million invested in its merchant cash advance portfolios. [Feingold Decl. ¶ 10.; S. Baldassarra Decl. ¶ 29.] Finally, BSI's other remaining business lines such as hotel and lodging, self-storage facilities, land banking, restaurants, and auto dealerships hold assets of a combined value well in excess of $150 million on a conservative basis. [Feingold Decl. ¶ 11.]

Based on the significant value of assets under BSI's control, the SEC cannot show irreparable harm absent a TRO and receiver. BSI's business lines hold significant assets and will earn sufficient revenues to continue the Fund's operations while this litigation is ongoing. Moreover, BSI's significant assets, such as the $200 million in unencumbered real estate assets and cash on hand, could be used to meet investor redemption demands if necessary.

### D.     The Balance of Equities Favors Defendants

The third factor to obtain a TRO requires the SEC to show that the threatened harm to it outweighs the potential harm to Defendants. *Schiavo*, 403 F.3d at 1231. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assist. Project*, 582 U.S. 571, 579 (2017). In considering the equities and overall public interest "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (quotation marks and citation omitted). In considering the balance of harms to parties, courts often consider such factors such as the threat to each party's rights; the potential economic harm to each party (*see Lakedreams v. Taylor*, 932 F.2d 1103, 1109-10 (5th Cir. 1991); the relative severity of harm on each party; the speculative nature of harm; the impact on the public; the harm to a business's employees; and voluntary remedial actions taken by defendants. *See, e.g.*, *Harmonia Holdings Group, LLC v. United States*, 150 Fed. Cl. 670, 673 (2020) (balancing of harms did not weigh in favor of a TRO where, among other things, a TRO

would require employees to stop working); *Miller v. Ziegler*, 582 F. Supp. 3d 640, 647 (W.D. Mo. 2022) ("[C]ourts consider the threat to each of the parties' rights that would result from granting or denying the injunction, the potential economic harm to the parties, and interested third parties, and whether the defendant has already taken remedial action.").

The balance of the equities weighs strongly in favor of not granting the TRO, asset freeze and appointing a receiver in this case. The SEC's motion for TRO is clearly just a mechanism to appoint the receiver and secure an asset freeze. Accordingly, the impact of the SEC's motion for TRO needs to be considered in the context of the SEC's desire to appoint the receiver over the Broadstreet entities. As the legal standards make clear, the appointment of a receiver is only appropriate if the receiver will do no more harm than good. *SEC v. Complete Business Solutions Group, Inc.*, No. 20-CV-81205-RAR, 2020 WL 9209279, at *2 (S.D. Fla. Dec. 16, 2020) (quoting *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)); *see also Calliope Cap. Corp. v. Earthfirst Techs., Inc.*, No. 8:08-CV-00219, 2008 WL 1995077, at *7 (M.D. Fla. May 6, 2008).

Under the circumstances here, the receiver, if appointed, clearly will do more harm than good. For example, appointing a receiver will have a catastrophic impact on BSI's infrastructure business line. Broadstreet affiliates own interests in special purpose vehicles ("SPV's") with Contender Development Inc., the real estate developer on BSI's projects. [Feingold Decl. ¶ 6; Howard Decl. ¶ 3.] The BSG Fund provides the equity capital through the SPV's that is utilized in conjunction with third-party mortgage financing to acquire the properties in question. The third-party lenders are mortgage lenders and have a first priority lien over the properties in question. The typical loan agreements have provisions that provide that appointment of a receiver would trigger an event of default. A typical provision is set forth below:

> 7.9   **Appointment of Receiver, Trustee, Liquidator.** Borrower, any Pledgor, any Guarantor or any of their Affiliates, applies for or consents in writing to the appointment of a receiver, trustee or liquidator, or all or substantially all of the other assets of Borrower, any Pledgor or any of their Affiliates, or an order, judgment or decree is entered by any court of competent jurisdiction on the application of a creditor appointing a receiver, trustee or liquidator of Borrower, any Pledgor, or any of their Affiliates, or all or substantially all of the other assets of Borrower, any Pledgor, or any of their Affiliates.

[Howard Decl. ¶ 11.] Triggering an event of default by appointment of a receiver would be devastating because lenders could immediately foreclose on the loans and sell the land (sometimes partially developed) for pennies on the dollar. [Howard Decl. ¶ 12.] Under these circumstances, it is highly likely that the proceeds from the real estate sales will go toward satisfying the first priority liens and there will be no value that flows back to a receivership estate. [*Id.* at ¶ 13.] If the lenders are somehow prevented from doing so by a receivership order, they still will maintain their first priority lien positions.[9]

Moreover, the homebuilders on the infrastructure deals would have remedies to break their agreements if a receiver is appointed. The contracts with the homebuilders all contain default provisions, which would require the prompt return of deposits on the transactions which would result in the return of tens of millions of dollars (in addition to the lenders being repaid). [Howard Decl. ¶ 15]. Below is a typical default provision in the homebuilding contracts:

> **Section 15.02.  Seller's Default.** In the event of any default by Seller ("**Seller's Default**"), Buyer shall be entitled to (a) terminate this Agreement, receive a prompt refund of the Deposit and be reimbursed by Seller for the actual out-of-pocket costs and expenses incurred by Buyer in connection with this Agreement, including, but not limited to, costs and expenses incurred in connection with the Inspections and/or (b) seek specific performance of this Agreement. However, nothing in this Section shall limit Buyer's remedies at law or in equity after each Closing as to all representations and warranties, indemnities, and other obligations of Seller contained in this Agreement that by the terms of this Agreement survive such Closing or earlier termination of this Agreement. Notwithstanding anything contained herein to the contrary, in the event specific performance is not available as a remedy, then Buyer may exercise

---

[9] It is not at all clear that a receiver, holding only equity interests in an SPV, could prevent a third-party lender holding a first priority lien from foreclosing on the properties in question.

[*Id.*]  In the view of Josh Howard of CDI, the appointment of a receiver would cause irreparable harm to CDI and the BSG Fund investors, and cause default on the development of the 44,000 homesites creating job losses and economic chaos in many of the Carolina local communities where the BSI/CDI projects are ongoing. [*Id.* ¶ 10.] Because of these realities, appointing a receiver will directly result in the loss of hundreds of millions in value to the BSG Fund. The only way for fund investors to be made whole is for the infrastructure and home building projects to continue to their completion and a receiver will have no ability to fulfill those commitments. If the mortgage lenders pull their financing, it would take months to line up replacement financing. [Howard Decl. ¶ 14.] Given these facts, there is little doubt that appointing a receiver will do significantly more harm than good in the instant case.

E.     **The Relief Sought by the SEC Is Not In The Public Interest**

The final factor to obtain a TRO requires the SEC to show that the relief sought is in the public interest. *Schiavo*, 403 F.3d at 1231. While it is in the public interest to protect against fraud (*Asset Recovery*, 340 F. Supp. 2d at 1311) there is no public interest in the perpetuation of an unlawful agency action. *See Texas v. U.S. Department of Homeland Security*, 700 F. Supp. 3d 539, (2023).

Shutting down Broadstreet through the appointment of receiver and ordering an asset freeze is not in the public interest. Broadstreet is one of the largest and fastest growing businesses in the Southeastern U.S. Taking into account all of the BSI's business lines, nearly 3000 people rely on the company for employment. [Feingold Decl., ¶ 5.] As stated above, issuing a TRO to appoint a receiver will have a disastrous impact on the value of BSI's assets and cause significant harm to the fund's investors. In the absence of a showing of irreparable harm, which the SEC cannot make as argued above, the SEC's request for TRO and appointment of a receiver is clearly not in the public interest.

- 35 -

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the SEC's motion for TRO, asset freeze and appointment of a receiver be denied in all respects. This case should be allowed to proceed to discovery and litigation for a decision on the merits.

**DATED: FEBRUARY 14, 2025**

Miami, Florida

Respectfully submitted,

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**

By: ***Thomas Scot Wolinetz***
Thomas Scot Wolinetz
Florida Bar No. 1001160
Irwin Weltz (PHV)
1 Old Country Road, Suite 275
Carle Place, New York 11514
Telephone: (212) 202-3176
Facsimile: (516) 855-8776
twolinetz@weltz.law

*Attorneys for Broadstreet Inc. and David Feingold*

**FOLEY & LARDNER LLP**

By: ***Thomas J. Krysa***
Thomas J. Krysa (PHV)
tkrysa@foley.com
1600 16th Street, Suite 200
Denver, CO 80202
Telephone: 720.437.2000

Andrew A. Howell (PHV)
ahowell@foley.com
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: 214.999.3000

Crystal B. Carswell (FBN 108882)
Primary email: ccarswell@foley.com

Secondary email: andre.melo@foley.com
100 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: 813.229.2300

**DANIELS, RODRIGUEZ, BERKELEY,**
        **DANIELS & CRUZ P.A.**

By: **Lorne E. Berkeley**
        Lorne E. Berkeley, Esq.
Florida Bar No. 146099
4000 Ponce De Leon Blvd., #800
Coral Gables, Florida 33146
Telephone: (305) 448-7988
Facsimile: (305) 448-7978
LBerkeley@drbdc-law.com

*Attorneys for Broadstreet Global*
*Management LLC, Joseph B. Baldassarra,*
*and Steven B. Baldassarra*

**MARCUS NEIMAN**
**RASHBAUM & PINEIRO LLP**

By: ***Bryan A. Almeida***
Daniel L. Rashbaum, Esq.
Florida Bar No. 75084
drashbaum@mnrlawfirm.com
Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mnrlawfirm.com
Bryan A. Almeida, Esq.
Florida Bar No. 1005558
balmeida@mnrlawfirm.com

One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131

Jeffrey A. Neiman, Esq.
Florida Bar No. 544469
jneiman@mnrlawfirm.com

One Financial Plaza
100 S.E. 3rd Ave., Ste. 805
Fort Lauderdale, Florida 33394

*Attorneys for Relief Defendants,
JosephBenjamin, Inc. and Just a Nice Day,
Inc.*

**Index of Defendants' Exhibits for TRO Hearing**

| Def. Ex. # | Description |
|---|---|
| A | Broad Street Global Fund PPM (September 2023) |
| A.1 | Supplement to Broad Street Global Fund PPM (September 2023) |
| B | Broad Street Global Fund Amended and Restated Agreement (September 2023) |
| C | Broad Street Global Fund Subscription Agreement |
| D | Broad Street Global Fund General Series Supplement |
| E.1 | BSG Fund Blackstream Development-D.R. Horton Infrastructure Subseries Slide Deck (September 2021) |
| E.2 | Merchant Cash Advance Presentation Slide Deck (August 2022) |
| E.3 | Public Access Lagoons Investment Summary Slide Deck (September 2024) |
| F.1 | May 2021 Investor Update |
| F.2 | June 2022 Investor Update |
| F.3 | December 2022 Investor Update |
| F.4 | Q2 2023 Investor Update |
| F.5 | Q4 2023 Investor Update |
| F.6 | Q1 2024 Investor Update |
| F.7 | Q3 2024 Investor Update |
| G | Data Room Disclosures |
| H | Institutional Data Room Disclosures |
| I | Compliance Acknowledgement Sampling |
| J.1 | Wells Fargo Account Snapshot - CJS MGMT (December 2024) |
| J.2 | Wells Fargo Account Snapshot - BSG MGMT (December 2024) |
| J.3 | Interactive Brokers Account Summary - CJS MGMT (December 2024) |
| J.4 | Interactive Brokers Account Summary - CJS MGMT #2 (December 2024) |
| J.5 | Gulf Atlantic Account Summary – BSG Series (December 2024) |
| J.6 | Gulf Atlantic Account Statement – BSG Series #2 (December 2024) |
| J.7 | Gulf Atlantic Account Statement – BSG Holdings (December 2024) |
| J.8 | Gulf Atlantic Account Statement – BSG Management (December 2024) |
| J.9 | Gulf Atlantic Account Statement – BSG Fund (December 2024) |
| J.10 | CCNB Account Statement – BSG Fund (December 2024) |
| J.11 | CCNB Account Statement – BSG Series (December 2024) |
| J.12 | CCNB Account Statement – BSG Fund #2 (December 2024) |
| J.13 | CCNB Account Statement – BSG Management (December 2024) |
| J.14 | CCNB Account Statement – BSG Holdings (December 2024) |
| J.15 | CCNB Account Statement – BS Inc. (December 2024) |
| J.16 | CCNB Account Statement – BSG Series #2 (December 2024) |
| J.17 | CCNB Account Statement – BSG Fund #3 (December 2024) |
| J.18 | CCNB Account Statement – BSG Management #2 (December 2024) |
| J.19 | CCNB Account Statement – CJS Tech Select Management (December 2024) |
| J.20 | CCNB Account Statement – BSG Management #3 (December 2024) |
| J.21 | CCNB Account Statement – BSG Fund #4 (December 2024) |
| J.22 | CCNB Account Statement – BSG Holdings #2 (December 2024) |

| J.23 | Gulf Atlantic Account Statement – BSG Series (January 2025) |
|------|-------------------------------------------------------------|
| K | 2024 Broadstreet Income Received |
| L.1 | Lennar Contract Example |
| L.2 | DR Horton Contract Example |
| M | Land Appraisals |
| N | Estimated Market Price of Crypto Machines |
| O | BasePoint MCA Securitization LLC Offering Memorandum (December 20, 2023) |
| P | Morningstar Credit Rating Letter for BasePoint MCA Securitization LLC (December 22, 2023) |
| Q | MCA Recovery after Write Off |
| R | Marriott Agreement Sampling |
| S | Durham Homes Sales Summary |
| T | BSD & CDI Investor Summary through October 2024 |
| U | Broadstreet Infrastructure Track Record |
| V | Project List by Builder as of January 1, 2025 |
| W | QSBS - TCVI Group Inc. - Draft S-1 (January 24, 2025) |
| X | QSBS Disclosure |
| Y | BSG Development Corporate Documents |
| Z | Juniper Disclaimer |
| AA | MCA Points Per Month (Samson Created Doc) through Q3 2024 |
| BB.1 | AVG Duration |
| BB.2 | AVG Factor Rate |
| BB.3 | Dave's ROI |
| BB.4 | David Feingold Mail – Monthly Reports 1.2 |
| BB.5 | David Feingold Mail – Monthly Reports 12.1 |
| BB.6 | David Feingold Mail – Weekly Reports 1.5 |
| BB.7 | Default Deal Losses 2023 |
| BB.8 | BSG Dave's ROI (January 5, 2024) |
| BB.9 | BSG Realty Dave's ROI (January 5, 2024) |
| BB.10 | Advance Amount 2015-23 Syndicator BD |
| BB.11 | AVG Deal Size |
| BB.12 | Deals Per State 2022-23 |
| BB.13 | Default Deal Losses 2015 |
| BB.14 | Sales Rep Deals 2023 |
| BB.15 | At-Risk Covid Deals |
| BB.16 | Deals Per State 2022-23(2) |
| BB.17 | Deals & Defaults 2019-2023 |
| BB.18 | Expected Expense % |
| BB.19 | Expected Profit % |
| BB.20 | Expected Revenue 2015-23 |
| BB.21 | Realized Revenue 2015-23 |
| BB.22 | Sales Rep Deals 2022-23 |
| CC.1 | Monthly Subseries Spreadsheets for DR Horton 5 – Monthly Deposit |
| CC.2 | Monthly Subseries Spreadsheets for DR Horton 5 – Holdings Breakdown |

| CC.3 | Monthly Subseries Spreadsheets for DR Horton 5 – Dividends Reinvestment Breakdown |
|------|-----------------------------------------------------------------------------------|

## CERTIFICATE OF SERVICE

I hereby certify that, on February 14, 2025, I electronically filed a copy of this document through the CM/ECF system, which will cause a copy of this document to be electronically served on all parties and counsel of record.

By: ***Bryan A. Almeida***
Bryan A. Almeida, Esq.