IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-20436

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DAVID J. FEINGOLD, JOSEPH B. BALDASSARRA, STEVEN S. BALDASSARRA, BROAD STREET GLOBAL MANAGEMENT, LLC, AND BROAD STREET INC.,

Defendants, and

JOSEPHBENJAMIN, INC.,
JUST A NICE DAY, INC.,

Relief Defendants.

**DECLARATION OF DAVID FEINGOLD**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1. I am the CEO and one of the owners of Broadstreet, Inc. ("BSI"). I am also an attorney in good standing and licensed to practice law in the State of Florida since 1991. I have personal knowledge of the facts set forth herein from my own personal observations, business records and/or from my role at BSI. I respectfully submit this declaration in opposition to Plaintiff's (the "SEC") Emergency TRO application for an asset freeze and receiver.

2. I categorically deny the SEC's allegations of wrongdoing and fraud.

3. As part of the SEC's strategy in maligning me and the other Defendants, it consciously avoids recognition of the massive business lines supporting and protecting BSG Fund investors. During the SEC's years' long investigation, we literally offered to redeem all BSG Fund investors because we can with our assets and funds.

4. AS CEO of BSI, I oversee the business lines that generate returns for the Broadstreet Global Fund LLC ("BSG Fund"), which is managed by Broadstreet Global Management LLC ("BSG Management"). I refer to these entities and BSI collectively as Broadstreet. I work closely with the owners of BSG Management, Steven Baldassara ("Steve") and Joseph Baldassarra ("Joe"), both of whom I have known for decades.

5. BSI is a leading private equity firm rooted in the Carolinas with its main offices in South Carolina. Broadstreet is the fourth largest private equity Infrastructure developer in the USA. Broadstreet is involved in over $5 billion in transactions and currently is involved in over 17,000 acres of land, more than 54 communities/Infrastructure projects, over 44,000 expected homesites, 863 hotel room units and over 130 total projects/businesses. Broadstreet and its affiliated/related entities' office operations have over 100 front office personnel and an estimated 3,000 job created from its projects which have an estimated $10 billion economic impact on the Carolinas.

6. There are 14 different business lines that include (1) Infrastructure (2) home development (3) hotel/lodging (4) land banking (5) restaurants (6) specialty finance/merchant cash advance ("MCA") (7) crypto mining (8) self storage facilities (9) automobile dealerships (10) data centers (11) broker/dealer (12) family office (13) insurance (14) mortgage conduit trading/securitization. BSG Fund provides equity capital or funding to many of these business lines and is entitled to receive distributions and profits from those business lines as a result. Each one

of those business lines may contain numerous special purpose vehicles ("SPVs") to hold the assets, such as the lands and management companies applicable to the individual land deals. By way of example, for each of the more than one hundred land deals, there is an individual SPV entity and management entity and hence upwards of two hundred entities involved. Business partners have communicated that a receiver or asset freeze will cause a cessation of continuation of business relationships.

7. I would also like to describe the substantial assets of these business lines because the SEC fails to do so. First, the Infrastructure business, which is our largest business is primarily responsible for delivery of 44,000 homesites to two primary clients, the largest homebuilder in the USA, DR Horton, Inc., and the second largest homebuilder in the USA, the Lennar Homes Corporation. Both are multi-billion dollar publicly traded companies that have entered into fixed contracts for the delivery of homesites for which they then build their homes. We provide the infrastructure (roads, sewers, electric, gas, grading, basically all services besides the actual building of the homes). Presently the average lot price is almost $110,000 per lot and hence that business alone will generate nearly $5 billion in lot sales which is also expected to generate approximately $500 million in distributions for the benefit of BSG Fund investors.

8. In addition, we operate a data center/crypto mining operation that is the largest Dogecoin miner in North America with sixteen thousand miners in five data center locations with an additional five more data centers in process of closing/development. We have nearly $225 million worth of machines that consumes 100 Megawatts of power or enough energy to power nearly 120,000 homes. It is a massive business.

9. We also independently own lands, and our first approximate thirty appraisals that we received on some of our lands show a value in excess of $200 million in pure unencumbered equity, independent of our other business lines.

10. The MCA business holds approximately $180 million in commercial papers and even assuming the SEC expert is correct, which she is not, if defaults were twenty five (25) percent and the portfolios make small profits, we could easily sell the portfolios and if there was a shortfall, we could sell our portion of lands that we own equity in and easily satisfy the return of all capital to all MCA investors.

11. BSI's other remaining business lines such as hotel and lodging, self-storage facilities, land banking, restaurants, and auto dealerships hold assets of a combined value well in excess of $150 million on a conservate basis.

12. In addition we generally maintain $75 million to $125 million in cash just in bank checking accounts alone.

13. There is no emergency here. The SEC investigation has been going on for at least since September 2022, approximately 2 ½ years, and the only items relied upon by the SEC to suggest an emergency is the website https://broadstreetprivateequity.com/ and certain bank statements for December 2024. Nothing in that website, that has been up since the last several years, nor do the bank statements provide any cause. Further, we have no material investor complaints, and no missed payments to any investor or counterparty. We chose to sue the SEC in federal court, write complaint letters about the SEC and meet with members of government to loudly announce our displeasure with the SEC and as a result I believe this aggressive action was taken in retaliation for our quite verbal opposition to the SEC. There are presently no risks of investor losses unless a receiver and asset freeze is approved as our counterparties have made it

quite clear that they will cease all funding, initiate actions to cause the liquidation of our assets which will cause the satisfaction of debts owed, however, liquidations also cause the least orderly sale of assets and hence all excess equity would likely be consumed and thereby leaving investors severely and unnecessarily harmed and damaged.

14. The drastic remedies sought by the SEC should be put in the context of the fact that (a) Broadstreet sued the SEC, (b) Broadstreet wrote complaint letters to senior persons in the US government about the SEC, and (c) the CEO of Broadstreet had meetings with senior people in the government about retribution. Hence, the harsh reaction after many years by the SEC is not unexpected based on the stance that Broadstreet took. Further, it will destroy investors and various businesses. In fact, the primary investigator who signed the affidavit in this case, Lee Robinson and the litigator who signed the pleadings in this case, both have been at the center of complaints by the CEO of Broadstreet to other members of government and those members of the SEC are aware of this fact.

15. It is unlikely that this Court has seen such remedies being sought under the circumstances presented of no insolvency, massive operating business lines, support of at least 99% of investors (discussed below), SEC reliance on stale information, no missed payments to investors, no secreting of assets and no sudden transfers of funds.

16. I dispute the SEC's assertions of emergency. If the SEC's TRO is granted, it will needlessly and catastrophically cause massive damage to investors and Broadstreet and their employees and affiliated businesses and those all working in the business lines and projects (numbered at nearly 3,000) will lose their jobs. This has been confirmed through discussions with business partners.

17. The core of the SEC's Complaint and motion papers can be boiled down to four items, which are refuted herein and extensively in other submissions. In brief, the SEC's claims of non-disclosures are simply wrong. The private placement memorandum, operating agreement, subscription agreement, Series Supplement, pitch deck, monthly/quarterly updates, data room disclosures and disclaimers and Compliance Update signed by approximately 99% of the investors demonstrate that the things the SEC claimed were not disclosed or concealed were actually disclosed over and over. Also, it cannot go unnoticed that the SEC does not even cite the appropriate private placement memorandum (PPM) to this Court, the SEC relies upon a PPM from over 4 years ago rather than disclosing to the Court the PPM from 2023 which has been made available to all investors via signature and/or the company's data room which all investors signed to read, acknowledge and be bound to each and every document therein. The Broadstreet investors are all accredited investors which has significance under the securities laws and which holds such investors to a higher standard of knowledge, sophistication and ability.

18. For example, the SEC claims that BSG Fund did not disclose the management fees when, in truth, it was repeatedly stated in disclosures to investors that BSG Management would receive a management fee of 6% a year for 5 years, up to 30%, which could be paid to others in the sole discretion of BSG Management and that management fee could be assessed in any time frame including all upfront or over time. Also, the management fees did not just go in personal pockets as BSG Management paid for employee compensation, partner distributions, payments to business lines among other things.

19. Another example is that the SEC claims that BSG Fund did not tell investors in the Infrastructure Series that their funds could be deployed in other investments while capital is waiting to be deployed in Infrastructure projects. In truth, investors were specifically told and

signed documents, as confirmed by 99% of the investors, that Infrastructure projects (i) were not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow, (ii) funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects, and (iii) that until the infrastructure and other real estate investments generate significant cash flow, their investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves. This was all in writing, signed by the investors and circulated to them additionally multiple times per year as well.

20. In addition, the monthly/quarterly reports' section on Infrastructure set forth that projects were in various stages of completion, but not yet cash flowing. Pictures were included showing the same as well as detailed reports giving the status of each and every project with said projects being encompassed in sometimes more than fifty detailed pages and circulated at first monthly and then quarterly as the business simply grew too large and took the convention of quarterly reports as consistent with large companies. The documents state it over and over in not just the signed documents, but also dozens of times through quarterly reports, monthly account statements and in the data room. The investors have been made well aware that their funds have been deployed in other investments, which also further refutes the SEC's allegations concerning investor knowledge, it was clearly stated that there would be risks that those other investors could ultimately incur losses within the Infrastructure Series.

21. Another example is that the SEC claims that BSG Fund told investors that BSG Management is an SEC Investment Advisor when, in truth, the offering materials say the exact opposite. In addition, not only do the offering materials specifically say that BSG Fund and its

Managers are not investment advisors but the investors also signed an acknowledgement stating specifically that Broadstreet is not their investment advisor and they specifically admit that they did not seek investment advice from Broadstreet.

22. Another example is that the SEC claims that BSG Fund told investors that it would use commercially reasonable efforts to provide GAAP audited financials when, in truth, this was removed from the September 2023 versions of the PPM and Operating Agreement because the cloud of the SEC investigation made it impossible to retain an audit firm. And, before that change, commercially reasonable efforts were made. The 2023 PPM very specifically states that only accrual based financials would be given, no audits, and each investor given the financials actually accepted an online acknowledgment and disclosure that specifically said the financials were not GAAP audits. Hence, the SEC takes a position directly contrary to what was stated to the investors and acknowledged by the investors.

23. Perhaps most misleading, is the SEC's claim that $880 million somehow vanished in BSG Management's pocket. In truth, these funds were correctly sent to BSG Management as Manager with sole discretion to manage BSG Fund. Indeed, the SEC's own purported expert, Ms. Davis, attests that $721 million of the funds were properly placed in the various business lines. BSG Management is simply the manager of BSG Fund, the operating agreement confers upon BSG Management to handle all monies for BSG Fund, which is exactly what BSG Management did and deployed all of the money, exactly in compliance with the PPM into all of the business lines and built an enormous real estate empire that the SEC now seeks to seize based on false allegations about MCA, which is but one of the 14 business lines that Broadstreet operates.

24. The SEC's assertions of diversion of investor funds is false and intentionally misleading. At page 10 of the SEC's Complaint there is a chart that supposedly explains these

purported diversions. Initially, the chart misleadingly suggests that all funds were disbursed at one time when this occurred over years. What the chart actually shows is that investor funds flowed to BSG Management which is completely proper as the Manager of BSG Fund. Further, the chart leaves out the most significant point which is the flow of funds out of BSG Management to the various business lines. The SEC makes it seem as if BSG Management simply kept the funds. BSG Management kept the management fees only, those management fees that every investor agreed to and signed off on. All the rest of the money went into the projects as the SEC's own expert report shows. Plain and simple, there is no diversion and investor funds were utilized to deploy into business lines at the Manager's discretion, which was done exactly as the documents to investors state. Defendants only received fees they were entitled to receive per disclosures.

25. As CEO of BSI, my role is primarily to oversee the 14 business lines. I have approximately 20 direct reports to me to keep me apprised of the 14 business lines and various administrative and finance issues. Steve Baldassarra's role is primarily in back office operations and he is the COO of BSI. Joe Baldassarra primarily deals with investors. I am in frequent communication with Steve and Joe and I provide input on business lines as well and review to the extent requested by Steve or Joe.

26. I am not a "control person" of BSG Management or BSG Fund. These are separate companies with separate observance of corporate formalities. The fact that Steve, Joe and I discuss the collective Broadstreet business together and there is a sharing of space and other items does not alter that result. The fact that I discuss with others the business line operations that I am involved in also does not alter that result. The fact that I want the collective Broadstreet business to succeed does not alter that result. In fact, the PPM of BSG Fund specifically authorizes Joe and Steve to have different divisions and hire different persons, such as me, to provide services to

oversee business lines. The website of Broadstreet makes clear that there are different business lines, different divisions and different personnel that work at different companies with different purposes.

27. When I first joined BSI in July 2022, I realized there was a growing business that required some improvements. Steve and Joe asked me for recommendations to improve the business and I provided some recommendations. One such improvement was to hire a full-time Chief Compliance Officer (Ed Fass). A compliance officer is not legally required. What is further interesting is that the SEC has never interviewed or contacted the chief compliance officer nor attempted to hear from him and his observation of compliance at the companies.

28. Other enhancements included having outside counsel reviewing the data room on an annual basis to ensure proper compliance, switching the vendor that prepares investor account statements (from Colonial to Juniper), having multiple sets of accounting professionals including one accountant who worked for a major firm and oversees the presentation of the financial statements. Not only did the SEC not contact or interview this accountant, the SEC did not even contact or interview Broadstreet's chief financial officer. Imagine trying to shut down a multi-billion business having never spoken to the accountant, nor the chief financial officer nor the chief compliance officer.

29. I also recognized that with all the different business lines and ownerships of assets, there was a need to secure all of these assets so that they would be pledged to paying investors as before my taking the CEO role, that was not addressed. In addition, in order to consolidate the financials, a document needed to be prepared that connected all of the various entities. Finally, when I reviewed the business, there appeared to be tax issues that needed to be addressed with a unifying document.

30. In simple terms, the Tri-Party Agreement was created to pledge all these assets and all personal assets to repay investors and to address all of the other referenced issues. That issue was discussed multiple times with corporate professionals, drafts of various versions of documents were created all prior to the execution date. The SEC claims the Tri-Party Agreement was somehow backdated based on alleged meta data of a document that was saved and sent to them. Just as the SEC has failed to disclose the proper PPM, has failed to disclose all of the disclosures and documents signed by investors and has failed to disclose that investors accepted that there would not be GAAP audits, the SEC assertions regarding dating of documents is not correct. The Tri-Party Agreement was created for legitimate business reasons and was not even circulated to investors, this was simply an internal document used for consolidation, tax planning and to protect assets. It is amazing that the SEC now criticizes a document necessary to achieve investor protection and consolidation of financials.

31. The SEC claims that "Defendants fraudulently offered and paid inflated returns to investors in at least two major Series, claiming that investments in Merchant Cash Advances – short term and fast funding transactions to small business – generated significant profits when in fact they did not." First of all, the investors were paid a preferred fixed return, they were not paid based on profits. The preferred return means they got a fixed amount of money, unsecured, with no calculation of payment based on profits. Hence, the actual profits, which will be shown that the SEC math is woefully incorrect, is irrelevant for purposes of investor payments. The bottom line is that investors signed that they received a fixed return and acknowledged that their returns could come from any business source, from any business line and from any funds. This means even from borrowings, management fees, asset sales, the balance sheet of the business, land

refinancing, just to name a few examples. **No different than any other major enterprise using its balance sheet to satisfy obligations.**

32. The SEC also is claiming that investors in the Infrastructure Series were offered and paid inflated returns. As stated before, they were paid a preferred fixed return that gets paid after the mortgages on the properties. As money was raised, assets were acquired which increased dramatically the value of the affiliated special purpose vehicles of Broadstreet, to the effect of hundreds of millions of dollars. Rather than liquidate the lands on a regular basis, the company paid returns, the fixed returns, from cash available.

33. The key to real estate is to hold the assets and let them grow. Right now the business has a receivable of nearly $500 million from the Infrastructure and $200 million from appraised and unencumbered lands. Rather than sell those assets, the business continues to amass more land and control its cash flow from operations.

34. I have been involved in real estate for more than 34 years, literally done billions of dollars in deals, and this is the way that a real estate empire is built, not as the SEC would suggest, by constantly selling assets to meet payments and debts every quarter. Not a single publicly-traded developer in business such as ours does that. It simply is impossible as real estate is simply not that liquid and it defeats the purpose of building a business by selling your assets every quarter.

35. As previously shown, investors in the Infrastructure Series were told and signed documents that stated "that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects" and "**that until the infrastructure and other real estate investments generate significant cash flow, my**

**investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves**." In addition, monthly/quarterly updates further reiterated that Infrastructure projects could take years to cash flow and generate returns.

36. The SEC correctly points out that Infrastructure did not generate income through year-end 2023. Of course it would not, if projects take five years to develop, you do not generate the money until you either refinance or sell lots. You leave the lands to grow in value. However, in 2024, Infrastructure started to generate monies, **about $45 million**. As such, the offering and payments to Infrastructure investors were not inflated because their "investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves." In addition, we prudently chose to take money out of Infrastructure in a measured basis to meet our obligations but did not oversell lands or over re-finance. We took only what was needed to meet all obligations and let the real estate grow. We are literally the largest private equity Infrastructure development organization in North and South Carolina, we are not going to be forced to sell lands to satisfy the SEC when our documents do not require that.

37. The SEC next criticizes the MCA business. From the outset it should be noted that the MCA investors are not paid the profits of the business. They are simply given an unsecured return of fourteen percent annually. It is uncontroverted by the SEC's own expert that the gross factor rate (comparable to an interest rate but is actually a discount rate) is 1.36 meaning 36% gross return on an average duration of ten months which means 3.6% is made monthly or 43.2% annual gross returns. This is uncontroverted by the SEC's own expert. That 43.2% is actually the

discount of what the receivables of the various businesses are purchased at and hence is analogous to the gross expected return, again, which the SEC does not challenge.

38. Furthermore, these portfolios involving the company Samson Funding (the actual MCA firm) have been securitized and rated on Wall Street and are recognized as a legitimate business. What the SEC fails to advise this Court is that its expert, likely to no fault of her own, has not been given the proper input data to perform the proper return calculations that net out and show that MCA is in fact a profitable endeavor and is run in complete compliance with all documents signed by the investors.

39. Without having the correct input data, as will be shown at this Court's hearing, the SEC expert is not able to derive the correct results and thereby making her calculations unreliable.

40. The SEC's expert report is significantly undercut by a recent securitization involving Samson's MCA lending. BasePoint Capital ("BasePoint"), a New York based specialty finance lender, is one of the syndicators who advances funds to merchants along with Broadstreet through Samson. When Samson offers an advance to merchants, Broadstreet and BasePoint often act as co-syndicators on the advance each providing a certain percentage of the overall advance. In December 2023, BasePoint completed an offering memorandum for a $100 million asset-backed securitization wherein the underlying assets consisted of MCA portfolios and with approval to upsize to $500 million. The offering was underwritten by Guggenheim Securities, LLC, one of the largest investment banks in the U.S. As part of the due diligence described in the offering memorandum, the underwriter analyzed a statistical pool of merchant cash advances that included approximately $61 million of advances serviced by Samson Funding (which comprised 69.85% of the advances analyzed). The Samson advances analyzed by the underwriter included much of the same advances that Broadstreet participated in as a co-syndicator with BasePoint. The

underwriter's analysis of Samson's portfolios showed materially different collection data than what was used by the SEC's expert in this matter. Also,, as a result of the underwriter's due diligence and BasePoint's offering materials, DBRS Morningstar rated the Class A and B notes for the securitization (which paid coupon rates of 8.704% and 11.286%, respectively) as investment grade. If Samson's MCA advances returned less than 3 percent annually and had the collection issues that the SEC's expert contends, there is no chance the BasePoint securitization would have been rated investment grade under those circumstances. The BasePoint offering memorandum and Morningstar ratings are included within Defendants' Exhibits submitted herewith.

41. Moreover, the SEC has its expert spend another portion of her report on alleged improper commingling of monies, when in fact, the expert relies on an over four year old PPM to arrive at her conclusions. Again, if the 2023 PPM were utilized, this Court will see that commingling of cash was absolutely permitted as it would be unreasonable for Broadstreet to open more than two hundred separate bank accounts for its more than two hundred special purpose vehicles for which it is involved. There is absolutely no legal requirement, the SEC has cited no law, rule or regulation that requires a private business to have so many checking accounts, especially in light of the PPM which clearly states cash will be commingled involving the operations of Broadstreet.

42. Finally, the SEC complains about the format of the financial statements from its expert when discussing the financial statements provided to investors. Yet again, the SEC has its expert rely upon an over 4 year old PPM when the 2023 PPM clearly does not provide that there will be a GAAP audit and furthermore each investor given the financials acknowledged that the financials were not GAAP audits. In fact, the accountants that put the financials together also specifically noted as such in the financial statements.

43. The SEC's claims about the QSBS Series are entirely false, as well, as it indicates the money was taken and not utilized. However, the SEC fails to advise, first and foremost, that an extensive registration statement costing hundreds of thousands of dollars was prepared, that all legal work has been done to pursue and complete the QSBS transaction and that the SEC was advised that at one point the QSBS transaction was on hold awaiting Congress which at one point had indicated that the tax beneficial program was going to be cancelled. Once it was learned that there was no longer a proposal to cancel the program, all legal work was done and even more importantly, at a minimum there was a five-year hold period on that deal as communicated to investors and the legal work and transactions have been done within that 5-year period. Hence, the SEC's characterization of QSBS is a complete mischaracterization as reflected in the extensive work done and Defendants' Exhibited submitted herewith provide this documentation.

44. The SEC's claim about misleading statements about "recordkeeping and financial statements practices" is also incorrect. Each and every series had separate ledgers and the PPM stated and was accepted by investors wherein it specifically provided that records would be kept in a format in the discretion of the Manager.

45. In truth, BSG Management kept and maintained separate records for each Series and specifically complied with the language of the PPM which stated that the Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion. The SEC may not like the format but it is the format which the sophisticated accredited investors empowered the Manager to use.

46. The prior versions of PPMs and Operating Agreements from over 4 years ago state that BSG Fund would use "commercially reasonable efforts" to provide audited financials and GAAP compliant annual reports from independent public accountants. That provision of the PPM

was amended after the SEC issued a subpoena to the auditors who had a corporate policy of automatically withdrawing when receiving a regulatory subpoena. The auditors did not ever state the financials were improper, they simply withdrew due to the subpoena and hence it was commercially not reasonable to issue a GAAP audit without an auditor. Hence, the PPM was changed and the most recent PPM and Operating Agreement of September 2023 *has taken out* any requirement to provide audited financials and GAAP compliant annual reports from independent public accountants. This was done because we have been unable to secure an accounting firm under the cloud of the SEC investigation.

47. The new language is set forth below:

> Financial information contained in all reports to the Members will be prepared on an accrual basis of accounting. The Fund will use commercially reasonable efforts to provide an annual report to Members that will be presented with the tax basis of accounting within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund will use commercially reasonable efforts to provide tax information to Members within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion employing such firms and professionals at its discretion.

PPM (Def. Ex. A) at 45.

> Except as may be provided in a Series Schedule, the Company shall use commercially reasonable efforts to prepare and make available to each Member financial statements of the Company. The Company will also use commercially reasonable efforts to make available periodic performance information, no less frequently than quarterly, to the Members after the end of each calendar quarter (other than the last calendar quarter of each Fiscal Year).

Operating Agreement (Def. Ex. B) at Section 9.03.

48. Recognizing that its allegations supporting an emergency and other central claims are false, the SEC cobbles together what it calls "additional deceptive conduct" much of which relies on the same allegations in the other main allegations. These allegation fail, as well.

49. The SEC complains about the Tri-Party Agreement. This is odd since the Tri-Party Agreement was created to protect investors by pledges of business and personal assets in favor of investors. The SEC claims that the Tri-Party Agreement "does not" protect investors when it expressly does. It also contends that it "creates cross-liability" without explanation. The SEC concedes that this document was not disseminated to investors, and further concedes that it could be amended. No investors were parties to the agreement and the SEC fails to tell this Court that one of the risk factors discussed in the PPM to investors was a risk of cross liability. Hence, the SEC complains about a document not given to investors, but which protects investors and even though the PPM specifically warns investors about the risk of cross liability.

50. In addition, as I previously testified, my recollection was that the concept of the agreement was conceived during the July 2022 period when Steve and Joe asked me about improvements of which the Tri-Party Agreement was one. The fact that the SEC has a document with later dated meta-data is simply much ado about nothing, there is absolutely no doubt that there is a Tri-Party Agreement, that all of the professionals involved analyzed the business for consolidation, tax and asset protection issues in 2022 and that such agreement is consistent with such need of the company. The added bonus of the document that it gives investors a level of protection wherein the owners of Broadstreet pledged personal guarantees should be seen as a positive, yet with the SEC they have been able to argue that a positive protection for the investors is somehow negative.

51. Since the SEC's unannounced emergency motion was filed, as CEO, I have been tasked with making sure communication take place with all of our business counterparties. To date, and for the most part, the counterparties have stood down from calling an event of default but have made it clear that in every single business, even Infrastructure, self storage, land banking

and data centers, to just name a few of the more valuable business, every single counterparty has confirmed that if a receiver is appointed or an emergency asset freeze is issued, they will all execute upon their right to pursue all of the assets and collateral of Broadstreet thus causing them to get paid, but with the liquidation process, the investors will likely receive substantially less than what they could. In addition, literally 3,000 persons will lose their jobs and projects for thousands upon thousands of homes will go idle.

52. For the reasons stated herein and in our submissions, I respectfully request that the Court deny the SEC's application in its entirety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of February, 2025.

DAVID FEINGOLD