IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-20436

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DAVID J. FEINGOLD, JOSEPH B. BALDASSARRA, STEVEN S. BALDASSARRA, BROAD STREET GLOBAL MANAGEMENT, LLC, AND BROAD STREET INC.,

Defendants, and

JOSEPHBENJAMIN, INC.,
JUST A NICE DAY, INC.,

Relief Defendants.

**DECLARATION OF STEVEN BALDASSARRA**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1. I am one of the Managers of the Broadstreet Global Fund LLC ("BSG Fund"), and one of the owners of Broadstreet Global Management LLC ("BSG Management") and Broadstreet, Inc. ("BSI") (collectively as "Broadstreet"). I have personal knowledge of the facts set forth herein from my own personal observations, business records and/or from my roles in Broadstreet. I respectfully submit this declaration in opposition to Plaintiff's (the "SEC") Emergency TRO application for an asset freeze and receiver.

2. I have reviewed the Defendants' Index of Exhibits for the TRO Hearing and the documents referenced therein. I can attest that the documents referenced in the Index and filed with the Court with the TRO pleadings are true and correct copies.

3. I categorically deny the SEC's allegations of fraud and any wrongdoing.

4. BSG Fund is a private fund of accredited and sophisticated investors. BSG Management is the Manager of BSG Fund. My brother Joseph Baldassarra ("Joe") and I manage BSG Fund. BSI is a leading private equity firm rooted in the Carolinas. David Feingold ("Dave") is the CEO of Broadstreet, I am COO and Joe is mostly involved in dealing with investors. Dave is involved in overseeing the business lines. Broadstreet's main offices are located in South Carolina.

5. Broadstreet is estimated to be the fourth largest private equity infrastructure developer in the USA and is involved in over $5 billion in transactions and currently is involved in over 17,000 acres of land, more than 54 communities/infrastructure projects, over 44,000 expected homesites, 863 hotel room units and over 130 total projects/businesses. Broadstreet and its affiliated/related entities' office operations have over 100 front office personnel and an estimated 3,000 jobs created from its projects which have an estimated $10 billion economic impact on the Carolinas.

6. I dispute the SEC's assertions of emergency. If the SEC's TRO is granted, it will needlessly and catastrophically cause massive damage to investors, Broadstreet and their employees and those all working in the business lines and projects.

7. BSG Fund investor returns are tied to about 14 different business lines that include (1) infrastructure (2) home development (3) hotel/lodging (4) land banking (5) restaurants (6) specialty finance/merchant case advance ("MCA") (7) crypto mining (8) self storage facilities (9)

automobile dealerships (10) data centers (11) broker/dealer (12) family office (13) insurance (14) mortgage conduit trading/securitization. BSG Fund provides funding for use in these business lines and is entitled to receive distributions and profits from the business lines as a result of these investments.

## The Broadstreet Entities

8. BSG Fund collects investor funds to place in various business lines overseen by BSI. The income from those business lines are used support investor returns. There have been no missed payments to investors and any investor redemption requests have been complied with.

9. BSG Management is the Manager of BSG Fund. BSG Management is not an investment advisor, nor is it required to be an investment advisor and the offering materials discussed below expressly state that BSG Management is not an investment advisor. The SEC alleges that $880 million in funds were diverted in some nefarious way to BSG Management. This is not correct as the Manager deploys investor funds into business lines on behalf of the fund to support returns for investors. As discussed below, the fund PPM and operating agreement as well as other disclosure materials give BSG Management discretion and control over fund capital. My understanding is that the SEC's own expert acknowledges that at least approximately 70% of money raised was placed into the various business lines. Defendants Exhibits A and B are true and correct copies of the fund's 2023 PPM and operating agreement, respectively.

10. Investor documents specifically provide that 30% of all monies could be received by management to pay management fees, business operations and distributions. In fact, in multiple documents and disclosures the investors are advised that fees of 6% per year for 5 years or a total of 30% of funds raised may be used to pay management fees, distributions and any other financial reason as per the discretion of the manager. In addition, the $170 million that the SEC claims were

undisclosed management fees were, in fact, fully disclosed to investors and spent as specifically authorized and disclosed to all investors. Importantly, BSG Management uses part of its management fees to cover BSI and fund related expenses.

11. BSG Management is owned by my brother Joe and me. We are the only individuals with authority to make decisions for BSG Fund. Both of us previously held securities licenses and were associated with registered SEC broker dealers and we formed private funds for investment in pre-IPO funds in or about 2016. When the pre-IPO market cooled down, Joe and I sought out other ventures and ultimately established the predecessor of the BSG Fund to focus primarily on real estate.

12. BSI was created in June 2022 during an organization restructuring. At that point, Broadstreet's operations and business had been growing at a fast pace and we wanted to bring in someone to assist us. Dave Feingold fit this role since he is an attorney with significant experience in infrastructure and real estate development. We have also known Dave for many years and he has provided us with legal guidance and consultation over the years. Based on Dave's skills and experience, he became the CEO of BSI and the primary person to oversee the various business lines.

13. BSI is owned by Joe, Dave and I and approximately 50 others who are considered partners in the business. BSI primarily oversees the 14 business lines described above with infrastructure being the largest with contracts involving the largest homebuilders in the USA and developing the infrastructure for 44,000 expected homesites. As CEO of BSI, Dave's role is primarily to oversee the 14 business lines. My role is primarily in back office operations for the fund and BSG Management and as mentioned above I am the COO of BSI. Joe primarily deals with investors. I am in frequent communication with Joe and Dave.

14. BSG Fund, BSG Management and BSI are separate companies with separate observance of corporate formalities. The fact that we discuss the collective Broadstreet business together and there is a sharing of space and other items does not alter that result. The fact that I want the collective Broadstreet business to succeed does not alter that result. In fact, the offering materials of BSG Fund specifically authorizes Joe and I to have different divisions and hire different persons, such as Dave, to provide services to oversee business lines.

15. In addition, the SEC's assertion that BSG Fund does not keep separate records for each Series and each investor in each Series is not correct. As noted in Mr. Robinson's Declaration, the "BSG Fund produced to the SEC a series of monthly spreadsheets historically tracking: 1) client holdings for each Series; 2) monthly investments into each Series; and 3) dividends paid and reinvested for each Series (the "BSG Fund Monthly Schedules"). These BSG Fund Monthly Schedules were given Bates numbers in the range of SEC-BSG Fund-E-0000103 through SEC-BSG Fund-E-0000184, but because of the size of the files, I have not attached them to my Declaration." Indeed, Mr. Robinson relies on the BSG Fund Monthly Schedules to describe the various Series. These monthly schedules are too voluminous to attach, but electronic versions may be utilized during the TRO hearing as needed.

16. Moreover, contrary to the SEC's assertions, there is nothing improper about the account statements provided to investors. The account statements, prepared by a third-party vendor, correctly track the Series, additions, deductions, and dividends received or reinvested. Further, the offering materials specifically provide that BSG Fund may keep its records in the format so elected by the Manager and no specific format is required. BSG Fund does not reduce a fund investor's principal balance when management fees are received by BSG Management.

Investors are able to redeem the entire amount of their original investment if and when they redeem their investments. BSG Fund has operated this way since its inception.

17. In addition, it is important to note the frequency with which prospective investors receive the numerous important disclosures and disclaimers attendant to the investments. Initially, all investors acknowledge and agree that they must go to and review materials in the BSG Fund's data room. The materials in the data room include the private offering memorandum, operating agreement, subscription agreement, Series Supplement, pitch decks, and monthly/quarterly updates. Also, each time an investor goes to the data room they must acknowledge various important disclosures and disclaimers. There is also an institutional data room that likewise requires investor acknowledgement of various important disclosures and disclaimers. Further, in order to gain access to the institutional data room, the investor must sign a Non-Disclosure Agreement to insure that the investor does not disseminate to others who may not properly gain access to such data room. Consequently, prospective investors and investors are provided with important disclosures and disclaimers, many of which address the information the SEC claims has not been disclosed.

18. Significantly, in July 2023, BSG Fund disseminated to investors a Compliance Acknowledgement Update to further confirm investor knowledge and representations concerning many of the items that the SEC incorrectly claims were not properly disclosed. Approximately 99% have signed and returned such update. Such update has been included with the offering materials since that time and through the present and each new fund investor must execute and acknowledge the Compliance Update. Additionally, every time an existing investor decides to invest in a different Series they are required to execute the document again. A true and correct copy of the Compliance Update has been marked as Defendants Exhibit I.

## **The Business**

19. The basic premise of BSG Fund is that accredited and sophisticated investors provide funds to BSG Fund and, in return, they expect to receive certain targeted returns or, in some instances, a profits interest. Regarding MCA, the one line out of the 14 business lines which the SEC seems most concerned about, investors are paid a fixed unsecured return. There is no guarantee of profits and the returns can be paid from any source per the data room disclosures. The investors own an LLC interest in BSG Fund and do not obtain ownership of the underlying business nor the underlying profits and they sign documents acknowledging the same.

20. An investor will select a Series to invest in pertaining to one or more business lines. As described in more detail below, investors must review and complete various offering materials in order to invest in BSG Fund. Those materials emphasize to investors the necessity of reviewing documents and disclosures placed in the BSG Fund's data room. The disclosures are comprehensive and agreed to literally dozens of times by each investor each time they access the data room.

21. All information pertaining to BSG Fund is included in its data room, including offering materials and information concerning investments such as monthly and quarterly updates. All investors have access to the data room and, as stated, acknowledge the necessity of reviewing data room materials and specifically that it is their obligation to go to the data room regularly as it is regularly updated. We engaged an outside law firm Sheppard Mullin LLP to review the PPM, the disclosures, and the data room materials during the period at issue before the SEC investigation began. Copies of Broadstreet's data room disclosures are marked as Defendants Exhibits G and H.

22. BSG Fund investors are provided with monthly and quarterly updates. The updates provide detailed information regarding the status of BSI's business lines and include financial data

where appropriate. The quarterly updates also provide detailed informational and risk disclosures discussed further below. True and correct copies of a sampling of the fund's monthly and quarterly updates for 2021-2024 have been marked as Defendants Exhibits F.1-F.4.

23. Each of BSI's business lines is described below:

**Infrastructure Land Development**

24. Infrastructure is BSI's largest business line and Series. Real-estate infrastructure development is the process of getting raw land ready for home developers. This generally includes (1) entitlements, (2) development site planning, (3) utility installation including gas, water, electric and sewer, (4) land contouring, (5) grading, (6) water retention plans, (7) clearing, (8) road paving, (9) curbing, (10) building pads, and (11) common areas.

25. Broadstreet works primarily with two real estate development companies (Contender and Blackstream) who develop the land for home builders such as D.R. Horton (largest in USA), Lennar (Second largest in the USA), Meritage, Pulte Homes and Ryan Homes. As indicated above, BSI's infrastructure Series currently has contracts in place to develop raw land to provide infrastructure for approximately 44,000 homesites. Representative examples of the contracts with homebuilders have been marked as Defendants Exhibits L.1 and L.2.

26. Data room disclosures were provided to investors indicating that Infrastructure projects take years to cash flow and that their funds could be deployed in other investments until such time. The BSG Fund data room also includes monthly/quarterly updates reflecting that the projects had not yet been developed to the point where they would generate investor returns. While the SEC states in its pleadings that no income came from the infrastructure projects through 2023, in 2024 the BSG Fund received $45 million from infrastructure projects. It is expected that BSG Fund will receive an additional $75 million from the infrastructure projects in 2025, and it is

expected that almost $500 million will be distributed to the fund over the next several years. In addition, Broadstreet currently holds unencumbered real estate lands valued at approximately $200 million. *See* Defendants Exhibit M including valuation.

27. Below are some photos of the various sites. Please note that since a substantial amount of the infrastructure work is below ground, involving installation of utilities, the actual progress is difficult to recognize until actual roads are put in, which is the last part of the infrastructure process.










**Crypto Mining**

28. Crypto Mining has become a large and successful business with 5 data centers located in the Carolinas and another 5 in process of being established by the end of the second quarter 2025. There are more than 16,000 machines operated by the business line making it the largest DOGE coin mining operation in the USA. The largest publicly traded company in this sector, Marathon Digital, has less DOGE coin miners than our division and trades at a market capitalization of $6 billion. We have approximately the same number of workers in our crypto mining business as Marathon, more DOGE coin miners and more facilities in the Carolinas than them. We also have more than approximately $225 million in machines presently and that number continues to grow monthly based on our manufacturing of more machines. *See* Defendants Exhibit N for machines.

**Specialty Finance or Merchant Cash Advance**

29. BSG Fund has MCA portfolios at Samson Funding, a company that specializes in and services MCA portfolios, currently valued by Samson at approximately $180 million over 12 portfolios. The crux of the MCA business is that it involves transactions in which a small business can receive quick funding by selling its future receivables at a steep discount. The advance is repaid by debiting a percentage of the business's daily sales. Samson Funding is one of the top ten servicers in the USA. As detailed in other submissions, Defendants dispute the SEC's allegations regarding the MCA portfolios.

**Hotel/Lodging**

30. This business line or Series pertains to the purchase or construction and operation of specific hotel properties. Broadstreet has funded multiple hotel projects under the Marriott and Hilton brands. The current projects include Marriott Brands in Asheville and Raleigh, an Element

Hotel in North Charleston, the Residence Inn in North Myrtle Beach and Ormond Beach, FL, the first-ever AC Retreat Hotel by Marriott in Daytona Beach, FL, and a Hilton-branded hotel coming to Miami International Airport. *See* Defendants Exhibit R for example of Marriott agreement.

31. The TownePlace Suites in Asheville, NC has been open since April 2022. Performance is being reported regularly, and the hotel has been operating successfully since its opening. Raleigh NC Townplace Suites exceeded budget expectations last quarter, achieving strong performance across key metrics. The Element Hotel in North Charleston is progressing on schedule with key milestones achieved. The Ormond Beach, FL Residence Inn has hotel construction progressing smoothly, with several key benchmarks recently achieved. The Residence Inn in Myrtle Beach, SC is making significant strides as we progress toward 90% completion of the hotel redesign. The Marriott in Daytona Beach, FL is in the process of completing the initial stages of this project and once completed, our AC Hotel by Marriott will be the first resort of its kind in the United States.

**Home Development**

32. This business line or Series pertains to investment in the construction of residential housing communities. This Series pays investors a return based on a profit split with the home builder (Durham Homes USA LLC). Durham Homes filed for bankruptcy re-organization. However, no required investor payments have been missed for this (or any) Series. BSG Fund management has used a portion of its management fees to cover investor payments so that no investor losses were suffered while the business has been in reorganization. Durham Homes USA LLC has built and sold many homes connected to this Series (see https://luxuryhomesbydurham.com/). Below are some photos of homes currently under construction:






**<u>Crystal Lagoons</u>**

33. This business line or Series pertains to investments in the construction and operation of a resort project in Columbia, South Carolina. The Crystal Lagoons® concept and technology, patented worldwide, is one in which the ultimate goal is to create idyllic beaches with lagoons of crystalline water and excellent quality, in previously unimaginable places.

34. Broadstreet has secured the exclusive rights to Crystal Lagoons for the entire state of South Carolina. We have identified a site location in Columbia, SC for our first Lagoon project. The land is already pre-approved for commercial construction and zoning is already secured. D.R.

Horton is proposing to develop approximately 2,400 single-family homes and town homes within the Oak Hills community, which spans six acres adjacent to the Crystal Lagoons. This development will include a 1.5-acre beach and a three-acre lagoon. In addition to the residential lots, Oak Hills will feature a range of recreational amenities, including tennis courts, a kids' zone, a wedding peninsula, waterfront restaurants, a retail hub, water sport rentals, a park, and a luxury hotel. We are getting closer to breaking ground with an estimated start date by the end of 2025.

**Self-Storage facilities**

35. This business line or Series pertains to investments in a collection of self-storage facilities. The objective is to locate facilities near our infrastructure projects based on the belief that our infrastructure projects will create housing and population centers that will need a self-storage component. As of September 2024, we have 12 self-storage facilities projects underway.

**Land Banking**

36. This business line or Series pertains to investments in significant acreage near other development projects and predicted growth areas. We acquire strategic lands, entitle those lands with a goal to hold the lands to sell or self-develop with one of our venture partners depending on market conditions and opportunities. The business thesis is simple, once one of our master planned communities begins construction, it raises the value of the lands located around it. This has proven in part by the increase in acreage prices we have seen. For example, in Oak Hills, we purchased 1,000 acres at $25,000 per acre, however, after the announcement of our massive project, surrounding lands began listing at $300,000 per acre. A natural consequence of an expected development and demand.

**Qualified Small Business Stock**

**37.** The SEC incorrectly takes issue with this Series. The QSBS division, Broadstreet Global Development Corp., was created on June 17, 2021. It has been incorporated in Delaware, and registered with state and federal tax authorities. Under the QSBS regulations, interests must be held a minimum of 5 years to take advantage of the tax benefit. In the past several years, politicians such as Senator Warren has threatened to remove or diminish the tax benefit. During this period, Broadstreet waited to see if the Congress would change the law. This delay was disclosed to investors and in fact the project laid dormant. However, recently it has become clear that the QSBS benefit is not being withdrawn by Congress, and this project has had extensive work done including all property transfers done, legal working including a registration statement by a major law firm and the project is within the required time frames under IRS regulations. In October 2024, the QSBS entity was rebranded to TCVI Group, Inc. as reflected in the draft registration statement. The corporate formation and tax documents for the QSBS division are marked as Defendants Exhibit Y, and the draft S-1 registration statement is marked as Defendants Exhibit W.

**Automobile Dealerships**

38. This business line or Series pertains to investments in Brannen Ford, an automobile dealership that specializes in fleet sales of police cruisers including the Ford Police Interceptor utility vehicle, the best-selling police vehicle in America.

**Pre-IPO securities**

39. This is largely a legacy Series inherited from our predecessor firms. It focused on purchasing pre-IPO stock and generating returns upon an IPO or other liquidating event. As the pre-IPO market has been greatly reduced in activity over the years, this business line simply holds investments and awaits if there is a public offering/IPO of those companies.

**Fixed Income securities**

40. This is largely a legacy Series inherited from our predecessor firms. It has focused on generating returns from a wide variety of income generating investments. This is a business line that is not very active due to a focus many years ago away from fixed income and towards real estate.

**Broker Dealer/Family Office/Insurance**

41. In order to be more of a full service firm to clients and to be able to offer certain regulated products and services as so requested, Broadstreet also participates in the brokerage, family office and insurance industries by having business arrangements with licensed professionals in those business lines for services as requested by investors.

## Recent Gross Receipts from Business Lines

42. During 2024, Broadstreet has received approximately $145 million in gross receipts associated with the business lines. This amount includes approximately $45 million from infrastructure, $61 million from MCA, and approximately $34 million from crypto mining/data centers. A spreadsheet listing the sources and amounts of gross revenues has been marked as Defendants Exhibit K.

## The BSG Fund Investors

43. Mr. Robinson correctly points out that BSG Management provides prospective investors with offering materials that detail terms of a potential investment. These offering materials provide that only persons who are "accredited investors" who can withstand the loss of their entire investment should invest, that the investment is speculative and that the investment included a myriad of risk factors.

44. While the SEC focuses on older versions of the private placement memorandum, subscription agreement, and operating agreement, I will focus on the most recent versions of these documents which were amended in September 2023 since the SEC is claiming ongoing conduct to suggest emergency. These documents include a Supplement to the Confidential Private Placement Memorandum (prepared by Shearman & Sterling LLP "to make customary updates pertaining to regulatory, tax and other exogenous developments that have transpired during the period since the date of the Memorandum"), the PPM, the Subscription Agreement and the Operating Agreement. As indicted above, the 2023 PPM and Operating Agreement have been marked as Defendants Exhibits A and B, respectively. The 2023 Subscription Agreement has been marked as Defendants Exhibit C.

45. On the very first page of the 2023 PPM, it states:

> A supplement to the Memorandum (each, a "Supplement") in respect of each Series will be created and distributed to prospective investors in such Series. Each Supplement will set forth the investment objective, investment strategy and terms related to the applicable Series. To the extent there is any conflict between the terms of a Supplement in respect of a Series and the terms of this Memorandum, the Supplement shall control with respect to such Series. <u>The term Supplement includes any materials which are contained in the data room of the Fund and hence each investor must read all materials contained in the aforementioned data room to understand all applicable terms and conditions and therefore each investor must regularly review the data room</u>. 2023 PPM (Def. Ex. A), pg. i.

46. As such, investors are specifically told to refer to the Series Supplement and data room for specific terms of a Series. Indeed, the Series Supplement is repeatedly referenced throughout the PPM. In the Subscription Agreement, the investor acknowledges that the Series Supplement is part of the offering materials and is controlling and that "that the Subscriber is responsible for reading each Account Communication posted to any applicable data room and each Subscriber will be bound by the terms of all posted materials." These statements are also included within the Operating Agreement as well.

47. As acknowledged by the SEC, there is a Standard Series Supplement applicable to all Series unless there is a side letter or customized Series Supplement. As acknowledge by the SEC, this Series Supplement "provides that BSG Management can charge a management fee of up to six percent per year on the funds received from the investor, and may receive five years of fees up front, such that BSG Management 'is expected to earn a fee of thirty percent on the total funds received from the investor.'" The Standard Series Supplement states:

> Fees including management/administrative **Manager has the right to charge up to six percent per year on the funds received from the investor and with each investment expected to have a duration of five years, the Manager may, at its discretion, receive the prepayment of all fees at once or in any sequence it so desires. Thereby it can receive all of its fees upfront on the initial investment of the investor or in any other manner so elected by the Manager and consequently at six percent per year over a five year assumed duration of each investment, the Manager is expected to earn a fee of thirty percent on the total funds received from the investor.**

48. It also states that,

> Performance Fee / Incentive Allocation **No performance fee, instead, the Manager is to receive all profits generated by the applicable sub-series venture after all distributions have been made. This fee is in addition to the fees expressed elsewhere in this supplement and/or the private placement materials.**

49. Thus, in addition to the disclosures in the PPM and Operating Agreement about management fees, such management fees are specified the Series Supplement, as well. The Standard Series Supplement has been marked as Defendants Exhibit D.

## Investor Compliance Acknowledgement

50. In order to further confirm that investors understood their investments, disclosures and associated risks, in July 2023, BSG Management disseminated to investors a Compliance Acknowledgement Update. Per our records, approximately 99% of investors signed and returned the document. As indicated above, a sampling of the Compliance Acknowledgement Update has been marked as Defendants Exhibit I.

51. The SEC gives little attention to the Compliance Acknowledgement Update because it undercuts its claims of lack of disclosure. By executing the Compliance Update, investors specifically confirmed, among other things, that they:

- Reviewed all offering materials,
- Still meet the definition of an accredited investor as presented in their original subscription documents,
- Read the private placement memorandum, series supplements, data room documents, monthly updates and disclosures of Broadstreet, and still consent to all matters contained in those documents,
- Are responsible for reviewing the data room on a regular basis and also all updates posted as they may affect deal terms,
- Consent to fees of up to 6% for 5 years,
- Acknowledge that real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow,
- Acknowledge that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects,
- Acknowledge that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves,

- Acknowledge that individual land is titled in SPVs owned, managed and/or controlled by BSI, BSG Management and/or BSG Fund, BSI,
- Acknowledge that BSG Management and BSG Fund are not investment advisors, and
- Acknowledge that they make their own investment decisions, and neither Broadstreet nor any of its affiliates act as an investment advisors.

52. Thus, the Compliance Acknowledgement Update rebuts the SEC's contentions that BSG Fund or BSG Management represented it was an investment advisor, that it was not disclosed that up to 30% in management fees could be taken, and that it was not disclosed that investor funds pertaining to infrastructure and other real estate investments could be deployed elsewhere or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves.

## Repeated Risk Disclosures Informing Investors

53. In their TRO papers, the SEC alleges that:

> "[T]he Defendants managed the Fund in a way that was inconsistent with what they told investors and that materially increased investors' risk. The Baldassarras and BSG Management told investors that the Fund would follow certain structures and practices to protect their investments: that they would keep the assets and liabilities of each Series separate, that there would not be commingling of funds or assets between the Series, that there would be no cross-liability between Series, and that the Fund would own the investments made with investor funds. In fact, funds were commingled and cross-liabilities created, subjecting investors in one Series to risks in other Series. Moreover, nearly all investor funds were diverted to accounts and assets owned and controlled by BSG Management, the Baldassarras, or BSI. The BSG Fund Series has almost no assets held in its name." SEC TRO Mtn. pg. 2.

54. The SEC focuses on a number of isolated snippets in offering materials as a centerpiece in this case. Yet, in reality, the things that the SEC claims were not disclosed were fairly disclosed. As shown, 99% of BSG Fund investors in July 2023 confirmed knowledge of the things that the SEC claims were concealed. Further, even if such disclosure had not been made and confirmed, they were not material to a reasonable investor placing funds in a speculative and

high risk venture replete with the numerous risks outlined in the PPM. Further, the Compliance Acknowledgement Update has been included in the offering materials since July 2023.

55. But more than that, the prior offering materials and data room disclosures provided numerous disclosures that rebut the concerns that the SEC has raised in this proceeding. The following paragraphs outline the numerous disclosures provided to fund investors through the PPM, Operating Agreement and Subscription Agreement that rebut the SEC's claims:

**(i) <u>Disclosures Stating that BSG Management given wide discretion in managing BSG Fund's operations, assets, affairs</u>**

> The Manager has wide latitude in choosing investments for a Series. **Although the Manager intends to pursue the strategies described above, the Operating Agreement does not expressly require it to do so and, more particularly, except as noted above, imposes no limits on the types of securities or other instruments in which a Series may invest, the types of positions it may take, the concentration of its investments** (by country, sector, industry, company or asset class) or the amount of leverage it may employ, including short positions (*i.e.*, sales of securities that a Series does not own). Further, depending on conditions and trends in investment markets, the Manager may pursue other strategies or employ other techniques it considers appropriate and in a Series' best interests. **A Series' assets may at times be fully invested in investments and at other times be held primarily in cash or cash equivalents or may be placed in other income generating investments, solely at the discretion of the Manager.** PPM (Def. Ex. A) at 7, emphasis supplied.
>
> Ownership in a Series does not confer to any investor ownership in the assets underlying a Series. The Supplement shall indicate the rights applicable to a Series. The Fund, the Manager or any affiliated individuals or entities of the same may be the ultimate owner of the underlying assets of a Series. PPM (Def. Ex. A) at 1.
>
> The investment objective in respect of a Series will be set forth in the applicable Supplement for such Series. The Manager may invest capital intended for a particular Series into investments so designated by the Manager while awaiting deployment of capital for a particular series in order to enhance the returns being generated. PPM (Def. Ex. A) at 1, emphasis supplied.
>
> A Series may represent a particular industry or vertical but **the Investor may not have any ownership interest in the underlying assets of a Series and may only have rights to specific returns or allocations of revenues, profits or such other structures set up in the sole discretion of the Manager.** PPM ( Def. Ex. A) at 9, emphasis supplied.

While the Manager is accountable to the Fund generally, **the Operating Agreement grants the Manager broad discretion as to many matters** and limits the Manager's fiduciary duties. By entering into the Operating Agreement and signing the Subscription Agreement, each investor acknowledges and consents to the exercise of such discretion by the Manager, including where the Manager has a conflict of interest. PPM (Def. Ex. A) at 26, emphasis supplied.

The Manager will have broad discretion to establish additional Series, and the investment strategy and other terms applicable to such Series without notice to or the consent of Members of any other Series. **The Operating Agreement provides that the Manager will have complete control of the business of the Fund** and that the Members will have no power to take part in the management of the Fund and each Series. PPM (Def. Ex. A) at 43.**The management of the Company and each Series shall be vested exclusively in the Manager.** The Manager shall have the authority, on behalf of and in the name of the Company or each Series, to take any action or make any decisions on behalf of the Company and each Series hereunder, to carry out any and all of the purposes of the Company and each Series set forth in Section 2.05, and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental thereto. Operating Agreement (Def. Ex. B) at Section 4.01, emphasis supplied.

the Company and any Series may engage in any activity or transaction that may, in the Manager's discretion, be necessary, suitable or proper to accomplish or further such objective, and do any and all other acts incidental to, arising from or connected with such purposes. Operating Agreement (Def. Ex. B) at Section 2.05.

The Company, in the Manager's sole discretion, may establish Classes within each Series, each of which having different terms, including, for example, different Management Fees, Incentive Allocation and withdrawal rights. New Classes may be established by the Manager without providing any notice to, or receiving consent from, existing Members. The terms of such Classes will be determined by the Manager in its sole discretion. Operating Agreement (Def. Ex. B) at Section 3.03.

**(ii) <u>Disclosures Stating that Investors must look to Series Supplement and Data Room for specifics</u>**

A supplement to the Memorandum (each, a "Supplement") in respect of each Series will be created and distributed to prospective investors in such Series. Each Supplement will set forth the investment objective, investment strategy and terms related to the applicable Series. To the extent there is any conflict between the terms of a Supplement in respect of a Series and the terms of this Memorandum, the Supplement shall control with respect to such Series. The term Supplement includes any materials which are contained in the data room of the Fund and hence each investor must read all materials contained in the aforementioned data room to understand all applicable terms and conditions and therefore each investor must regularly review the data room. PPM (Def. Ex. A) at i.

ALL INVESTORS ARE CAUTIONED TO ACCESS THE DATA ROOM MAINTAINED BY THE FUND IN ORDER TO UNDERSTAND ALL APPLICABLE TERMS AND CONDITIONS, WHICH ARE SUBJECT TO CHANGE AND UPDATE AND SUCH NEW AND/OR ADDITIONAL INFORMATION MAY ONLY BE MADE AVAILABLE IN THE DATA ROOM. IT IS THE INVESTOR'S RESPONSIBILITY TO REGULARLY REVIEW THE DATA ROOM TO BE MADE AWARE OF ANY NEW, ADDITIONAL OR DIFFERENT TERMS AND CONDITIONS WHICH MAY BE APPLICABLE. PPM (Def. Ex. A) at ii.

Each Member consents to the electronic delivery of Account Communications. An email or other notice will be sent to each affected Member when a new Account Communication is posted on any website or electronic data room. Each Member is responsible for reading each Account Communication posted to such data room and each Member will be bound by the terms of all posted materials. PPM (Def. Ex. A) at 5.

The Subscriber acknowledges that the Subscriber is responsible for reading each Account Communication posted to any applicable data room and each Subscriber will be bound by the terms of all posted materials. Subscription Agreement (Def. Ex. C) at Section 5.19.

Each Series may pay the Manager a management fee (the "Management Fee") for managing the investment and reinvestment of such Series' assets, the terms and amount of which are set forth in the applicable Supplement in respect of such Series. The Manager may, in its sole discretion, waive, reduce or rebate the Management Fee as to particular Members. The Manager may also, in its sole discretion, vary the Management Fee applicable to a particular Series, Class or Member, as set forth in the applicable Supplement related to such Series. The Manager may pay its Management Fee to others or alter the terms, conditions and amount at any time in its absolute discretion. PPM (Def. Ex. A) at 4.

Distributions may be made at such time and in such amounts as the Manager may determine in its discretion and as set forth in any applicable Supplement. Any distributions (other than in connection with withdrawals) will be made in accordance with the Members' relative capital account balances. In the Manager's discretion, distributions may be made in assets held by the Fund. PPM (Def. Ex. A) at 5.

Prospective investors should consider carefully the information set out in this Memorandum and should in particular consider the following risk factors and conflicts of interest before making an investment in a Series. **The risks and uncertainties described below and elsewhere in this Memorandum are not the only risks facing a Series. Additional risks and uncertainties presently not known to the Fund or that the Fund currently deems immaterial or unlikely**

**may also adversely affect the performance of the Fund or Series. Where relevant, additional risks not otherwise described herein which are applicable to a particular Series will be described in the Supplement relating to such Series.** PPM (Def. Ex. A) at 15, emphasis supplied.

**(iii) Disclosures that BSG Management is not an Investment Advisor**

Broad Street Global Management LLC, a South Carolina limited liability company (the "Manager"), has sole authority to manage the Fund's activities and to deploy the Fund's assets in any manner the Manager determines to be necessary, suitable, or proper to accomplish the Fund's purposes. The Manager is not currently registered as an investment adviser with the Securities and Exchange Commission ("SEC") or any state and does not expect to become registered. The Manager may appoint affiliates to act in its capacity at any time for any reason. PPM (Def. Ex. A) at 1.

**Absence of Regulation**. The Fund is not registered under any comprehensive regulatory scheme. There may be liquidity risks associated with these investments. The Manager is not currently registered as an investment adviser. PPM (Def. Ex. A. ) at 23.

**Investment Advisers Act of 1940**. The Manager is not currently registered with the SEC or any state as an investment adviser. If the Manager is required to register, such registration may limit or adversely affect certain aspects of the Fund's operations. For instance, SEC rules regarding certain trading practices, such as principal transactions, may limit the ability of a Series to transact with affiliates without engaging in certain approval processes which may cause the Series to forgo investment opportunities. In addition, a Series may have to bear additional costs arising from the Manager's regulatory compliance obligations. PPM (Def. Ex. A) at 24.

**(iv) Disclosures regarding Delaware law on Series LLCs had not been tested and there could be commingling**

**Risk of Cross Liability**. While Delaware law provides statutory protection against the risk that a Series may be liable for the liabilities and obligations of another Series, such protection has not been judicially tested in all contexts. Moreover, such protection can be lost if certain formalities are not observed, including not commingling assets and maintaining separate books and records for each Series. PPM (Def. Ex. A) at 17.

Accordingly, the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular class of a Series is intended to apply only against the assets of such class and not against the assets of the Series generally. However, **there can be no assurance that the use of separate classes of Interests will prevent creditors from proceeding against the assets of the entire Series or the Fund. In addition, cash assets pertaining to various classes**

**of Interests (but not assets pertaining to multiple Series) may be commingled and not held separately.** PPM (Def. Ex. A) at 9, emphasis supplied.

The property belonging to each particular Series shall be charged with the liabilities of the Company with respect to a Series and all losses, debts, obligations, liabilities, expenses, whether arising in contract, tort or otherwise existing, and reserves attributable to such Series. In the event that there is such property, losses, debts, obligations, liabilities, expenses, or any income, earnings, profits, and proceeds thereof, funds, or payments which are not readily identifiable as belonging to any particular Series, the Manager shall allocate them among any one or more of the Series established and designated, from time to time, in such manner and on such basis as the Manager, in its sole discretion, deems fair and equitable. Each such allocation by the Manager shall be conclusive and binding upon the Members for all purposes. Operating Agreement (Def. Ex. B) at Section 5.01(e)(ii).

**(v) <u>Disclosures Regarding Payments to Third Parties and Affiliates</u>**

In addition, each Series indirectly bears its pro rata share of all such costs incurred by the investments in which it invests. Such costs may include costs relating to structuring and operating such investments and/or costs and expenses that the Manager and its affiliates incur in providing administrative, support and/or oversight services to or in connection with the investments (which services may vary over time). PPM (Def. Ex. A) at 5.

The Manager may cause a Series to pay a portion of its Management Fees to third parties and such is left to the absolute discretion of the Manager. PPM (Def. Ex. A) at 9.

The particular fees to a series are more particularly described in the Supplement. PPM (Def. Ex. A) at 13.

Each Series may pay the Manager a Management Fee for managing the investment and reinvestment of such Series' assets and for providing such Series with the facilities and personnel to manage and administer such Series' business, the terms and amount of which are set forth in the applicable Supplement. The Manager may, in its sole discretion, waive, reduce or rebate the Management Fee as to particular Members.

The Management Fee applicable to a particular Series may vary from the foregoing description, and any such differences will be set forth in the applicable Supplement for such Series. PPM at (Def. Ex. A) 13.

In addition, each Series indirectly bears its pro rata share of all such costs incurred by the investments in which it invests. Such costs may include costs relating to structuring and operating such investments and/or costs and expenses that the Manager and its affiliates incur in providing administrative, support and/or oversight services to investments (which services may vary over time). The effect

of such expenses will be reflected in the value of the interests held by a Series in such investments. PPM (Def. Ex. A) at 14.

The Manager and its affiliates may from time to time incur expenses on behalf of the Fund or a Series, other client accounts of the Manager or its affiliates, and one or more subsequent entities established by the Manager. Although the Manager and its affiliates will attempt to allocate such expenses on a basis that they consider fair and equitable over time, there can be no assurance that such expenses will in all cases be allocated appropriately or equitably. PPM (Def. Ex. A) at 14.

As a standard business practice, the Manager may cause a Series to pay a portion of its Management Fees to third parties (e.g., brokers, dealers, investment advisers, banks, etc.) that introduce investors to the Series, based on the ownership positions in the Series by such investors. The amount of the fees paid to such third parties will be debited against the capital accounts of the introduced investors and paid by the Series to such third parties. PPM (Def. Ex. A) at 15.

**(vi) <u>Disclosures Regarding Conflicts of Interest</u>**

**Conflicts of Interest**. The Manager and its affiliates, managers, directors, officers and employees (together, the "Associated Parties") may from time to time act for, own an interest in, or be otherwise involved with funds or accounts (other than the Fund) that may have a similar investment objective to that of a Series and may result in actual or potential conflicts of interest. Such conflicts may include, by way of example only: (i) the allocation of time by principals or employees of the Manager between Fund business and other activities, (ii) dealings between an Associated Party, as principal or agent, and the Fund, (iii) an investment by a Series in investments that could further benefit the Associated Parties or third-parties with whom they transact, (iv) an Associated Party directing a Series to invest in an investment which may result in a benefit to a different fund, (v) the Manager's allocation of investment opportunities between a Series and other clients, (vi) the Manager's payment of fees and expenses to financial intermediaries, if any, that introduce investors to a Series (which fees may be based on the amount invested and could cause the interests of the financial intermediary to conflict with those of the investor), and (vii) the Manager's input in determining the fair value of certain securities from time to time, where such determinations may affect the compensation paid to the Manager. Similar and additional conflicts may also apply with respect to the financial intermediaries, the custodian, and other parties with whom a Series or the Associated Parties transact from time to time.

To mitigate any such conflicts, each Associated Party will at all times give due regard to its obligations to the Fund and each Series and will seek to ensure that such conflicts are resolved fairly, with due observance of applicable law. Transactions between the Fund and any Associated Party will be effected on normal commercial terms negotiated on an arm's-length basis. The Manager and their related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among the Fund and/or other client accounts.

Nevertheless, there can be no assurance that the foregoing conflicts of interest will not result in the payment of additional fees or expenses, that the treatment of the Fund and other client accounts will be equal in all respects, or that such conflicts of interest will not adversely impact an investor. (See "Potential Conflicts of Interest".)

**By acquiring Interests of the Fund, each investor will be deemed to have acknowledged the existence of actual and potential conflicts of interest set forth throughout this Memorandum and to have waived any potential claim with respect to the existence of such conflicts.** PPM (Def. Ex. A) at 17, emphasis supplied.

**(vii) Disclosures that Audited financials were not promised ("commercially reasonable" not guaranteed) and SEC investigation made this impossible**

Financial information contained in all reports to the Members will be prepared on an accrual basis of accounting. The Fund will use commercially reasonable efforts to provide an annual report to Members that will be presented with the tax basis of accounting within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund will use commercially reasonable efforts to provide tax information to Members within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion employing such firms and professionals at its discretion. PPM (Def. Ex. A) at 45.

Except as may be provided in a Series Schedule, the Company shall use commercially reasonable efforts to prepare and make available to each Member financial statements of the Company. The Company will also use commercially reasonable efforts to make available periodic performance information, no less frequently than quarterly, to the Members after the end of each calendar quarter (other than the last calendar quarter of each Fiscal Year). Operating Agreement (Def. Ex. B) at Section 9.03.

**(viii) Disclosures Regarding Investment Risks**

The Interests are a speculative investment and this offering involves substantial risks of loss as described herein. The Interests are suitable only for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to accept and assume the risks involved with the investment program of the Fund. (See "Certain Risk Factors"). PPM (Def. Ex. A) at i.

An investment in the Fund is speculative and involves a high degree of risk. Certain of the Fund's investment practices increase the risks to which the Fund is otherwise subject. In addition, there are a number of conflicts of interest in the structure and

> operation of the Fund. Investors should carefully consider such risks prior to making an investment. See "Certain Risk Factors" PPM (Def. Ex. A) at 1.
>
> An investment in a Series is speculative, involves a high degree of risk, and should only be made with the risk capital segment of an investor's portfolio. The value of Interests of the Fund may depreciate as well as appreciate, and investors may lose all or a substantial portion of their investment. Accordingly, an investment in a Series should only be made by persons who are willing and able to bear the risk of loss of the entire amount invested. PPM (Def. Ex. A) at 15.
>
> You have such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of acquiring an Interest, and you have not relied in connection with this investment upon any representations, warranties or agreements other than those set forth in the Offering Documents. Your financial situation is such that you can afford to bear the economic risk of holding the Interest for an indefinite period of time, and you can afford to suffer the complete loss of your investment in the Interest. Subscription Agreement (Def. Ex. C) at Section 5.5.
>
> You are an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act, and you so have indicated in the Investor Questionnaire attached hereto as Attachment 1 (together with all attachments thereto, collectively, the "Investor Questionnaire") the manner in which you so qualify. Subscription Agreement (Def. Ex. C) at Section 5.8.

56. In addition, BSG Fund investors were provided slide decks that outlined a Series or business line. These slide decks were posted to the data room and contained key information and risk disclosures. The disclosures provide information about management fees and how investor funds can be used and invested. Specifically, these disclosures also provide that funds from one Series could be used to make payments with respect to another Series. Below are relevant excerpts from the infrastructure slide deck (SEC Ex. 87):

> IN ADDITION, THE MANAGER, ITS AFFILIATES AND THIRD PARTIES CHARGE SIGNIFICANT FEES AND EXPENSES WHICH CAN DRAMATICALLY AFFECTTHE PEFORMANCE OF AN INVESTMENT. YOU SHOULD MAKE SURE THAT YOU ARE ABLE TO READ ALL MATERIAL PROVIDED TO YOU AND IF YOU ARE NOT ABLE TO DETERMINE WHAT THE MANAGER, ITS AFFILIATES AND/OR ANYTHIRD PARTIES ARE MAKING IN ANY TRANSACTION THEN IT IS YOUR RESPONSIBILITYTO REQUEST, IN WRITING, A COMPLETE SUMMARY. IF YOU DO NOT MAKE SUCH A REQUEST IN WRITING, THEN IT IS ASSUMED THAT YOU ARE

ABLE TO CALCULATE ALL SUCH FEES AND EXPENSES AND THAT YOU ACCEPT THE SAME. THE FEES AND EXPENSES CHARGED CAN BE A SIGNIFICANT AMOUNT, IN FACT, SUCH A LARGE AMOUNTTHATTHE FEES AND EXPENSES CHARGED COULD CAUSE AN INVESTMENTTO NOT BE PROFITABLE TO YOU AND THEREFORE YOU ARE URGED TO READ EVERYTHING ABOUT ANY INVESTMENT YOU MAKE AND TO CONFIRM THAT YOU KNOW EXACTLY WHAT ALL OF THE FEES AND EXPENSES ARE. DEPENDING ON THE PRODUCT, THE MANAGER, ITS AFFILIATES, OR THIRD PARTIES MAY MAKE SUBSTANTIALLY MORE THAN YOU CAN MAKE IN THE INVESTMENT.

THE FUND OPERATES IN MANY LINES OF BUSINESS AND INDUSTRIES. IN THE EVENTTHATAN INTEREST PAYMENT, RETURN OF CAPITAL OR ANY OTHER FORM OF PAYMENTOR DISTRIBUTION IS BEING MADE TO AN INVESTOR, THE FUND MAY USE ITS REVENUES OR EARNINGS FROM OTHER BUSINESS LINES IN ORDER TO MAKE PAYMENTS TO INVESTORS. FOR EXAMPLE, IN REAL ESTATE DEALS, INVESTORS ARE GENERALLY PROVIDED AN EXPECTED RETURN, <u>HOWEVER, DEPENDING ON THE REAL ESTATE PROJECT AND THE TIMING OF WHEN SUCH A PROJECT BEGINS TO GENERATE REVENUES FROM OPERATIONS, THE FUND MAY MAKE PAYMENTS TO INVESTORS FROM MONIES GENERATED FROM OTHER INVESTMENTS WHICH THE FUND HAS MADE SO THAT POSITIVE INVESTOR RETURNS CAN BE ACHIEVED. WITHOUT SUCH PAYMENTS BEING MADE FROM THE FUND BY ITS OTHER BUSINESS LINES, RETURNS MAY NOT HAVE BEEN ABLE TO HAVE BEEN MADE TO INVESTORS. HENCE, INVESTORS COULD RECEIVE PAYMENTS BY THE FUND FROM INDUSTRIES OTHER THAN THAT WHICH THE INVESTOR INITIALLY INTENDED TO INVEST</u>.

FOR CERTAIN INVESTMENTS IN EITHER FIXED INCOME OR REAL ESTATE PROJECTS, THE INVESTOR MAY PAY MONIES TO PARTICIPATE IN A TRANSACTION AND THE FUND MAY USE SOME OR ALL OF THE INVESTOR FUNDS TO GENERATE RETURNS THROUGH INVESTMENTS UNREIATED TO THE INVESTED INDUSTRY IDENTIFIED BY THE INVESTOR. <u>FOR EXAMPLE, INVESTORS IN REAL ESTATE PROJECTS MAY HAVE SOME OR ALL OF THE FUNDS WHICH THEY HAVE PLACED WITH THE FUND ACTUALLY PLACED IN NON REAL ESTATE INVESTMENTS SUCH AS SECURITIES, DERIVATIVE CONTRACTS, DEBT PORTFOLIOS, MERCHANT CASH ADVANCE OR FIXED INCOME PRODUCTS IN ORDER TO GENERATE RETURNS TO PAY INVESTORS WHILE THE REAL ESTATE PROJECTS ARE BEING DEVELOPED AND NOT YET OPERATIONAL. THE FUND MANAGER IS SPECIFICALLY GIVEN THE AUTHORITYTO USE SUCH FUNDS IN SUCH MANNER AS IT DEEMS APPROPRIATE IN ORDER TO GENERATE RETURNS FOR THE BENEFIT OF INVESTORS. SEC Ex. 87, emphasis supplied.</u>

57. In addition, the BSG Fund's monthly and quarterly updates provided similar information and risk disclosures. These reports further demonstrate that investors in the Infrastructure Series were well aware that their preferred returns were not yet being paid from the Infrastructure projects. Thus, the update for July 2022 (SEC Ex. 47) on Infrastructure goes project by project showing none of the projects have been completed. In addition, this July 2022 update like all others include risk disclosures and disclaimers such as:

> FURTHERMORE, PRODUCTS SUCH AS LOT TAKEDOWN/INFRASTRUCTURE DEALS AND/OR REAL ESTATE RELATED INVESTMENTS PROVIDE FOR ADDITIONAL MONIES TO BE PAID OUT OF FUNDS RECEIVED BY INVESTORS AND ARE IDENTIFIED IN THE FINANCIAL PROJECTIONS AS CAPITAL CONTRIBUTIONS FOR INVESTMENT PARTICIPATION. SUCH CONTRIBUTIONS WILL GENERALLY EQUATE TO SIX PERCENT PER YEAR FOR THE INITIAL FIVE YEARS OF THE INVESTMENT AND IN THE DISCRETION OF THE MANAGER, THIS ENTIRE CONTRIBUTION MAY BE COLLECTED DURING THE INITIAL FUND RAISE OF THE APPLICABLE INVESTMENT AND PAID TO THE MANAGER, AN AFFILIATE OF THE MANAGER, A SERVICE PROVIDER, DEAL SYNDICATOR, OR ANY PROFESSIONAL OR ENTITY WHICH ASSISTS THE FUND WITH SAID TRANSACTION AND THE AMOUNT PAID TO ANY OF THESE SHALL BE IN THE SOLE DISCRETION OF THE FUND AND ITS MANAGER.

> THE FUND OPERATES IN MANY LINES OF BUSINESS AND INDUSTRIES. IN THE EVENT THAT AN INTEREST PAYMENT, RETURN OF CAPITAL OR ANY OTHER FORM OF PAYMENT OR DISTRIBUTION IS BEING MADE TO AN INVESTOR, THE FUND MAY USE ITS REVENUES OR EARNINGS FROM OTHER BUSINESS LINES IN ORDER TO MAKE PAYMENTS TO INVESTORS. FOR EXAMPLE, IN REAL ESTATE DEALS, INVESTORS ARE GENERALLY PROVIDED AN EXPECTED RETURN, HOWEVER, DEPENDING ON THE REAL ESTATE PROJECT AND THE TIMING OF WHEN SUCH A PROJECT BEGINS TO GENERATE REVENUES FROM OPERATIONS, THE FUND MAY MAKE PAYMENTS TO INVESTORS FROM MONIES GENERATED FROM OTHER INVESTMENTS WHICH THE FUND HAS MADE SO THAT POSITIVE INVESTOR RETURNS CAN BE ACHIEVED. WITHOUT SUCH PAYMENTS BEING MADE FROM THE FUND BY ITS OTHER BUSINESS LINES, RETURNS MAY NOT HAVE BEEN ABLE TO HAVE BEEN MADE TO INVESTORS. HENCE, INVESTORS COULD RECEIVE PAYMENTS BY THE FUND FROM INDUSTRIES OTHER THAN THAT WHICH THE INVESTOR INITIALLY INTENDED TO INVEST.

> IDENTIFIED BY THE INVESTOR. FOR EXAMPLE, INVESTORS IN REAL ESTATE PROJECTS MAY HAVE SOME OR ALL OF THE FUNDS WHICH THEY HAVE PLACED WITH THE FUND ACTUALLY PLACED IN NON REAL ESTATE INVESTMENTS SUCH AS SECURITIES, DERIVATIVE CONTRACTS, DEBT PORTFOLIOS, MERCHANT CASH ADVANCE OR FIXED INCOME PRODUCTS IN ORDER TO GENERATE RETURNS TO PAY INVESTORS WHILE THE REAL ESTATE PROJECTS ARE BEING DEVELOPED AND NOT YET OPERATIONAL. THE FUND MANAGER IS SPECIFICALLY GIVEN THE AUTHORITY TO USE SUCH FUNDS IN SUCH MANNER AS IT DEEMS APPROPRIATE IN ORDER TO GENERATE RETURNS FOR THE BENEFIT OF INVESTORS.

58. Likewise, in the 2023 Q3 report (SEC Ex. 48), none of the Infrastructure projects are noted as being completed and includes the same disclosures and disclaimers in the July 2022 update including:

> THE FUND OPERATES IN MANY LINES OF BUSINESS AND INDUSTRIES. IN THE EVENT THAT AN INTEREST PAYMENT, RETURN OF CAPITAL OR ANY OTHER FORM OF PAYMENT OR DISTRIBUTION IS BEING MADE TO AN INVESTOR, THE FUND MAY USE ITS REVENUES OR EARNINGS FROM OTHER BUSINESS LINES IN ORDER TO MAKE PAYMENTS TO INVESTORS. FOR EXAMPLE, IN REAL ESTATE DEALS, INVESTORS ARE GENERALLY PROVIDED AN EXPECTED RETURN, HOWEVER, DEPENDING ON THE REAL ESTATE PROJECT AND THE TIMING OF WHEN SUCH A PROJECT BEGINS TO GENERATE REVENUES FROM OPERATIONS, THE FUND MAY MAKE PAYMENTS TO INVESTORS FROM MONIES GENERATED FROM OTHER INVESTMENTS WHICH THE FUND HAS MADE SO THAT POSITIVE INVESTOR RETURNS CAN BE ACHIEVED. WITHOUT SUCH PAYMENTS BEING MADE FROM THE FUND BY ITS OTHER BUSINESS LINES, RETURNS MAY NOT HAVE BEEN ABLE TO HAVE BEEN MADE TO INVESTORS. HENCE, INVESTORS COULD RECEIVE PAYMENTS BY THE FUND FROM INDUSTRIES OTHER THAN THAT WHICH THE INVESTOR INITIALLY INTENDED TO INVEST.

**<u>Financial Statements</u>**

59. The SEC references unaudited consolidated financial statements as of December 31, 2022 and December 31, 2023. These financial statements were only disseminated to a small percentage of investors.

60. The SEC also fails to disclose that the PPM and Operating Agreement of September 2023 removed the requirement to take commercially reasonable efforts to disseminate audited or GAAP financials because we recognized that these would be extremely difficult under the cloud of an SEC investigation. Our efforts to nonetheless become GAAP compliant was done in order to enhance our financial reporting. The SEC seemingly suggests that we did make serious efforts to obtain an auditing firm, but this is untrue. The SEC investigation has made it impossible to retain an outside audit firm to conduct GAAP compliant audits.

61. The prior versions of PPMs and Operating Agreements state that BSG Fund would use "commercially reasonable efforts" to provide audited financials and GAAP compliant annual reports from independent public accountants. The most recent September 2023 PPM and Operating Agreement of September 2023 *has taken out* any requirement to provide audited financials and GAAP compliant annual reports from independent public accountants. The new language is set forth below:

> Financial information contained in all reports to the Members will be prepared on an accrual basis of accounting. The Fund will use commercially reasonable efforts to provide an annual report to Members that will be presented with the tax basis of accounting within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund will use commercially reasonable efforts to provide tax information to Members within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion employing such firms and professionals at its discretion.

PPM (Def. Ex. A) at 45.

> Except as may be provided in a Series Schedule, the Company shall use commercially reasonable efforts to prepare and make available to each Member financial statements of the Company. The Company will also use commercially reasonable efforts to make available periodic performance information, no less frequently than quarterly, to the Members after the end of each calendar quarter (other than the last calendar quarter of each Fiscal Year).

Operating Agreement (Def. Ex. B) at Section 9.03.

62. The SEC's reliance on an email where BSG Management sought to part ways with an accounting firm is not meaningful. That firm was not well suited for the job. BSG Management attempted to hire other firms, such as Cohen Reznik, but this was made impossible by the SEC's investigation. In that regard, the SEC's investigation resulted in termination of other relationships and potential relationships including its banking relationship.

## <u>No Diversion of Investor Funds</u>

63. The SEC's assertions of diversion of investor funds is false and intentionally misleading. At page 10 of the SEC's Complaint there is a chart that supposedly explains these purported diversions. Initially, the chart misleadingly suggests that all funds were disbursed at one time when this occurred over years. What the chart actually shows is that investor funds flowed to BSG Management which is completely proper as the manager of BSG Fund. Further, the chart leaves out the most significant thing which is the flow of funds out of BSG Management to the

various business lines. The SEC makes it seem as if BSG Management simply kept the funds. Plain and simple, there is no diversion and investor funds were utilized to deploy into business lines at Manager's discretion, which was done. Defendants only received fees they were entitled to receive per disclosures.

## SEC MCA Claims are Without Merit

64. The SEC claims that "Defendants fraudulently offered and paid inflated returns to investors in at least two major Series, claiming that investments in Merchant Cash Advances – short term and fast funding transactions to small business – generated significant profits when in fact they did not." As described in the accompanying submissions, these assertions are untrue.

65. Also, as shown, investors in the Infrastructure Series were told "that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects" and "**that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves**." In addition, monthly/quarterly updates further reiterated that Infrastructure projects could take years to cash flow and generate returns.

66. The SEC correctly points out that Infrastructure did not generate income through year-end 2023. However, in 2024, Infrastructure started to generate income, **about $45 million**. As such, offering and payments to Infrastructure investors were not inflated because their "investment may be used to generate profits elsewhere while awaiting deployment in real estate

projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves."

## SEC Claims about Records and Practices Untrue

67. The SEC's claim about misleading statements about "recordkeeping and financial statements practices" is also incorrect. The SEC contends that there were "false and misleading statements that separate records would be maintained for each Series, that BSG Management would use commercially reasonable efforts to prepare and distribute to investors financial statements in compliance with Generally Accepted Accounting Principles ("GAAP"), and that those financial statements would be audited." In truth, BSG Management kept and maintained separate records for each Series as discussed above.

## CONCLUSION

For the reasons stated in all of Defendants' submissions herewith, I respectfully request that the Court deny the SEC's applications in the entirety.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this 14 day of February, 2025.

STEVEN BALDASSARRA