## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 1:25-cv-20436-DPG

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT, LLC,

and

BROAD STREET INC.,

      Defendants, and

JOSEPHBENJAMIN, INC., and
JUST A NICE DAY, INC.,

      Relief Defendants.

_____/

### MONITOR'S FIRST STATUS REPORT

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................. 3

MONITOR'S FIRST STATUS REPORT ........................................................................5

    A.  Designating a Point of Contact for each Monitorship Entity.............................5

    B.  Disseminating the Monitorship Order to BSG Fund Investors...........................5

    C.  Production of Books and Records........................................................6

    D.  Material Business Decisions.............................................................8

    E.  Segregation of Series Assets...........................................................10

    F.  Retention of Auditing Firm.............................................................10

    G.  The SEC's Allegations and Ongoing Operations of the Monitorship Entities.............10

        i.  The SEC's Allegations & BSG Parties' Response to Date.......................11

        ii.  Monitor's Investigation to Date...........................................12

            a.  Engagement with the Monitorship Entities.........................13

            b.  Initial Data Collection..........................................14

            c.  Identification of Potential Witnesses for Interviews.............15

        iii.  Monitor's Initial Findings and Assessment................................15

            a.  The Data Rooms....................................................15

            b.  Management Fee Disclosures........................................16

            c.  Recordkeeping of Management Fees..................................17

            d.  The MCA and QSBS Lines of Business................................18

            e.  The Assets of the Monitorship Entities............................18

    CONCLUSION .................................................................................19

## EXECUTIVE SUMMARY

1.      On January 29, 2025, Plaintiff Securities and Exchange Commission ("SEC") commenced this action by filing a complaint (the "Complaint"), along with a motion seeking temporary and preliminary injunctions and an asset freeze order ("PI Motion") and a motion for the appointment of a receiver ("Receiver Motion"). [ECF Nos. 9 & 13].

2.      The Court held a hearing on the PI Motion and Receiver Motion that began on February 26, 2025, and was scheduled to resume the following day. Prior to resuming on February 27, 2025, the Court granted the SEC's unopposed motion to vacate the hearing to allow the parties to document a tentative agreement they reached that would resolve the PI Motion and Receiver Motion. [ECF Nos. 79 & 80].

3.      On April 18, 2025, pursuant to the parties' agreement to resolve the PI and Receiver Motions, the parties filed a joint stipulated motion for appointment of a monitor, to adjourn the hearing that was scheduled to continue on the PI Motion and Receiver Motion, and for other relief. [ECF No. 94].

4.      On April 21, 2025, this Court granted the parties' motion for appointment of a monitor (the "Monitorship Order") and appointed Jeffrey C. Schneider (the "Monitor") as Monitor for Defendant Broad Street Global Management, LLC ("BSG Management"), Defendant Broad Street, Inc. ("BSI"), Broadstreet Global Fund, LLC ("BSG Fund"), Broadstreet Global Holdings, LLC, BSG Series CM, LLC, Relief Defendant Just A Nice Day, Inc., and Relief Defendant Josephbenjamin, Inc. (collectively, the "Monitorship Entities"). [ECF No. 95]. The Monitorship Entities, together with Defendants David J. Feingold, Joseph B. Baldassarra, and Steven S. Baldassarra, are collectively referred to as the "BSG Parties."

5.    The Monitorship Order, among other things:

    a.  obligates the Monitorship Entities to designate a point of contact for each Monitorship Entity [ECF No. 95, at ¶ 8];

    b.  obligates the Monitorship Entities to make all BSG Fund investors aware of the Monitorship Order [*Id.* at ¶ 16];

    c.  obligates the Monitorship Entities to produce its books and records to the Monitor [*Id.* ¶¶ 6 & 7];

    d.  obligates the Monitorship Entities to make the Monitor aware of all material business decisions prior to those decisions being implemented. [*Id.* at ¶ 10].

    e.  obligates the Monitorship Entities, within a reasonable period of time, to transfer all assets purchased with BSG Fund investor monies to an entity or entities owned by the appropriate series of the BSG Fund [*Id.* at ¶ 24];

    f.  obligates the Monitorship Entities to promptly retain an independent and suitable auditing firm [*Id.* at ¶ 25];

    g.  obligates the Monitor to review the allegations in the SEC's Complaint, the PI Motion, and Receiver Motion, and to make recommendations and issue reports regarding the Monitor's assessment of the ongoing operations of the Monitorship Entities and the SEC's allegations [*Id.* at ¶ 11]; and

    h.  permits the Monitor to engage and employ attorneys to assist in carrying out the Monitor's duties and responsibilities under the Monitorship Order [*Id.* at ¶ 13].[1]

6.    In short, the Monitorship Order imposes a number of obligations on the Monitorship Entities, as more fully discussed below, and the Monitor. The Monitor is pleased to

---

[1] The Monitor has retained his law firm, Levine Kellogg Lehman Schneider + Grossman, LLP, as his counsel, and will file a motion in short order.

4

report that, to the best of his knowledge, the Monitorship Entities have generally complied with those initial obligations.

## MONITOR'S FIRST STATUS REPORT

### A. Designating a Point of Contact for each Monitorship Entity

7.      The Monitorship Order requires the Monitorship Entities to designate point of contacts for dealings with the Monitor. [ECF No. 95, ¶ 8]. The Monitorship Entities have done so.

### B. Disseminating the Monitorship Order to BSG Fund Investors

8.      The Monitorship Order requires the Monitorship Entities to disseminate the Monitorship Order to all BSG Fund investors. [ECF No. 95, ¶ 16]. During the Monitor's first communication with the Monitorship Entities, he asked for confirmation that this had occurred or will occur. The Monitor was told, and has since confirmed, that the Monitorship Order was posted on the data rooms through which BSG Fund communicates with its investors.

9.      The Monitor has learned that there are two data rooms—one for institutional investors and one for non-institutional investors. The data room for non-institutional investors had a "Newly Uploaded" link that included a link to the Monitorship Order. The data room for institutional investors included access to the data room for non-institutional investors.

10.     The Monitor wanted the institutional investors to receive the Monitorship Order directly, so he asked management to add a "Newly Uploaded" link to the institutional data room that included the Monitorship Order. The Monitorship Entities immediately complied with this request.

11.     The Monitorship Entities also included a reference to agreeing to the appointment of a monitor in their Quarterly Report for the first quarter of 2025, which was posted in the data room for non-institutional investors on or about April 21, 2025 (after the parties had filed the stipulated motion for appointment of a monitor, but before the Court had entered the Monitorship

Order). That Quarterly Report also re-published an article in the "Regulatory" section that referenced these proceedings.

12.     The Monitor found the article re-published in the "Regulatory" section of the Quarterly Report to be inaccurate and misleading, so he asked management to remove it and explain to investors that it was removed because it was inaccurate and misleading. The Monitorship Entities immediately complied with this request. A revised Quarterly Report, with a new "Regulatory" section that the Monitor approved in advance, was posted on both the institutional data room and the non-institutional data room on April 28, 2025.

**C.  Production of Books and Records**

13.     The Monitorship Order requires the Monitorship Entities to produce, and authorizes and empowers the Monitor to review, the books and records of all Monitorship Entities. [ECF No. 95, ¶¶ 6, 7]. Such books and records include (but are not limited to) the following specific records (if they exist):

> a. all contractual agreements, including leases, and documents related to the BSG Fund's assets;
>
> b. all records of transactions by the Monitorship Entities;
>
> c. all financial statements, bank records, and ledgers of the Monitorship Entities and by series, including any detail of underlying assumptions used in or related to these records;
>
> d. all records reflecting ownership of assets related to the BSG Fund and which series owns such assets;
>
> e. all records reflecting the valuation of assets related to the BSG Fund;

      f. all documents related to any changes to ownership of assets related to the BSG

Fund or which series owns such assets; and

      g. all communications provided by any of the Monitorship Entities to any BSG

Fund investor.

    14.    The Monitor can confirm that, soon after his appointment, the Monitorship Entities began a rolling production of books and records. The Monitorship Entities provided access to a database, titled "Audit for 2025," which contains bank records, consolidated financial statements, general ledgers, valuations, among many other documents.

    15.    The Monitorship Entities also provided access to a document review platform that contains approximately 60,000 emails between the Monitorship Entities and the investors.[2]

    16.    In response to specific requests by the Monitor, the Monitorship Entities also have produced, among other materials, hundreds of thousands of pages of documents related to past and ongoing infrastructure projects, including the deal documents and operating agreements for the special purpose vehicles ("SPVs") that own the infrastructure assets and development rights.

    17.    In response to a specific request by the Monitor, the Monitorship Entities also produced 22 spreadsheets of "investor ledgers."[3] These ledgers memorialized "dividends" and "return on capital contributions" accrued for the benefit of investors, and whether those "dividends" and "return on capital contributions" were distributed or re-invested at the direction of the investor. The "investor ledgers" did not memorialize management fees deducted from the investors' "equity balances."

---

[2] These emails were previously produced to the SEC.

[3] These spreadsheets were produced to and referenced in the SEC's filings, but not attached as exhibits due to the personal identifying information contained therein.

18.    In addition to producing documents, the Monitorship Entities provided the Monitor with access to both the institutional investor data room and the non-institutional investor data room. In response to a specific request, the Monitorship Entities granted to the Monitor and his Retained Personnel the ability to download documents from the two data rooms.[4]

**D.  Material Business Decisions**

19.    The Monitorship Order requires the Monitorship Entities to make the Monitor aware of all material business decisions prior to those decisions being implemented. [ECF No. 95, ¶ 10].

20.    The Monitorship Entities have consulted with the Monitor on various press releases and communications to investors about transactional updates.

21.    ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████

22.    In addition, the Monitorship Entities have advised and consulted with the Monitor on various prospective business transactions. ██████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[4] The default access granted to the investors does *not* include the ability to download documents.



23.

24.

### E.  Segregation of Series Assets

25.     The Monitorship Order requires the Monitorship Entities, within a reasonable time, to transfer all assets purchased with BSG Fund investor monies to an entity or entities owned by the appropriate series of the BSG Fund. [ECF No. 95, ¶ 24]. The Monitor has engaged in conversation with the Monitorship Entities about the requirement to segregate assets by series. Given the number of SPVs that exist with respect to the infrastructure business (literally hundreds), the Monitorship Entities have represented that they are working to figure out a way to segregate the assets in a way that is least disruptive to ongoing projects. The Monitor will continue to work with the Monitorship Entities on this requirement created by the Monitorship Order.

### F.  Retention of Auditing Firm

26.     The Monitorship Order requires the Monitorship Entities to promptly engage an independent and suitable auditing firm. [ECF No. 95, ¶ 25]. The Monitor has confirmed that the Monitorship Entities had already engaged an auditing firm in November 2024—well before the Monitorship Order was issued. The Monitor has researched the firm and believes that it is independent and suitable. The Monitor has shared the identity of the firm and its qualifications with the SEC, as required by the Monitorship Order.

### G.  The SEC's Allegations and Ongoing Operations of the Monitorship Entities

27.     The Monitorship Order directs the Monitor to review the allegations in the Complaint [ECF No. 1], the PI Motion, [ECF No. 9], and the Receiver Motion [ECF No. 13], and to make recommendations (and issue reports) regarding his assessment of the ongoing operations of the Monitorship Entities and the SEC's allegations. [ECF No. 95, ¶ 11].

i. **The SEC's Allegations & BSG Parties' Response to Date**

28. In the Complaint, the SEC asserts various securities claims premised on, among others, six central allegations, four of which address the BSG Fund management generally and two of which reference specific investment series.

29. First, the BSG Parties allegedly improperly co-mingled investor funds from all the various Series and exposed individual Series' investors to risk from other Series (the "Co-Mingling Claim"). *See* Compl. ¶¶ 4; 174–186.

30. Second, the BSG Parties allegedly mislead investors into believing that BSG Fund owned and controlled the investments and the investment's assets, when the "funds and assets of BSG Fund were not being held by BSG Fund" (the "Asset Ownership Claim"). *See* Compl. ¶¶ 187–198.

31. Third, the BSG Parties allegedly misappropriated investor funds to pay insiders, including the Relief Defendants (the "Misappropriation Claim"). *See* Compl. ¶¶ 8, 11, 252, and 253. Relatedly, the SEC alleges that "BSG Management and the Baldassarras . . . do not have systems in place to track the amount of management fees that BSG Management may charge with respect to each Series." *See* Compl. ¶ 247.

32. Fourth, BSG Management allegedly "acts as an investment adviser with respect to BSG Fund" even though "BSG Management is not registered as an investment adviser with the SEC." *See* Compl. ¶ 29.

33. Fifth, the BSG Parties allegedly reported profits for the MCA Series that were artificially inflated and, as a result, purportedly used those profits to pay inflated returns to investors in the MCA Series, as well as to investors in the Infrastructure Series (the "MCA Inflated Profits Claim"). *See* Compl. ¶ 3.

11

34.     Sixth, the BSG Parties allegedly made misrepresentations about the tax treatment of the Qualified Small Business Stock Series (the "QSBS Claim"). *See* Compl. ¶ 5.

35.     While the BSG Parties' response to the Complaint is not due to be filed until May 6, 2025, *see* ECF No. 98, the BSG Parties have denied these allegations generally and articulated an initial position in their responsive briefing to the PI Motion and Receiver Motion. [ECF Nos. 54 & 55]. The crux of the BSG Parties' response to many of the SEC's allegations, including specifically the Co-Mingling Claim and the Misappropriation Claim, is that all of the complained-about conduct was properly disclosed to investors through the private placement memoranda, various supplements, and a compliance acknowledgment form. [ECF No. 54, at 17–23]. The BSG Parties quote from the various disclosures—which are, indeed, quite broad—in their response to the PI Motion and Receiver Motion. [*Id.*]. As to the MCA Inflated Profits Claim, the BSG Parties contend the SEC used incorrect and incomplete figures. [ECF No. 54, at 14]. As to the QSBS Claim, the BSG Parties dispute the SEC's factual allegations and materiality of the Series. [ECF No. 54, at 23–24].

### ii.     Monitor's Investigation to Date

36.     To fulfill the duties enumerated by the Court, including to provide an assessment of the allegations made by the SEC, the Monitor is engaged in ongoing information gathering and review of materials, including those materials filed with the Court and those materials provided to the Monitor upon request.

37.     This report contains a summary of some of the investigative steps and analyses undertaken to date. This report does not include an exhaustive summary of the investigation, nor does it include all of the Monitor's initial impressions and assessment of the SEC's allegations and the Monitorship Entities' ongoing operations. As the Monitor's investigation unfolds, the Monitor

will continue to update the Court and the SEC on his progress, as well as his assessment and recommendations, as is required.

### a. Engagement with the Monitorship Entities

38.     On April 22, 2025, the Monitor interviewed the Monitorship Entities' designated representatives. The discussion surrounded the Monitorship Entities' basic organizational structure—including assets, expenses, and general disposition; the location of books and records; the timing of the production of those records; and the SEC's various claims.

39.     On April 24, 2025, the Monitor interviewed Defendant David Feingold, in the presence of several of his counsel, to obtain a more-detailed overview of the Monitorship Entities' organizational structure, corporate structure, assets, expenses, and general disposition. The Monitor again discussed the location of books and records and the timing of the production of those records (which had already commenced by that time). The Monitor again discussed the SEC's various claims, in more detail.

40.     As to the Misappropriation Claim, Mr. Feingold reiterated the explanation provided in the BSG Parties' various filings with this Court and confirmed by the Monitorship Entities' designated representatives: the amounts received were contractually permitted management fees that were properly disclosed to investors.

41.     Specifically, Mr. Feingold and the Monitorship Entities' designated representatives confirmed that the placement documents, including supplements, permitted the Monitorship Entities to charge 6% in fees per year, for a period of five years, and that the Monitorship Entities could collect those fees up front in the aggregate. In other words, the Monitorship Entities could collect up to 30% of investor funds up front as fees.

### b. Initial Data Collection

42.     Given the Monitorship Entities' position that much of the conduct about which the SEC complains was disclosed to investors, a focus of the Monitor's investigation has been on what disclosures were made, how, and when regarding, among other things, the treatment and use of investor funds, the holding of assets, and the right to management fees. To that end, the Monitor is collecting and reviewing the various investor agreements and disclosures, including those made in numerous private placement memoranda, supplements thereto, subscription agreements, and compliance acknowledgment forms.

43.     As to the Misappropriation Claim, the Monitor also is reviewing the financial analysis provided by the SEC, the underlying source documents (which the Monitorship Entities produced to the Monitor upon request), as well as additional investor data provided by the Monitorship Entities in an effort to determine how, if at all, the Monitorship Entities accounted for the management fees they contend comprise the amount of funds not spent on investments and/or sent to insiders.

44.     As relevant to the Asset Ownership Claim, as well as to prospective deals, the Monitor has collected and is reviewing the underlying deal documents and ownership documents for the Infrastructure Series and other Series to assess the ownership structure of the assets purchased with the BSG Funds' investors' money.

45.     As relevant to Misappropriation Claim, Co-Mingling Claim, Asset Ownership Claim, and MCA Inflated Profits Claim, among others, the Monitor also is reviewing the 2025 audit file, which include consolidated financial statements and general ledgers.

46.     In addition, the Monitor is reviewing the deposition transcripts of ten witnesses, including David Feingold, Joseph Baldassara, Steven Baldassara, which the SEC provided to the Monitor.

### c.  Identification of Potential Witnesses for Interviews

47.     Through review of the documents and materials received to date, as well as ongoing discussions with the Monitorship Entities' designated representatives and Mr. Feingold, the Monitor is compiling a list of witnesses for interviews. The Monitor will commence in-person witness interviews in the near term. The Monitor has confirmed a visit to the Monitorship Entities' offices for the first week of June 2025, during which in-person interviews will be conducted.

### iii.   Monitor's Initial Findings and Assessment

### a.  The Data Rooms

48.     As stated above, the Monitor has learned that there are two Internet-based, password protected "data rooms"—one for institutional investors and one for non-institutional investors—through which the Monitorship Entities primarily communicate with their investors. The data room for institutional investors includes access to the data room for non-institutional investors.

49.     The Monitorship Entities post informational updates about their projects, including, but not limited to, pitch decks and quarterly updates, to the data rooms. The data room for institutional investors includes detailed financial information.

50.     In addition to informational updates, financial information, and quarterly and other reports, the Monitorship Entities post legal documents—including supplements to the private placement memoranda—in the data rooms. According to the Monitorship Entities and the private placement memoranda, the posting to the data rooms of these legal documents (including

supplements to the private placement memoranda) is sufficient to alter the legal obligations of the parties; unilaterally impose legally binding obligations on the parties; and/or create new benefits for the parties, including as it relates to the amount of fees the Monitorship Entities can collect and when those fees may be collected.

51.     While the investors are able to read and review the documents and materials posted in the data rooms, a representative for Monitorship Entities confirmed that the default setting is that the investors are *not* able to download or save a copy of the documents and materials posted in the data room.

52.     The Monitorship Entities have access to and have produced audit trails for the data rooms. Those audit trails show the date and time a document is uploaded into the data room, as well as the dates and times that users accessed documents in the data rooms.

### b.  Management Fee Disclosures

53.     Of note, within the data rooms, the Monitor located a document that is central to the Monitorship Entities' response to the SEC's allegation about management fees. Within the "Admin-Legal-TEF-Miscellaneous" folder of the general investor data room, the Monitor located a document titled: "Standard Series Supplement to PPM.pdf." The Standard Series Supplement to PPM is an undated, one-and-a-half-page document, signed by Steven Baldassarra as manager for BSG Management. It is not countersigned and does not appear to have a written acknowledgment by an investor. Although the Standard Series Supplement to PPM is undated, the Standard Series Supplement to PPM appears to have been executed by Steven Baldassarra on or before July 11, 2022, because the data room audit trail indicates that the document was added to the general investor data room on July 11, 2022. [Robinson Decl. Ex., 56, at 6].

54.     The execution date of the Standard Series Supplement to PPM may be significant, because certain Series' supplements that post-date July 11, 2022 may contain a different fee provision. For instance, an initial review of the Supplement to the PPM for the MCAs, dated January 30, 2023, represented the following with respect to the payment of management fees: "Up to 5% per annum on asset price, *provided investor Distributions are paid first as a preferred return* and management fees to be reduced or returned in order to guarantee the payment of the below described distribution which shall be treated as a preferred return." [Robinson Decl., Ex. 37, at 2 (emphasis added)]. In other words, if the MCA Series investors are entitled to a "preferred return" before any management fees are taken, this would appear to differ from the Standard Series Supplement to PPM, requiring an analysis of which document controls in the event of a conflict.

55.     Importantly, the Monitorship Entities also produced approximately 4,035 Compliance Acknowledgment forms, executed by investors across various Series on dates varying throughout 2023, 2024, and 2025.  In the Compliance Acknowledgment forms, the investors acknowledge, among other terms, that the investor is

> aware of and continue[s] to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks.

Compliance Acknowledgment ¶ 6.

### c.   Recordkeeping of Management Fees

56.     The Monitor has reviewed the "investor ledgers" provided by the Monitorship Entities. The "investor ledgers" do not contain a record or accounting of any management fees being deducted from the investors' "equity balances." Further, a Monitorship Entities' representative confirmed that the individual investor ledgers do not reflect "a management fee

17

removal." The Monitor has requested production of any other records that reflect the removal of a management fee from the investors' contributions.

### d. The MCA and QSBS Lines of Business

57.     While the MCA business and the QSBS business lines are prominently discussed in the SEC's filings, those lines of business do not appear to be as significant—at least in relative monetary terms—to the Monitorship Entities. In other words, it has been represented by the Monitorship Entities that the Infrastructure Series and the Crypto Series both contain nine-figures of investor dollars, and considerably higher valuations, while the QSBS Series has only $6 million in investor contributions and the MCA Series currently has only approximately $50 million in investor contributions.

### e. The Assets of the Monitorship Entities

58.     The Monitorship Entities appear to have significant assets with valuations that have been represented to far exceed the amounts owed to investors. The Monitor is verifying the accuracy of those representations, including the ongoing review of operating and other agreements that purport to vest ownership and control of certain assets in BSG Fund. In addition, as stated above, the Monitorship Entities have advised and consulted with the Monitor on various prospective business transactions that appear to be very significant transactions that will generate substantial sums for investors. As the transactions progress, the Monitor will continue to update the Court and provide his assessment and recommendations on those transactions.

## CONCLUSION

59.    Given that it has been only 14 days since the Monitor's appointment, the Monitor's work is in its infancy and still ongoing. This report provides the Monitor's initial findings and assessment based upon information that the Monitor has analyzed thus far. As noted previously, this report does not include an exhaustive summary of the investigation, nor does it include all of the Monitor's initial impressions and assessment of the SEC's allegations and the Monitorship Entities' ongoing operations. As the monitorship progresses, the Monitor will continue to update the Court and the SEC on his progress, as well as his assessment and recommendations.

Dated: May 5, 2025                              Respectfully submitted,


By: /s/ *Jeffrey C. Schneider, P.A.*
Jeffrey C. Schneider, P.A.
Florida Bar No. 933244
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL  33131
Telephone:  (305) 403-8788
Facsimile:  (305) 403-8789
Primary email: jcs@lklsg.com
Secondary e-mail: ph@lklsg.com

*Court-Appointed Monitor*

Stephanie L. Hauser, Esq.
Florida Bar No. 92765
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL  33131
Telephone:  (305) 403-8788
Facsimile:  (305) 403-8789
Primary email: slh@lklsg.com
Secondary e-mail: ame@lklsg.com

*Counsel for Court-Appointed Monitor*

<u>**CERTIFICATE OF SERVICE**</u>

I, Jeffrey C. Schneider, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 6th day of May, 2025.

By:  <u>*/s/ Jeffrey C. Schneider, P.A.*</u>
Jeffrey C. Schneider, P.A.