**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:25-cv-20436-DPG**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT, LLC,

and

BROAD STREET INC.,

Defendants, and

JOSEPHBENJAMIN, INC., and
JUST A NICE DAY, INC.,

Relief Defendants.
_____________________________________/

**MONITOR'S THIRD STATUS REPORT**

# TABLE OF CONTENTS


**EXECUTIVE SUMMARY** .......... 4

**MONITOR'S THIRD STATUS REPORT** .......... 5

**A. Status of Monitorship Entities' Compliance with Various Obligations Under the Monitorship Order** .......... 5

**i. Segregation of Assets by Series** .......... 6

**ii. Retention of an Auditing Firm** .......... 7

**B. Monitor's Investigation to Date** .......... 8

**i. Retention of Forensic Accountant** .......... 8

**ii. Ongoing Engagement with the Monitorship Entities and Data Collection** .......... 9

**iii. Witness Interviews** .......... 9

**C. The Monitor's Key Findings Regarding the Ongoing Operations of the Monitorship Entities** .......... 10

**i. The BSG Fund's Various Series Investments** .......... 10

**a. Update on Infrastructure Business Lines** .......... 12

**b. Discontinuation of the MCA Series and Liquidation of MCA Portfolios** .......... 15

**c. Discontinuation of QSBS Series** .......... 16

**d. Reverse Merger of BSG CM (Altcoin Series)** .......... 16

**ii. Recordkeeping of Investor Funds and Management Fees** .......... 17

**iii. The Monitorship Entities' Financial Statements** .......... 18

**iv. Viability of BSG Fund's Ongoing Operations** .......... 18

**a. BSG Fund's Source of Incoming Funds in 2025** .......... 19

**b. BSG Fund's Expenses in 2025** .......... 21

v. [redacted] ..........21

**D. The Monitor's Assessment of the SEC's Allegations as Applied to Ongoing Operations of the Monitorship Entities** ..........22

**i. The Co-Mingling Claim and the Asset Ownership Claim** ..........22

**ii. The Misappropriation Claim** ..........23

**iii. The MCA Inflated Profits Claim** ..........24

**iv. The QSBS Claims** ..........24

**E. The Monitor's Recommendations** ..........25

**CONCLUSION** ..........25

## EXECUTIVE SUMMARY

1. On April 21, 2025, this Court granted the parties' motion for appointment of a monitor (the "Monitorship Order") and appointed Jeffrey C. Schneider (the "Monitor") as Monitor for Defendant Broad Street Global Management, LLC ("BSG Management"), Defendant Broad Street, Inc. ("BSI"), Broadstreet Global Fund, LLC ("BSG Fund"), Broadstreet Global Holdings, LLC, BSG Series CM, LLC, Relief Defendant Just A Nice Day, Inc., and Relief Defendant Josephbenjamin, Inc. (collectively, the "Monitorship Entities"). [ECF No. 95].

2. The Monitorship Order, among other things, requires the Monitor to file quarterly reports within 30 days of the close of a quarter. [Monitorship Order at ¶ 15]. The Monitor files this Third Status Report because the second quarter of 2025 ended on June 30, 2025.

3. This report provides an update on the Monitorship Entities' compliance with various obligations imposed by the Court in the Monitorship Order. The report also includes a summary of the Monitor's findings and assessment of the Monitorship Entities' operations, including an assessment of the SEC's allegations as applied to ongoing operations to date based on information available to and reviewed by the Monitor.

4. This report does not provide an exhaustive assessment of the Monitorship Entities' operations and should be read in conjunction with the Monitor's prior reports (which are not summarized in full herein). The Monitor's findings and assessment are based in large part on information that the Monitorship Entities have provided to the Monitor as a fiduciary of the Court. As the monitorship progresses, the Monitor will continue to update the Court and the SEC on his progress, as well as his assessment and recommendations.

# MONITOR'S THIRD STATUS REPORT

## A. Status of Monitorship Entities' Compliance with Various Obligations Under the Monitorship Order

5. The Monitorship Order imposes a number of obligations on the Monitorship Entities. [ECF No. 95, at ¶¶ 6–8, 10, 16, 24, 25].

6. As of the First Status Report, which was filed only two weeks into the Monitorship, the Monitorship Entities already had accomplished or were in the process of complying with these various obligations.

7. For instance, the Monitorship Entities made their books and records available to the Monitor immediately upon his appointment. [ECF No. 95, ¶¶ 6, 7]. The Monitorship Entities have continued to produce requested records and information over the last quarter, as well as have made the principals of BSG Fund, BSI, and Contender Development, Inc. (the infrastructure development partner) available for interviews.

8. Additionally, the Monitorship Entities have kept the Monitor apprised of material business decisions, made relevant documents available for review and revision, and, as needed, have complied with and implemented various of the Monitor's recommendations related to ongoing material business operations for the benefit of investors. [ECF No. 95, ¶ 10]. To that end, the Monitor, upon request of the Monitorship Entities, has participated in meetings with various builder counterparties and lenders in an effort to preserve and maintain continuity of operations of the infrastructure business line in the ordinary course of business for the benefit of the investors. Recently, the Monitor worked with the Monitorship Entities, the builder title insurers, and the SEC to obtain a Court order, dated July 24, 2025, that authorized developed infrastructure lots to be sold in the ordinary course of business and free from liens by the SEC. [ECF No. 132]. This order was crucial to BSG Fund's ability to generate and collect profits from the infrastructure business.

Relatedly, the Monitor imposed a protocol on the Monitorship Entities to ensure that the profits generated from the lot sales are sent to BSG Fund for the benefit of the investors.

9. As of this Third Status Report, various obligations on the Monitorship Entities remain outstanding: the segregation of series assets, ECF No. 95, ¶ 24; and the retention of an auditing firm to conduct an accounting, ECF No. 95, ¶ 25. To the best of the Monitor's knowledge, the Monitorship Entities have attempted to and continue to be in the process of complying with those obligations.

**i. Segregation of Assets by Series**

10. The Monitorship Order requires the Monitorship Entities, within a reasonable time, to transfer all assets purchased with BSG Fund investor monies to an entity or entities owned by the appropriate series of the BSG Fund. [ECF No. 95, ¶ 24].

11. [redacted].

12. For the last few weeks, the Monitorship Entities have been working with outside counsel to create a Series-specific structure and associated operating agreements that would effectuate the transfer of each Series' assets into a Special Purpose Vehicle ("SPV") whose member/owners would be the BSG Fund investors that invested in that respective Series. That restructuring paperwork is currently with the SEC for review and comment. The Monitor will continue to work with the Monitorship Entities and the SEC so that the Monitorship Entities' obligations under Paragraph 24 of the Monitorship Order are met.

**ii. Retention of an Auditing Firm**

13. The Monitorship Order requires the Monitorship Entities to promptly engage an independent and suitable auditing firm to conduct an accounting of the Monitorship Entities' assets, liabilities, profits or losses, expenses, and revenues. [ECF No. 95, ¶ 25]. This same paragraph also requires the auditing firm to provide that accounting to the SEC. On July 25, 2025, the Court granted a joint motion to continue various deadlines, including extending the deadline to provide the accounting until August 31, 2025. [ECF No. 134].

14. As of the First Status Report, filed May 5, 2025, the Monitorship Entities had provided the Monitor with a copy of an engagement letter with an auditing firm that had been executed well before the monitorship, in November 2024.

15. Subsequently, the Monitorship Entities advised that they needed to switch auditing firms, because the prior one was not PCAOB certified. The Monitorship Entities subsequently advised that they again needed to switch auditors, because the most recent candidate could not complete the assignment within the allotted timeframe. Then, in late June 2025, the Monitorship Entities provided a copy of an engagement letter with a new, third accounting firm, which the Monitor provided to the SEC. It is the Monitor's view that the proposed accounting firm is

independent and suitable to prepare the accounting as required by Paragraph 25 of the Monitorship Order, but that more information is needed to assess whether the accounting firm is a satisfactory option to prepare audited financial statements going forward. The Monitor has shared this view with both the Monitorship Entities and the SEC.

**B. Monitor's Investigation to Date**

16. To fulfill the duties enumerated by the Court, including to provide an assessment of the allegations made by the SEC relative to ongoing operations of the Monitorship Entities, the Monitor has engaged a forensic accountant and is engaged in ongoing information-gathering and review of materials, including those materials provided to the Monitor upon request.

17. This report contains a summary of some of the investigative steps and analyses undertaken to date. This report does not include an exhaustive summary of the investigation, nor does it include an exhaustive assessment of the Monitorship Entities' ongoing operations. The findings and assessment provided herein are based on information provided by the Monitorship Entities to the Monitor, as a fiduciary of the Court. As the Monitor's investigation unfolds, the Monitor will continue to update the Court and the SEC on his progress, as well as his assessment and recommendations.

**i. Retention of Forensic Accountant**

18. On May 23, 2025, the Monitor, with Court approval, *see* ECF No. 116, retained Yip Associates to provide forensic accounting services to the Monitor.

19. The Monitor requested that Yip Associates analyze, among other things, the Monitorship Entities' cash flow and sources of investor dividend payments for January 1, 2025, through present.

### ii. Ongoing Engagement with the Monitorship Entities and Data Collection

20. The Monitor has continued to request access to certain records and databases, which the Monitorship Entities have provided. For instance, the Monitor now has "read only" access to (i) the Monitorship Entities' QuickBooks; (ii) BSG Fund's investor database (called Juniper); and (iii) Samson's MCA Track database. Additionally, as certain documents and records were referenced in witness interviews, the Monitor requested and then received copies. While the Monitorship Entities generally comply with document and information requests in a timely manner, there remain a few outstanding requests, as noted throughout this report.

### iii. Witness Interviews

21. In June 2025, the Monitor and his team traveled to Greenville, South Carolina where they visited the BSG Fund office and conducted in-person interviews of the following individuals: Defendant Steven Baldassara, Defendant Joseph Baldassara, Gabriel Alvarez (the tax preparer for the Monitorship Entities), Sean Coggins (the accountant who prepares the consolidated financial statements for the Monitorship Entities), Josh Howard (principal and Chief Legal Officer of Contender Development), and Michael Leich (Chief Business Officer of Contender Development).

22. Also in June 2025, the Monitor and his team interviewed Jackie Texeira, the Chief Financial Officer of BSI, BSG Fund, and BSG Management.

23. In July 2025, the Monitor and his team interviewed Defendant David Feingold in Miami, Florida.

24. Additionally, the Monitor's team has spoken with various investors who reached out directly to the Monitor.

### C. The Monitor's Key Findings Regarding the Ongoing Operations of the Monitorship Entities

25. The key individuals who control and operate the Monitorship Entities are Defendant Steven Baldassarra, who oversees BSG Management's and BSG Fund's back office; Defendant Joseph Baldassarra, who runs BSG Fund's investor relations; and Defendant David Feingold, whose role is to oversee and liaise with the managers of the business lines through his role as CEO of BSI.

26. For many of the Series, BSG Fund is the equity provider, while a non-Monitorship Entity manages the day-to-day decision making and finances for the investments. Defendant Feingold, through BSI, liaises with the non-Monitorship Entity managers of the business lines.

27. For instance, for the Infrastructure Series, Hotels Series, Self-Storage Series, Car Dealership Series, Crystal Lagoons Series, and other real estate-based investments, while BSG Fund provides the equity funds, Contender Development[1] manages the acquisition, development, and finances of all of those projects, including the preparation of all budgets, financial projections, account and financial statements, and K-1s.

28. The result of this structure is that, at times, information is siloed. BSG Management and BSG Fund rely on Contender Development to communicate financial information about the projects, but, at times, that information is communicated through multiple steps, with Defendant Feingold (an owner of both Contender Development and BSI) as the intermediary.

#### i. The BSG Fund's Various Series Investments

29. Historically, BSG Fund had over a dozen lines of business, referred to as Series, including Infrastructure, Car Dealerships, Bitcoin Mining, various pre-IPOs, Altcoin (BSG CM),

[1] Defendant Feingold is a partner and owner of Contender Development.

MCA, and QSBS. Since late 2024, some of these Series are no longer active, either because they were discontinued or because they are in the process of going public (and, as such, are no longer on the books of BSG Fund).

30. The current and active BSG Fund Series are:

- Infrastructure
- Crystal Lagoons
- Self-Storage
- Car Dealership
- Hotels
- Land Banking
- Durham
- Data
- BSG15 (Infrastructure)
- 1031 Exchange
- Bitcoin Mining
- TIC-Land
- Annuities
- TEFs
- Fixed Income
- Approximately 35 pre-IPOs

31. As of the end of the second quarter of 2025, according to the Monitorship Entities' records, the balance of the investors' capital accounts across all Series is approximately $633,000,000. The infrastructure-based Series comprise more than half of investor funds, with

approximately $239,000,000 invested in the Infrastructure Series and another $144,000,000 invested into an infrastructure series called BSG15. This balance does not include investors in the former MCA, QSBS, Altcoin (BSG CM), or TCVI Series.

**a. Update on Infrastructure Business Lines**

32. As investments in infrastructure account for more than half of BSG Fund's investor capital, the Monitor has taken a particular interest in that business line.

33. As reported in the Second Status Report, each infrastructure project is held by a project-specific SPV. While BSG Fund generally provides the equity toward the infrastructure projects (in exchange for BSI having 70% ownership of the SPV and entitlement to profits),[2] Contender Development acts as the development partner (in exchange for 30% ownership of the SPV and entitlement to profits). BSG Fund's role is limited to providing the equity, while Contender Development assumes the day-to-day management of the projects, including the acquisition, development, and finances of all of those projects (*e.g.*, preparation of all budgets, financial projections, account and financial statements, and K-1s).

34. In addition to obtaining records from and interviewing the principals of the Monitorship Entities, the Monitor has obtained, through the Monitorship Entities, records from Contender Development, as well as interviewed key individuals from Contender Development. During those interviews, Contender Development walked the Monitor through financial projections and the finances of the various infrastructure projects.

35. In summary, the financing for a given infrastructure project is comprised of some combination of BSG Fund equity, an acquisition and development loan ("A&D loan"), and earnest

[2] According to the Monitorship Entities, pursuant to the Tri-Party Agreement (which has been the subject of the parties' briefing), any profits generated by the SPVs with BSI as the "equity partner" will, in fact, flow to the investors in the BSG Fund.

money contributed by the ultimate builder/buyer as advance payment for the developed lots. Typically, the A&D lender holds the earnest money until the A&D loan is eligible for disbursement. Usually, the SPV cannot access the A&D loan funds until all of the entitlements (*e.g.*, zoning and permits) on the land are obtained and the developer has broken ground. As such, BSG Fund's contribution of equity is essential to provide funding for the infrastructure projects from acquisition through entitlements, at which time the SPV can access the A&D loan and earnest money to fund further development of the land and repay a portion of the equity infusion provided by BSG Fund.

36. For each such project, the SPV (i) holds title to the real estate; (ii) is the borrower under any A&D loan that is secured by the real estate, if the project has an A&D loan; (iii) undertakes development of the real estate by installing infrastructure and creating finished lots; and (iv) sells the finished lots to home builders pursuant to individual Lot Purchase Agreements between the SPV and the home builder (each, a "LPA").

37. In the ordinary course of business, the builder buys the developed lots in tranches according to a schedule and at prices set forth in the LPA. The SPV then uses the proceeds of the lot sales to repay the A&D loan first, because, among other reasons, the A&D loan is interest-bearing. With the exception of the earnest money distributions, only after the A&D loan has been paid (or in those cases where there is no A&D loan) are lot sale proceeds paid directly to the SPV. The SPV thereafter receives the proceeds from the lot sales and distributes the proceeds according to the SPV's operating agreement. Any lot sale proceeds distributed to BSI under the SPV's operating agreement are thereafter transmitted to BSG Management, which is the Manager of BSG

Fund.[3] Pursuant to a protocol imposed by the Monitor, the Monitorship Entities must provide confirmation that any profits paid from lot sales to BSI, as the equity partner, are thereafter (and immediately) transmitted to BSG Fund.

38. Contender Development advised that, according to its projections, it takes approximately three to five years for an infrastructure project to realize profits.

39. Due to the structure of paying down and satisfying the A&D loan first, despite ongoing lot sales to builders pursuant to the LPAs, Contender Development advised that, through December 31, 2024, only approximately $300,000 in *profits* ever had been realized on any of the infrastructure development projects and that only one project was realizing profits as of June 4, 2025. That figure, however, is to be expected given that the Monitorship Entities began investing in infrastructure projects in 2020, with increasing investments from 2021 through 2024, and there is a three-to-five-year ramp up period for the infrastructure projects to turn a profit.

40. More recently, on July 29, 2025, BSG Fund received approximately $1,036,256 from an SPV for lot sales for a project where there was not an A&D loan. The Monitorship Entities advised that BSG Fund expects to receive an additional approximately $5.6 million as an advance on lot sales for another infrastructure project in the near team.

41. Further, the Monitorship Entities have advised that approximately $70,000,000 is owed from builders for infrastructure lot sales, but that those lot sales had been delayed due to title concerns posed by the SEC enforcement action. On July 24, 2025, the Monitor obtained the Order referred to above permitting those lots to be sold in the ordinary course of business free of liens

[3] Nothing in this Report should be construed as the Monitor making any findings or opining on the allegations made in the various litigation about, among other issues, profit participation in approximately seven infrastructure assets in the Broadstreet portfolio with various entities, including an investment fund called L3 Capital Income Fund, LLC.

from the SEC, *see* ECF No. 132, with the goal that those expected funds will be released for the benefit of the investors.

42. [redacted].

43. The Monitor maintains his view that the Monitorship Entities appear to have significant assets, particularly with regard to infrastructure, with appraisals that have been represented to far exceed the total amounts owed to investors.

**b. Discontinuation of the MCA Series and Liquidation of MCA Portfolios**

44. During the interviews in Greenville, SC the first week of June 2025, the Monitorship Entities advised that, in late 2024, BSG Fund wound down/rolled over and discontinued the MCA Series.[4]

45. The MCA Series investors were given the option to fully redeem or to roll over into a new infrastructure Series, called BSG15. To effectuate the roll over from the MCA Series into BSF15, BSG Fund "credited over" the MCA Series investors' capital accounts to the BSG15 Series. In other words, no actual funds changed hands (or Series) when the discontinuation occurred.

[4] On June 12, 2025, the Monitor advised the SEC about the discontinuation and rollover of the MCA Series. On July 28, 2025, the SEC requested from the Monitor the relevant documentation for this discontinuation and rollover.

46. As a result, the only remaining MCA portfolios are the remnants of the various MCA Series and the invested infrastructure funds. Prior to the discontinuation of the MCA Series, some of the MCA distributions were re-invested into MCA portfolios. Now, all of those historic MCA portfolios have been placed into liquidation (*i.e.*, the distributions are no longer being re-invested). As discussed further in Section C(iv), currently the incoming funds from the historic MCA portfolios to BSG Fund are being used to pay investor dividends across all Series.

**c. Discontinuation of the QSBS Series**

47. During the interviews in Greenville the first week of June 2025, the Monitorship Entities advised that, in the first quarter of 2025, BSG Fund wound down/rolled over and discontinued the QSBS Series.[5]

48. The QSBS investors were given the option to (i) fully redeem; (ii) roll over into BSG15; or (iii) roll over into something called the Broadstreet Tennessee subseries (TCVI), for which the Monitorship Entities have advised that the filing of an S-1 is forthcoming.

**d. Reverse Merger of BSG CM (Altcoin Series)**

49. The Altcoin Series is in the process of engaging in a reverse merger that will have all investors in the Altcoin Series becoming shareholders of a publicly-traded entity. The transaction is in the process of obtaining approvals, but, at present, the Monitorship Entities do not have any outstanding financial obligations or dividend payments due for the Altcoin Series, which previously included approximately $416,000,000 in investor capital.

50. According to the Monitorship Entities, an S-4 has been filed. In the event the entity is not listed on Nasdaq Stock Market by December 31, 2025, however, the reverse merger will be

[5] On June 12, 2025, the Monitor advised the SEC about the discontinuation and rollover of the QSBS Series. On July 28, 2025, the SEC requested from the Monitor the relevant documentation for this discontinuation and rollover.

unwound and the $416,000,000 owed to investors will again become an obligation of BSG Fund (bringing the total owed to all investors to approximately $1,049,000,000).

**ii. Recordkeeping of Investor Funds and Management Fees**

51. Through interviews with Defendant Steven Baldassarra, the Monitor learned that BSG Fund utilizes a software called Juniper to track investor funds. Each BSG Fund investor has access to Juniper to view the investor's individual investor page, which shows the total amount invested, into which Series, how much in dividends has been accrued, and when and whether those dividends have been paid, re-invested into the same Series, or re-invested into a different Series.

52. In the First Status Report, the Monitor reported that the Monitorship Entities' "investor ledgers" do not contain a record or accounting of any management fees being deducted from the investors' "equity balances." Indeed, the Monitorship Entities advised the Court that: "BSG Fund does not reduce a fund investor's principal balance when management fees are received by BSG Management. Investors are able to redeem the entire amount of their original investment if and when they redeem their investments." *See* S. Baldassarra Feb. 14, 2025 Decl. ¶ 16, ECF No. 54-2.

53. The Monitor has confirmed that, likewise, Juniper does not track or report to BSG Fund or the investors the amount of management fees deducted from their investments. As a result, both BSG Fund's internal records and the investor-facing records all reflect that all investors' capital accounts contain the amount invested without any reduction for the up to 30% in up front management fees. Moreover, the investors' dividends, which typically are a set percentage of the capital account, are not reduced proportionately to the management fees collected.

54. BSG Fund does, however, collect—and distribute to its manager/partners—management fees, despite such fees not being reflected on the investor ledgers.

55. When BSG Fund solicited and received investor funds, BSG Fund held "closings" twice a month, on the 1st and 15th, when it would receive and then deploy investor funds.

56. From the interview with Steven Baldassarra, the Monitor learned that BSG Fund maintains what it refers to as a "management fee worksheet." In essence, with each "closing" (*i.e.*, when investor funds were received historically on the 1st and 15th of each month), Steven Baldassarra calculated how much BSG Fund *could* collect in management fees on a Series-by-Series basis.

### iii. The Monitorship Entities' Financial Statements

57. Since BSG Fund's inception, the Monitorship Entities have had unaudited consolidated financial statements prepared. The unaudited consolidated financial statements are provided to the institutional investors, but not to the individual investors.

58. When the Monitor was appointed, the 2024 unaudited consolidated financial statements remained in the institutional investor data room. At the request of the Monitor, the Monitorship Entities have removed the 2024 unaudited consolidated financial statements from the investor data room.

59. As set forth below, the Monitor has recommended, among other things, that the Monitorship Entities not represent revenue, income, or profit figures unless it is through audited financial statements.

### iv. Viability of BSG Fund's Ongoing Operations

60. At present, according to records provided by the Monitorship Entities, the investor capital account balances across all Series is approximately $633,000,000. From January 1, 2025 through May 31, 2025, according to Juniper records, BSG Fund paid approximately $75,073,250 in investor dividends.

### a. BSG Fund's Source of Incoming Funds in 2025

61. Based on internal accounting records and bank statements provided by the Monitorship Entities and reviewed by the Monitor's forensic accountant team, from January 1, 2025, through May 31, 2025, BSG Management, as manager of BSG Fund, received a total of approximately $73,955,551 in incoming transfers. Of that, approximately $5,012,503, or 6.8%, was from Contender Development.[6] Another $8,714,034, or 11.78%, was from crypto mining activity. The remaining approximately $58,958,667, or 79.7%, was from Samson, representing liquidated profits from the historic MCA portfolios.

62. During his interview, Defendant Feingold represented that, at this time, all incoming funds from the historic MCA portfolios are "profits." This is significant to the Monitor, because the incoming funds from the historic MCA portfolios comprised approximately 79.7% of the incoming funds to BSG Management, as manager of BSG Fund, in the first five months of 2025 and essentially funded the payment of all investor dividends. This is also significant given the SEC's concerns about the profitability of the MCA Series.

63. To verify this representation, the Monitor requested from the Monitorship Entities documentation showing the total amount of funds, separated by MCA Series and Infrastructure Series, sent to Samson for investments in MCA portfolios.

64. As of the filing of this Third Status Report, the Monitorship Entities provided a summary of the total amount of funds (not separated by MCA Series and Infrastructure Series) sent to Samson for investments in MCA portfolios for the years 2023, 2024, and 2025, as well as

[6] As of the filing of this report, the Monitorship Entities have not been able to advise whether the approximately $5,000,000 in incoming funds between January 1 and May 15, 2025 from Contender Development represents income from lot sales. As noted earlier, on July 29, 2025, BSG Fund received an additional approximately $1,036,256, which was confirmed to be income from lot sales.

the total amount of funds received from Samson for the years 2023, 2024, and 2025. As of the filing of this Third Status Report, the Monitorship Entities have not provided a similar accounting for 2021 and 2022.

65. According to the Monitorship Entities' records, from 2023 through present, BSG Fund sent approximately $182,500,000 to Samson to be invested in MCA portfolios, which includes investor money from various MCA Series and the invested infrastructure funds. During that same time period, from 2023 through present, BSG Fund received approximately $184,915,273 from Samson. In other words, based on this timeframe of records, it appears that currently all incoming funds from Samson to BSG Fund are, indeed, profits.

66. As for projected incoming funds, according to the Monitorship Entities, the MCA portfolios owe approximately $115,000,000[7] and will be fully liquidated by the beginning of 2026.

67. With regard to infrastructure, those projects generally were projected to profit in approximately three to five years. As BSG Fund began investing in infrastructure projects in 2020, it is anticipated that the BSG Fund will realize profits in the very near term. To that end, the Monitorship Entities have advised that approximately $70,000,000 is owed from builders for infrastructure lot sales.[8] Additionally, as stated above, on July 29, 2025, BSG Fund received approximately $1,036,256 in revenue from lot sales.

68. In addition to these projected incoming funds, the Monitorship Entities appear to have other significant assets, particularly in real estate and infrastructure projects, with valuations

---

[7] As of the filing of this report, the Monitor has not been able to conduct a full collectability analysis of the remaining MCA portfolios. As such, it should be assumed that $115,000,000 is the *most* BSG Fund could collect, with the caveat that the ultimate amount could be less.

[8] On July 24, 2025, the Monitor obtained an Order permitting those lots to be sold in the ordinary course of business free of liens from the SEC, *see* ECF No. 132, with the goal that those expected funds will be released for the benefit of the investors.

that have been represented to far exceed the amounts owed to investors. The Monitorship Entities advised that they continue to explore options to sell all or part of the infrastructure portfolio.

**b. BSG Fund's Expenses in 2025**

69. From January 1, 2025 through May 31, 2025, according to Juniper records, BSG Fund paid approximately $75,073,250 in investor dividends.

70. From January 1, 2025 through May 31, 2025, based on internal accounting records and bank statements provided by the Monitorship Entities and reviewed by the Monitor's forensic accountant team, BSG Fund also sent approximately $45,180,000 to a Contender Development project account, presumably for investment into ongoing or new infrastructure projects. At present, BSG Fund is not raising new investor capital. As such, the only funds available for investment into new projects come from existing investment revenue or "return of capital" from Contender Development.

71. Ultimately, for BSG Fund to be able to meet its dividend obligations going forward, and particularly into 2026, it appears that BSG Fund must begin to receive significantly more revenue from non-MCA sources (such as infrastructure), liquidate certain assets, or sell all or part of its equity in the infrastructure portfolio.

[redacted]

[redacted]

---

[redacted]

[redacted]

**D. The Monitor's Assessment of the SEC's Allegations as Applied to Ongoing Operations of the Monitorship Entities**

75. The Monitorship Order directs the Monitor to review the allegations in the Complaint [ECF No. 1], the PI Motion, [ECF No. 9], and the Receiver Motion [ECF No. 13], and to make recommendations (and issue reports) regarding his assessment of the ongoing operations of the Monitorship Entities and the SEC's allegations. [ECF No. 95, ¶ 11].

76. The Monitor conferred with Plaintiff SEC and counsel for the Monitorship Entities, who advised that they agree that the Monitor is not to opine on the merits of the SEC's allegations related to past conduct. Rather, the Monitor is to assess and report to the Court on whether the Monitorship Entities' ongoing conduct would warrant or give rise to further allegations of the conduct alleged in the Complaint. As such, the Monitor has limited his assessment of the SEC allegations relative to the Monitorship Entities' ongoing operations.

**i. The Co-Mingling Claim and the Asset Ownership Claim**

77. The SEC alleges that the BSG Parties allegedly improperly co-mingled investor funds from all the various Series and exposed individual Series' investors to risk from other Series (the "Co-Mingling Claim"). See Compl. ¶¶ 4; 174–186.

78. Second, the SEC alleges that the BSG Parties allegedly mislead investors into believing that BSG Fund owned and controlled the investments and the investment's assets when the "funds and assets of BSG Fund were not being held by BSG Fund" (the "Asset Ownership Claim"). See Compl. ¶¶ 187–198.

79. In an effort to curb the alleged risk exposure created by the alleged co-mingling and to ensure the BSG Fund investors were invested in business lines legally owned and controlled by BSG Fund, the Monitorship Order requires the Monitorship Entities, within a reasonable time, to transfer all assets purchased with BSG Fund investor monies to an entity or entities owned by the appropriate series of the BSG Fund. [ECF No. 95, ¶ 24]. As mentioned above, the Monitorship Entities have prepared documents to effectuate the goals of Paragraph 24, which are under review by the SEC. Once those transfers are effectuated, the SEC's concerns about the co-mingling of assets across Series and asset ownership should be alleviated.

**ii. The Misappropriation Claim**

80. The SEC alleges that the BSG Parties misappropriated investor funds to pay insiders, including the Relief Defendants (the "Misappropriation Claim"). *See* Compl. ¶¶ 8, 11, 252, and 253. Relatedly, the SEC alleges that "BSG Management and the Baldassarras . . . do not have systems in place to track the amount of management fees that BSG Management may charge with respect to each Series." *See* Compl. ¶ 247.

81. Pursuant to a Stipulation and Order, dated January 31, 2025 [ECF No. 18] and as adopted as part of the Monitorship Order, it is not permitted for there to be a transfer of any assets that have been invested in BSG Fund to the Defendants' personal accounts and the Relief Defendants. [ECF No. 95, ¶ 26(b)]. Further, as no new investor funds are being received, there are no management fees being deducted. The Monitor's forensic accountants have confirmed that no

money has been transferred to the Defendants' personal accounts and Relief Defendants since January 30, 2025.

82. As for the allegation that BSG Management and the Baldassarras . . . do not have systems in place to track the amount of management fees that BSG Management may charge with respect to each Series," *see* Compl. ¶ 247, while the investor ledgers do not track management fees, the Monitorship Entities do, indeed, track management fees in the "management fee worksheets" discussed above.

**iii. The MCA Inflated Profits Claims**

83. The SEC alleges that the BSG Parties allegedly reported profits for the MCA Series that were artificially inflated and, as a result, used those funds to pay inflated returns to investors in the MCA Series, as well as to investors in the Infrastructure Series (the "MCA Inflated Profits Claim"). *See* Compl. ¶ 3.

84. As the Monitorship Entities have discontinued the MCA Series, this allegation does not seem affect prospective, ongoing operations. That said, the Monitorship Entities have provided records demonstrating that the MCA portfolios were profitable and all current incoming funds from the historic MCA portfolios represent profit.

**iv. The QSBS Claims**

85. The SEC alleges that the BSG Parties allegedly made misrepresentations about the tax treatment of the Qualified Small Business Stock Series (the "QSBS Claim"). *See* Compl. ¶ 5.

86. As the Monitorship Entities have discontinued the QSBS Series, this allegation also does not affect prospective, ongoing operations.

**E. The Monitor's Recommendations**

87. The Monitor makes the following recommendations relative to BSG Fund's investor dividend obligations:

(i) Within 30 days, BSG Fund conduct an analysis and forecast its options for meeting its dividend obligations through the conclusion of 2026; and

(ii) To the extent there are "return of capital" transfers to BSG Fund, such funds should *not* be used to pay investor dividends.

88. The Monitor makes the following recommendations relative to financial statements:

(i) It is the Monitor's recommendation that the Monitorship Entities not represent revenue, income, or profit figures to any investors, including institutional investors, unless it is through audited financial statements; and

(ii) It is the Monitor's recommendation that Defendant Feingold cause Contender Development to communicate to BSG Management and BSG Fund the source and reason for any funds transferred to BSG Fund contemporaneously with the transfer of such funds.

**CONCLUSION**

89. The Monitor's work is still ongoing. This report provides the Monitor's findings and assessment based on information that the Monitorship Entities have provided to the Monitor. This report includes a summary of the Monitor's findings, assessment, and recommendations, but does not include an exhaustive account of the entirety of the Monitorship Entities' ongoing operations. As the monitorship progresses, the Monitor will continue to update the Court and the SEC on his progress, as well as his assessment and recommendations.

Dated: July 30, 2025

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP

By: /s/ *Jeffrey C. Schneider*
Jeffrey C. Schneider, P.A.
Florida Bar No. 933244
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL 33131
Telephone: (305) 403-8788
Primary email: jcs@lklsg.com
Secondary e-mail: ph@lklsg.com

*Court-Appointed Monitor*

By: /s/ *Stephanie Hauser*
Stephanie L. Hauser, Esq.
Florida Bar No. 92765
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL 33131
Telephone: (305) 403-8788
Primary email: slh@lklsg.com
Secondary e-mail: ame@lklsg.com

*Counsel for Court-Appointed Monitor*

**CERTIFICATE OF SERVICE**

I, Stephanie Hauser, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 30th day of July, 2025 and that an unredacted version was served via email on counsel for the SEC and the Monitorship Entities.

By: */s/ Stephanie Hauser*
Stephanie Hauser