UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-cv-20436-DPG

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT, LLC,

and

BROAD STREET INC.,

    Defendants, and

JOSEPHBENJAMIN, INC., and
JUST A NICE DAY, INC.,

    Relief Defendants.
_____/

**SUPPLEMENT TO MONITOR'S THIRD STATUS REPORT**

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** .......................................................................................................... 3

**SUPPLEMENT TO MONITOR'S THIRD STATUS REPORT** ............................................ 4

## **EXECUTIVE SUMMARY**

1. On April 21, 2025, this Court granted the parties' motion for appointment of a monitor (the "Monitorship Order") and appointed Jeffrey C. Schneider (the "Monitor") as Monitor for Defendant Broad Street Global Management, LLC ("BSG Management"), Defendant Broad Street, Inc. ("BSI"), Broadstreet Global Fund, LLC ("BSG Fund"), Broadstreet Global Holdings, LLC, BSG Series CM, LLC, Relief Defendant Just A Nice Day, Inc., and Relief Defendant Josephbenjamin, Inc. (collectively, the "Monitorship Entities"). [ECF No. 95].

2. The Monitorship Order, among other things, requires the Monitor to file quarterly reports within 30 days of the close of a quarter. [Monitorship Order at ¶ 15]. The Monitor's Third Status Report [ECF No. 135] was filed on July 30, 2025.

3. The Monitorship Order also requires the Monitor to file reports "at such other times as the Monitor has information deemed material or as he or she otherwise deems appropriate." [Monitorship Order at ¶ 15].

4. The Monitor files this Supplement to the Monitor's Third Status Report because, since its filing, the Monitor has received records causing the Monitor to retract certain statements he made about:

- (i) the "profitability" of the MCA Series (as the Monitor understands the term and used it in the Third Status Report); and

- (ii) the current funds being received by BSG Fund on account of the MCA portfolios and being used by BSG Fund to fund the vast majority of the distributions to investors.

**SUPPLEMENT TO MONITOR'S THIRD STATUS REPORT**

5.     In the Third Status Report, the Monitor reported that, as of the filing of the report on July 30, 2025, the current incoming funds from Samson (the manager of BSG Fund's MCA portfolios) "represent[ed] liquidated profits from the historic MCA portfolios," and that the current incoming funds from the liquidation of BSG Fund's MCA portfolios appeared to be "profits." *Id.* ¶¶ 61, 65 & 84. The Monitor's prior statements on profitability were based on a simple money in/money out definition of "profits." The Monitor now retracts those statements on profitability based on records received subsequent to the filing of the Third Status Report.

6.     The Monitor's statement on MCA profitability was based on both representations from the Monitorship Entities and Defendant Feingold, as well as a review of corroborating records of money in/money out for the years 2023, 2024, and 2025. *Id.* ¶¶ 62 & 63. The Monitor noted that he had requested a similar "money in/money out" accounting for the years 2021 and 2022, but that the Monitorship Entities had not provided those records as of the filing of the Third Status Report. *Id.* ¶ 64.

7.     As the Monitor reported, the accounting provided by the Monitorship Entities for 2023 to mid-2025 showed that: (i) "BSG Fund sent approximately $182,500,000 to Samson to be invested in MCA portfolios;" and (ii) "BSG Fund received approximately $184,915,273 from Samson." *Id.* ¶ 65. Based on that accounting, it appeared that the Monitorship Entities had received approximately $2.4 million more than they had sent out to Samson during the past two-and-one-half years. Given that the Monitorship Entities advised that the average MCA portfolio had an approximate 10-month duration, the Monitor reported that, "based on this timeframe of records, it appears that currently all incoming funds from Samson to BSG Fund are, indeed, profits." *Id.* ¶

65. This corroboration was consistent with Mr. Feingold's representation to the Monitor that the MCA Series was "profitable."

8. The Monitor was clear about how he was defining "profitability." The Monitor defined "profitability" in the Third Status Report ("money in" exceeding "money out"). The Monitor was consistent in conversations with the Monitorship Entities prior to the filing of the Third Status Report. Indeed, prior to filing the Third Status Report, the Monitor shared a copy of the report with the Monitorship Entities so that they could comment on both the proposed redactions, as well as the accuracy of the information being reported to the Court and to the public. No corrections were made to the Monitor's statements about profitability or the way in which he viewed profitability ("money in" exceeding "money out").

9. The Monitor also was clear that he was reporting on the present-day profitability of the MCA portfolios because the Samson incoming transfers comprised approximately 79.7% of all incoming funds to BSG Fund from January 1, 2025 through May 31, 2025, and therefore had a direct and material impact on the ability of BSG Fund to meet its current and prospective investor dividend obligations. *Id.* ¶ 62.

10. Following the publication of the Third Status Report, the Securities and Exchange Commission questioned the representations made to the Monitor about the MCA portfolios being "profitable" and asked the Monitor to continue to follow up with the Monitorship Entities for the accounting of the "money in" and "money out" for the years prior to 2023. As a result, on August 5, 2025, the Monitor requested the following from the Monitorship Entities via email: (i) "Can you tell me the total amount BSG Fund sent to Samson to be invested in MCA portfolios from the beginning of time?;" and (ii) "Can you tell me the total amount BSG Fund received from Samson from the beginning of time?" This, too, made it clear, as did the prior conversations and the

Monitor's Third Status Report, that the Monitor was defining "profitability" based on "money in" and "money out."

11. In response, the Monitorship Entities provided a spreadsheet prepared by Samson with "Total Funded" and "Total Payback" figures for the years 2019, 2020, 2021, 2022, and 2023 to "support our position regarding the earlier years' MCA portfolios." Year after year, those "Total Payback" figures were greater than the "Total Funded" figures, which appeared to be consistent with the Monitorship Entities' representations to the Monitor that the total "money in" exceeded the total "money out" and, as a result, the funds being currently received from Samson represented "profits." In other words, the historical data that the Monitorship Entities provided seemed to confirm the Monitorship Entities' prior representations to the Monitor.

12. The Monitor now understands, however, that the Samson figures for "Total Payback" do ***not*** represent actual funds received by the Monitorship Entities. Rather, the "Total Payback" figures include "right to receive" or "RTR" figures—which are *projected* best-case-scenario figures that assume ***all*** accounts receivable are collected.

13. The Monitor confronted the Monitorship Entities about why they provided *projected* figures, as opposed to the actual figures, in response to questions that called for "the total amount BSG Fund sent to Samson" and "the total amount BSG Fund received from Samson" from the beginning of time. The Monitorship Entities explained that, in their view, GAAP rules and accrual accounting allow the use of RTR projections to determine the "profitability" of MCA portfolios. That may be so. The Monitor offers no view on that subject. But that is not the question that the Monitor asked, and the Monitor thinks he was clear. The Monitor was analyzing profitability based on "money in" and "money out." The Monitor so concluded for the years 2023 through mid-2025 in the Third Status Report. The Monitor thereafter sought to validate the

conclusion—bolstered by representations from the Monitorship Entities—for the prior period (2019 through 2022). The Monitorship Entities, however, never told the Monitor that they were not providing the money in/money out figures the Monitor specifically requested.

14. On October 3, 2025, the Monitor finally received from the Monitorship Entities a draft accounting of the money in/money out for the years 2019 through 2022.[1] The complete accounting of money in/money out for 2019 to mid-2025 now tells a very different story than the accounting for the years 2023 to mid-2025 did in insolation. The updated accounting from the Monitorship Entities reveals that, from 2019 through mid-2025, **the Monitorship Entities sent at least $40 million *more* to Samson than the Monitorship Entities have received from Samson**.

15. As the accounting for the years 2019 to mid-2025 reflects that more funds were sent than received, the Monitor retracts the statement that current incoming funds from the liquidated MCA portfolios represent "profits" based on the Monitor's money in/money out definition of the term.

16. The issue as to whether the MCA portfolios were historically "profitable," or are currently "profitable" if the accrual accounting method is applied, remain active issues in the litigation. The Monitor takes no position on these issues or the propriety of determining profitability using the accrual method.

---

[1] The SEC also provided the Monitor with a draft accounting of all money in/money out between Samson and the Monitorship Entities for 2019 to mid-2025. While there are some immaterial differences in the accountings provided by the SEC and the Monitorship Entities for the years 2021 and 2022, the numbers largely align.

Dated: October 7, 2025

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP

By: /s/ *Jeffrey C. Schneider*
Jeffrey C. Schneider, P.A.
Florida Bar No. 933244
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL 33131
Telephone: (305) 403-8788
Primary email: jcs@lklsg.com
Secondary e-mail: ph@lklsg.com
*Court-Appointed Monitor*

By: /s/ *Stephanie L. Hauser*
Stephanie L. Hauser, Esq.
Florida Bar No. 92765
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL 33131
Telephone: (305) 403-8788
Primary email: slh@lklsg.com
Secondary e-mail: ame@lklsg.com
*Counsel for Court-Appointed Monitor*

## CERTIFICATE OF SERVICE

I, Stephanie Hauser, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 7th day of October, 2025.

By: */s/ Stephanie L. Hauser, Esq.*
Stephanie L. Hauser