IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-20436-GAYLES/SHAW-WILDER

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT, LLC, and
BROAD STREET, INC.,

Defendants, and

JOSEPHBENJAMIN, INC., and
JUST A NICE DAY, INC.,

Relief Defendants.

**DEFENDANTS AND RELIEF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants and Relief Defendants ("Defendants") respectfully move for summary judgment in their favor and against Plaintiff Securities and Exchange Commission ("SEC").

## INTRODUCTION

Earlier this year, on March 20, 2026, the SEC represented to this Court:

> I think the other point to make on the location of operative facts is you hear a lot in the briefs and today about the extent of the real estate operations in South Carolina, and I want to make it really clear that our case is not about what is going on in those projects on the ground.

(ECF 278-2 at 20:12-16). To which, the Court responded: "I'm sorry. The case is not about what?" (*Id.* at 20:17). The SEC then clarified:

> It's not about what is going on on the ground on those real estate projects. It's about the representations that were made to investors in all lines of business, and whatever the quality or progress or status of what is happening on the ground in South Carolina is not going to be an issue at trial. We are not going to take the jury out to a homesite in South Carolina or anywhere to, you know, address or assess the merits of our claims. The claims are about what investors were told, and the difference between what they were told and what the defendants knew at the time they made those statements to investors. ***<u>So the case is not about Broad[s]treet's business generally. It's about what investors were told by Broad[s]treet, specifically about what they were told as alleged in our Complaint</u>***.

(*Id.* at 20:18-21:7) (emphasis added). The Court then accepted the SEC's representation: "[The SEC's case is] really just about those representations … not the business or business model overall." (*Id.* at 27:6–8).

The SEC made the above representation in support of its argument to keep this case in the Southern District of Florida. (*See generally* ECF 278-2). The SEC convinced the Court that no issues regarding Broadstreet's (defined below) business would be raised, hence no tours of the massive business operations would be necessary for the jury to see and no reason to transfer the case to the District of South Carolina, where Broadstreet is indisputably "at home." (*Id.* at 11:14-

16). So, now after years of investigation and litigation initiated based on enormous allegations, the SEC has made it abundantly clear, the only question left to address in this case concerns representations made to investors. That question can be answered now.

**SOLE QUESTION BEFORE THE COURT**

By its own admission, the SEC's case boils down to one question: Did Defendants make material misrepresentations to investors? Broadstreet's disclosures provide a clear answer: No. As a result, summary judgment should be granted now in favor of Defendants. The pleadings are closed, the SEC has limited the issues, and no more wasting of judicial resources is necessary.

**FACTUAL BACKGROUND**

Prior to initiating this action on January 29, 2025, the SEC investigated Defendants for more than two years, during which it issued more than ninety document subpoenas to third parties and Broadstreet-related entities and individuals, including Defendants' bank and financial institutions. (ECF 54 at 5). Defendants produced hundreds of thousands of pages of materials in response. (*Id.*). The SEC also took testimony from ten Broadstreet-related witnesses over a span of seventeen months. (*Id.*; ECF 60 at 5-9). The SEC then initiated this case on a flawed TRO application, falsely claiming that Broadstreet was a massive fraud and that nearly all money raised was missing. (*See* sealed documents entered on January 30, 2025, Docket Entries 9, 10, 12, 13). After a forceful response by Broadstreet (ECF 54), the SEC then abandoned the TRO application mid-hearing on day one. (ECF 79).

The SEC initially claimed it could only find $62,500 deployed in investments.[1] It thereafter retreated from this blatantly false and outrageous statement. In fact, the SEC's own expert at the

[1] Senior Trial Attorney of the SEC, Chris Martin, falsely represented to this Court that:

TRO hearing acknowledged that she was able to identify approximately $880 million in monies as having been deployed in investments for the benefit of investors and that Broadstreet had kept quite extensive records. (ECF 84 at 121:22-23 ("[T]he amount of funds that were transferred to [the fund's manager Broad Street Global Management LLC ("BSGM")] was, approximately $880 million"); *id.* at 124:25-125:2 ("The investor funds were transferred to [BSGM], and from there the investments were made"); *see also, e.g., id.* at 122:13-19 (the SEC's expert discusses Broadstreet's extensive records)).

It was also acknowledged that nearly $1.2 billion was raised[2] and that the investor disclosure documents advised that 30% in total fees[3] and costs were permitted to be removed and hence approximately $880 million in cash was left to be invested, the exact amount traced by the SEC's own accounting expert as having been deployed in investments[4] and a far cry from the lie stated in open court by the SEC that only $62,500 had been put in investments. However, this was just the beginning of embarrassments for the SEC.

Even more embarrassing for the SEC, as this case has progressed, Broadstreet has sold two of its business divisions for stock in publicly traded companies on the NASDAQ and NYSE for a

---

their own management company. We will also show you today they only invested about $62,500 of this $868 million that the fund received.

(ECF 84 at 25:19-21). Martin would suddenly depart from the SEC shortly after making this statement.

[2] *Id.* at 124:17-19.

[3] *Id.* at 63:18-25.

[4] *Id.* at 121:22-23; *id.* at 124:25-125:2.

combined value of $3.6 billion. (*See* Declaration of Steven Baldassarra attached hereto as **Exhibit 1** at ¶ 23). Taking into account that $1.2 billion was raised to be deployed for investments and $3.6 billion in transactions has occurred, that is a ***three times (3x) return*** on capital (*id.*), an outstanding result in the private equity industry. This is a devastating development to the SEC's case and helps explain why, after the announcement of the redemption in late 2025,[5] the SEC's counsel proceeded to represent to the Court in March of 2026, as noted above, that the SEC is no longer focusing on the business and rather just representations made to investors.

Despite all the filings back and forth, what this case boils down to is quite simple. The SEC began this case by alleging Broadstreet's business is a massive fraud. During the litigation, a $3.6 billion in value transaction was accomplished, which gutted the SEC's other exaggerated claims and pushed the SEC to rely on a single theory, alleged misrepresentations to investors.

In short, this is not the typical SEC enforcement action. There is no destruction of evidence, sudden transfer of funds or moving funds outside of the jurisdiction. There is, however, plenty of evidence that Defendants built a viable multi-billion-dollar real estate business with substantial assets and investments. (ECF 54 at 5; ECF 54-2 at ¶¶ 5, 7, 19-42; ECF 60 at 2; ECF 103 at ¶ 58; ECF 135 at ¶¶ 43, 68).

**A. The Investors**

Broadstreet Global Fund, LLC ("BSGF") is the only entity to which investors can subscribe and which accepted investor money. (Ex. 1 at ¶ 4). BSGF is managed by BSGM. (*Id.*).[6] Broadstreet focused on ultra-high net worth and sophisticated investors ("UHNW") to participate. (*Id.* at ¶ 6).

---

[5] *See, e.g.,* ECF 141 at 1.

[6] BSGF, BSGM and their affiliate or related entities are collectively referred to herein as "Broadstreet."

This was by design. Indeed, the Private Placement Memorandum ("PPM") provides:

> Each investor must have sufficient knowledge and experience in financial and business matters generally, and in securities investment in particular, to allow such investor to evaluate the merits and risks of investing in a Series.
>
> Investors must be 'accredited investors' within the meaning of Rule 501 of Regulation D promulgated under the Securities Act.

(PPM attached hereto as **Exhibit 2** at 10; *Id.* at 9).

Broadstreet catered to the wealthiest people in the United States. The Average Broadstreet Investor ("ABI") is a UHNW.[7] The reason for this design is also spelled out in the PPM:

> An investment in a Series is an illiquid investment that involves a high degree of risk because the right to withdraw, if any, and transfer Interests is subject to restrictions. Only investors financially able to maintain their investment, and who can afford to lose all or a substantial part of that investment, should invest in a Series.

(Ex. 2 at 16).

Nearly every Broadstreet investor is college educated and most have an advanced educational degree beyond a college degree. (Ex. 1 at ¶ 8). In addition, nearly all of Broadstreet's investors are professionals, including lawyers, persons with medical degrees that are executive officers of major healthcare practices, CEOs of major private and public companies, hedge fund managers, chief investment officers, operators of high-net-worth family offices, owners of hotel chains, real estate developers, accountants, and partners in large accounting and consulting firms. (*Id.*).

**B. <u>Broadstreet's Disclosures</u>**

Every Broadstreet investor was required to review, accept, sign, and continuously review

---

[7] Roughly 75% of the ABI have net worths estimated between $10 million and $100 million and roughly 10% of the ABI have estimated net worths between $100 million and $1 billion. (Ex. 1 at ¶ 7).

several documents ("Critical Documents"). (*Id.* at ¶ 9).[8] These Critical Documents are explained in detail in Steven Baldassarra's prior declaration submitted in opposition to the TRO application abandoned by the SEC. (*See* ECF 54-2). The disclosures contained in the Critical Documents are quite broad. (Ex. 1 at ¶ 9). This fact has been confirmed verbatim in writing by the Court-appointed corporate monitor, Jeffrey Schneider. (ECF 103 at ¶ 35 ("The Broadstreet parties quote from the various disclosures—which are indeed, quite broad—in their response to the PI Motion and Receiver Motion")). The Critical Documents are detailed and prepared for the exact type of investor at issue here, accredited investors which each BSGF investor represented and warranted to be. (*Id.* at ¶ 10).[9]

### C. Investor Compliance Acknowledgment

In fact, in addition to the other Critical Documents, in July 2023, BSGM disseminated to investors a Compliance Acknowledgement Update ("CAU"). (*Id.* at ¶ 12). Examples of the CAU are attached hereto as **Exhibit 3**. Broadstreet's investors have signed the CAU. (Ex. 1 at ¶ 13). The SEC gives little attention to the CAU because it defeats its claims of misrepresentations. By executing the CAU, investors specifically confirmed as follows (the CAU is a one-page document and an executed example of it in its entirety is on the following page):

[8] The Critical Documents are the PPM, BSGF Operating Agreement, Subscription Agreement, series supplements, slide decks, data room documents, monthly and quarterly updates and disclosures of Broadstreet. (*Id.*).

[9] Broadstreet presented each investor the opportunity to review the Critical Documents at least thirty-seven (37) times per year. Specifically, the investors were provided them at least once per month when clients logged into their account statements; at least once per month when investor reports were released; at least once per month as investors were advised to check the company data room; and on an annual basis when tax forms were transmitted to investors. (*Id.* at ¶ 11).

## Compliance Acknowledgement Update – July 2023

I, the undersigned do hereby swear and affirm to the following to be used and relied upon by Broadstreet Global Fund, LLC and any of its affiliated entities including but not limited to Broadstreet, Inc. and Broadstreet Global Management (collectively "Broadstreet"):

1) I still meet the definition of an accredited investor as presented in my original subscription documents.
2) My mailing address and contact information has not changed and is accurate and up to date as reflected in my original subscription documents, and in the event it has changed I will promptly notify Broadstreet.
3) I have read the private placement memorandum, series supplements, data room documents, monthly updates and disclosures of Broadstreet, and still consent to all matters contained in those documents.
4) I acknowledge that I am responsible for reviewing the data room on a regular basis and also all updates posted as they may affect deal terms. Updates may not be provided to me by email and thereby I must enter the data room to make sure I have reviewed all information. That is my responsibility. These investments involve risk.
5) I am aware that if I do not log into the data room on a regular basis that I do so at my own risk as many significant and material terms and conditions are contained therein that may affect my investment. Broadstreet does not email me every material document and I should review the data room as a result.
6) I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks.
7) I understand that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects.
8) I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves.
9) I am aware that my investment in Broadstreet provides ownership in the applicable Broadstreet subseries. Individual land is titled in special purpose vehicles owned, managed and/or controlled by Broadstreet. Also, I only have ownership in the subseries for which I have invested and no others.
10) I acknowledge that I have no complaints involving the operation of Broadstreet or any matters involving Broadstreet and the company makes itself readily available to answer my questions.
11) I have always been given the opportunity to ask questions regarding Broadstreet products and operational information. I am a sophisticated investor and it is my obligation to ask questions if I feel I need more information.
12) I make my own investment decisions, neither Broadstreet nor any of its affiliates act as an investment advisor.
13) I have had the opportunity to seek my own legal and accounting advice when making decisions in relation to Broadstreet.
14) I recognize that at anytime I have questions or concerns, I can contact the Compliance Department at compliance@bsgfund.com
15) I understand if there are any material changes in my investment objectives or investment qualifications, I must notify Broadstreet immediately.

**By my signature, I certify that all information above is accurate.**

Signed: ________________________ (Verified by signNow)

Dated: 07/31/2023

(*See* Ex. 3). In sum and as explained below, the CAU is a one-page document that defeats the SEC's entire case of purported misrepresentations to investors.

**D. <u>The Redemption</u>**

Defendants have sold their business lines for $3.6 billion in value from a total of capital of $1.2 billion and each investor likewise is to be redeemed for ***<u>triple their investment</u>***. (*See, e.g.*, ECF 264-1 at 4). These devastating facts caused the SEC to retreat from its attack on the business and now pursue its last attempt of a case, by arguing that this is a case about misrepresentations while trying to conceal the CAU from this Court's attention.

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat . . . summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Purcell v. City of Fort Lauderdale*, 753 F. Supp. 3d 1308, 1323 (S.D. Fla. 2024) (emphasis in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). "Mere metaphysical doubt as to the material facts will not suffice." *Org. of Pro. Aviculturists, Inc. v. Kershner*, 564 F. Supp. 3d 1238, 1243 (S.D. Fla. 2021) (citation and internal quotations omitted). "Summary judgment must be granted if the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1294 (11th Cir. 2005) (citations and internal quotations omitted).

While the Court "construe[s] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor," this "does not mean" that the Court is "constrained to accept all the nonmovant's factual characterizations and legal arguments."

*Ferry v. Zaino*, 815 F. Supp. 3d 1284, 1292 (S.D. Fla. 2025) (citation and internal quotations omitted). An "inference based on speculation and conjecture is not reasonable," and "[s]peculation does not create a *genuine* issue of fact . . . ." *Kershner*, 564 F. Supp. 3d at 1248 (emphasis in original) (citations and internal quotations omitted). "Conclusory allegations without specific supporting facts have no probative value." *Id*. at 1247. Defendants easily satisfy this standard.

## ARGUMENT

The SEC's case is limited to allegations of misrepresentations to investors. It is axiomatic that federal securities law targets this basic conduct: "misrepresenting or concealing material facts." *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 125, 144 S. Ct. 2117, 2130, 219 L. Ed. 2d 650 (2024). The SEC cannot meet this basic burden. While the SEC's scattershot complaint is 64 pages, the SEC's allegations of misrepresentations to investors are limited to Broadstreet's representations concerning the following six issues:

1. Broadstreet's use of investor funds across BSGF series;
2. Merchant Cash Advance ("MCA") "purported returns" and "ending balance" account statements;
3. Broadstreet's deployment of investor funds;
4. Qualified Small Business Stock Subseries ("QSBS");
5. Broadstreet's recordkeeping and financial statements; and
6. BSGM's investment adviser status.

Each of these claims of misrepresentations to investors is defeated by the Critical Documents and the CAU.

**I. The SEC's allegations of misrepresentations as to Broadstreet's use of investor funds are misguided and fail.**

The SEC alleges misrepresentations were made to investors regarding the use of investor funds across BSGF Series and into BSGM and affiliate accounts. (ECF 8 at ¶¶ 4, 174–198). This is wrong. Broadstreet's investors have themselves confirmed ***in writing*** that they were aware that funds may be used for other purposes or investments:

> I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects.
>
> I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves.

(Ex. 3 at ¶¶ 7, 8). Indeed, the PPM acknowledges:

> Cash assets pertaining to various classes of Interests (but not assets pertaining to multiple Series) may be commingled.
>
> [P]rotection [from cross-Series liability] can be lost if certain formalities are not observed, including not commingling assets and maintaining separate books and records for each Series.

(Ex. 2 at 9, 16). BSGF's Operating Agreement (attached hereto as **Exhibit 4**) does too:

> In the event that there is such property, losses, debts, obligations, liabilities, expenses, or any income, earnings, profits, and proceeds thereof, funds, or payments which are not readily identifiable as belonging to any particular Series, the Manager shall allocate them among any one or more of the Series established and designated, from time to time, in such manner and on such basis as the Manager, in its sole discretion, deems fair and equitable. Each such allocation by the Manager shall be conclusive and binding upon the [investors] for all purposes.
>
> [S]ubject to the right of the Manager in its sole discretion to allocate general liabilities, expenses, costs, charges or reserves as herein provided…

(Ex. 4 at §§ 5.01(e)(ii), (f)).

More than that, the investors were provided slide decks and monthly and quarterly updates, containing disclosures that funds from one Series could be used to make payments with respect to another Series, noting that projects in the infrastructure Series were in early stages. (ECF 54-2 at ¶¶ 56-58). As all of this shows, the SEC's allegations of misrepresentations to investors as to use of funds are patently false and should be dismissed as such. The investors explicitly accepted ***in writing*** the exact investment style the SEC complains of.

**II. The SEC's allegations of misrepresentations as to the MCA fail.**

The SEC alleges (1) that Defendants paid "purported returns" not supported by actual MCA performance, and (2) that the "ending balance" account statements misled investors (ECF 8 at ¶¶ 137, 143–149). The SEC is wrong on both. The "purported returns" the SEC points to is Broadstreet's mere recitation to investors of what Broadstreet's contract rates were with Samson, not "purported returns." (Ex. 1 at ¶ 14).[10] And the account statements did not mislead investors as alleged. Such statements instead provided exactly what the PPM requires. The PPM specifically states that the investments will be held at cost. (Ex. 2 at 25). The MCA portfolio was held at cost as provided on the account statements and as required by the PPM. (Ex. 1 at ¶ 15). Thus, the account statements cannot be false given investors were advised investments would be held at cost and that the investors accepted ***in writing*** this format of account statement. The PPM further advised that there was no guarantee that holding investments at cost would represent the fair market value of the investments. (Ex. 2 at 25). BSGF's investors are sophisticated accredited investors who understood these disclosures.

---

[10] Samson is the company with the MCA expertise. Broadstreet paid Samson to generate financial performance metrics regarding the MCA business. (Ex. 1 at ¶ 14). Not only were those numbers not generated by Broadstreet, they were made by an expert in the MCA field, Samson, that was hired to do this work and who had its financial work audited and reviewed by third parties as well. (*Id.*).

**III. The SEC's allegations of misrepresentations concerning Broadstreet's deployment of funds fail.**

Throughout its pleading, the SEC claims that BSGM diverted approximately $880 million in investor funds. This too is incorrect. Investor funds were not diverted but rather deployed on behalf of BSGF by its manager, BSGM, as confirmed by the SEC's own expert. (ECF 84 at 121:22-23 ("The amount of funds that were transferred to [BSGM] was, approximately $880 million"); *id.* at 124:25-125:2 ("The investor funds were transferred to [BSGM], and from there the investments were made")). Those monies ended up in business lines which were ultimately then sold for $3.6 billion in value, providing a significant exit and opportunity for Broadstreet investors. (Ex. 1 at ¶ 23). There was no requirement that the money only be kept in one operating account. In fact, the money was distributed to affiliated accounts under the name Broadstreet and went to the business lines eventually sold, excluding the monies taken for fees, which was also disclosed as acknowledged in writing by the investors. (Ex. 3 at ¶ 6).

Under the Operating Agreement and as acknowledged by the court-appointed monitor, BSGM has broad discretion and control over investor funds. For example, Section 4.01 of the Operating Agreement outlines in sixteen (16) subparts the broad powers and discretion provided to BSGM to manage, own and control fund assets. Section 4.01 states in pertinent part:

> The management of the Company and each Series shall be vested exclusively in the Manager. The Manager shall have the authority, on behalf of and in the name of the Company or each Series, to take any action or make any decisions on behalf of the Company and each Series ….

(Ex. 4 at Section 4.01). The Operating Agreement goes on to further describe BSGM's discretion and control including to:

> [A]cquire, hold, sell, transfer, exchange and dispose of Investments, and exercise all rights, power, privileges and other incidents of ownership and possession with respect to such Investments, including without limitation, the voting of

> Investments, the approval of restructuring of entities in connection with Investments …

(*Id.* at Section 4.01(c)).

Moreover, Section 4.09 of the Operating Agreement states in relevant part, "[t]he Manager and its Affiliates may purchase an investment that would otherwise be appropriate for the Fund or a Series to own." (Ex. 4 at Section 4.09). BSGF's PPM also contains several disclosures regarding the manager's discretion and control over fund assets. For example:

> A Series may represent a particular industry or vertical but the Investor may not have any ownership interest in the underlying assets of a Series and may only have rights to specific returns or allocations of revenues, profits or such other structures set up in the sole discretion of the Manager.
>
> While the Manager is accountable to the Fund generally, the Operating Agreement grants the Manager broad discretion as to many matters and limits the Manager's fiduciary duties. By entering into the Operating Agreement and signing the Subscription Agreement, each investor acknowledges and consents to the exercise of such discretion by the Manager, including where the Manager has a conflict of interest.
>
> The Manager will have broad discretion to establish additional Series, and the investment strategy and other terms applicable to such Series without notice to or the consent of Members of any other Series. The Operating Agreement provides that the Manager will have complete control of the business of the Fund and that the Members will have no power to take part in the management of the Fund and each Series.

(Ex. 2 at 9, 26, 43).

The SEC's suggestion that $880 million in funds were diverted is false. The money simply went to affiliated entities, which were in business lines sold for the benefit of investors and more importantly as disclosed and agreed to by investors. Broadstreet's investors have confirmed the same in multiple places including:

> I am aware that my investment in Broadstreet provides ownership in the applicable Broadstreet subseries. Individual land is titled in special purpose vehicles owned, managed and/or controlled by Broadstreet. Also, I only have ownership in the subseries for which I have invested and no others.

(Ex. 3 at ¶ 9). BSGM simply deployed fund capital pursuant to its authority under the Operating Agreement and PPM. BSGF's investors were provided copies of these documents as part of the subscription documents when they initially invested in the BSGF. The investors have acknowledged same. (*Id.* at ¶ 3). Thus, BSGM's control and discretion over fund assets and their deployment was disclosed and agreed upon with investors.

**IV. The SEC's claims of misrepresentations as to the QSBS Subseries fail.**

The SEC claims that BSGF's qualified small business stock ("QSBS") subseries never was implemented and that BSGM made misrepresentations regarding the status of the subseries. (ECF 8 at ¶ 248). This too is false.

To start, it is simply incorrect that BSGM had not taken any steps to implement this subseries. Broadstreet's QSBS entity, Broad Street Global Development Corp., was founded on June 17, 2021, was incorporated in Delaware, and was registered with state and federal tax authorities. (Ex. 1 at ¶ 18). In October 2024, the QSBS entity was rebranded under the name TCVI Group, Inc., and a major national law firm had been in the process of completing a draft Form S-1 registration statement for the rebranded QSBS entity. (*Id.*). There has been some uncertainty in the last several years as politicians suggested potential changes to the tax code related to QSBS. (ECF 54-2 at ¶ 37). These political winds coupled with the SEC investigation impacted the progress related to the QSBS subseries. (*Id.*). However, the SEC's assertion that BSGM has not moved the ball forward is inaccurate.

Moreover, under the IRS statutes and rules, QSBS stock has a 5-year holding period before tax benefits can be secured. (*See* Internal Revenue Code, Section 1202). There is no IRS special criteria checklist as to how the money should be handled during the 5-year wait period before QSBS becomes ripe for favorable tax treatment. At bottom, QSBS was pursued. The Series,

however, was discontinued in the first quarter of 2025 and QSBS investors were given the option to be redeemed or have their investment rolled over into another business line. (Ex. 1 at ¶ 19). Those who rolled over are being redeemed along with Broadstreet's other investors in accordance with the redemption. (*Id.* at ¶ 20).

Also, this subseries involved $6 million in investor funds which is an immaterial amount to the BSGF's overall subseries investments. The fact that the SEC included allegations regarding Broadstreet's QSBS subseries which involved only $6 million investor funds is telling – it signals the weakness in the SEC's overall case.

In sum, the SEC cannot dispute the registration statement, the national law firm drafting documents, that such a deal had a five year hold as per IRS statute or the redemption of the investors. Like the others, the SEC's claims of misrepresentation as to the QSBS fail.

**V. The SEC's claims of misrepresentations as to BSGF's recordkeeping and financial statements fail.**

The SEC complains that BSGM did not generate financial statements for the fund that were prepared and audited pursuant to GAAP. (ECF 8 at ¶ 252). What the SEC fails to advise this Court is that each and every investor signed a document acknowledging that they would ***not*** be receiving GAAP audited financials and Broadstreet is ***not*** required to have GAAP audits. (*See* Ex. 3 at ¶ 3; Ex. 1 at ¶ 21). In reality, a major contributing factor for not receiving such an audit was this: Broadstreet advised potential auditors that it was under SEC investigation. (Ex. 1 at ¶ 21). Nonetheless and of most importance, the investors signed that they accepted that they would not be receiving GAAP audits. (*See* Ex. 3 at ¶ 3; Ex. 1 at ¶ 21).

Moreover, BSGM only disclosed to investors that it would use "commercially reasonable efforts" to deliver financial statements to investors. (Ex. 1 at ¶ 21). These disclosures appeared in both the fund Operating Agreement and the PPM. (Ex. 4 at Section 9.03; Ex. 2 at 45; *see also* 54-

5 at 14-19; 54-1 at ¶ 46). Again, in the face of an SEC investigation it was not reasonable to expect BSGM to be able to obtain audited financial statements and so disclosures were made to investors that financials statements in such format were not being prepared.[11] The PPM also states that the "[f]inancial information contained in all reports to the Members will be prepared on an accrual basis of accounting . . . The Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion employing such firms and professionals at its discretion." (Ex. 2 at 45). Given these many disclosures, the SEC's allegations on this issue are unavailing.

As to the SEC's claims about Broadstreet falsely representing that separate records would be maintained for each Series, this too is false. BSGM kept and maintained separate records for each Series. (*See* Declaration of Lee Robinson executed on January 28, 2025 and filed under seal by the SEC on January 30, 2025 at ¶ 55). Indeed, Mr. Robinson relies on the BSGF Monthly Schedules to describe the various Series and notes they are too massive to attach. (*Id.*).

### VI. The SEC's claims of misrepresentations regarding BSGM's investment adviser status fail.

The SEC claims that Broadstreet acted as an investment adviser but represented otherwise to its investors. (ECF 8 at ¶ 250). Broadstreet's investors disagree:

> I make my own investment decisions, neither Broadstreet nor any of its affiliates act as an investment advisor.
>
> I have had the opportunity to seek my own legal and accounting advice when making decisions in relation to Broadstreet.

(Ex. 3 at ¶¶ 12, 13). The investors' statements are consistent with the PPM:

> The Manager is not currently registered as an investment adviser with the Securities and Exchange Commission ("SEC") or any state and does not expect to become

---

[11] In addition, Defendants provided a fulsome accounting to the SEC in accordance with the Monitor Order. (ECF 95 at ¶ 25).

> registered.
>
> The Fund may appoint one or more investment advisers or individuals or entities with respect to one or more Series to provide investment management and related services. In such cases, the Manager will retain ultimate authority but may delegate certain investment management decisions to the investment adviser.

(Ex. 2 at 1). The investors' statements are also consistent with the disclaimers provided to investors (attached as **Exhibit 5**):

> "…the Fund does not provide legal or investment advice to you as it is your responsibility to seek professional assistance with such decisions."

(*Id*. at 1).

## CONCLUSION

For the reasons set forth herein, Defendants request this Court grant summary judgment in their favor and against the SEC.

Dated: July 2, 2026

Respectfully submitted,

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**

By: ***Thomas Scot Wolinetz***
Thomas S. Wolinetz, Esq.
Florida Bar No. 1001160
Irwin Weltz (PHV)
1 Old Country Road, Suite 275
Carle Place, New York 11514
Telephone: (212) 202-3176
Facsimile: (516) 855-8776
twolinetz@weltz.law
irwin@weltz.law

**GALLIVAN WHITE & BOYD P.A.**

By: ***Ioannis (Ian) G. Conits***
Ioannis (Ian) G. Conits (PHV)
55 Beattie Pl., Suite 1200
Greenville, South Carolina 29601
Telephone: 864-271-5432
iconits@gwblawfirm.com

**LETT LAW FIRM**

By: ***Ariel Lett***
Ariel Lett, Esq.
Florida Bar No. 115513
6303 Blue Lagoon Dr., Suite 400
Miami, FL 33126
Telephone: 305-912-5388
alett@lettlawfirm.com

*Attorneys for Broadstreet Inc. and David Feingold*

**BERKELEY LAW P.A.**

By: ***Lorne E. Berkeley***
Lorne E. Berkeley, Esq.
Florida Bar No. 146099
10600 Griffin Road, Suite 104
Cooper City, Florida 33328
Telephone: (954) 719-3484
Lorne@BerkeleyLawFL.com

*Attorneys for Broadstreet Global Management LLC, Joseph B. Baldassarra, and Steven B. Baldassarra*

**LOMAX LEGAL PLLC**

By: ***Brianna P. Hathaway***
Brianna P. Hathaway, Esq.
Florida Bar No. 1019219
396 Alhambra Circle, Suite 202
Coral Gables, FL 33134
Telephone: 305.582.6506
Brianna@LomaxLegal.com

*Attorneys for Broadstreet Global Management LLC and for Relief Defendants, JosephBenjamin, Inc. and Just a Nice Day, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 2, 2026, I filed this document through the CM/ECF system, which will cause a copy of this document to be served by Notice of Electronic Filing on all counsel and parties of record.

***Brianna P. Hathaway***
Brianna P. Hathaway, Esq.