# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-20436-GAYLES/SHAW-WILDER

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT, LLC, and
BROAD STREET, INC.,

Defendants, and

JOSEPHBENJAMIN, INC., and
JUST A NICE DAY, INC.,

Relief Defendants.

**DECLARATION OF STEVEN BALDASSARRA**

I, Steven Baldassarra, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am over the age of eighteen and am a Defendant in the above-captioned action. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, I could and would testify competently to them. I make this Declaration in support of Defendants and Relief Defendants' Motion for Summary Judgment dated July 2, 2026 ("Motion").

2. I am an owner of Broad Street Global Management, LLC ("BSGM"). BSGM is the Manager of Broadstreet Global Fund LLC ("BSGF"). In my role with BSGM, I am familiar with the organization, operations, offering documents, investor base, recordkeeping, and business lines

of BSGF, BSGM, Broad Street, Inc. (“BSI”), and their affiliated and related entities (collectively, “Broadstreet”).

3. I previously submitted a declaration in this matter in opposition to the SEC’s application for a temporary restraining order, which the SEC thereafter abandoned. (ECF 54-2.).

**The Fund and Its Manager**

4. BSGF is the only Broadstreet entity to which investors subscribe and the only entity that accepts investor money. BSGF is managed by BSGM.

5. Broadstreet built a multi-billion-dollar real estate and investment business with substantial assets and investments, supported by extensive books and records.

**Broadstreet’s Investors**

6. By design, Broadstreet focused on ultra-high-net-worth, sophisticated, accredited investors. The Private Placement Memorandum (“PPM”) requires that each investor have sufficient knowledge and experience in financial and business matters to evaluate the merits and risks of an investment, and requires that each investor be an accredited investor within the meaning of Rule 501 of Regulation D. A true and correct copy of the PPM is attached to the Motion as Exhibit 2.

7. Based on my knowledge of Broadstreet’s investor base, roughly 75% of Broadstreet investors have estimated net worths between $10 million and $100 million, and roughly 10% have estimated net worths between $100 million and $1 billion.

8. Broadstreet’s investors are extremely sophisticated and well educated. Nearly every investor is college educated, and most hold an advanced educational degree beyond a college degree. Nearly all of Broadstreet’s investors are professionals, including lawyers, physicians who serve as executive officers of major healthcare practices, chief executive officers of major private

and public companies, hedge fund managers, chief investment officers, operators of high-net-worth family offices, owners of hotel chains, real estate developers, accountants, and partners in large accounting and consulting firms.

**The Critical Documents**

9. Every Broadstreet investor was required to review, accept, sign, and continuously review a set of documents that I refer to as the "Critical Documents," consisting of the PPM, the BSGF Operating Agreement, the Subscription Agreement, series supplements, slide decks, data room documents, and Broadstreet's monthly and quarterly updates and disclosures. A true and correct copy of the BSGF Operating Agreement is attached to the Motion as Exhibit 4.

10. The disclosures contained in the Critical Documents are broad and detailed, and were prepared for the sophisticated, accredited investors that each BSGF investor represented and warranted itself to be.

11. Broadstreet presented each investor with the opportunity to review the Critical Documents at least thirty-seven times per year: at least once per month when investors logged in to view their account statements; at least once per month when investor reports were released; at least once per month when investors were advised to check the company data room; and on an annual basis when tax forms were transmitted to investors.

**The Compliance Acknowledgement Update**

12. In July 2023, BSGM disseminated to investors a Compliance Acknowledgement Update (the "CAU"). True and correct examples of the CAU are attached to the Motion as Exhibit 3.

13. Broadstreet's investors signed the CAU. By executing the CAU, each investor confirmed, among other things, that each investor:

a. reviewed the offering materials;

b. still meets the definition of an accredited investor;

c. read the PPM, series supplements, data room documents, and monthly updates and disclosures, and consents to the matters contained in them;

d. is responsible for reviewing the data room and updates on a regular basis;

e. consents to fees of up to 6% per year for five years;

f. acknowledges that real estate development projects often take years to generate cash flow;

g. acknowledges that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital awaits deployment;

h. acknowledges that individual land is titled in special purpose vehicles owned, managed, or controlled by Broadstreet;

i. acknowledges that BSGM and BSGF are not investment advisers; and

j. acknowledges that the investor makes the investor's own investment decisions.

The CAU is a one-page document and an executed example of it in its entirety is on the following page):

## Compliance Acknowledgement Update – July 2023

I, the undersigned do hereby swear and affirm to the following to be used and relied upon by Broadstreet Global Fund, LLC and any of its affiliated entities including but not limited to Broadstreet, Inc. and Broadstreet Global Management (collectively "Broadstreet"):

1) I still meet the definition of an accredited investor as presented in my original subscription documents.
2) My mailing address and contact information has not changed and is accurate and up to date as reflected in my original subscription documents, and in the event it has changed I will promptly notify Broadstreet.
3) I have read the private placement memorandum, series supplements, data room documents, monthly updates and disclosures of Broadstreet, and still consent to all matters contained in those documents.
4) I acknowledge that I am responsible for reviewing the data room on a regular basis and also all updates posted as they may affect deal terms. Updates may not be provided to me by email and thereby I must enter the data room to make sure I have reviewed all information. That is my responsibility. These investments involve risk.
5) I am aware that if I do not log into the data room on a regular basis that I do so at my own risk as many significant and material terms and conditions are contained therein that may affect my investment. Broadstreet does not email me every material document and I should review the data room as a result.
6) I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks.
7) I understand that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects.
8) I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves.
9) I am aware that my investment in Broadstreet provides ownership in the applicable Broadstreet subseries. Individual land is titled in special purpose vehicles owned, managed and/or controlled by Broadstreet. Also, I only have ownership in the subseries for which I have invested and no others.
10) I acknowledge that I have no complaints involving the operation of Broadstreet or any matters involving Broadstreet and the company makes itself readily available to answer my questions.
11) I have always been given the opportunity to ask questions regarding Broadstreet products and operational information. I am a sophisticated investor and it is my obligation to ask questions if I feel I need more information.
12) I make my own investment decisions, neither Broadstreet nor any of its affiliates act as an investment advisor.
13) I have had the opportunity to seek my own legal and accounting advice when making decisions in relation to Broadstreet.
14) I recognize that at anytime I have questions or concerns, I can contact the Compliance Department at compliance@bsgfund.com
15) I understand if there are any material changes in my investment objectives or investment qualifications, I must notify Broadstreet immediately.

**By my signature, I certify that all information above is accurate.**

Signed: ______________________ Verified by signNow

Dated: 07/31/2023

(*See* Ex. 3 to Motion).

**The MCA Account Statements**

14. The Merchant Cash Advance ("MCA") figures that the SEC characterizes as "purported returns" were Broadstreet's recitation to investors of its contract rates with Samson, the company that possessed the MCA expertise. Broadstreet retained Samson to generate the financial performance metrics regarding the MCA business; those figures were not generated by Broadstreet, and Samson's work was audited and reviewed by third parties.

15. The PPM provides that investments would be held at cost and that there was no guarantee that holding investments at cost would represent their fair market value. The MCA portfolio was reflected on investor account statements at cost, consistent with the Critical Documents. Investors accepted this specific format of account statement in writing.

**Deployment of Investor Funds**

16. Investor funds were not diverted. They were deployed on behalf of BSGF by its manager, BSGM, into Broadstreet-affiliated business lines. The only funds not deployed into business lines were the fees, which were disclosed and acknowledged in writing by the investors.

17. There was no requirement that investor money be held in a single operating account. Under the Operating Agreement and the PPM, BSGM has broad discretion and control over the management of the Fund and the deployment of Fund assets, and each investor acknowledged and consented to that discretion. BSGF's investors were provided copies of the PPM and Operating Agreement as part of their subscription documents when they initially invested.

**The QSBS Subseries**

18. Broadstreet took concrete steps to implement its Qualified Small Business Stock ("QSBS") subseries. Broadstreet's QSBS entity, Broad Street Global Development Corp., was

founded on June 17, 2021, was incorporated in Delaware, and was registered with state and federal tax authorities. In October 2024, the QSBS entity was rebranded as TCVI Group, Inc., and a national law firm was in the process of completing a draft Form S-1 registration statement for the rebranded entity.

19. The QSBS subseries was discontinued in the first quarter of 2025, and QSBS investors were given the option to be redeemed or to roll their investment over into another business line. Those who rolled over are being redeemed along with Broadstreet's other investors.

20. The QSBS subseries involved approximately $6 million in investor funds, which is an immaterial amount relative to BSGF's overall subseries investments. And, as stated, the business line was closed and the investors are being redeemed along with the other Broadstreet investors.

**Recordkeeping and Financial Statements**

21. Each Broadstreet investor signed a CAU acknowledging that the investor would not receive GAAP-audited financial statements. BSGM disclosed in both the Operating Agreement and the PPM that it would use commercially reasonable efforts to deliver financial statements to investors. A significant contributing factor to the absence of an audit was that Broadstreet and/or the SEC advised potential auditors that it was under SEC investigation.

22. BSGM kept and maintained separate records for each Series, including monthly spreadsheets that historically tracked client holdings for each Series, monthly investments into each Series, and dividends paid and reinvested for each Series. These records were produced to the SEC.

**Performance and Redemption**

23. During the course of this litigation, Broadstreet sold two of its business divisions for stock in publicly traded companies listed on the NASDAQ and NYSE for a combined value of approximately $3.6 billion. Against approximately $1.2 billion raised, that transaction value represents approximately a three-times (3x) return. (*See, e.g.*, ECF 264-1 at 4).

24. There has been no destruction of evidence, no sudden transfer of funds, and no movement of funds outside the jurisdiction.

25. I have reviewed Defendants' Motion for Summary Judgment and the documents referenced therein. I can attest that the documents referenced are true and correct copies.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 2, 2026 in Greenville County, South Carolina.

Steven Baldassarra