# EXHIBIT 2

Memorandum No.___________
Recipient's Name___________

# BROAD STREET GLOBAL FUND LLC

A Delaware Series Limited Liability Company

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
## UPDATE AND SUPPLEMENT

SEPTEMBER 2023

THESE MEMBERSHIP INTERESTS (THE "INTERESTS") HAVE NOT BEEN REGISTERED OR QUALIFIED FOR SALE UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, AND ARE BEING OFFERED PURSUANT TO EXEMPTIONS THEREFROM. THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") HAS NOT BEEN FILED WITH OR REVIEWED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION AND NEITHER THAT COMMISSION NOR ANY STATE SECURITIES ADMINISTRATOR HAS PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE FUND OR THE ACCURACY OR THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**BROAD STREET GLOBAL MANAGEMENT LLC**
**Manager**
**211 N. Main Street**
**Greenville, SC 29601**

This Confidential Private Placement Memorandum (the "Memorandum") sets forth the terms and conditions of the private offering by Broad Street Global Management LLC (the "Manager"), as manager, of the membership interests ("Interests") in Broad Street Global Fund LLC (the "Fund"). The Fund is divided into separate series (each, a "Series") operated in a manner so as to avoid cross-liability between the Series, to the fullest extent permitted under Delaware law. Each Series is a separate pool of assets with its own investment strategy and objective. A supplement to the Memorandum (each, a "Supplement") in respect of each Series will be created and distributed to prospective investors in such Series. Each Supplement will set forth the investment objective, investment strategy and terms related to the applicable Series. To the extent there is any conflict between the terms of a Supplement in respect of a Series and the terms of this Memorandum, the Supplement shall control with respect to such Series. The term Supplement includes any materials which are contained in the data room of the Fund and hence each investor must read all materials contained in the aforementioned data room to understand all applicable terms and conditions and therefore each investor must regularly review the data room.

The Interests are being offered to prospective purchasers whom the Manager believes to have the qualifications necessary to permit the Interests to be offered and sold pursuant to an exemption from registration under Section 4(a)(2) of the U.S. Securities Act of 1933, as amended (the "Securities Act"), Regulation D promulgated thereunder, and applicable state securities laws. The Manager may require any prospective purchaser to produce information evidencing its status as an "accredited investor" as defined in Regulation D under the Securities Act. Each investor will be required to warrant and represent to the Fund that such investor is acquiring the Interest for its own account, for investment purposes only, and not with a view to the distribution thereof. Investors will not be able to resell Interests unless such Interests are registered under the Securities Act and/or qualified under applicable state statutes, or unless exemptions therefrom are available. The Manager is under no obligation to obtain any such registration or qualification, nor is it contemplated that such will ever be effected. There is no public or other market for the Interests, and no such market is expected to develop. In addition, the Fund's Operating Agreement (as amended, restated and/or supplemented from time to time, the "Operating Agreement") provides that an investor may not assign or encumber its Interest or substitute another person as a member of the Fund, without the prior consent of the Manager, which consent may be withheld for any reason. Further, withdrawals of investments in the Fund are subject to certain restrictions and certain Series may not permit any withdrawals. As a result, an investor must be willing and able to bear the economic risk of an investment in the Fund for an indefinite period.

The Fund is not registered as an investment company under the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"). It is anticipated that the Fund will conduct its activities so as not to be deemed an investment company subject to registration under the Investment Company Act.

This Memorandum does not constitute an offer to sell or the solicitation of an offer to buy Interests in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction. In addition, this Memorandum constitutes an offer only if an identification number appears in the appropriate space on the cover of this Memorandum. This Memorandum is not, and under no circumstances is it to be construed as, a prospectus or advertisement, and the offering contemplated in this Memorandum is not, and under no circumstances is it to be construed as, a public offering of the Interests.

The Interests are a speculative investment and this offering involves substantial risks of loss as described herein. The Interests are suitable only for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to accept and assume the risks involved with the investment program of the Fund. (See "Certain Risk Factors").

Prospective investors are not to construe the contents of this Memorandum as legal, business or tax advice and are urged to consult their own attorneys and business, investment and tax advisors with respect to such matters. No assurance can be given that existing laws will not be changed or interpreted adversely. This Memorandum is intended solely to provide qualified offerees with an introduction to this offering and to the Fund and its proposed business. Information contained in this Memorandum is stated

as of the date on the cover page, except where noted otherwise, and shall not create the impression or imply that any information contained herein is correct as of any time subsequent to the date hereof.

Certain provisions of agreements are summarized in this Memorandum, but it should not be assumed that such summaries are complete and such summaries are qualified in their entirety by the contents of the definitive agreements. If any provision of the Operating Agreement at any time conflicts with any of the provisions of this Memorandum, the provisions of the Operating Agreement will prevail.

Prospective and existing investors are advised to review carefully the provisions of this Memorandum under the headings “Certain Risk Factors”, “United State Federal Income Tax Considerations” and “Certain ERISA Considerations” before making an investment in the Fund. Each prospective investor is invited to meet with the Manager to ask questions of and receive answers from the Manager concerning the terms and conditions of this offering of the Interests and to obtain any additional information, to the extent the Manager possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the information in this Memorandum.

This Memorandum is confidential and has been prepared for use solely in connection with the private placement of the Interests and it may not be photocopied or otherwise duplicated, in whole or in part, distributed to any person other than the original addressee hereof, or used for any other purpose without the prior written consent of the Manager. Each potential investor, by accepting delivery of this Memorandum, agrees to return the same and all related documents to the Manager in the event such investor does not purchase any Interests. Capitalized terms used above and not otherwise defined are defined elsewhere in this Memorandum.

No person has been authorized to give any information or to make any representations, other than those contained in this Memorandum, in connection with the offering of Interests and, if given or made, such information or representations must not be relied on as having been authorized by the Fund or the Manager.

All references in this Memorandum to “$” are to U.S. Dollars.

ALL INVESTORS ARE CAUTIONED TO ACCESS THE DATA ROOM MAINTAINED BY THE FUND IN ORDER TO UNDERSTAND ALL APPLICABLE TERMS AND CONDITIONS, WHICH ARE SUBJECT TO CHANGE AND UPDATE AND SUCH NEW AND/OR ADDITIONAL INFORMATION MAY ONLY BE MADE AVAILABLE IN THE DATA ROOM. IT IS THE INVESTOR’S RESPONSIBILITY TO REGULARLY REVIEW THE DATA ROOM TO BE MADE AWARE OF ANY NEW, ADDITIONAL OR DIFFERENT TERMS AND CONDITIONS WHICH MAY BE APPLICABLE.

## TABLE OF CONTENTS

Key Information .......... 1
Investment Objective and Strategy .......... 7
Management .......... 8
Offering of Interests .......... 9
Withdrawals and Transfers of Interests .......... 11
Management Fee and Expenses .......... 13
Valuation .......... 15
Certain Risk Factors .......... 15
Potential Conflicts of Interest .......... 26
United States Federal Income Tax Considerations .......... 29
Certain ERISA Considerations .......... 39
Summary of the Operating Agreement .......... 42
Additional Information .......... 45

## KEY INFORMATION

The following is a summary of certain information contained in this Memorandum and is qualified in its entirety by the Operating Agreement, the form of which will be provided to prospective investors upon request, and by the more detailed information contained in this Memorandum or in other documents referred to herein. Prospective investors should carefully read this Memorandum and the Operating Agreement in their entirety before making any investment decision regarding the Fund. Prospective investors should also consult their own advisers in order to understand fully the consequences of an investment in the Fund.

**The Fund**

Broad Street Global Fund LLC (the "Fund") is a series limited liability company formed under the Delaware Limited Liability Company Act, as amended. The Fund is divided into separate series ("Series") operated in a manner so as to avoid cross-liability between the Series, to the fullest extent permitted under Delaware law. Each Series is a separate pool of assets with its own investment objective and strategy.

Ownership in a Series does not confer to any investor ownership in the assets underlying a Series. The Supplement shall indicate the rights applicable to a Series. The Fund, the Manager or any affiliated individuals or entities of the same may be the ultimate owner of the underlying assets of a Series.

**Investment Objective and Strategies**

The investment objective in respect of a Series will be set forth in the applicable Supplement for such Series. The Manager may invest capital intended for a particular Series into investments so designated by the Manager while awaiting deployment of capital for a particular series in order to enhance the returns being generated.

The particular investment strategies expected to be employed in a Series will be set forth in the applicable Supplement for such Series.

**Manager**

Broad Street Global Management LLC, a South Carolina limited liability company (the "Manager"), has sole authority to manage the Fund's activities and to deploy the Fund's assets in any manner the Manager determines to be necessary, suitable, or proper to accomplish the Fund's purposes. The Manager is not currently registered as an investment adviser with the Securities and Exchange Commission ("SEC") or any state and does not expect to become registered. The Manager may appoint affiliates to act in its capacity at any time for any reason.

**Investment Adviser**

The Fund may appoint one or more investment advisers or individuals or entities with respect to one or more Series to provide investment management and related services. If so appointed, the Manager is generally expected to delegate authority over investment management decisions to the investment adviser. In such cases, the Manager will retain overall responsibility and supervisory authority over the Series and will monitor the services provided by each investment adviser.

If applicable, additional information about the investment adviser(s) for a particular Series, including any additional fees paid by such Series to such investment adviser(s) will be included in the applicable Supplement.

**Risk Factors**

An investment in the Fund is speculative and involves a high degree of risk. Certain of the Fund's investment practices increase the risks to which the Fund is otherwise subject. In addition, there are a number of conflicts of interest in the structure and operation of the Fund. Investors should carefully consider such risks prior to making an investment. See "Certain Risk Factors"

and "Potential Conflicts of Interest".

**Eligible Investors**

The Fund is offering membership interests in the Fund ("Interests") to a limited number of sophisticated individuals and entities that are "accredited investors" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act. Investors are required to meet such other qualifications as the Manager shall determine from time to time.

**Interests Offered**

The class or classes of Interests Offered for sale to investors by each Series will be set forth in the relevant Supplement for such Series.

The Manager may authorize additional Series or additional classes of Interests in a Series to be offered pursuant to this Memorandum or a separate offering document or documents. Each such Series or class within a Series may be associated with a separate investment portfolio and may have different offering terms and/or investment objectives and strategies than those of the Interests being offered pursuant to this Memorandum or any current Supplement. The members of the Fund ("Members") will have no interest in the assets pertaining to any other Series of Interest, unless they purchase such other Series. The Manager may close any Series or class of Interests, at any time or from time to time, in its sole discretion.

**Minimum Investment**

The applicable Series Supplement may set forth a minimum initial investment in a Series and any minimum additional investment. The Manager may, in its discretion, waive or reduce these requirements in particular cases or change them as to new investors in the future.

**Subscriptions**

Interests in a Series will be offered on such days as specified in the applicable Supplement in respect of such Series. To subscribe for an Interest in a Series, a prospective investor must (a) complete, date and sign the Fund's subscription agreement (the "Subscription Agreement"), (b) send it to the Fund by facsimile, e-mail, or courier delivery service, (c) make payment in accordance with the Subscription Agreement and (d) provide such other information or documentation as the Fund may require at its sole discretion to ensure compliance with anti-money laundering and other applicable laws, rules, regulations and policies. The Manager reserves the right to accept or reject any subscription in whole or in part in its sole discretion for any reason whatsoever and to withdraw or suspend the offering of Interests at any time. New Members generally will not share in items of income, gain, loss (whether or not realized) or deduction arising before the date of their admission.

**Withdrawals**

Subject to certain restrictions as set forth below and in the applicable Supplement, with respect to certain Series, Members may withdraw all or a portion of their capital account relating to a Series on such days and under such terms as are set forth in the applicable Supplement in respect of such Series. A request for withdrawal received following the required notice date will be treated as a request for withdrawal on the next following date of withdrawal, unless approved otherwise by the Manager in its sole discretion.

The Manager may elect to treat any partial withdrawal from a Series as a request for a complete withdrawal from such Series if the aggregate capital contributions of the Member, less the sum of all prior withdrawals and the current withdrawal request in respect of such Series, is less than the applicable minimum that may be set forth in a Supplement.

Payment on any withdrawal may be made in cash and/or securities, at the

discretion of the Manager, generally within sixty (60) days after the effective date of withdrawal. However, for complete withdrawals, the Manager may delay payment of up to 10% of its estimate of the withdrawn amount, without interest, until the Fund's audited financial statements for the year of the withdrawal are completed. Payments of withdrawals may be in cash or in securities, at the discretion of the Manager. In addition, as to some or all of a withdrawal, the Manager may establish a segregated portfolio of some of the Fund's securities and liquidate those securities for the withdrawing Member's account. In such a case, the Member would bear the risk of a decline in the value of the securities in the segregated portfolio between the effective time of withdrawal and the time of payment. The transaction costs involved in funding a withdrawal may be specially charged to the withdrawing Member.

The Manager may at any time suspend or restrict the right of any Member to withdraw capital or receive a distribution from the Fund or any Series if, in the Manager's judgment, such suspension or restriction would be in the best interests of the Fund or such Series. Situations in which such a suspension might occur are further described under "Withdrawals and Transfers of Interests – Suspension of Withdrawals". No withdrawal requests will be accepted during any period in which a suspension is in effect.

The foregoing withdrawal rights may be modified with respect to a Series as set forth in the applicable Supplement. Such modifications may include, among others, the introduction of a gate or lock-up period.

**Mandatory Withdrawals**

The Manager may in its sole discretion cause a partial or a complete withdrawal from a Member's capital account in respect of one or more Series, as applicable, in certain circumstances, such as where (i) the Member has breached any representation, declaration or warranty given to the Fund,
(ii) the Member's continued ownership of its Interest would result in a violation of law, (iii) the Member has transferred or attempted to transfer any portion of its Interest in violation of the Operating Agreement, (iv) the Member's continued ownership of its Interest may be harmful or injurious to the business or reputation of the Fund, any Series or the Manager, or may subject the Fund, any Series or any Member to risk of adverse tax or other fiscal consequences, or (v) it is otherwise in the best interests of the Fund or any Series, as determined in the sole discretion of the Manager, to cause such a withdrawal. A complete withdrawal from a Member's capital account mandated by the Manager will be treated as a termination of the Member's Interest in the applicable Series. Mandatory withdrawals will generally be treated in a similar manner as voluntary withdrawals; with respect to any Series that does not permit withdrawal rights in the ordinary course, such Member shall receive the fair value of its Capital Account in connection with a mandatory withdrawal.

**Transfers of Interest**

A sale, assignment, transfer, pledge, or other disposition or encumbrance by a Member of its Interests (other than a withdrawal) in whole or in part to any person is not permitted without the prior consent of the Manager. The Manager may grant or deny its consent to a proposed sale, assignment, transfer, pledge, or other disposition or encumbrance in its sole discretion and
may subject its consent to such conditions as it may require.

**Management Fee**

Each Series may pay the Manager a management fee (the "Management Fee") for managing the investment and reinvestment of such Series' assets, the terms and amount of which are set forth in the applicable Supplement in respect of such Series. The Manager may, in its sole discretion, waive, reduce or rebate the Management Fee as to particular Members. The Manager may also, in its sole discretion, vary the Management Fee applicable to a particular Series, Class or Member, as set forth in the applicable Supplement related to such Series. The Manager may pay its Management Fee to others or alter the terms, conditions and amount at any time in its absolute discretion.

**Performance Allocation**

A performance allocation may be allocated to the Manager in relation to a particular Series, the terms and amount of which are set forth in the applicable Supplement in respect of such Series.

**Allocations of Profit and Loss**

Generally, subject to any performance allocation, Net Profit and Net Loss in respect of each Series for each period (both realized and unrealized) are allocated to the Members of such Series in proportion to their relative capital account balances as of the start of the relevant period. Net Profit and Net Loss include not only Series income and expenses, but also all realized and unrealized portfolio gains and losses.

**Fund Expenses**

The Fund bears all of the costs of operating and administering its affairs, including, without limitation: brokerage commissions; custodial fees; fees and reimbursable expenses of any Fund administrator; expenses incurred by the Manager that are directly related to the Fund's investment activities, communication and printing expenses of the Manager and its affiliates in connection with Fund activities (including marketing materials); transfer and other taxes; the costs of insurance premiums; legal and bookkeeping costs; auditing; accounting and tax preparation fees and expenses; interest on margin and other borrowings, including on credit facilities obtained to provide funding for withdrawals; borrowing charges on securities sold short; filing fees; costs of Member reporting; costs of Fund governance activities (such as obtaining Member consents if and when necessary or appropriate); fees of any additional investment manager or investment adviser appointed for one or more Series; and all other costs and expenses related to the management and operation of the Fund and/or the purchase, sale or transmittal of Fund assets and distribution of Fund Interests (such as costs associated with services that may be used to access certain distribution platforms and the costs associated with such platforms), as well as costs and expenses in part or whole related to the use of data obtained by transparency system providers, all as the Manager determines in its sole discretion. In general, each Series will be responsible for a *pro rata* portion of the Fund's expenses as set forth above. Notwithstanding the foregoing, to the extent any Fund expenses do not relate to all Series, such expenses will be shared *pro rata* among the Series to which such expenses relate.

Each Series bears all of the fees and expenses relating to the formation and operation of such Series and the offering of Interests in such Series (and a *pro rata* portion of the organizational expenses of the Fund). General overhead and operating expenses that are not allocable to a particular Series will be allocated across all Series in a manner determined by the Manager to be equitable to all Members. In addition, each Series indirectly bears its *pro rata* share of all such costs incurred by the investments in which it invests. Such costs may include costs relating to structuring and operating such investments and/or costs and expenses that the Manager and its affiliates incur in providing administrative, support and/or oversight services to or in connection

with the investments (which services may vary over time).

**Distributions**

Distributions may be made at such time and in such amounts as the Manager may determine in its discretion and as set forth in any applicable Supplement. Any distributions (other than in connection with withdrawals) will be made in accordance with the Members' relative capital account balances. In the Manager's discretion, distributions may be made in assets held by the Fund.

**Reports / Data Room**

The Fund will use commercially reasonable efforts to provide each Member with annual financial statements, unaudited interim reports on a quarterly or more frequent basis, and copies of the Member's Schedule K-1 to each relevant Series' tax return. It is possible and should be expected that each Series will provide annual Schedules K-1 to Members after April 15. Members should, therefore, be prepared to file extensions with relevant U.S. federal, state and local tax authorities.

The Fund and the Manager may deliver and make reports, statements and other communications, including, without limitation, financial statements, the Form 1065, Schedules K-1 and other tax related information and documentation ("Account Communications"), available to the Members in electronic form, such as e-mail or by posting on a web site (including, without limitation, any electronic data room made available to the Member). Each Member consents to the electronic delivery of Account Communications. An email or other notice will be sent to each affected Member when a new Account Communication is posted on any website or electronic data room. Each Member is responsible for reading each Account Communication posted to such data room and each Member will be bound by the terms of all posted materials.

**Fiscal Year**

The Fund's fiscal year is the calendar year.

**Tax Considerations**

It is intended that each Series of the Fund will be treated as a separate partnership, and not an association taxable as a corporation, and will be operated in a manner such that it should not be treated as a "publicly traded partnership" that is taxable as a corporation or otherwise generally subject to entity level taxes, for U.S. federal income tax purposes.

The contents of this Memorandum do not constitute legal or tax advice. Potential and existing investors bear the responsibility to inform themselves of any income tax and other tax consequences relevant to their particular circumstances in connection with the subscription, holding, transfer or withdrawal of Interests or the receipt of distributions, if any, paid thereon. Prospective and existing investors should review carefully the matters discussed under "Certain Risk Factors" and "United States Federal Income Tax Considerations" and should consult with their own tax advisors about the consequences of investing in the Fund.

**ERISA Considerations**

The Interests may be acquired by plans subject to the fiduciary responsibility provisions of Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"). Unless otherwise set forth in the applicable Supplement in respect of a Series, each Series intends to limit investment by such plans to less than 25% of each class of Interests of each Series, based on assurances received from investors, with the intent that
neither the Fund's assets nor the assets of any Series will be considered to be "plan assets" for purposes of ERISA or Section 4975 of the Code. See

"Certain ERISA Considerations."

**Accountant** ASC Advisors, LLC. acts as the professional services firm which has prepared financial statements for the Fund.

**Legal Counsel** Sheppard Mullin Richter & Hampton LLP acted as counsel to the Fund in connection with the private placement memorandum created for use in 2020 which was supplemented by the law firm of Shearman & Sterling LLP in 2023.

## INVESTMENT OBJECTIVE AND STRATEGY

**Investment Objective**

The Fund has been established to pursue multiple investment objectives and investment strategies in different Series so investors can select the investment objectives and investment strategies to which the investor wishes to have exposure. The Manager intends to tailor the strategy of each Series to seek to achieve certain stated objectives. A Series may vary from other Series due to, among other things, investment strategy and objectives, risk and return profile, use of leverage, exposure to particular strategies and other factors. **There can be no assurance that the investment objective of any Series will be achieved.**

Each Series will have its own investment objective, which will be set forth in the applicable Supplement.

**Investment Strategy**

The following is a general discussion of the investment strategies that are expected to be employed by at least one Series. To the extent that the specific strategies of a particular Series vary from the below, such variations will be set forth in the applicable Supplement relating to such Series.

The following is a general description of the Fund's current 4 primary investment strategies. The applicable Series Supplement contains additional details that apply with respect to a Series.

Real Estate and Real Estate Development

Certain Series of the Fund seek to invest in specific real estate projects, including multi-family real estate deals and lot developments deals. Generally, such Series will invest alongside or with third-party real estate developers that are expected to control the underlying real estate project. Investors in a specific series are not expected to own the underlying real estate asset of said series but rather the rights to certain returns.

Private Investments in Non-Public Enterprises

Certain Series of the Fund seek to purchase, hold and/or sell restricted securities in private companies prior to their initiation of an initial public offering and/or private equity debt securities. The objective of such Series is to focus on innovative businesses by making minority stake investments in such companies for a holding period to be determined by the Manager. Investments are expected to range from $200,000 to $25 million in each company. Generally each Series or Class will invest in a single issuer.

Fixed-Income Investments

Certain Series of the Fund seek to provide positive returns by investing in a wide variety of income generating investments in publicly-traded securities that primarily reflect debt, equity or closed-end funds that have exposure to government agency and/or similar income generating investments as so identified by the Manager. One focus of investment is on United States agency guaranteed investments or similar entities, either via equity, debt or closed-end traded funds, that hold such investments or similar investments as decided in the discretion of the Manager.

Merchant Cash Advances

Certain Series of the Fund seek to provide positive returns by investing in a wide variety of portfolios in the merchant cash advance industry by purchasing portfolios of or joint venturing with or investing in companies that issue merchant cash advance funding to small and medium sized businesses located in the United States of America. This industry focuses on advancing money to small businesses and then

receiving a percentage of daily, weekly or monthly collections from those businesses which generally have difficulty qualifying for conventional bank financing.

The Manager has wide latitude in choosing investments for a Series. Although the Manager intends to pursue the strategies described above, the Operating Agreement does not expressly require it to do so and, more particularly, except as noted above, imposes no limits on the types of securities or other instruments in which a Series may invest, the types of positions it may take, the concentration of its investments (by country, sector, industry, company or asset class) or the amount of leverage it may employ, including short positions (*i.e.*, sales of securities that a Series does not own). Further, depending on conditions and trends in investment markets, the Manager may pursue other strategies or employ other techniques it considers appropriate and in a Series' best interests. A Series' assets may at times be fully invested in investments and at other times be held primarily in cash or cash equivalents or may be placed in other income generating investments, solely at the discretion of the Manager.

## MANAGEMENT

### MANAGER

### Broad Street Global Management LLC

The Fund is managed by its Manager, Broad Street Global Management LLC, a South Carolina limited liability company.

Broad Street and related entities were founded by Joseph and Steven Baldassarra in 2016. The Baldassarras bring more than 35 years of combined investment experience as fund managers, participants in investment advisory firms, stock brokerage firms and the securities industry.

***Mr. Joseph Baldassarra*** is a co-founder of Broad Street and has devoted the majority of his business time to the Manager and related entities since 2016. Mr. Baldassarra currently focuses on strategic growth and relationships for the Fund. Previously, he was a founding partner of CJS Financial Advisors and has been in the financial services industry for 19 years. Prior to co-founding CJS Financial Advisors, Mr. Baldassarra was a registered representative at Lasalle Street Securities serving high net-worth clients. In his free time, Mr. Baldassarra enjoys spending time with his wife and three children and his involvement in youth sports.

***Mr. Steven Baldassarra*** is a co-founder of Broad Street and has devoted the majority of his business time to the Manager and related entities since 2016. Mr. Baldassarra currently focuses on portfolio management and the strategic growth of the Fund. Previously, he was a founding partner of CJS Financial Advisors and has worked in the financial services industry for the past 17 years. Prior to co-founding CJS Financial Advisors, Mr. Baldassarra focused on servicing high net worth individuals, businesses, and institutional clients as an independent registered representative at LaSalle St. Securities. In his free time, Mr. Baldassarra enjoys spending time on the lake with his wife and four children.

### Capital Contributions

Capital contributions made by the Manager will generally be treated on the same basis as capital contributions made by Members, except that the Manager will not be charged Management Fees or Performance Fees. With respect to Series that permit withdrawals, the Manager may withdraw from its capital account on any date on which all Members of such Series are allowed to withdraw.

## OFFERING OF INTERESTS

**Interests Offered**

The class or classes of Interests offered for sale to investors by each Series will be set forth in the relevant Supplement. The Manager has the discretion to determine from time to time the dates, terms and conditions upon which Interests of a Series will be offered. Interests generally will be offered as of such dates as may be determined by the Manager in its sole discretion (each, an "Offering Date").

The applicable Supplement may set forth a minimum initial investment in a Series and any minimum additional investment. The Manager may, in its discretion, waive or reduce these requirements in particular cases or change them in the future.

The Manager may cause a Series to pay a portion of its Management Fees to third parties and such is left to the absolute discretion of the Manager.

The Fund is divided into separate Series operated in a manner so as to avoid cross-liability between the Series, to the fullest extent permitted under Delaware law. Each Series is a separate pool of assets with its own investment objective and strategy. The Manager may authorize additional Series to be offered pursuant to this Memorandum or a separate offering document or documents. Each such Series will be associated with a separate investment portfolio and may have different offering terms and/or investment objectives and strategies than as described in this Memorandum or any current Supplement. Members will have no interest in the assets pertaining to any other Series unless they purchase such other Series. The Manager may close any Series, at any time or from time to time, in its sole discretion. Separate and distinct records will be maintained for each Series and the assets associated with any such Series will be held and accounted for separately from the other assets of such Series or any other Series. Accordingly, the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series is intended to apply only against the assets of such Series and not against the assets of other Series of the Fund. A Series may represent a particular industry or vertical but the Investor may not have any ownership interest in the underlying assets of a Series and may only have rights to specific returns or allocations of revenues, profits or such other structures set up in the sole discretion of the Manager.

In addition, the Manager may authorize additional classes of Interests in a Series to be offered pursuant to this Memorandum or a separate offering document or documents. Each such class may have different offering terms than those of the Interests being offered by this Memorandum or any current Supplement. Members will be given notice of any such creation and offering of additional classes of Interest, but will have no interest in the assets pertaining to any other class of Interest unless they purchase such other class of Interest. The Manager may close any class of Interests, at any time or from time to time, in its sole discretion. In the event that an additional class of Interests of a Series is created, separate and distinct records will be maintained for each class of Interests and the assets associated with any such class will be held and accounted for separately from the other assets of such Series or any other class of Interests. Accordingly, the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular class of a Series is intended to apply only against the assets of such class and not against the assets of the Series generally. However, there can be no assurance that the use of separate classes of Interests will prevent creditors from proceeding against the assets of the entire Series or the Fund. In addition, cash assets pertaining to various classes of Interests (but not assets pertaining to multiple Series) may be commingled and not held separately.

**Eligible Investors**

Investors must be "accredited investors" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act. In addition, prospective investors must make certain representations in the

Subscription Agreement relating to securities and commodities law compliance. The Manager may waive certain of these standards in limited circumstances and may apply additional admission standards.

**Suitability**

A prospective investor's satisfaction of the eligibility standards noted above and the ability to make the other representations in the Subscription Agreement do not necessarily mean that Interests are a suitable investment for such prospective investor. Prospective investors should carefully evaluate whether an investment in a Series is suitable for their particular circumstances and investment needs. In doing so, they should consult with such legal, tax and financial advisors as they consider appropriate, and should avail themselves of the opportunity to ask questions of the Manager.

Each investor must have sufficient knowledge and experience in financial and business matters generally, and in securities investment in particular, to allow such investor to evaluate the merits and risks of investing in a Series. In addition, each investor should have sufficient funds, beyond those intended to be invested in the Fund, to meet personal needs and contingencies. Investors should expect that they will not have access to the funds invested in any Series for extended periods and should be capable of absorbing a loss or reduction in the value of their investments. (See "Certain Risk Factors".) Investors who are subject to income tax should be aware that, if a Series' investment activities are successful, an investment in such Series is likely to create taxable income or gains but that such Series may not make distributions of cash with which to pay the resulting tax liabilities.

*Potential adverse tax consequences arising out of a Series' use of borrowings or credit facilities to fund withdrawals make an investment in such Series unsuitable for certain types of tax-exempt entities, such as charitable remainder trusts.*

**Subscribing for Interests**

To subscribe for an Interest in a Series, an investor must (a) complete, date and sign the Fund's Subscription Agreement (together with any required attachments), (b) send it to the Fund by facsimile, e-mail, or courier delivery service, (c) make payment in accordance with the Subscription Agreement, and (d) provide such other information or documentation as the Fund may require at its sole discretion to ensure compliance with anti-money laundering and other applicable laws, rules, regulations, and policies. The Manager reserves the right to accept or reject any subscription in whole or in part in its sole discretion for any reason whatsoever and to withdraw or suspend the offering of Interests at any time. Tendered funds will either be held in a non-interest bearing account until the subscription has been accepted or rejected, or may be moved into the Fund's operating account for cash management. If a subscription has been accepted, funds will be credited to the capital account of the Member without interest. If a subscription has been rejected, funds will be returned to the applicant without interest. Except as described in a Supplement, new Members generally will not share in items of income, gain, loss (whether or not realized) or deduction arising before the date of their admission.

The Fund requires that the Subscription Agreement be received at least ten (10) days prior to the applicable Offering Date (and at least five (5) days prior for any additional subscription requests). If the Subscription Agreement is not timely received by the Fund, such Subscription Agreement may not be accepted for the intended Offering Date and, solely at the Manager's discretion, may be treated as an application to subscribe for Interests as of the next Offering Date. Facsimiles or e-mails sent to the Fund will only be effective when actually acknowledged by the Fund. Payment for accepted subscription requests must be received by the Fund in U.S. Dollars five (5) business days prior to the applicable Offering Date, and subscribers will generally become Members as of the day following the relevant Offering Date, provided that payment has been received in good order. No interest will be payable to the subscriber on such payment. All investment amounts will be exclusive of applicable sales charges, bank charges, and other applicable fees. The Manager may, in its sole discretion, waive any of the foregoing subscription and payment requirements with regard to any potential investor.

The Manager may, in its sole discretion, waive any subscription and payment requirements with regard to any potential investor (including the deadlines for receipt of a Subscription Agreement and proxy and/or subscription monies).

Each subscriber will also be required to acknowledge in the Subscription Agreement that each of the Fund and/or the Manager may disclose to one another, to any affiliate, to any other service provider to the Fund or any Series, and to any regulatory body in any applicable jurisdiction to which any of the Fund and/or the Manager is or may be subject, copies of the subscriber's Subscription Agreement and any information concerning the subscriber in their respective possession, whether provided by the subscriber to the Fund and/or the Manager or otherwise, including details of that investor's holdings in the Fund, historical and pending transactions in the Fund's Interests and the values thereof, and any such disclosure will not be treated as a breach of any restriction upon the disclosure of information imposed on any such person by law or otherwise.

## WITHDRAWALS AND TRANSFERS OF INTERESTS

**Withdrawals at the Option of Members**

Subject to certain restrictions as set forth below and in the applicable Supplement, Members may withdraw all or a portion of their capital account relating to a Series on such days and under such terms as are set forth in the applicable Supplement in respect of such Series. A request for withdrawal received following the required notice date will be treated as a request for withdrawal on the next following date of withdrawal, unless approved otherwise by the Manager in its sole discretion. The Manager may, in its sole discretion, waive or reduce any Series' notice period either generally for one or more investors or in particular circumstances. Any such withdrawal will be given effect after adjustments, including accrued Management Fee for the period ending on the date of withdrawal. A request for withdrawal received following the required notice date will normally be treated as a request for withdrawal on the next following date of withdrawal, unless approved otherwise by the Manager in its sole discretion. The Manager may however, in its sole discretion, accept a request for a withdrawal received on other dates. Requests for withdrawal may be withdrawn in all circumstances only with the consent of the Manager.

In the event that the Manager permits its affiliate to make a withdrawal from its capital account in respect of a Series on less than the notice period applicable to such Series with respect to a withdrawal date, the Manager will similarly waive the notice period for any Member of such Series that seeks to make a withdrawal with respect to the same withdrawal date although no general notice to Members may be made.

The foregoing withdrawal rights may be modified with respect to a Series as set forth in the applicable Supplement. Such modifications may include, among others, the introduction of a gate or lock-up period. Certain Series may not permit any withdrawals. In the event that the Manager determines it necessary, all withdrawals may be modified or paid back in kind if the Manager so determines it to be in the best interest of the Fund and such decision is left to the sole and absolute discretion of the Manager.

**Withdrawals/Manager Decisions**

The Manager may at any time suspend or restrict the right of any Member to withdraw capital or receive a distribution of the amount being withdrawn from the Fund or any Series if, in the Manager's judgment, such suspension or restriction would be in the best interests of the Fund or such Series. Situations in which such a suspension might occur include, but are not limited to: (i) when a withdrawal would cause the Fund, a Series or the Manager to violate securities or other laws; (ii) when disruptions in securities markets make pricing and/or liquidation of some or all Fund or Series assets difficult or would result in losses if the Fund or a Series attempted such liquidations; (iii) when the Manager determines, in consultation with tax advisors, that the withdrawal could result in the Fund or a Series being treated as a "publicly traded partnership" that is taxable as a corporation; or (iv) if other events make accurate determination of the Fund's or a Series' value difficult. The Manager will give prompt notice to Members who have made withdrawal requests and are affected by any such suspension, and may (but is not

required to) allow such Members to rescind their suspended withdrawal request to the extent of any portion of the withdrawal proceeds not yet remitted. Withdrawal requests affected by any such suspension will generally become effective on the last day of the calendar quarter in which the suspension is lifted, on the basis of the Member's capital account balance at that time. No withdrawal requests will be accepted during any period in which a suspension is in effect.

The Manager may in its sole discretion cause a partial or a complete withdrawal from a Member's capital account in respect of one or more Series, as applicable, in certain circumstances, such as where (i) the Member has breached any representation, declaration, or warranty given to the Fund by such Member, (ii) the Member's continued ownership of its Interest would result in a violation of law, (iii) the Member has transferred or attempted to transfer any portion of its Interest in violation of the Operating Agreement, (iv) the Member's continued ownership of its Interest may be harmful or injurious to the business or reputation of the Fund, any Series or the Manager, or may subject the Fund, any Series or any Member to risk of adverse tax or other fiscal consequences, or (v) it is otherwise in the best interests of the Fund or any Series, as determined in the sole discretion of the Manager, to cause such a withdrawal. A complete withdrawal from a Member's capital account mandated by the Manager will be treated as a termination of the Member's Interest in the applicable Series.

Mandatory withdrawals will generally be effective as of the date the Manager notifies the Member of the withdrawal. However, where the Member's continued ownership of its Interest could, in the Manager's sole discretion, jeopardize the Fund's ability to remain excluded from the definition of "investment company" under the Investment Company Act, or where the Member's continued ownership of its Interest could cause the Fund's or any Series' assets to be considered "plan assets" under ERISA or Section 4975 of the Code (see "Certain ERISA Considerations"), the effective date may be an earlier time. If a Member in the Fund dies or becomes bankrupt, insolvent, or incompetent, such Member may be deemed to have withdrawn effective at the end of the quarter in which the event occurred. Mandatory withdrawals will generally be treated in a similar manner as voluntary withdrawals; with respect to any Series that does not permit withdrawal rights in the ordinary course, such Member shall receive the fair value of its Capital Account in connection with a mandatory withdrawal. Notwithstanding anything else in any Supplement, side letter or any other form of document, In the event that the Manager determines it necessary, all withdrawals may be modified or paid back in kind if the Manager so determines it to be in the best interest of the Fund and such decision is left to the sole and absolute discretion of the Manager

**Payment**

Withdrawn amounts generally will be paid within sixty (60) days after the effective date of the withdrawal without any interest. However, for complete withdrawals, the Manager may delay payment of up to 10% of its estimate of the withdrawn amount, without interest, until the Fund's audited financial statements for the year of the withdrawal are completed. Payments of withdrawals may be in cash or in securities, at the discretion of the Manager. In addition, as to some or all of a withdrawal, the Manager may establish a segregated portfolio of some of the Fund's securities and liquidate those securities for the withdrawing Member's account. In such a case, the Member would bear the risk of a decline in the value of the securities in the segregated portfolio between the effective time of withdrawal and the time of payment. The transaction costs involved in funding a withdrawal may be specially charged to the withdrawing Member. Notwithstanding anything else in any Supplement, side letter or any other form of document, In the event that the Manager determines it necessary, all withdrawals may be modified or paid back in kind if the Manager so determines it to be in the best interest of the Fund and such decision is left to the sole and absolute discretion of the Manager.

**Transfer of Interests**

A sale, assignment, transfer, pledge, or other disposition or encumbrance by a Member of its Interests (other than a withdrawal) in whole or in part to any person is not permitted without the prior consent of the Manager. The Manager may grant or deny its consent to a proposed sale, assignment, transfer, pledge, or other disposition or encumbrance in its sole discretion and may subject its consent to such conditions as it may require. Any attempt to transfer or otherwise dispose or encumber Interests without the prior consent of the Manager will be null and void. Neither the Fund nor the Manager is under any obligation to, and the Fund does not intend to, register the Interests for resale.

A transferee will not be admitted as a substituted Member unless the Manager specifically consents to such admission in the Manager's absolute discretion. A transferee is required to furnish the same information as would be required in connection with a direct subscription, including verification of identity and source of funds in connection with anti-money laundering regulations, in order for a transfer application to be considered by the Manager. In any event, the Fund will not register a transfer of Interests unless the transferee, if not an existing Member, has completed subscription documents, including the Subscription Agreement, to the satisfaction of the Manager. None of the Fund, any Series, the Manager, or any Fund service provider will be liable to the transferor or transferee for any loss suffered by them as a result of the delay in or the non-approval of a transfer.

The Fund reserves the right to decline to honor any withdrawal request from a pending transferee during such time when such transferee's transfer request remains unsettled.

If a Member (after obtaining the appropriate consents) transfers its Interest, the transfer will be recognized for the purpose of making distributions (if any) and allocating Net Profit or Net Loss as of such date as determined by the Manager in its discretion. If the transfer occurs in the middle of a period, all Net Profit or Net Loss for the period in which the transfer occurs generally will be pro-rated between the transferor and the transferee based upon the number of days in the period that each was a holder of the Interest.

### Change in Manager

Upon written notice to Members, the Manager may appoint a new or additional manager of the Fund or any Series or directly or indirectly transfer, assign, sell, or otherwise convey its interest as manager of the Fund or any Series to any other party (whether or not such party is an Affiliate of the Manager). The Manager may withdraw as manager of the Fund upon written notice to the Members so long as there is at least one remaining manager of the Company and each Series. The Members acknowledge that no Member shall have the right to vote or consent to such change in manager.

## MANAGEMENT FEE AND EXPENSES

The following summarizes the amounts and type of fees, reimbursements, and share of Fund income, losses and distributions, and other benefits the Manager receives in connection with the operation of the Fund. However, the particular fees to a series are more particularly described in the Supplement.

### Management Fee

Each Series may pay the Manager a Management Fee for managing the investment and reinvestment of such Series' assets and for providing such Series with the facilities and personnel to manage and administer such Series' business, the terms and amount of which are set forth in the applicable Supplement. The Manager may, in its sole discretion, waive, reduce or rebate the Management Fee as to particular Members.

The Management Fee applicable to a particular Series may vary from the foregoing description, and any such differences will be set forth in the applicable Supplement for such Series.

### Performance Allocation

A performance allocation may be allocated to the Manager in respect of a Series. The terms and amount of any such performance allocation will be set forth in the applicable Supplement in respect of such Series. Where a Performance Allocation is charged to a Series, the Manager may, in its sole discretion, waive, reduce or rebate such Performance Allocation as to particular Members.

**Operating Expenses**

The Fund bears all the costs of operating and administering its affairs, including, without limitation: brokerage commissions; custodial fees; fees and reimbursable expenses of any Fund administrator and other Fund service providers; expenses incurred by the Manager that are directly related to the Fund's investment activities; communication and printing expenses of the Manager and its affiliates in connection with Fund activities (including marketing materials); transfer and other taxes; the costs of insurance premiums; legal and bookkeeping costs; auditing; accounting, and tax preparation fees and expenses; interest on margin and other borrowings, including on credit facilities obtained to provide funding for withdrawals; borrowing charges on securities sold short; filing fees; costs of Member reporting; costs of Fund governance activities (such as obtaining Member consents if and when necessary or appropriate); fees of any additional investment manager or investment adviser appointed for one or more Series; and all other costs and expenses related to the management and operation of the Fund and/or the purchase, sale or transmittal of Fund assets and distribution of Interests (such as costs associated with services that may be used to access certain distribution platforms and the costs associated with such platforms), as well as costs and expenses in part or whole related to transparency reporting and the use of data obtained by transparency system providers, all as the Manager determines in its sole discretion. In addition, each Series indirectly bears its *pro rata* share of all such costs incurred by the investments in which it invests. Such costs may include costs relating to structuring and operating such investments and/or costs and expenses that the Manager and its affiliates incur in providing administrative, support and/or oversight services to investments (which services may vary over time). The effect of such expenses will be reflected in the value of the interests held by a Series in such investments.

In general, each Series will be responsible for a *pro rata* portion of the Fund's expenses as set forth above. Notwithstanding the foregoing, to the extent any Fund expenses do not relate to all Series, such expenses will be shared *pro rata* among the Series to which such expenses relate.

Each Series bears all of the fees and expenses relating to the formation and operation of such Series and the offering of Interests in such Series (and a *pro rata* portion of the organizational expenses of the Fund). General overhead and operating expenses that are not allocable to a particular Series will be allocated across all Series in a manner determined by the Manager to be fair and equitable over time to all Members. The Manager may waive its fees or carry certain of the Fund's or any Series' expenses and may cease doing so at any time in its discretion.

The Manager provides the Fund with office space, utilities, office equipment, and certain administrative services. To the extent those facilities and services comprise part of the Manager's own operating, general administrative, and overhead costs, the Manager is not entitled to direct reimbursement from the Fund or any Series.

The Manager and its affiliates may from time to time incur expenses on behalf of the Fund or a Series, other client accounts of the Manager or its affiliates, and one or more subsequent entities established by the Manager. Although the Manager and its affiliates will attempt to allocate such expenses on a basis that they consider fair and equitable over time, there can be no assurance that such expenses will in all cases be allocated appropriately or equitably.

For accounting purposes, each Series' organizational costs will generally be amortized on a straight-line basis over 60 months from the date that the Series commences operations, except as otherwise determined by the Manager in its discretion. Each Series will bear its *pro rata* share of the organizational expenses of the Fund.

**Increase in Fees and Expenses**

The above-mentioned fees may be increased from time to time for the Fund, for any Series or for one or more classes of Interests at the discretion of the Manager, subject to compliance with any applicable laws and regulations. Levels of expenses other than fees are also subject to fluctuation. Any increases in fees under the various agreements will be described in the Fund's periodic reports to investors.

**Payment of Fees to Third Parties**

As a standard business practice, the Manager may cause a Series to pay a portion of its Management Fees to third parties (*e.g.*, brokers, dealers, investment advisers, banks, etc.) that introduce investors to the Series, based on the ownership positions in the Series by such investors. The amount of the fees paid to such third parties will be debited against the capital accounts of the introduced investors and paid by the Series to such third parties. Under these circumstances, the Manager will waive or reduce a portion of the Management Fees that would otherwise be paid to them by an introduced investor. Such arrangements may be based upon guaranteed minimum investment levels maintained in the Series, periods of holding an interest in the Series, or other factors or considerations determined at the discretion of the Manager.

## VALUATION

Except as may be described in a Supplement for a Series, generally all illiquid assets will be held by a Series at cost until realization.

Subject to the foregoing, the Manager will value the investments held by a Series in a manner that it believes represents their fair value. It is expected that such investments will be valued: (i) at their last published sale price, if they are listed on an established securities exchange or in the Nasdaq National Market; or (ii) if they are not so listed, at the highest reported closing bid, for securities held "long", and the lowest reported closing asked price, for "short" positions, in certain established quotation systems. However, if the Manager (in exceptional situations as described above) determines that market prices or quotations of investments held by a Series do not fairly represent the value of an investment in such Series' portfolio (for example, if a security is a restricted security of a class that is publicly traded, or if a Series owns a large block of a security), the Manager may assign a different value. The Manager may, but is not required to, cause a Series to obtain independent valuations of assets. Such valuations will be at such Series' expense. Where an asset for which no established market exists has been valued in any of these ways, a Series could, under some circumstances, suffer adverse effects if the Series were unable to obtain the value for that asset assigned by the Manager. Determinations of value will be conclusive and binding on all Members.

## CERTAIN RISK FACTORS

Prospective investors should consider carefully the information set out in this Memorandum and should in particular consider the following risk factors and conflicts of interest before making an investment in a Series. **The risks and uncertainties described below and elsewhere in this Memorandum are not the only risks facing a Series. Additional risks and uncertainties presently not known to the Fund or that the Fund currently deems immaterial or unlikely may also adversely affect the performance of the Fund or Series. Where relevant, additional risks not otherwise described herein which are applicable to a particular Series will be described in the Supplement relating to such Series.**

**GENERAL INVESTMENT RISKS**

An investment in a Series is speculative, involves a high degree of risk, and should only be made with the risk capital segment of an investor's portfolio. The value of Interests of the Fund may depreciate as well as appreciate, and investors may lose all or a substantial portion of their investment. Accordingly, an investment in a Series should only be made by persons who are willing and able to bear the risk of loss of the entire amount invested.

A Series' performance may also be affected by legal, regulatory, tax, accounting, investment guidelines or restrictions applicable to its investments.

**Reliance upon the Manager**. The success of a Series depends on the ability of the Manager, and particularly on certain key employees to manage the operations of such Series. Except under specified circumstances, in the event of the removal or withdrawal of the Manager, the Fund will be dissolved. A Series' investment performance could be materially adversely affected if any of such key employees were to die, become ill or disabled or otherwise cease to be involved in the active management of the business of such Series' portfolio.

**No Management Rights**. The Members have no right or power to participate in the management of a Series or the conduct of its business. Each Series has broad discretion to vary the nature and concentration of its investments without the consent of Members. Any decision to engage in a new activity could result in the exposure of a Series to additional risks, which may be substantial. Furthermore, the Management Fee and any performance fee or allocation was not negotiated at arm's length. While the Manager has consulted with counsel, accountants, and other experts regarding the structure and terms of the Fund and each Series, such persons do not, and will not, represent Members.

**Limited Liquidity of Interests**. An investment in a Series is an illiquid investment that involves a high degree of risk because the right to withdraw, if any, and transfer Interests is subject to restrictions. Only investors financially able to maintain their investment, and who can afford to lose all or a substantial part of that investment, should invest in a Series. Furthermore, the Manager does not anticipate that an active secondary market will develop in the Interests. Accordingly, investors may be able to realize their investment in the Interests only through the withdrawal of their Interests, if applicable, or through the liquidation of the Series after realization of the underlying investments. If the Manager suspends the withdrawal rights of the Interests of the Fund or any Series, an investment in the Interests of a Series may be difficult to realize and it may be difficult to obtain reliable information about the value of the relevant Interests or the extent of the risks to which those Interests are exposed. Members intending to withdraw Interests that become subject to a suspension of the right of withdrawal will continue to be Members, subject to the market and other risks described herein, and will continue to participate in the gains and losses attaching to their Interests until such Interests are actually withdrawn.

In addition, a Series may have limited rights pursuant to which it may withdraw, transfer or otherwise liquidate its investments. Pursuant to the terms of an investment in which a Series is invested, the ability of a Series to redeem any invested amount may be subject to certain restrictions and conditions.

**General Economic and Market Conditions**. Changes in economic conditions – including, for example, interest rates, availability of credit, inflation rates, industry conditions, changes in investment liquidity, competition, technological developments, political and diplomatic events and trends, tax laws and innumerable other factors – may adversely affect the value of a Series' investments. The current global economic environment may continue to contribute to market volatility and may have long term effects on the U.S. and international financial markets. Various sectors of the global financial markets have also been experiencing an extended period of adverse conditions. These conditions have resulted in reduced liquidity, greater volatility, general widening of credit spreads and a lack of price transparency. The short- and longer-term impact of these events is uncertain, but could have a material effect on general economic conditions, consumer and business confidence and market liquidity. A prolonged market downturn, could negatively impact a Series' investments. Investments made by a Series are expected to be sensitive to the performance of the overall economy. A negative impact on economic fundamentals and consumer and business confidence would likely increase market volatility which could have a material adverse effect on the performance of a Series and these or similar events may affect the ability to execute the investment strategies of such Series. The Manager cannot predict how long the financial markets will continue to be affected by these events and cannot predict the effects of these or similar events in the future on a Series, the global economy and investments.

**Concentration of Investments**. The Operating Agreement does not limit the amount of a Series' capital that may be committed to any single investment, industry, sector or investment style or technique. At times a Series may invest in a single investment or related investments. Losses incurred by any one investment could have a materially adverse effect on a Series' overall financial condition. Moreover,

under certain market conditions, strategies and investments may become more highly correlated with one another in ways that might not have been apparent or predictable.

**Risk of Realization of Investments and Limited Liquidity of Some Investments.** There is a significant risk that a Series will be unable to realize its investment objective by the sale or other disposition of an investment at attractive prices or that it will otherwise be unable to complete any exit strategy. Some investments may be relatively illiquid. A Series may also invest in investments for which no market exists and/or which are restricted as to their transferability under federal or state securities laws. A Series may own a relatively large percentage of an issuer's investments and/or may be deemed to be an "affiliate" or a "control" person with respect to certain investments. Therefore, significant legal or practical limitations may inhibit a Series' ability to liquidate certain of its investments promptly, which could adversely affect the Series' gain or loss on the investment. The sale of any such investments may be subject to delays and additional costs and may be possible only at substantial discounts.

**Risk of Cross Liability**. While Delaware law provides statutory protection against the risk that a Series may be liable for the liabilities and obligations of another Series, such protection has not been judicially tested in all contexts. Moreover, such protection can be lost if certain formalities are not observed, including not commingling assets and maintaining separate books and records for each Series.

**Conflicts of Interest**. The Manager and its affiliates, managers, directors, officers and employees (together, the "Associated Parties") may from time to time act for, own an interest in, or be otherwise involved with funds or accounts (other than the Fund) that may have a similar investment objective to that of a Series and may result in actual or potential conflicts of interest. Such conflicts may include, by way of example only: (i) the allocation of time by principals or employees of the Manager between Fund business and other activities, (ii) dealings between an Associated Party, as principal or agent, and the Fund, (iii) an investment by a Series in investments that could further benefit the Associated Parties or third-parties with whom they transact, (iv) an Associated Party directing a Series to invest in an investment which may result in a benefit to a different fund, (v) the Manager's allocation of investment opportunities between a Series and other clients, (vi) the Manager's payment of fees and expenses to financial intermediaries, if any, that introduce investors to a Series (which fees may be based on the amount invested and could cause the interests of the financial intermediary to conflict with those of the investor), and (vii) the Manager's input in determining the fair value of certain securities from time to time, where such determinations may affect the compensation paid to the Manager. Similar and additional conflicts may also apply with respect to the financial intermediaries, the custodian, and other parties with whom a Series or the Associated Parties transact from time to time.

To mitigate any such conflicts, each Associated Party will at all times give due regard to its obligations to the Fund and each Series and will seek to ensure that such conflicts are resolved fairly, with due observance of applicable law. Transactions between the Fund and any Associated Party will be effected on normal commercial terms negotiated on an arm's-length basis. The Manager and their related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among the Fund and/or other client accounts. Nevertheless, there can be no assurance that the foregoing conflicts of interest will not result in the payment of additional fees or expenses, that the treatment of the Fund and other client accounts will be equal in all respects, or that such conflicts of interest will not adversely impact an investor. (See "Potential Conflicts of Interest".)

**By acquiring Interests of the Fund, each investor will be deemed to have acknowledged the existence of actual and potential conflicts of interest set forth throughout this Memorandum and to have waived any potential claim with respect to the existence of such conflicts.**

**Failure and Default**. A Series may be subject to the creditworthiness of clearinghouses, counterparties and financial intermediaries, as well as the risks of clearinghouse failure, broker or dealer failure, or default, delay, or inability or refusal of counterparties to perform, any of which could result in a loss of all or a portion of the investments with or through the relevant clearinghouse, broker, dealer, or counterparty.

**Illiquid Assets**. Investments owned or acquired by a Series may by illiquid. The Series may not be able to promptly liquidate its investments if the need should arise. Such illiquidity can be caused by interrelationships between or among markets, governmental or regulatory authority rules, applicable laws, rules, regulations or policies, or the nature of the investments.

**Use of Leverage**. A Series may use leverage for or in connection with its investments. A Series may, in the discretion of the Manager, leverage its positions in investments by borrowing funds from banks or other financial institutions or entities. The cumulative effect of the use of leverage by a Series in an investment that moves adversely to the Series' positions would result in a loss to the Series that would be greater than if leverage were not employed by the Series. In addition, the costs of leverage will affect the operating results of a Series.

While each Series attempts to negotiate favorable terms for its financing arrangements, its ability to do so may be limited. A Series could be subject to changes in the value that a lender ascribes to investments that are designated by a Series to support its borrowings, the amount and type of assets required to support such borrowings, the interest rate and other fees charged to finance such borrowings, and the lender's willingness to continue to provide credit. If the investments that are pledged to lenders to secure a Series' borrowing decline in value or lenders from whom a Series has borrowed increase their collateral requirements (*i.e.*, reduce the percentage of a position that can be financed), the Series could be subject to lender demands, pursuant to which the Series would be required either to deposit additional funds with the lender or suffer mandatory liquidation of its pledged assets. In the event of a precipitous drop in the value of the Series' assets, the Series might incur losses as a result of mandatory liquidation or sale of its positions at depressed prices. A mandatory liquidation or sale of Fund assets may occur without consent of the Series, and the Manager may not be entitled to direct any such mandatory liquidation.

**SPECIFIC INVESTMENT STRATEGY RISKS**

**Real Estate Development and Related Investments**

**General Real Estate-Related Risks**. The Fund may make investments in residential and commercial real estate and so will be exposed to the risks of investing in real estate generally. The real estate industry is extensively regulated and subject to frequent regulatory change. The adoption of new government laws and regulations (including laws and regulations with respect to usage, improvements, disclosures, zoning and taxes) or changes in, or new interpretations of, existing laws can have a significant impact on methods of doing business, costs of doing business and amounts of reimbursement from governmental and other agencies. The real estate industry is and will continue to be subject to varying degrees of regulation and licensing by federal and state regulatory authorities in various states and localities. In addition, real estate investments are subject to a variety of inherent risks that may have an adverse impact on the values of, and returns (if any) from, such investments, including: changes in the general economic climate, local conditions (such as an oversupply of space or a reduction in demand for space), the quality and philosophy of management, competition based on rental rates, attractiveness and location of the properties, the financial condition of tenants, buyers and sellers of properties, the quality of maintenance, insurance and management services, changes in operating costs, interest rate levels, the availability of financing, potential liability under environmental and other laws (including costs of remediation and liabilities associated with environmental conditions), energy prices, the ongoing need for capital improvements, tenant default or distress, construction risks, as well as natural catastrophes (such as earthquakes, hurricanes, floods and other natural disasters), acts of war, terrorism, civil unrest, vandalism, uninsurable losses and other factors beyond the control of the Manager. The Fund will also be exposed to the risk of mismanagement of the real estate assets by third parties.

In addition, the Fund may be subject to the risks incident to the making of nonrecourse mortgage loans secured by real estate, including: (a) risks associated with the general economic climate; (b) local real estate conditions; (c) risks due to dependence on cash flow; (d) risks and operating problems arising out of the absence of certain construction materials; (e) changes in supply of, or demand for, competing properties in an area (as a result, for instance, of over-building or changes in the relative popularity of property types and locations); (f) the financial condition of tenants, buyers and sellers of properties; (g)

changes in availability of debt financing; (h) energy and supply shortages and fluctuations in energy prices; (i) laws, local governmental regulations and various administrative guidelines relating to real estate lending, management and/or ownership that are complex or unclear or otherwise difficult to comply with; changes in tax, real estate, environmental and zoning laws and regulations beyond the control of the Manager (and unanticipated expenditures in connection therewith); (j) various uninsured or uninsurable risks; (k) natural disasters; (l) risks related to tenants operating in regulated industries; and (m) the ability of the Fund or third-party borrowers to manage the real properties.

The Fund's success will in large part be dependent on the ability of third parties to successfully operate the underlying real estate assets such that they are able to repay the Investments. The Fund's investment strategy, which may involve the acquisition of distressed or underperforming Investments, will involve a high degree of legal and financial risk, and there can be no assurance that the Fund's rate of return objectives will be realized or that there will be any return of capital. There is no assurance that there will be a ready market for resale of Investments or other Fund assets (including properties obtained through foreclosure processes) because investments in real-estate-related assets generally are not liquid. The possibility of partial or total loss of capital exists and investors should not subscribe unless they can readily bear the consequences of such loss.

**Development, Redevelopment and Renovation Risk**. The Fund may originate or acquire investments in, or secured by, properties in need of substantial development, redevelopment or renovation or in new properties. In addition to the risks inherent in the ownership of any real property, risks associated with new project development, redevelopment and major renovation work include risks of the availability of construction financing and the risks of construction delays (including the risks of strikes, shortages of materials, adverse weather conditions, uninsurable losses and other factors beyond the control of the Manager), significant cost overruns that may increase project costs, risks that the properties will not achieve anticipated sales prices or occupancy levels or sustain anticipated rent levels and new project commencement risks, such as the failure to obtain entitlement, zoning, occupancy and other required governmental permits and authorizations and the incurrence of development costs in connection with projects that are not pursued to completion. Properties under development may receive little or no cash flow from the date of acquisition through the date of completion of development and may still experience operating deficits well after the date of completion. Newly developed or newly renovated properties do not have the operating history that would allow objective pricing decisions in determining whether to invest the Fund's assets in these properties. For all of these reasons, development, redevelopment and renovation projects entail risks that investments may not perform in accordance with expectations and can carry an increased risk of litigation (and its attendant risks) with contractors, subcontractors, suppliers, development and/or operating partners and others. In addition, these risks could result in substantial unanticipated expenses or delays, and under certain circumstances, could prevent the completion of development, redevelopment or renovation activities.

**Environmental Liabilities**. The Fund may be exposed to substantial risk of loss from environmental claims arising from the properties underlying Investments involving undisclosed or unknown environmental, health or occupational safety matters, or problems with inadequate reserves, insurance or insurance proceeds for such matters that have been previously identified. Under various national, federal, state and local laws, ordinances and regulations, an owner of real property may be liable for the costs of removal or remediation of certain hazardous or toxic substances on or in such property. Such laws may impose joint and several liability, which can result in a party being obligated to pay for greater than its share, or even all, of the liability involved. Such liability may also be imposed without regard to whether the owner knew of, or was responsible for, the presence of such hazardous or toxic substances. The cost of any required remediation and the owner's liability therefor as to any property are generally not limited under such laws and could exceed the value of the property and/or the aggregate assets of the owner. The presence of such substances, or the failure to properly remediate contamination from such substances, may adversely affect the owner's ability to sell the real estate or to borrow funds using such property as collateral, which could have an adverse effect on value of an Investment.

**Private Investments in Non-Public Enterprises**

**Locating Securities**. There can be no assurance that the Series will be successful in purchasing and/or selling securities at advantageous prices, if at all, or that any investment by the Series in securities, will prove to be profitable. Members should be aware that there is a risk that the Series may not be able to locate and/or purchase securities at prices that are advantageous or at any price and they may lose their entire investment in the Series. If the Series does not make any investment in portfolio securities, the Series will dissolve in accordance with the Operating Agreement. Moreover, even if the Series is able to purchase securities, there can be no assurances it will be able to directly and/or indirectly sell such securities at prices above that paid by the Series, if at all.

**Forward Contracts**. If the Series enters into any forward contract(s) or economic interest agreement(s) for the purchase of portfolio securities, it may expose the Series to unexpected risks and potential losses. The purchase of any portfolio securities may be accomplished by means of a contract with a prospective seller for the purchase of any such portfolio securities at a future date, subject to the satisfaction of certain conditions, otherwise known as a "Forward Contract" or an "Economic Interest Agreement". The closing on any Forward Contract or Economic Interest Agreement which the Series will enter into will typically require the satisfaction and removal of any transfer restrictions which any portfolio securities may be subject at the time of entering into the Forward Contract or Economic Interest Agreement. Any Forward Contract or Economic Interest Agreement the Series enters into will be individually negotiated and non-standardized. Until such time as any portfolio securities subject to a Forward Contract or Economic Interest Agreement are transferred, the Series is subject to default risk and, if an event of default occurs, the Series may have to incur additional costs to enforce the contract. These factors could subject us to increased costs and/or loss of an investment.

**Concentration of Investments**. A Series was formed for the purpose of purchasing portfolio securities of a particular underlying company without regard to excessive concentration, balance or other limitations normally associated with portfolio management practices. The Series may have all or a majority of its proceeds invested directly and/or indirectly in one or a limited number of issuers. Given the potential concentration of the Series' investments, the value of an investment in the Series may be subject to greater volatility and may be more susceptible to any single economic, political or regulatory occurrence than would be the case if the Series' investments were more diversified.

**No Disclosure Materials Regarding Issuers or Issuer Securities**. Investors may not be provided with any disclosure materials of any kind regarding any issuer or securities. Investors will be required to acknowledge and represent that such disclosure materials will not be provided, and that they are purchasing the interests in the Fund based on their own assessment and knowledge of the underlying company and its investment objective. Investors may not be provided information on any issuer or securities subsequent to closing and cannot, and should not expect to, rely on the Manager or the underlying company for any information about the issuer.

**No Control over the Issuers**. The Series will be an owner of restricted securities of the issuers, and will have no control over any issuers. Further, the value of the Series' investment in any issuer securities will be dependent upon the performance of the issuers. The Series has received no disclosure from the issuers and it has not received, nor does it have access to, any public or non-public, verifiable information that would allow it to justify the current or future valuations of any portfolio securities it purchases. The Series will not have any control over the management of any issuer and the success of any investments it makes in portfolio securities depends, in large part, on the ability and success of the management of any issuer, in addition to economic and market factors. The issuer's services or products that are not yet developed or ready to be marketed or that have no established market, may be operating at a loss or have significant fluctuations in operating results, may be engaged in a rapidly changing business, may require substantial additional capital to support their operations, to finance expansion or to maintain their competitive position, or otherwise may have a weak financial condition. There is a limited, negotiated market for portfolio securities. Accordingly, valuations may fluctuate considerably and the valuations of the portfolio securities that are negotiated by the Series may bear limited or no relationship to future valuations of such portfolio securities or the specific issuer in any market that may develop for the portfolio securities, whether private or public.

**No Assurance of an Initial Public Offering or other Liquidity Event in any Portfolio Securities**. Although investments in portfolio securities may offer the opportunity for gains, such investments involve a high degree of business and financial risk that can result in substantial losses. The Manager may disburse any portfolio securities in a particular Series to Members of such Series in the event of an initial public offering by the applicable issuer after the expiration of any applicable restriction period. However, no public market exists for any portfolio securities at the time of purchase by the Series and no assurance can be given that an initial public offering or other liquidity event will be consummated by the issuer in the future. Changes in the securities markets and general economic conditions, including economic downturns, fluctuations in interest rates, the availability of credit, inflation, and other factors may affect the value of investments of the Series. The market for public offerings is cyclical in nature and, accordingly, there can be no assurance that the securities markets will, at any point in time, be receptive to public offerings. Due to the illiquid nature of many of the investments the Fund expects to make, the Manager is unable to predict with confidence what, if any, exit strategy will ultimately be available for any given investment. Exit strategies that appear to be viable when an investment is initiated may be precluded by the time the investment is ready to be realized due to economic, legal, political or other factors. For example, there may not be an active market for initial public offerings of securities, so a Series may not be able to realize an exit through the public markets. If such an event does not occur, Members may lose their entire investment.

**Merchant Cash Advances**

**General Risk of Merchant Cash Advances**. Merchant cash advances are more likely to be used by small businesses that are unable to obtain more traditional financing, such as bank loans, from other sources. These businesses may have limited or poor credit history. There is also a greater chance (as compared to large businesses) that a small business will be unable to repay the advance if its business is no longer profitable or the number and amount of transactions rapidly declines. In addition small businesses often rely heavily on the skills and reputation of the founder of the business, and if such founder is no longer able to operate the business, then the business is more likely to shut down and be unable to repay the advance. Because there is less information available about small businesses, there is a greater chance of fraud in connection with an advance than in more traditional loan financing transactions. Merchant cash advances are generally repaid from a proportion of credit card sales so fluctuations in the amount of credit card transactions may result in an uneven repayment of the advance.

**Recharacterization of Merchant Cash Advances as Loans**. Certain jurisdictions classify merchant cash advances as loans. Additional jurisdictions may do so in the future. If characterized as loans, merchant cash advances may become subject to state usury laws imposing maximum interest rates and the Fund may become regulated as a loan provider. In addition, becoming subject to state usury laws could result in penalties for violation, including restitution of excess interest and unenforceability of debt. Any unfavorable action challenging contracts or agreements in which the Fund is a party may have an adverse impact on the returns to the Fund and may negatively impact the returns to Members.

**Fixed Income Investments Generally**

Debt securities are subject to various risks. Debt securities are subject to two primary (but not exclusive) types of risks: credit risk and interest rate risk. These risks can affect a security's price volatility to varying degrees, depending upon the nature of the instrument. In addition, the depth and liquidity of the market for an individual or class of debt security can also affect its price and, hence, the value of the Partnership.

**Credit Risk**. Credit risk refers to the likelihood that an issuer will default in the payment of principal and/or interest on a security. Financial strength and solvency of an issuer are the primary factors influencing credit risk. In addition, lack of or inadequacy of collateral or credit enhancements for a fixed income security may affect its credit risk. Credit risk of a security may change over time, and securities that are rated by ratings agencies are often reviewed and may be subject to downgrade.

The Fund may invest in securities rated below investment grade. Debt securities that are rated below investment grade are considered to be speculative and are also commonly known as "junk bonds." These securities are regarded as bonds predominately speculative with respect to the issuer's continuing ability to meet principal and interest payments. Because investment in lower quality securities involves greater investment risk, achievement of the Fund's investment objectives will be more dependent on the Manager's analysis than would be the case if the Fund were investing in higher quality debt securities. In addition, lower quality securities may be more susceptible to real or perceived adverse economic and individual corporate developments than would investment grade debt securities. Moreover, the secondary trading market for lower quality securities may be less liquid than the market for investment grade securities. This potential lack of liquidity may make it more difficult for the Manager to accurately value certain portfolio securities.

**Interest Rate Risk.** Interest rate risk refers to the change in value of debt instruments associated with changes in interest rates. Interest rate changes may affect the value of a debt security directly (especially in the case of fixed rate securities) and indirectly (especially in the case of adjustable rate securities). In general, rises in interest rates will negatively impact the value of fixed rate securities and falling interest rates will have a positive effect on value. The degree to which a security's price will change as a result of changes in interest rates is measured by its "duration." Generally, securities with longer maturities have a greater duration and thus are subject to greater price volatility from changes in interest rates. Adjustable rate instruments also react to interest rate changes in a similar manner although generally to a lesser degree (depending, however, on the characteristics of the reset terms, including the index chosen, frequency of reset and reset caps or floors, among other things).

**Prepayment Risk**. The terms of investments originated or acquired by the Fund may be subject to early redemption features, refinancing options, prepayment options or similar provisions which, in each case, could result in the issuer repaying the principal on an obligation held by the Fund earlier than expected, either with or without a prepayment premium. This prepayment right could result in the borrower repaying the principal on an investment earlier than expected. This may happen when there is a decline in interest rates, when the borrower's improved credit or operating or financial performance allows the refinancing of certain classes of debt with lower cost debt. Assuming an improvement in the credit market conditions, early repayments of the obligations held by the Fund could increase. The yield of the Fund's investment assets may be affected by the rate of prepayments differing from the Manager's expectations. In addition, there is no assurance that the Fund will be able to reinvest proceeds received from prepayments in investments that satisfy its investment objectives, and any delay in reinvesting such proceeds may materially affect the performance of the Fund. Furthermore, changes in prepayment rates could reduce the value of loans directly held by the Fund or underlying a security held by the Fund and volatility with respect to prepayment risks may result in reduced earnings or losses and reduce the availability of cash.

**COMPANY RISKS**

**Tax Liability Without Distributions and Delayed Tax Return Filing**. Members are liable to pay taxes on their allocable shares of Series taxable income. The Manager does not intend to make distributions to the Members corresponding to profits. Taxable income can be expected to differ from Net Profit, primarily because generally only *realized* gains and losses are considered for income tax purposes but Net Profit and Net Loss will include *unrealized* gains and losses. It is possible that sales of appreciated investments in a particular period could cause some Members to have taxable gain for that period at the same time that *unrealized* losses result in an overall Net Loss. It will generally be necessary for Members to pay such tax liabilities out of separate funds or withdrawals from a Series. There are certain limitations on a Member's right to withdraw funds from a Series. (See "Withdrawals and Transfers of Interests", "Summary of the Operating Agreement" and "United States Federal Income Tax Considerations".)

To the extent that a Series invests in partnerships and limited liability companies that are treated as partnerships for U.S. federal income tax purposes, such Series' tax return will depend in part on the tax information reported to it by such entities. Therefore, any delay by such entities in providing that information to the Fund will cause a corresponding delay in providing tax reporting information to the Members and may require the Members to file for an extension of the due date for filing their tax returns.

**Potential Mandatory Withdrawal**. The Manager may, in its sole discretion at any time, require a Member to withdraw all or a portion of such Member's capital account balance in respect of a Series. Such mandatory withdrawal could result in adverse tax and/or economic consequences to the Member. Interests may also be called by a Series for mandatory withdrawal if, inter alia, in the opinion of the Manager such withdrawal would be appropriate to prevent the assets of the Fund or any Series from being considered assets of a Plan (as defined below) or otherwise to prevent violations of ERISA or Section 4975 of the Code. (See "Withdrawals and Transfers of Interests – Mandatory Withdrawals" and "Certain ERISA Considerations".)

**Broad Indemnification of Manager**. The Operating Agreement contains provisions that may provide broader indemnification of the Manager and its officers, employees, members, and other affiliates against claims or lawsuits arising out of the Fund's activities than would apply in the absence of such provisions. The Fund is under no obligation to purchase any insurance relating to its indemnity obligations.

**Side Letters.** A Series may, without notice to the Members, enter into agreements with certain investors who, in the Manager's judgment, make significant contributions to the Fund's capital granting them, among other things, greater portfolio transparency, fee waivers or reductions, different voting rights or restrictions, additional rights to reports or other information and other more favorable investment terms than the terms associated with an investment by Members in the Series Interests offered pursuant to this Memorandum. The Series has the power to create different classes of interests for certain substantial investors and may create additional classes having different rights for the purposes of implementing such agreements. For example, such additional classes of interests may have different voting rights, management fees or incentive fees. In offering more favorable investment terms to certain Members, the Manager shall have no obligation to offer such additional rights, terms or conditions to all Members.

**REGULATORY RISKS**

**Absence of Regulation**. The Fund is not registered under any comprehensive regulatory scheme. There may be liquidity risks associated with these investments. The Manager is not currently registered as an investment adviser.

**Recent Regulatory Developments.** The regulatory environment in which the Fund and the Manager and operate can be subject to periods of wide-ranging reform on a global basis. New legislation as well as changes to existing legislation may alter, in a variety of ways, the manner in which the investment fund industry is regulated. Although it is difficult to predict which proposals will become law and when and how new legislation ultimately will be implemented by regulators (including in respect of the extraterritorial effect of reforms), it is possible that significant aspects of existing regulatory regimes governing investment funds will change. These include changes in the way investment funds generally are regulated, restrictions on the conduct of certain lines of business and changes in disclosure obligations. The scope and pace of such reforms may vary from jurisdiction to jurisdiction. Changes in law could, individually or in the aggregate, have substantial adverse effects on the ability of the Manager to successfully pursue the investment objectives of a Series. While it is impossible to predict the extent to which legal and regulatory reform will impact the operations of the Fund and the Manager over time, such reforms could lead to increased demands on the time and attention of the Manager and its personnel in discharging their related compliance obligations. Such increased demands, either alone or together with any additional consequences of the reforms, could potentially impair the ability of the Manager to successfully pursue the investment objective of a Series.

**Investment Company Act**. If the Fund were considered an "investment company" within the meaning of the Investment Company Act, it would be subject to numerous requirements and restrictions relating to its structure and operation. If the Fund were required to register as an investment company under the Investment Company Act and comply with these requirements and restrictions, it would have to make significant changes in its proposed structure and operations, which could adversely affect its business.

The Fund intends to operate in a manner that will permit it to be excluded from the definition of "investment company" under the Investment Company Act. The Manager may require the complete or

partial withdrawal by a Member should the Member's continued investment in the Fund jeopardize the Fund's exemption from registration and regulation under the Investment Company Act. Each prospective investor will be required to make certain representations and undertakings to assure that an exemption will be available to the Fund on an ongoing basis. Interpretations of Investment Company Act are complex and uncertain in several respects and, as a result, there can be no assurance that the Fund will remain entitled to rely on any exemption. If the Fund were found not to have been entitled to such reliance, the Fund and the Manager could be subject to legal actions by the SEC and/or other regulatory authorities, and the Fund could be forced to terminate its business under adverse circumstances.

**Private Offering Exemption**. The Fund intends to offer Interests on a continuing basis without registration under Section 4(a)(2) of the Securities Act in reliance on an exemption for "transactions by an issuer not involving any public offering", and without registration or qualification of the Interests under state securities laws in reliance on similar exemptions. While the Manager believes reliance on such exemptions is justified, there can be no assurances that factors such as the manner in which offers and sales are made, concurrent offerings by other funds of the Manager, the scope of disclosure provided, failures to file notices or renewals of claims for exemption, or changes in applicable laws, regulations, or interpretations will not cause the Fund to fail to qualify for such exemptions under federal or one or more state laws. Failure to so qualify could result in the rescission of sales of Interests at prices higher than the current value of those Interests which could materially and adversely affect the Fund's performance and business. Further, even non-meritorious claims that offers and sales of Interests were not made in compliance with applicable securities laws could materially and adversely affect the Manager's ability to conduct the Fund's business.

**Anti-Money Laundering**. If the Manager, any Fund service provider or any governmental agency believes that the Fund has accepted subscriptions for Interests by, or is otherwise holding assets of, any person or entity that is acting, directly or indirectly, in violation of any U.S., international or other anti-money laundering laws, rules, regulations, treaties, or other restrictions, or on behalf of any suspected terrorist or terrorist organization, the Fund or such governmental agency may freeze the assets of such person or entity invested in the Fund or suspend their withdrawal rights. The Fund may also be required to remit or transfer those assets to a governmental agency.

To ensure compliance with applicable statutory requirements relating to anti-money laundering and anti-terrorism initiatives, the Manager or other Fund service provider, on behalf of the Fund may require verification of identity from all prospective investors. Depending on the circumstances of each subscription, it is not normally necessary to obtain full documentary evidence of identity where: (a) the investor is a recognized financial institution; or (b) the investor makes the payment from an account held in the investor's name at a recognized financial institution.

The Manager and Fund service providers reserve the right to request such further information as they consider necessary to verify the identity of a prospective investor. In the event of delay or failure by the prospective investor to produce any information required for verification purposes, the Manager may refuse to accept a capital contribution until proper information has been provided, and any funds received will be returned without interest to the account from which the monies were originally debited.

**Investment Advisers Act of 1940**. The Manager is not currently registered with the SEC or any state as an investment adviser. If the Manager is required to register, such registration may limit or adversely affect certain aspects of the Fund's operations. For instance, SEC rules regarding certain trading practices, such as principal transactions, may limit the ability of a Series to transact with affiliates without engaging in certain approval processes which may cause the Series to forgo investment opportunities. In addition, a Series may have to bear additional costs arising from the Manager's regulatory compliance obligations.

**Securities Dealer Status**. Although the Manager believes the Fund is not a "dealer" within the meaning of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act") and accordingly, does not intend to register the Fund as such, it is possible that the SEC or a court could find otherwise. In such an event, the Fund could be fined, and could be prevented from continuing its business, either temporarily or

permanently. If the Fund were required to register as a "dealer", its operating expenses would increase significantly, its activities would be restricted, and its profitability would suffer.

**Other**. The Fund and the Manager will be subject to various other securities and similar laws and regulations that could limit some aspects of the Fund's operations or subject the Fund or the Manager to the risk of sanctions for non-compliance.

**TAX RISKS**

**Tax Considerations**. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the applicable taxing authority. Should any such positions be successfully challenged by the U.S. Internal Revenue Service or other applicable taxing authority, there could be a material adverse effect on the Fund.

In addition, an audit of a Series or an Underlying Fund may result in an audit of the returns of some or all of the Members, which examination could result in adjustments to the tax consequences initially reported by the Series or an Underlying Fund and affect items not related to a Member's investment in the Series. If such adjustments result in an increase in a Member's federal income tax liability for any year, such Member may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of a Series' tax return will be borne by the Series. The cost of any audit of a Member's tax return will be borne solely by the Member.

Furthermore, new partnership audit rules will apply to each Series. Absent certain elections by a Series, this new audit regime could cause any adjustments to Series tax items, and any resulting tax liability, to be determined and collected at the Series level and thus borne by its Members in the year in which the audit is completed, rather than the year to which the audit relates. Members (including former Members) may be required to indemnify a Series for any taxes (and related interest, penalties or other charges or expenses) payable by the Series and attributable to such Members' Interests.

Certain expenses of a Series may not result in deductions for Members or the deductibility of such items may be limited. In particular, amounts paid or incurred to market interests in a Series that qualify as "syndication expenses" are not deductible or amortizable. Payments of finders or servicing fees to third parties who introduce Members to a Series will be syndication expenses that are not deductible or amortizable, although they will be included in a Member's adjusted tax basis for its Interest, as discussed below in "United States Federal Income Tax Considerations".

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Because each Series will invest in Underlying Funds whose investment programs are not under the Series' control, certain safe harbors under the Code and the Treasury Regulations (the "Regulations") may not be available to the Series. In those circumstances, the treatment of the Series will depend upon whether the rights of Members to make withdrawals from the Series are considered the substantial equivalent of the Interests being readily tradable on a secondary market. If a Series were classified as a publicly traded partnership and a safe harbor with respect to the character of the Series' income were to not be satisfied, then the Series would be subject to U.S. federal income taxation as if it were a corporation, which would have material adverse consequences for investors in the Series.

Each Series may invest, directly or indirectly, in stocks of non-U.S. corporations most of whose income is dividends, interest or other passive income or most of whose assets produce passive income. Such a foreign corporation would be a passive foreign investment company (a "PFIC") if either (a) 75% or more of its gross income for the taxable year is passive income, or (b) at least 50% of its assets produce passive income. Investing in a PFIC has adverse consequences for an investor subject to U.S. federal income tax, as discussed in "United States Federal Income Tax Considerations".

U.S. tax-exempt organizations should be aware that a substantial portion of a Series's income may be treated as unrelated business taxable income ("UBTI"). U.S. tax-exempt Members generally will be required to report and pay tax on their share of such UBTI. Tax-exempt investors should consult with their own legal and financial advisors regarding the tax and other considerations involved in an investment in a Series.

Tax legislation has been proposed or introduced and, from time to time, additional tax legislation may be proposed or introduced that could, if enacted, cause material adverse changes to the tax consequences of an investment in the Fund. It is not possible to predict the extent to which any of these or other provisions will be enacted and, if enacted, what their final form and effective dates will be. Prospective and existing investors should consult their own tax advisors regarding the status of proposed tax-related legislative changes and the effect, if any, on their investment in the Fund.

The taxation of partnerships and partners is complex. Potential investors are strongly urged to review the discussion below under "United States Federal Income Tax Considerations".

**Foreign Taxation**. A Series' income from sources in other jurisdictions may be subject to withholding taxes on dividends, interest, and in some cases capital gains, and such withholding taxes will vary from jurisdiction to jurisdiction. See also "United States Federal Income Tax Considerations".

**The foregoing investment considerations do not purport to be a complete enumeration or explanation of all the risks and significant considerations involved in an investment in the Fund. Prospective and existing investors should read this entire Memorandum and consult with their own legal, financial, tax and other advisers regarding the desirability of purchasing Interests and the suitability of an investment in the Fund.**

## POTENTIAL CONFLICTS OF INTEREST

Conflicts may arise between the interests of the Manager and those of the Members. While the Manager is accountable to the Fund generally, the Operating Agreement grants the Manager broad discretion as to many matters and limits the Manager's fiduciary duties. By entering into the Operating Agreement and signing the Subscription Agreement, each investor acknowledges and consents to the exercise of such discretion by the Manager, including where the Manager has a conflict of interest.

### Fees

Fees charged by the Manager may be greater or lower than fees charged by other investment advisers for similar services. (See "Management Fee and Expenses".)

### Financial Intermediaries

Financial intermediaries that introduce investors to the Fund may receive a fee equal to a portion of the fees the Manager receives from the Fund. The amount of fees paid to a financial intermediary with respect to an investor's investment in the Fund may vary based on the size of that investment. The potential to receive compensation tied to the amount of assets invested and held by an investor in the Fund could cause the interests of the financial intermediary to conflict with those of the investor.

### Other Business Relationships

The Manager devotes as much of its time and resources to the activities of the Fund as it deems necessary and appropriate. The Operating Agreement does not restrict the Manager or its principals from entering into other investment advisory relationships or engaging in other business activities, even though those activities may be in competition with the Fund and/or may involve substantial amounts of their time and resources. The Manager may organize and act as manager, investment manager, or investment

advisor for other memberships or other investment vehicles, some of which have investment objectives similar to that of the Fund or any Series. These activities could be viewed as creating a conflict of interest in that the employees of the Manager are not devoted exclusively to the business of the Fund but are allocated between that business and the other activities. Other investment funds the Manager may manage could have compensation and profit sharing arrangements that differ from those provided in the Operating Agreement and which may create incentives that could affect the Manager's decisions as to how to allocate its resources and investment opportunities.

**Certain Affiliate Transactions**

The Manager and its affiliates may purchase an investment that would otherwise be appropriate for the Fund or a Series to own, such as during any period when the Fund does not have capital available to make such investment. For example, the Manager or its affiliate may purchase an investment for their own accounts prior to launching a new Series or completing an offering of Interests to make such investment. The Manager and its affiliates may then sell such an investment to the Fund at a value determined by an independent third party. The Members will be required to acknowledge and agree that the Manager and its affiliates may undertake such transactions in the future without the consent of any Member to the particular transaction.

**Transaction Execution and Investment Opportunities**

Conflicts of interest could also arise in connection with investment transactions for the accounts of a Series, other investment vehicles in which the Manager or its principals and employees are involved, other advisory clients of the Manager, and the Manager or its members. These transactions could differ in substance, timing and amount, due to, among other things, differences in investment objectives or other factors affecting the appropriateness or suitability of particular investment activities to a Series or other clients, or to limitations on the availability of particular investment or transactional opportunities. The Manager will allocate transactions and opportunities among its various accounts in a manner it believes to be fair and equitable over time, considering each account's objectives, programs, limitations and capital available for investment, but all accounts will not necessarily invest in the same investments. Further, neither the Manager nor any of its principals or employees will have any obligation to provide a Series or any other account with any particular investment opportunity or to refrain from taking advantage of an investment opportunity that could be beneficial to a Series.

**Asset Valuation**

The value of most marketable securities will typically be based on prices reported in the public markets, at times the size of a block of securities held by a Series or temporary restrictions on resale may justify imposing a discount on the market-determined value. Whether and how much to reduce the value of securities in any of these circumstances is subject to the Manager's discretion. The value of investments that are restricted, non-marketable or otherwise illiquid will be determined in the Manager's discretion. The Manager may face conflicts of interest in making any of these valuation decisions. In addition, any reduction in the value of any assets held by a Series could reduce the amount of Management Fee to which the Manager is entitled.

**Exculpation and Indemnification**

The Operating Agreement provides that, to the fullest extent permitted by law, the Fund or a Series (as applicable) will indemnify and hold harmless the Manager and its affiliates, members, partners, directors, shareholders, officers, employees and legal representatives (e.g., executors, guardians and trustees) of any of them, including persons formerly serving in such capacities (each, an "Indemnified Party") from and against any and all costs, losses, claims, damages, liabilities, expenses (including reasonable legal and other professional fees and disbursements), judgments, fines or settlements (collectively, "Indemnified Losses") suffered or sustained by such Indemnified Party by reason of any act, omission or alleged act or omission arising out of, related to or in connection with the Fund, such Series or the Operating Agreement, or any and all claims, demands, actions, suits or proceedings (civil, criminal,

administrative or investigative, which includes formal and informal inquiries and “sweep” examinations in connection with a Series’ investment activity), actual or threatened (each, a “Proceeding”) in which an Indemnified Party may be involved, as a party or otherwise, arising out of, related to or in connection with such Indemnified Party’s service to or on behalf of, or management of the affairs or assets of, the Fund or such Series, or which relate to the Fund or such Series, except for any Indemnified Losses that are judicially determined to be primarily attributable to the bad faith, gross negligence, willful misconduct or fraud of such Indemnified Party. The Fund or a Series (as applicable) will also indemnify and hold harmless each Indemnified Party from and against any and all Indemnified Losses suffered or sustained by such Indemnified Party by reason of any acts, omissions or alleged acts or omissions of any broker or agent of the Fund or such Series; provided that such broker or agent was selected, engaged or retained by such Indemnified Party directly or on behalf of the Fund or such Series in accordance with the standard of care set forth above. The termination of a Proceeding by settlement or upon a plea of *nolo contendere*, or its equivalent, shall not, of itself, create a presumption that such Indemnified Party’s acts, omissions or alleged acts or omissions were primarily attributable to the bad faith, gross negligence, willful misconduct or fraud of such Indemnified Party. Expenses (including legal and other professional fees and disbursements) incurred in any Proceeding may, with the consent of the Manager, be paid by the Fund or a Series (as applicable) in advance of the final disposition of such Proceeding upon receipt of an undertaking by or on behalf of such Indemnified Party to repay such amount if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified by the Fund or such Series as authorized hereunder.

Each Indemnified Loss will be the liability solely of the Series to which such Indemnified Loss is attributable, and will not be the liability of any other Series. Liability for Indemnified Losses that are attributable to the Fund generally, and not specifically attributable to one or more Series, will be apportioned among the Series in a manner that the Manager, in its sole discretion, determines is fair and equitable.

Some securities laws can, in some circumstances, impose liability even when a person acts in good faith, and the exculpation and indemnification provisions of the Operating Agreement may not be effective to limit the Manager’s (or its affiliates’) liability to the extent liability would otherwise be imposed under certain provisions of the securities laws.

**Carried Interest**

Tax reform legislation informally known as the Tax Cuts and Jobs Act (the “Tax Act”) was enacted in the United States on December 22, 2017. Under changes enacted as part of the Tax Act, in order for the Manager or its affiliates to be taxed at the more favorable long-term capital gains rates on any carried interest or similar performance allocation, the Fund will generally have to hold the relevant investment for more than three years prior to disposing of it. The long-term capital gain holding period for allocations to other Members of capital gains continues to be one year. This increase in the required holding period for carried interest may create an incentive for the Manager to make different decisions regarding the timing and manner of disposing of an investment from those that would have been made if the carried interest did not require a longer three-year holding period to qualify for long term capital gain treatment.

**No Separate Representation**

Law firms employed by the Fund generally only act as counsel to the Fund in connection with this offering of Interests. Said legal counsel (“Legal Counsel”) may also represents the Manager or its affiliates. In connection with this offering of Interests and ongoing advice to the Fund, the Legal Counsel does not, and will not, represent any Members of the Fund. No independent counsel has been retained to represent Members of the Fund.

The Legal Counsel’s representation of the Fund, the Manager and its affiliates is limited to those specific matters upon which it has been consulted. There may exist other matters which would have a bearing on any of them upon which the Legal Counsel has not been consulted. The Legal Counsel does not undertake to monitor compliance with the investment program, valuation procedures and other guidelines

set out herein, nor does it monitor compliance with applicable laws. Additionally, the Legal Counsel relies upon information furnished to it by the Manager and does not investigate or verify the accuracy and completeness of information set out herein concerning the Fund, the Manager, other service providers, or their affiliates and personnel.

## UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of certain U.S. federal income tax considerations that may be relevant to prospective U.S. Investors in considering an investment in the Fund. This summary is general, and may not apply to all categories of investors, some of which may be subject to special rules (*e.g.*, tax-exempt organizations, banks, thrifts, insurance companies, regulated investment companies, real estate investment trusts, dealers and other investors that do not own their interests in the Fund as capital assets). The actual tax and financial consequences of the purchase and ownership of interests in the Fund will vary depending upon the investor's particular circumstances. This summary is based on the Code, the regulations promulgated thereunder ("Treasury Regulations"), court decisions and published rulings of the Internal Revenue Service (the "Service") currently in effect and does not take into account the possible effect of future legislative or administrative changes or court decisions. The Fund has not sought a ruling from the Service or any other federal, state or local agency with respect to any of the tax issues affecting the Fund, nor has it obtained an opinion of counsel with respect to any tax issues. The Service or a court might reach a contrary conclusion with respect to the issues addressed herein if the matter were contested. Future legislative or administrative changes or court decisions may significantly change the conclusions expressed herein, and any such changes or decisions may have a retroactive effect with respect to the transactions contemplated herein.

This summary is not intended as a substitute for careful tax planning. The tax matters relating to an investment in the Fund are complex and are subject to varying interpretations. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Investors will vary with the particular circumstances of each Investor.

**EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR IN ORDER TO FULLY UNDERSTAND THE UNITED STATES FEDERAL, STATE, LOCAL AND NON-U.S. INCOME TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.**

For purposes of this discussion, a "U.S. Investor" means an individual or entity who or that is: (i) for purposes of the Code, an individual who is a citizen or resident of the United States; (ii) a corporation (including an entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States or any political subdivision thereof; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (A) the administration of which is subject to primary supervision by a court within the United States and as to which one or more U.S. persons have the authority to control all substantial decisions, or (B) which was in existence on August 20, 1996, and has properly elected to be treated as a "United States person" for U.S. federal income tax purposes. As used in this Memorandum, the term "non-U.S. investor" is an investor that is not a U.S. investor.

The U.S. federal income tax treatment of an entity taxable as a partnership will depend upon the tax-status of its partners. U.S. Investors investing in the Fund through a partnership should consult their own tax advisors regarding the tax effects of investing in the Fund.

### Fund Operations

#### Classification of each Series.

The Fund expects and intends for each Series to be treated as a separate partnership for U.S. federal income tax purposes. Neither the Fund nor any Series is expected to be treated as an association taxed

as a corporation. In general, and as discussed below, entities taxed as partnerships are not subject to tax, instead the tax attributes and liabilities will flow through to its members.

Section 7704 of the Code provides that certain "publicly traded partnerships" are treated as corporations for U.S. federal income tax purposes. If, however, all of the interests in a Series are offered in a private placement, and the Series has not more than 100 investors, the interests in the Series will not be considered readily tradable on a secondary market (or its substantial equivalent). For purposes of determining the number of investors, the beneficial owners of an interest in a partnership, grantor trust or S corporation (a "look through entity") that invests in a Series will be treated as investors in the Series, but only if substantially all of the value of the beneficial owner's interest in the look through entity is attributable to that entity's interest in the Series, and a principal purpose for the tiered arrangement was to satisfy the 100 investor condition. In addition, even if a Series is considered to be publicly traded, the Series may avoid treatment as a corporation if at least 90% of its annual gross income consists of "qualifying income," which term includes, among other things, interest, dividends, and gains from the sale of securities. It is anticipated that 90% or more of each Series' gross income for each of its taxable years will be "qualifying income." Accordingly, the Manager does not expect any Series to be treated as a corporation even if it is a publicly traded partnership within the meaning of Section 7704 of the Code. It should be noted, however, that the Manager cannot control the operations of any other funds in which the Series may invest. Thus, there can be no absolute assurance that a Series will not become a publicly traded partnership that is taxable as a corporation. In the event that the Manager anticipates that a Series will not satisfy the 90% qualifying income exception, the Manager would investigate whether a Series could avoid taxation as a publicly traded partnership by restricting Investors' ability to withdraw Interests in a Series or the Fund, modifying the terms on which Investors may withdraw Interests or by limiting the number of Investors in a Series, and might elect to do so. The Operating Agreement permits the Manager to restrict withdrawals or limit the number of investors if necessary or advisable to protect a Series from being taxed as a corporation. In certain circumstances, however, the imposition of withdrawal or ownership restrictions following a violation of the qualifying income safe harbor would not prevent a Series from being treated as a PTP taxable as a corporation.

If it were determined that a Series should be treated as a corporation for U.S. federal income tax purposes, the taxable income of the Series would be subject to corporate income tax when recognized by the Series; Series distributions would be treated as dividend income when received by the Members to the extent of the current or accumulated earnings and profits of the Series; and Members would not be entitled to report profits or losses realized by the Series.

The following discussion assumes that each Series will be treated as a partnership for U.S. federal income tax purposes.

Unless otherwise indicated, references in the following discussion to the tax consequences of Series investments, activities, income, gain and loss include the direct and any indirect investments, activities, income, gain and loss of a Series, including through an underlying fund. To the extent that an underlying fund is treated as a partnership for U.S. tax purposes, an investing Series will take into account its distributive share of each item of such underlying fund's income, gain, loss, deduction and credit

As a partnership, a Series generally will not be subject to U.S. federal income tax. Instead each Member will generally be subject to U.S. federal income tax on its distributive share of the Series' items of income, gain, loss, deduction, expense, and credit, regardless of whether such Investor has received or will receive any distribution of cash or property from the Fund. For U.S. federal income tax purposes, an Investor's allocable share of items of income, gain, loss, deduction, expense, and credit will be governed by the Operating Agreement (which for purposes of this section includes any applicable side letter) if such allocations have "substantial economic effect" or are determined to be in accordance with such Investor's interest in the Fund. The Manager believes that, for U.S. federal income tax purposes, such allocations should be given effect and the Manager intends to prepare tax returns based on such allocations. If the Service successfully challenged the allocations made pursuant to the Operating Agreement, the redetermination of the allocations to a particular Investor for U.S. federal income tax purposes could be less favorable than the allocations set forth in the Operating Agreement.

*Partnership Tax Reporting*

The amount of tax due, if any, with respect to gains and income of a Series will be determined separately for each Member. Each Series will be required to file annually an information return on IRS Form 1065 and, following the close of the Series' taxable year, to provide each Member with a Schedule K-1 indicating such Member's allocable share of that Series' income, gain, losses, deductions, credits and items of tax preference. Each Member, however, is responsible for keeping its own records for determining such Member's tax basis in its Interest and calculating and reporting any gain or loss resulting from a Series distribution or disposition of an Interest.

**IT IS POSSIBLE AND INVESTORS SHOULD EXPECT THAT EACH SERIES WILL PROVIDE SCHEDULES K-1 TO INVESTORS AFTER APRIL 15 AND INVESTORS SHOULD, THEREFORE, BE PREPARED TO FILE EXTENSIONS WITH RELEVANT FEDERAL, STATE AND LOCAL TAXING AUTHORITIES**.

Each U.S. Investor will be required to report separately on its U.S. federal income tax return its distributive share of Series' net long-term capital gain or loss, net short-term capital gain or loss and all other items of ordinary income or loss. Each U.S. Investor will be taxed on its distributive share of a Series' taxable income and gain regardless of whether such Investor has received or will receive a distribution from the Series.

*Allocation of Profits and Losses*

The Operating Agreement provides that items of income, deduction, gain, loss or credit recognized by a Series for each taxable year generally are to be allocated for U.S. federal income tax purposes among the Members pursuant to the applicable Treasury Regulations, in such manner as reflects equitably amounts credited or debited to each Member's capital account for the current and prior fiscal years. However, under the Operating Agreement, for U.S. federal income tax purposes, the Manager has the discretion to allocate specially an amount of a Series' net gains or net losses (or items of gross income or losses or deduction) to a partially or completely withdrawing U.S. Investor (including by reason of death) to the extent that the amount withdrawn differs either positively or negatively from the U.S. Investor's federal income tax basis in its withdrawn Interest, or to reduce any discrepancy between amounts previously allocated to the U.S. Investor's Capital Account and amounts previously allocated to that U.S. Investor for U.S. federal income tax purposes.

The special allocation of items of a Series' income, gain or loss upon withdrawal of capital accounts, which income, gain or loss retains the same character as in the hands of the Series, may alter the character of a withdrawing U.S. Investor's income (*e.g.*, by replacing some amount of long-term capital gain recognized upon receipt of a withdrawal payment with allocations of ordinary income or short-term capital gain taxable as ordinary income). No assurance can be given that, if the Manager makes such a special allocation, the IRS will accept the allocation. If the allocation were successfully challenged by the IRS, the amount of income or loss allocated to particular U.S. Investors for U.S. federal income tax purposes may be increased or reduced or the character of such income or loss may be modified.

*Tax Elections, Returns and Audits*

The fiscal year of each Series will be the calendar year, unless the Code requires a taxable year other than the calendar year, in which case the fiscal year will be that taxable year which is required by the Code.

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to section 754 of the Code. As a result of the complexity and added expense of the tax accounting required to implement such an election, the Manager may decide not to make such an election.

Notwithstanding the foregoing, adjustments to the basis of partnership property generally are not optional, but rather are mandatory, in the case of (i) a distribution of partnership property to a partner where the basis of partnership property would have been reduced by more than $250,000 had a partnership made a section 754 election and (ii) a transfer of a partnership interest where the adjusted basis of partnership property exceeds by more than $250,000 its fair market value. Although a partnership would not be required to make basis adjustments to its property in the case of transfer of a partnership interest if it qualifies as an "electing investment partnership," it is unlikely that a Series would so qualify.

The Manager will decide how to report the partnership items on each Series' tax returns it is possible that the IRS may not agree with the manner in which a Series' items have been reported. In the event the U.S. federal income tax returns of a Series are audited by the IRS, the U.S. federal income tax treatment of the Series' income and deductions generally is determined at the Series level in a single proceeding rather than by individual audits of the U.S. Investors. Under a new audit regime, a "Partnership Representative" will have sole authority to act on behalf of a Series in any audit proceeding, and generally will bind the Series and its U.S. Investors. Absent certain elections by a Series, this new audit regime could cause any adjustments to Series tax items, and any resulting tax liability, to be determined and collected at the Series level and thus borne its U.S. Investors in the year in which the audit is completed, rather than the year to which the audit relates. U.S. Investors (including former U.S. Investors) may be required to indemnify a Series for any taxes (and related interest, penalties or other charges or expenses) payable by the Series and attributable to such U.S. Investors' Interests. It is expected that the Manager or its designee will act as the Series' Partnership Representative and, as such, will have authority to make elections and otherwise act on behalf of the Series in the event of an audit.

*Organizational and Syndication Expenses*

In general, for U.S. federal income tax purposes, neither a Series nor any U.S. Investor may deduct organizational or syndication expenses. An election may be made by a partnership generally to amortize organizational expenses over a period of not less than one hundred eighty (180) months. The Manager has made such an election with respect to each Series. However, syndication expenses must be capitalized and cannot be amortized or otherwise deducted. As such, the capitalization of such syndication expenses may result in increased capital loss or decreased capital gain on the disposition or liquidation of an Interest. The Manager may compensate placement agents in connection with the offering of Interests. Accordingly, the IRS could take the position that some portion of Management Fees represents a reimbursement of such expense, and therefore require that such amounts be capitalized. It is not clear whether such a position would prevail in court.

**Distributions**

A U.S. Investor generally will not be subject to U.S. federal income tax with respect to a cash distribution by a Series to such U.S. Investor except to the extent the amount of cash so distributed exceeds such U.S. Investor's adjusted tax basis in that Series immediately before such distribution. Any such excess generally will be taxable to such U.S. Investor as if it were a gain from the sale of such Interest. Generally, if a U.S. Investor has held its interest in a Series for more than one year, such gain or loss would be long-term capital gain or loss. No loss is recognized with respect to a non-liquidating distribution. For this purpose, any decrease in a U.S. Investor's share of non-recourse debt of a Series will be treated as if cash in a like amount were distributed to such U.S. Investor.

A U.S. Investor receiving a cash liquidating distribution from a Series, in connection with a complete withdrawal from the Series, generally will recognize capital gain or loss to the extent of the difference between the proceeds received by such U.S. Investor and such U.S. Investor's adjusted tax basis in its Interest. Such capital gain or loss will be short-term, long-term, or some combination of both, depending upon the timing of the U.S. Investor's contributions to the Fund.

A U.S. Investor receiving either a non-liquidating or liquidating distribution will recognize ordinary income to the extent such U.S. Investor's allocable share of the Series' "unrealized receivables" and "substantially appreciated inventory" deemed disposed of exceeds the U.S. Investor's basis in such items (as

determined pursuant to the Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by a Series will be treated as an unrealized receivable, with respect to which a withdrawing U.S. Investor would recognize ordinary income. A U.S. Investor will be required to recognize the full amount of any such ordinary income even if that amount exceeds the overall gain on the sale and even if such U.S. Investor recognizes an overall loss on the sale.

**A U.S. Investor generally will not be subject to U.S. federal income tax with respect to a distribution of property to such U.S. Investor by a Series. However, under section 731 of the Code, a distribution consisting of marketable securities generally is treated as a distribution of cash (rather than property) unless the distributing partnership is an "investment partnership" within the meaning of section 731(c)(3)(C)(i) and the recipient is an "eligible partner" within the meaning of section 731(c)(3)(C)(iii). Each Series will determine at the appropriate time whether it qualifies as an "investment partnership".**

**Disposition of Interest in a Series**

Upon a sale or transfer of an Interest in a Series, a U.S. Investor will recognize gain or loss equal to the difference between such U.S. Investor's amount realized (as determined for tax purposes) and such U.S. Investor's adjusted tax basis in the Interest (or portion thereof) sold or transferred. A U.S. Investor's "amount realized" generally will include both the fair market value of the consideration received and the U.S. Investor's allocable share of any liabilities of the Series. A U.S. Investor's tax basis in its Interest in the Series initially will be the amount paid for the relevant Interest plus the U.S. Investor's share (as determined for federal income tax purposes) of any liabilities of the Series, and will thereafter be adjusted as required under the Code to give effect on an ongoing basis to the U.S. Investor's share of the Series' tax items, distributions, and liabilities. The rules governing basis adjustments and the taxation of distributions are complex, and prospective investors should consult with their own tax advisers concerning these rules.

A U.S. Investor's gain or loss upon a disposition of its Interest in a Series will typically be capital gain or loss, long-term if the U.S. Investor holds the interest for more than one year, except that gains or losses attributable to inventory or unrealized receivables (defined broadly to include, among others, recapture items, market-discount bonds, short-term obligations, and stock in certain foreign corporations) will be ordinary income or loss. As described below the use of capital losses is subject to significant limitations.

**Series Investments**

*In General.* The Fund expects that Investors will recognize both capital gains (both short-term and long-term) and ordinary income in connection with investments made by the Series. The current maximum ordinary income tax rate for individuals is 37% and, in general, the current maximum individual income tax rate for "Qualified Dividends" and long-term capital gains is 20%, although in all cases the actual rates may be higher due to the phase out of certain tax deductions, exemptions and credits. In addition, both ordinary income and capital gains allocated to individuals who are citizens or residents of the United States generally must be taken into account in calculating any additional Medicare contribution tax on "net investment income" that applies to them (and which, if applicable, is imposed at a rate of 3.8%).

A Series may recognize capital losses for U.S. federal income tax purposes, and U.S. Investors may be subject to significant limitations on the ability to offset any such losses against other income. The excess of capital losses over capital gains may be offset against the ordinary income of an individual taxpayer, subject to an annual deduction limitation of $3,000. Capital losses of an individual taxpayer may generally be carried forward to succeeding tax years to offset capital gains and then ordinary income (subject to the $3,000 annual limitation). For corporate taxpayers, the current maximum income tax rate is 21%. Capital losses of a corporate taxpayer may be offset only against capital gains, but unused capital losses may be carried back three years (subject to certain limitations) and carried forward five years.

Other limitations may also apply to affect the timing of or reduce a U.S. Investor's ability to utilize any losses sustained by a Series, including the "at risk" rules, the "passive loss" rules, and the limitation of losses to the amount of a U.S. Investor's tax basis in its Interest. In particular, in the case of investments in partnerships, certain U.S. limited liability companies or other U.S. or non-U.S. entities that are treated as "pass-through" (tax-transparent) entities for U.S. federal income tax purposes that are engaged in trade or business activity ("Operating Partnerships"), the "passive activity loss" and "at-risk" rules could limit the deductibility of losses derived from such investments. The passive loss rules and at-risk rules apply to non-corporate and certain corporate taxpayers. Under the passive activity loss rules, losses, credits and deductions from passive activities are generally limited to the income from passive activities. Generally, a passive activity is a trade or business in which the taxpayer does not materially participate. Under the at-risk rules, losses are deductible only to the extent the taxpayer is at risk with respect to the activity based on Capital Contributions or personal liability for borrowings utilized in the activity.

In addition, to the extent that a non-corporate Investor's allocable share of a loss is otherwise available after application of the passive loss limitations, such loss may be treated as an "excess business loss." Under the Tax Act, a noncorporate Investor may use an excess business loss to offset other income only up to a specified dollar amount (generally $250,000, or $500,000 in the case of married taxpayers filing jointly). Any disallowed excess business loss generally will be added to the Investor's net operating loss and may be carried over to future years. The deductibility of net operating loss carryforwards is subject to further limitations.

*Income from Merchant Cash Advances and Debt Securities*

A Series will generally realize ordinary income from accruals of interest on debt securities. While the matter is not free from doubt, income earned on merchant cash advances is likely to be treated as interest and taxed as ordinary income. In addition a Series may hold debt obligations with "original issue discount." In such case, a Series would be required to include amounts in taxable income on a current basis even though receipt of such amounts may occur in a subsequent year. A Series may also acquire debt obligations with "market discount". Absent an election to include the market discount income as it accrues, upon disposition of such an obligation, a Series generally would be required to treat gain realized as ordinary income to the extent of the market discount that accrued during the period the debt obligation was held by the Series.

*Equity Investments in Private Companies*

Other than described below under the heading "Investments in Foreign Corporations", a Series will realize ordinary income from dividends with respect to investments in stock of corporations. Certain dividends received by a Series (including, under certain circumstances, dividends from a non-US corporation) may be eligible in the case of non-corporate U.S. Investors, for taxation at long-term capital gain rates.

If a Series invests in companies taxed as partnerships, such companies will not be subject to federal income tax. Instead investors in that Series must take into account their distributive share of each such company's items of taxable income, gain, loss, deduction, and credit without regard to whether the Series receives actual distributions, and such tax items must be reported by the Investors. Moreover, the Series and Investors will be deemed engaged in any trade or business carried on by a company taxed as a partnership. The Fund expects that gains or losses from the disposition of its investments in companies taxed as partnerships will typically be capital gains or losses, long-term if the Series holds the investment for more than one year, except that gains or losses attributable to inventory or unrealized receivables (defined broadly to include, among others, recapture items, market- discount bonds, short-term obligations, and stock in certain foreign corporations) will be ordinary income or loss.

*Real Estate Development Projects*

Generally, if a Series invests in real property development projects, the type of income allocated to the U.S. Investors will depend on the type of income generated by such assets. Equity investments in real estate development projects through an entity taxed as a partnership or a joint venture is likely to

generate taxable gain or loss on the sale of the property. Any such gain or loss will be ordinary income or loss if the Series is treated as holding the property in the ordinary course of business and as capital gains if the Series is treated as an investor in the property. There can be no assurance that that an interest in a real estate development project will be treated as an investment rather than as property held in the ordinary course of business.

*Investments in Foreign Corporations*.

A Series may invest in stock of a foreign entity treated as a corporation for U.S. federal income tax purposes. In that event, U.S. Investors may be subject to special rules, as described below.

*Passive Foreign Investment Companies*. If a Series invests in a non-U.S. portfolio company that is classified as a passive foreign investment company ("PFIC"), U.S. Investors will be subject to taxation under Sections 1291 through 1298 of the Code. In general, a non-U.S. corporation is a PFIC if 75% or more of its gross income constitutes "passive income" or 50% or more of its assets produce passive income. Under the PFIC rules, a penalty tax is imposed on any U.S. shareholder of the PFIC when that shareholder sells (or receives an "excess distribution" with respect to) its shares. In general, the penalty tax is equivalent to the U.S. income tax at maximum ordinary income rates, calculated as if any gain on that sale were realized (or the excess distribution were made) ratably over the U.S. shareholder's holding period for the shares, plus an interest charge on taxes that are deemed due during the period the U.S. shareholder owned those shares. A U.S. U.S. Investor will be treated as a U.S. shareholder with respect to its proportionate share of any PFIC stock owned by the Series. If, however, that PFIC is also a "controlled foreign corporation" in which the U.S. U.S. Investor is a "United States Shareholder," the PFIC rules will be superseded by the rules discussed below dealing with controlled foreign corporations. A Series will not independently assess whether any portfolio company is or may become a PFIC, and cannot assure U.S. U.S. Investors that they will not be treated as holding shares in a PFIC by virtue of the Series' or an Underlying Fund's investments in non-U.S. portfolio companies. Prospective U.S. Investors are urged to consult with their own tax advisors regarding the application of the PFIC rules.

If a portfolio company agrees to provide certain financial information, a U.S. U.S. Investor may elect to treat any portfolio company that is a PFIC as a "qualified electing fund" and, if that election is made, each electing U.S. U.S. Investor will be subject to tax currently on its share of certain earnings of that company.

Alternatively, a U.S. shareholder in a PFIC is allowed to make a "mark-to-market" election with respect to the PFIC stock, provided that such stock is "marketable." Generally, to be "marketable" the shares of a PFIC must be publicly traded on an established securities exchange, among other requirements.

The PFIC rules are highly technical and it is possible that a non-U.S. portfolio company will be classified as a PFIC. Moreover, because the test for PFIC status must be made on an annual basis, there is no assurance that the character of the income and assets of a portfolio company might not change after the acquisition of an interest in such company by the Series such that the portfolio company becomes a PFIC in a later year. If a Series does invest in a PFIC, or if a portfolio company becomes a PFIC, each U.S. Limited Partner may be able to elect to treat that corporation as a "qualified electing fund" or make the mark-to-market election with respect to the stock of such corporation, in order to avoid the penalty tax.

*Controlled Foreign Corporations*. Under Sections 951 through 971 of the Code, special rules apply to U.S. Persons who own, directly or indirectly (including through a partnership such as a Series) and applying certain attribution rules, 10% or more of the total combined voting power or value of all classes of stock of a non-U.S. corporation (each, a "U.S. Shareholder") that is a "controlled foreign corporation" (a "CFC"). A portfolio company generally will be a CFC if U.S. Shareholders collectively own more than 50% of the total combined voting power or total value of the corporation's stock during any taxable year. U.S. Shareholders of a CFC generally must include in their gross income for U.S. federal income tax purposes their proportionate shares of certain earnings and profits of the CFC.

Further, under Section 1248 of the Code, if a U.S. Shareholder sells or exchanges stock in a CFC and that person is or was a U.S. Shareholder at any time during the five-year period ending on the date of

such sale or exchange, that shareholder generally will be required to treat a portion of the gain recognized upon such sale or exchange as a dividend (treated for U.S. tax purposes as ordinary income rather than capital gain) to the extent of the earnings and profits of the CFC attributable to such shares. Under U.S. tax rules, the determination regarding whether a U.S. U.S. Investor is a 10% owner (and therefore a U.S. Shareholder) of a portfolio company generally will be made by treating each such U.S. U.S. Investor as owning a Series and a Underlying Fund's proportionate share of that stock.

*Limitation on Deductibility of Interest.*

Section 163(d) of the Code disallows a non-corporate taxpayer's deduction for "investment interest" (*i.e.*, interest for "indebtedness properly allocable to property held for investment") in excess of "net investment income." "Net investment income" generally includes all gross income of the taxpayer from property held for investment and net gain attributable to the disposition of property held for investment, but includes "qualified dividend income" only to the extent the taxpayer elects to pay tax on such amounts at ordinary income tax rates A U.S. Investor that could not deduct losses currently as a result of the application of Section 163(d) would be entitled to carry forward such losses to future years, subject to the same limitation. The investment interest limitation could apply to limit the deductibility of interest paid by a non-corporate Partner on any indebtedness incurred to finance its investment in the Fund.

Conversely, under provisions newly added by the Tax Act, if all or a portion of a Series' operations constitute a trade or business, the deduction for the "business interest" expense properly allocable to such trade or business will be limited to the sum of the Series' business interest income and 30% of its "adjusted taxable income." For the purposes of this limitation, the Series' adjusted taxable income generally means its ordinary taxable business income computed without reduction for any business interest or business interest income, and in the case of taxable years beginning before January 1, 2022, without reduction for depreciation, amortization or depletion. This limitation is first applied at the partnership level and any deduction for business interest is taken into account in determining the Series' non-separately stated taxable income or loss.

In addition, for each taxable year, Section 1277 of the Code limits the deduction of the portion of any interest expense on indebtedness incurred by a taxpayer to purchase or carry a security with market discount which exceeds the amount of interest (including original issue discount) includible in the taxpayer's gross income for such taxable year with respect to such security ("Net Interest Expense"). In any taxable year in which the taxpayer has Net Interest Expense with respect to a particular security, such Net Interest Expense is not deductible except to the extent that it exceeds the amount of market discount which accrued on the security during the portion of the taxable year during which the taxpayer held the security. Net Interest Expense which cannot be deducted in a particular taxable year under the rules described above can be carried forward and deducted in the year in which the taxpayer disposes of the security. Alternatively, at the taxpayer's election (which it appears would have to be made by the Series rather than by a U.S. Investor), such Net Interest Expense can be carried forward and deducted in a year prior to the disposition of the security, if any, in which the taxpayer has net interest income from the security.

Code Section 1277 would apply to a U.S. Investor's share of a Series' Net Interest Expense attributable to a security held by the Series with market discount. In such case, a U.S. Investor would be denied a current deduction for all or part of that portion of its distributive share of the Series' ordinary losses attributable to such Net Interest Expense and such losses would be carried forward to future years, in each case as described above. Although no guidance has been issued regarding the manner in which an election to deduct previously disallowed Net Interest Expense in a year prior to the year in which a bond is disposed of should be made, it appears that such an election would be made by the Series rather than by the U.S. Investor. Code Section 1277 would also apply to the portion of interest paid by a U.S. Investor on money borrowed to finance its investment in the Series to the extent such interest was allocable to securities held by the Series with market discount.

*Limitations on Deductibility of Expenses.*

Certain expenses will be treated as miscellaneous itemized deductions if a Series is classified as an investor in securities rather than as a trader in securities for U.S. federal income tax purposes. The Tax Act suspends the deduction for miscellaneous itemized expenses and places an overall limit on itemized deductions for taxable years beginning January 1, 2018 through December 31, 2025. During these taxable years, non-corporate Investors will not be able to deduct miscellaneous itemized deductions, including their share of certain Series expenses. U.S. Investors that are corporations for U.S. federal income tax purposes are not affected by limitations on miscellaneous itemized deductions, but such limitations do apply to individual shareholders of S corporations that are U.S. Investors. Provided the suspension is not extended, for taxable years beginning on or after January 1, 2026, such items will be deductible only to the extent they exceed 2% of the taxpayer's adjusted gross income. The Code will also restrict the ability of an individual with an adjusted gross income in excess of a specified amount to deduct itemized deductions such that miscellaneous itemized deductions in excess of 2% of adjusted gross income, together with an individual's other itemized deductions, will be reduced by the lesser of (i) 3% of the excess of the individual's adjusted gross income over the specified amount or (ii) 80% of the amount of certain itemized deductions otherwise allowable for the taxable year. Each year, a Series will make a determination as to whether it will take the position that, for U.S. federal income tax purposes, it is (i) a trader in securities or (ii) an investor in securities. This determination will be made separately each year based primarily on the level of the Series activities during the particular year. A Series' position as a trader or investor may vary from year to year and it is difficult to predict in advance whether all or a portion of a Series' operations will qualify as trading - rather than investment - activities, the expenses for which would not be treated as investment expenses. Therefore, the limitations on deductibility may apply to a noncorporate U.S. Investor's share of the expenses of a Series, including payments made on certain derivative instruments.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, noncorporate U.S. Investors should consult their tax advisors with respect to the application of these limitations.

*Alternative Minimum Tax*. Miscellaneous itemized deductions are not allowable deductions in computing alternative minimum taxable income. Other items may also be treated differently under the alternative minimum tax. Prospective investors who may be subject to the alternative minimum tax and should consult their own tax advisors concerning the tax consequences of an investment in the Fund taking into account their individual situations.

**Medicare Tax**

A U.S. Investor that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from tax, is subject to a 3.8% tax on the lesser of (1) the U.S. Investor's "net investment income" for the relevant taxable year and (2) the excess of the U.S. Investor's modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000, depending on the individual's circumstances). A U.S. Investor's net investment income will generally include its rental income, dividend income and its net gains from the disposition of real estate investments held by the Series, unless such rental income, dividends or net gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities). Prospective U.S. Investors that are individuals, estates or trusts should consult their tax advisors regarding the applicability of the Medicare tax to an investment in the Fund.

**Unrelated Business Taxable Income**

Income recognized by a U.S. tax-exempt entity is generally exempt from U.S. federal income tax except to the extent of the entity's unrelated business taxable income (as defined in sections 512 and 514 of the Code) ("UBTI"). With exceptions for certain types of entities, UBTI is generally defined as income from a trade or business regularly carried on by a U.S. tax-exempt entity that is unrelated to its exempt purpose (including an unrelated trade or business regularly carried on by a partnership of which the entity is a partner). Subject to the discussion below of "debt-financed property," UBTI generally does not include,

among other items, dividends, interest, royalties, and gains from the sale of property that is neither inventory nor held for sale to customers in the ordinary course of business. In addition, UBTI does not include certain types of rental income. It may, however, include income from certain real estate development projects.

As described above, UBTI includes income from "debt-financed property." Subject to certain exceptions, "debt-financed property" is any property which is held to produce income and with respect to which there is "acquisition indebtedness" at any time during the taxable year (or if the property was disposed of during the taxable year, at any time during the 12 months preceding the date of disposition). Acquisition indebtedness is generally indebtedness incurred by a tax-exempt entity directly or through a partnership: (i) in acquiring or improving a property; (ii) before acquiring or improving a property if the indebtedness would not have been incurred but for such acquisition or improvement; or (iii) after acquiring or improving a property if the indebtedness would not have been incurred but for such acquisition or improvement and the incurrence of such indebtedness was reasonably foreseeable at the time of the acquisition or improvement. The Fund generally intends to obtain financing in connection with investments by a Series under circumstances that could cause income and gain to be UBTI under the debt-financed property rules, if the debt were incurred and the income were earned directly by a U.S. tax-exempt investor.

In addition, if a U.S. tax-exempt investor borrows any amount to fund its capital contributions, some or all of its distributive share of income from a Series could be UBTI, which would be taxable to such tax-exempt investor (and which could give rise to additional tax liability for certain limited categories of tax-exempt investors).

A U.S. tax-exempt U.S. Investor's allocable share of any UBTI earned by a Series will be subject to U.S. federal income taxation and may be subject to state and local taxation as well. Further, as a result of the Tax Act, a tax-exempt U.S. Investor's share of the income or gains of the Series which is treated as UBTI may not be offset by losses of the tax-exempt organization either from the Series or otherwise, unless such losses are treated as attributable to the same unrelated trade or business.

Potential U.S. investors which are tax-exempt organizations should take into account, in making their decision whether or not to invest in the Fund, that it is expected that such U.S. tax-exempt investors will incur a substantial amount of UBTI by reason of an investment in the Fund. Potential tax-exempt investors are urged to review this discussion with their tax advisors before making an investment in the Fund.

**Other Taxation**

Income and gains from investments held by the Fund may be subject to withholding taxes or other taxes in non-U.S. jurisdictions, subject to the possibility of reduction under applicable tax treaties. In addition, with respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of various taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries.

The Fund may make investments outside of the United States. Members generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains). However, in general, a tax-exempt entity will not be able to utilize such tax credits. The foreign tax credit rules are complex, and may, depending on each U.S. Investor's particular circumstances, limit the availability or use of foreign tax credits.

**The foregoing is a summary of some of the important tax rules and considerations affecting the U.S. Investors, the Fund, and the Fund's proposed operations and does not purport to be a complete analysis of all relevant tax rules and considerations, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding an interest in the Fund. The foregoing does not address tax considerations affecting investors which are not U.S.**

**persons. Prospective and existing investors in the Fund are urged to consult their own tax advisors about the consequences of investing in the Fund.**

## CERTAIN ERISA CONSIDERATIONS

**General**

The following is a summary of certain considerations associated with an investment in the Fund by employee benefit plans that are subject to Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), plans, individual retirement accounts ("IRAs") and other arrangements that are subject to Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or provisions under any other federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan"). Also discussed are certain consequences under ERISA and the Code which a fiduciary of an "employee benefit plan" as defined in, and subject to the fiduciary responsibility provisions of, ERISA or of a "plan" as defined in and subject to Section 4975 of the Code who has investment discretion should consider before deciding to invest the plan's assets in the Fund (such "employee benefit plans" and "plans" being referred to herein as "Plans," and such fiduciaries with investment discretion being referred to herein as "Plan Fiduciaries").

The following summary is not intended to be complete, but only to address certain questions under ERISA and the Code that are likely to be raised by the Plan Fiduciary's own counsel. Any discussion of U.S. federal tax issues set forth in this Memorandum was written in connection with the promotion and marketing by the Fund and the Manager of the Interests. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each investor should seek advice based on its particular circumstances from an independent tax adviser.

In general, the terms "employee benefit plan" as defined in ERISA and "plan" as defined in Section 4975 of the Code together refer to any plan or account of various types which provides retirement benefits or welfare benefits to an individual or to an employer's employees and their beneficiaries. Such plans and accounts include, but are not limited to, corporate pension and profit-sharing plans, "simplified employee pension plans," Keogh plans for self-employed individuals (including partners), individual retirement accounts described in Section 408 of the Code and medical benefit plans.

Each Plan Fiduciary must give appropriate consideration to the facts and circumstances that are relevant to an investment in the Fund, including the role an investment in the Fund plays in the Plan's investment portfolio. Each Plan Fiduciary, before deciding to invest in the Fund, must be satisfied that investment in the Fund is a prudent investment for the Plan, that the investments of the Plan, including the investment in the Fund, are diversified so as to minimize the risks of large losses and that an investment in the Fund complies with the documents of the Plan and related trust.

EACH PLAN FIDUCIARY CONSIDERING ACQUIRING INTERESTS MUST CONSULT ITS OWN LEGAL AND TAX ADVISERS BEFORE DOING SO.

**General Fiduciary Matters.**

ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (an "ERISA Plan") and prohibit certain transactions involving the assets of an ERISA Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of an ERISA Plan

or the management or disposition of the assets of an ERISA Plan, or who renders investment advice for a fee or other compensation to an ERISA Plan, is generally considered to be a fiduciary of the ERISA Plan.

In considering an investment in the Fund of a portion of the assets of any Plan, a fiduciary should determine, particularly in light of the risks and lack of liquidity inherent in an investment in the Fund, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law relating to a fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws. Furthermore, absent an exemption, the fiduciaries of a Plan should not invest in the Fund with the assets of any Plan if the General Partner, the Investment Advisor, or any of their respective affiliates is a fiduciary with respect to such assets of the Plan.

Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code. The acquisition and/or ownership of Interests by an ERISA Plan with respect to which the Fund is considered a party in interest or a disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the U.S. Department of Labor (the "DOL") has issued prohibited transaction class exemptions, or "PTCEs," that may apply to the acquisition and holding of investments in the Fund. These class exemptions include, without limitation, PTCE 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1 respecting insurance company pooled separate accounts, PTCE 91-38 respecting bank collective investment funds, PTCE 95-60 respecting life insurance company general accounts, and PTCE 96-23 respecting transactions determined by in-house asset managers.

**Plan Assets**

Under ERISA and the regulations promulgated thereunder (the "Plan Asset Regulations"), when an ERISA Plan acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless it is established either that less than 25% of the total value of each class of equity interests in the entity is held by "benefit plan investors" as defined in Section 3(42) of ERISA (the "25% Test") or that the entity is an "operating company," as defined in the Plan Asset Regulations. The Fund will not qualify as an "operating company," as defined in the Plan Asset Regulations. For purposes of the 25% Test, the assets of an entity will not be treated as "plan assets" if, immediately after the most recent acquisition of any equity interest in the entity, less than 25% of the total value of each class of equity interests in the entity (including each Series) is held by "benefit plan investors," excluding equity interests held by persons (other than benefit plan investors) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof. The term "benefit plan investors" is generally defined to include employee benefit plans subject to Title I of ERISA or Section 4975 of the Code (including "Keogh" plans and IRAs), as well as any entity whose underlying assets include plan assets by reason of a plan's investment in such entity (e.g., an entity of which 25% or more of the total value of any class of equity interests is held by benefit plan investors and which does not satisfy another exception under ERISA). ERISA provides that a Plan Assets Entity is considered to hold plan assets only to the extent of the percentage of the Plan Assets Entity's equity interests held by benefit plan investors. Investments by benefit plan investors in the Fund will be deemed to be not significant if benefit plan investors own, in the aggregate, less than 25% of the total value of each class of equity interests of the Fund (determined by not including the investments of persons with discretionary authority or control over the assets of such entity, of any person who provides investment advice for a fee (direct or indirect) with respect to such assets, and "affiliates" (as defined in the regulations issued under ERISA) of such persons; provided, however, that under no circumstances are investments by benefit plan investors excluded from such calculation).

Thus, absent satisfaction of another exception under ERISA, if 25% or more of the total value of any class of equity interests (including any Series) of the Fund were held by benefit plan investors, an undivided interest in each of the underlying assets of the Fund would be deemed to be "plan assets" of any ERISA Plan that invested in the Fund.

**Plan Asset Consequences**

If the assets of the Fund were to be deemed to be "plan assets" under ERISA, this would result, among other things, in (i) the application of the prudence and other fiduciary responsibility standards of ERISA to investments made by the Fund, and (ii) the possibility that certain transactions in which the Fund might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the Manager and/or any other fiduciary that has engaged in the prohibited transaction could be required to (i) restore to the ERISA Plan any profit realized on the transaction and (ii) reimburse the ERISA Plan for any losses suffered by the ERISA Plan as a result of the investment. In addition, each disqualified person (within the meaning of Section 4975 of the Code) involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. ERISA Plan fiduciaries who decide to invest in the Fund could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Fund or as co-fiduciaries for actions taken by or on behalf of the Fund or the Manager. With respect to an IRA that invests in the Fund, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, would cause the IRA to lose its tax-exempt status.

In order to avoid causing assets of the Fund to be "plan assets," the Fund intends to restrict the aggregate investment by benefit plan investors to under 25% of the total value of each class of equity interests (including each Series) of the Fund – not including the investments of the Manager, any person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Fund, and any entity (other than a benefit plan investor) that is directly or indirectly through one or more intermediaries controlling, controlled by or under common control with any of such entities, and each of the principals, members, officers, and employees of any of the foregoing entities who has the power to exercise a controlling influence over the management or policies of such entity or of the Fund. Furthermore, because the 25% test is ongoing, it not only restricts additional investments by benefit plan investors, but also can cause the Fund to require that existing benefit plan investors withdraw from the Fund in the event that other investors withdraw or may restrict non-benefit plan investors from redeeming from the Fund or any Series.

The Manager will use commercially reasonable efforts to limit equity participation by benefit plan investors in the Fund to less than 25% of the total value of each class of equity interests (including each Series) in the Fund as described above, so that the underlying assets of the Fund should not constitute "plan assets" of any ERISA Plan which invests in the Fund. However, there can be no assurance that, notwithstanding the commercially reasonable efforts of the Manager, the Fund will be able to limit equity participation by benefit plan investors in the Fund to less than 25% of the total value of each class of equity interests (including each Series) in the Fund.

Under the Operating Agreement, the Manager will have the power to take certain actions to avoid having the assets of the Fund characterized as "plan assets," including, without limitation, the right to cause a Member that is a benefit plan investor to withdraw from the Fund. While the Manager and the Fund do not expect that the Manager will need to exercise such power, neither the Manager nor the Fund can give any assurance that such power will not be exercised.

**Reporting of Indirect Compensation**

Under ERISA's general reporting and disclosure rules, ERISA Plans are required to include information regarding their assets, expenses and liabilities. To facilitate a plan administrator's compliance with these requirements, it is noted that the descriptions of the fees and expenses contained in this

Memorandum and any applicable Supplement, including the descriptions of the Management Fee payable to the Manager and any performance fee or allocation payable or allocable to the Manager, are intended to satisfy the disclosure requirements for "eligible indirect compensation" for which the alternative reporting option on Schedule C of Form 5500 Annual Return/Report may be available.

**Ineligible Investors**

In general, Interests may not be purchased with the assets of a Plan if the Manager, any person who introduces prospective investors to the Fund, any of their respective affiliates or any of their respective employees either: (i) has investment discretion with respect to the investment of such plan assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such plan assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such plan assets and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Except as otherwise set forth, the foregoing statements regarding the consequences under ERISA and the Code of an investment in the Fund are based on the provisions of the Code and ERISA as currently in effect, and the existing administrative and judicial interpretations thereunder. No assurance can be given that administrative, judicial or legislative changes will not occur that may make the foregoing statements incorrect or incomplete. The foregoing discussion is general in nature and is not intended to be all-inclusive. Each Plan Fiduciary should consult with its legal advisor concerning the considerations discussed above before making an investment in the Fund. As indicated above, Similar Laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their advisors, should consider the impact of their respective laws and regulations on an investment in the Fund and the considerations discussed above, if applicable.

ACCEPTANCE OF SUBSCRIPTIONS ON BEHALF OF PLANS IS IN NO RESPECT A REPRESENTATION BY THE MANAGER OR ANY OTHER PARTY RELATED TO THE FUND THAT THIS INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO INVESTMENTS BY ANY PARTICULAR PLAN OR THAT THIS INVESTMENT IS APPROPRIATE FOR ANY PARTICULAR PLAN. THE PERSON WITH INVESTMENT DISCRETION SHOULD CONSULT WITH HIS OR HER ATTORNEY AND FINANCIAL ADVISERS AS TO THE PROPRIETY OF AN INVESTMENT IN THE FUND IN LIGHT OF THE CIRCUMSTANCES OF THE PARTICULAR PLAN.

## SUMMARY OF THE OPERATING AGREEMENT

The rights and obligations of Members are governed by the Operating Agreement, a copy of which will be provided to investors. The following briefly summarizes certain provisions of the Operating Agreement that are not described elsewhere in this Memorandum. Prospective investors are urged to read the Operating Agreement in its entirety before subscribing.

**General**

The Fund has been organized as a series limited liability company under the Delaware Limited Liability Company Act. Broad Street Global Management LLC is the sole Manager. The Fund is divided into separate Series operated in a manner so as to avoid cross-liability between the Series, to the fullest extent permitted under Delaware law. Each Series is a separate pool of assets with its own investment

objective and strategy. The Manager will have broad discretion to establish additional Series, and the investment strategy and other terms applicable to such Series without notice to or the consent of Members of any other Series. The Operating Agreement provides that the Manager will have complete control of the business of the Fund and that the Members will have no power to take part in the management of the Fund and each Series. Except as provided with respect to certain Series in a Series Supplement, upon admission to a Series, each Member will acquire a percentage interest in a Series equal to such Member's capital contribution as of the date of admission divided by the sum of the capital accounts of all Members in such Series (including the investor) as of that day. A Member's percentage interest in a Series will be adjusted to take account of each additional capital contribution to such Series using the same technique. Each Member's percentage interest in a Series should be expected to increase or decrease proportionally as additional capital contributions or withdrawals of capital are made in such Series.

**Term**

The Fund was organized in September 2020 and will continue in existence until dissolved at the election of the Manager or upon the happening of certain events specified in the Operating Agreement. A Series may be dissolved at the election of the Manager. Subject to the procedures set forth in the Operating Agreement, at the election of the Manager in anticipation of dissolution, the Fund or a Series, as applicable, will in an orderly and prudent manner liquidate its positions and distribute the net proceeds to its Members. The dissolution of a Series will not cause the dissolution of the Fund unless at such time there is no other Series.

**Allocation of Net Profit and Net Loss**

Generally, Members share in the profits and losses of a Series for each accounting period in proportion to their relative capital account balances as of the beginning of that period. The Operating Agreement provides detailed procedures for maintaining each Member's capital account(s) and allocating Net Profit and Net Loss to such accounts. All Series income (such as interest) and all expenses (including the Management Fee) are calculated to arrive at Net Profit or Net Loss for the period. A Series' value generally is determined by valuing all assets and taking into account all accounts payable, accrued expenses and other liabilities of the Series. All investments are valued as described above under the heading "Valuation". All other determinations of value are to be made in good faith by the Manager.

Capital accounts generally are adjusted at the beginning and the end of each month to reflect allocations arising out of various events. As of the beginning of each period, each Member's capital account in respect of a Series is increased to reflect additional capital contributions made to such Series as of the beginning of the period (less any special administrative charge the Manager assesses or expenses arising out of contributions of assets) and decreased to reflect withdrawals from such Series effective as of the end of the prior period (regardless of whether the amount of the withdrawal has actually been delivered to the Member). As of the end of each period, each Member's capital account in respect of a Series is decreased to reflect any distributions in respect of such Series during the period, the Member's share of the Management Fee owed to the Manager for that period in respect of such Series, and certain other special allocations (such as for expenses of any withdrawals by the Member in respect of such Series) and tentatively increased or decreased to reflect the Member's share of Net Profit or Net Loss in respect of such Series.

If the Manager elects to create and issue additional Series, the net proceeds of issue of each Series will be assigned to a portfolio of investments pertaining to such Series and a separate set of capital accounts will be created for the purchasers of such Series. All income and gains from the portfolio pertaining to a given Series will be allocated only to the set of capital accounts relating to that Series. Any liabilities peculiar to a given Series will be allocated to the set of capital accounts relating to that Series. Any liability of the Fund not associated with a particular Series will be apportioned among the Series *pro rata* based on the relative value of the Series.

**Allocation of Taxable Income and Loss**

Each Series attempts to allocate all items of taxable income, gain, loss, deduction, and credit among the Members in a manner that the Manager, in consultation with tax advisers, believes is consistent with the manner in which the economic benefits and burdens of the Series are shared. The Manager retains discretion to use any technique it considers appropriate and consistent with applicable income tax laws and regulations. (See “Income Tax Considerations – Taxation of the Fund and its Members – Fund Allocations”.)

**Amendments**

The Manager retains discretion to amend the Operating Agreement in any manner it deems desirable. Notwithstanding the foregoing, the Manager may also amend the Operating Agreement, among others, to cure any ambiguity, to correct a manifest error, to comply with any applicable requirements of law, to admit additional Members, or to make any change that does not adversely affect the Members in any material respect, without providing an opportunity for Members to withdraw their Interests as described above. If an amendment relates solely to one or more Series and not to the Fund as a whole, only the Members of such Series will have the right to withdrawal as described above.

**Distributions**

Except as provided otherwise for certain Series, distributions (other than in connection with withdrawals) are not expected, but may be made at such time and in such amounts as the Manager may determine in its discretion. Any distributions (other than in connection with withdrawals) in respect of a Series will be made in accordance with the Members’ relative capital account balances in respect of such Series. In the Manager’s discretion, distributions may be made in assets held by a Series.

**Reserves; Adjustments for Contingencies**

The Manager is authorized to create reserves against contingent liabilities the Manager may identify or become aware of and to accrue expenses and effect charges against Members’ capital accounts in such amounts as the Manager, in its sole discretion, considers appropriate. Amounts designated for such reserves in any fiscal period will generally be deducted from the capital accounts of the Members in proportion to the amounts of their capital account balances as of the beginning of that period, and any decreases in reserves in a period will generally be added to capital accounts of Members as of the beginning of that period.

**Voting Rights**

Members have limited voting rights under the Operating Agreement. Other than as explicitly set forth in the Operating Agreement, Members will have no voting rights as to the Fund or its management or any Series. In particular, Members have no right to remove the Manager or elect additional or replacement managers. Actions requiring a vote may be accomplished by written consent of the Members holding the requisite percentage interests. If an action is proposed by the Manager, the Manager may request such consents, require that responses be provided within a specified period (not less than fifteen days), and provide that failure to respond within the specified period will be deemed consent.

**Liability of Members**

The Operating Agreement provides that no Member will be personally liable for any of the debts of the Fund or any Series or for any losses of the Fund or any Series beyond the amount contributed by such Member to such Series, plus such Member’s share of the undistributed profits of such Series; except that when a Member has received a distribution from a Series or made a withdrawal, the Member will be liable to return such amount to such Series to the extent that, immediately after giving effect to the distribution or withdrawal, the liabilities of such Series, other than those to members on account of their interests in the Series and those as to which recourse of creditors is limited to specified assets of the Series, exceed

the fair value of the Series' assets (other than those assets subject to liabilities as to which recourse of creditors is so limited, to the extent of such liabilities).

**Reports**

Financial information contained in all reports to the Members will be prepared on an accrual basis of accounting. The Fund will use commercially reasonable efforts to provide an annual report to Members that will be presented with the tax basis of accounting within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund will use commercially reasonable efforts to provide tax information to Members within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion employing such firms and professionals at its discretion.

## ADDITIONAL INFORMATION

The Manager is available to answer prospective and existing investors' questions and will make available any additional information to the extent such information can be obtained without unreasonable effort or expense.