IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-20436-GAYLES/SHAW-WILDER

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT, LLC, and
BROAD STREET, INC.,

Defendants, and

JOSEPHBENJAMIN, INC., and
JUST A NICE DAY, INC.,

Relief Defendants.

**DEFENDANTS AND RELIEF DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1, Defendants and Relief Defendants ("Defendants") hereby file their Statement of Material Facts in support of Defendants' Motion for Summary Judgment (ECF 300).

1. Earlier this year, on March 20, 2026, the SEC represented to this Court that this "case is not about Broad[s]treet's [as defined below] business generally. It's about what investors were told by Broad[s]treet, specifically about what they were told as alleged in our Complaint. (ECF 278-2 at 21:4-7).

2. The Court then accepted the SEC's representation: "[The SEC's case is] really just about those representations … not the business or business model overall." (*Id.* at 27:6–8).

3. The SEC made the above representation in support of its argument to keep this case in the Southern District of Florida. (*Id.* at 21:8-13).

4. Broadstreet is indisputably "at home" in South Carolina. (*Id.* at 11:14-16).

5. Prior to initiating this action on January 29, 2025, the SEC investigated Defendants for more than two years, during which it issued more than ninety document subpoenas to third parties and Broadstreet-related entities and individuals, including Defendants' bank and financial institutions. (ECF 54 at 5).

6. Defendants produced hundreds of thousands of pages of materials in response. (*Id.*).

7. The SEC also took testimony from ten Broadstreet-related witnesses over a span of seventeen months. (*Id.*; ECF 60 at 5-9).

8. The SEC then initiated this case on a flawed TRO application, falsely claiming that Broadstreet was a massive fraud and that nearly all money raised was missing. (*See* sealed documents entered on January 30, 2025, Docket Entries 9, 10, 12, 13).

9. After a forceful response by Broadstreet (ECF 54), the SEC then abandoned the TRO application mid-hearing. (ECF 79).

10. The SEC initially claimed it could only find $62,500 deployed in investments. (ECF 84 at 25:19-21).

11. The SEC thereafter retreated from this blatantly false and outrageous statement as the SEC's own expert at the TRO hearing acknowledged that she was able to identify approximately $880 million in monies as having been deployed in investments for the benefit of investors and that Broadstreet had kept quite extensive records. (ECF 84 at 121:22-23; *id.* at 124:25-125:2; *see also, e.g., id.* at 122:13-19).

12. It was also acknowledged at the TRO hearing that nearly $1.2 billion was raised (*id.* at 124:17-19) and that the investor disclosure documents advised that 30% in total fees (*id.* at 63:18-25) and costs were permitted to be removed and hence approximately $880 million in cash was left to be invested, the exact amount traced by the SEC's own accounting expert as having been deployed in investments. (*Id.* at 121:22-23; *id.* at 124:25-125:2).

13. Broadstreet has sold two of its business divisions for stock in publicly traded companies on the NASDAQ and NYSE for a combined value of $3.6 billion. (*See* ECF 300-1 at ¶ 23).

14. Taking into account that $1.2 billion was raised and $3.6 billion in transactions has occurred, that is a ***<u>three times (3x) return</u>*** on capital. (*Id.*).

15. After the announcement of this redemption in late 2025 (*see, e.g.,* ECF 141 at 1), the SEC's counsel proceeded to represent to the Court in March of 2026, as noted above, that the SEC is no longer focusing on the business and rather just representations made to investors. (ECF 278-2 at 21:4-7).

16. There is no evidence of destruction of evidence, sudden transfer of funds or moving funds outside of the jurisdiction. There is, however, plenty of evidence that Defendants built a viable multi-billion-dollar real estate business with substantial assets and investments. (ECF 54 at 5; ECF 54-2 at ¶¶ 5, 7, 19-42; ECF 60 at 2; ECF 103 at ¶ 58; ECF 135 at ¶¶ 43, 68).

17. Broadstreet Global Fund, LLC ("BSGF") is the only entity to which investors can subscribe and which accepted investor money. (ECF 300-1 at ¶ 4).

18. BSGF is managed by BSGM. (*Id.*).[1]

19. Broadstreet focused on ultra-high net worth and sophisticated investors ("UHNW") to participate. (*Id.* at ¶ 6).

20. The Private Placement Memorandum ("PPM") confirms such focus. (ECF 300-2 at 10; *Id.* at 9).

21. The Average Broadstreet Investor ("ABI") is a UHNW. Roughly 75% of the ABI have net worths estimated between $10 million and $100 million and roughly 10% of the ABI have estimated net worths between $100 million and $1 billion. (ECF 300-1 at ¶ 7).

22. The reason that the ABI is UHNW is also spelled out in the PPM. (ECF 300-2 at 16).

23. Nearly every Broadstreet investor is college educated and most have an advanced educational degree beyond a college degree. (ECF 300-1 at ¶ 8).

24. Nearly all of the Broadstreet investors are professionals, including lawyers, persons with medical degrees that are executive officers of major healthcare practices, CEOs of major private and public companies, hedge fund managers, chief investment officers, operators of high-

[1] BSGF, BSGM and their affiliate or related entities are collectively referred to herein as "Broadstreet."

net-worth family offices, owners of hotel chains, real estate developers, accountants, and partners in large accounting and consulting firms. (*Id.*).

25. Every Broadstreet investor was required to review, accept, sign, and continuously review several documents ("Critical Documents"). (*Id.* at ¶ 9).[2]

26. These Critical Documents are explained in detail in Steven Baldassarra's prior declaration submitted in opposition to the TRO application abandoned by the SEC. (*See* ECF 54-2).

27. The disclosures contained in the Critical Documents are quite broad (ECF 300-1 at ¶ 9), as has been confirmed verbatim in writing by the Court-appointed corporate monitor, Jeffrey Schneider. (ECF 103 at ¶ 35).

28. The Critical Documents are detailed and prepared for the exact type of investor at issue here, accredited investors which each BSGF investor represented and warranted to be many times. (*Id.* at ¶ 10).[3]

29. In addition to the other Critical Documents, in July 2023, BSGM disseminated to investors a Compliance Acknowledgement Update ("CAU"). (*Id.* at ¶ 12).

30. Broadstreet's investors have signed the CAU. (ECF 300-1 at ¶ 13).

31. By executing the CAU, Broadstreet's investors certified that the information

---

[2] The Critical Documents are the PPM, BSGF Operating Agreement, Subscription Agreement, series supplements, slide decks, data room documents, monthly and quarterly updates and disclosures of Broadstreet. (*Id.*).

[3] Broadstreet presented each investor the opportunity to review the Critical Documents at least thirty-seven (37) times per year. Specifically, the investors were provided them at least once per month when clients logged into their account statements; at least once per month when investor reports were released; at least once per month as investors were advised to check the company data room; and on an annual basis when tax forms were transmitted to investors. (*Id.* at ¶ 11).

contained therein is accurate. (*See* ECF 300-3).

32. The SEC's case is limited to allegations of misrepresentations to investors. (ECF 278-2 at 21:4-7; *id.* at 27:6–8).

33. The SEC's allegations of misrepresentations to investors are limited to Broadstreet's representations concerning the following six issues:

a. Broadstreet's use of investor funds across BSGF series (ECF 8 at ¶¶ 4, 174–198);

b. Merchant Cash Advance ("MCA") "purported returns" and "ending balance" account statements (*id.* at ¶¶ 137, 143–149);

c. Broadstreet's deployment of investor funds (*id.* at ¶ 178);

d. Qualified Small Business Stock Subseries ("QSBS") (*id.* at ¶ 248);

e. Broadstreet's recordkeeping and financial statements (*id.* at ¶ 252); and

f. BSGM's investment adviser status (*id.* at ¶ 250).

34. The SEC alleges misrepresentations were made to investors regarding the use of investor funds across BSGF Series and into BSGM and affiliate accounts (ECF 8 at ¶¶ 4, 174–198).

35. Broadstreet did not make misrepresentations to investors regarding the use of investor funds across BSGF series and into BSGM and affiliate accounts. Broadstreet's investors have themselves confirmed ***in writing*** that they were aware that funds may be used for other purposes or investments. (ECF 300-3 at ¶¶ 7, 8).

36. The PPM acknowledges the investors were aware that funds may be used for other purposes or investments. (ECF 300-2 at 9, 16).

37. BSGF's Operating Agreement does too. (ECF 300-4 at §§ 5.01(e)(ii), (f)).

38. Investors were also provided slide decks and monthly and quarterly updates, containing disclosures that funds from one Series could be used to make payments with respect to another Series, noting that projects in the infrastructure Series were in early stages. (ECF 54-2 at ¶¶ 56-58).

39. The SEC alleges (a) that Defendants misrepresented that Defendants paid "purported returns" not supported by actual MCA performance, and (b) that the "ending balance" account statements misled investors (ECF 8 at ¶¶ 137, 143–149).

40. The alleged "purported returns" are not purported returns, however. The "purported returns" the SEC points to is Broadstreet's mere recitation to investors of what Broadstreet's contract rates were with Samson, not "purported returns." (ECF 300-1 at ¶ 14).[4]

41. And the account statements provided exactly what the PPM requires: that investments will be held at cost. (ECF 300-2 at 25).

42. The MCA portfolio was held at cost as provided on the account statements and as required by the PPM. (ECF 300-1 at ¶ 15).

43. The PPM further advised that there was no guarantee that holding investments at cost would represent the fair market value of the investments. (ECF 300-2 at 25).

44. In its pleading, the SEC claims that BSGM diverted approximately $880 million in investor funds. (ECF 8 at ¶ 178).

[4] Samson is the company with the MCA expertise. Broadstreet paid Samson to generate financial performance metrics regarding the MCA business. (ECF 300-1 at ¶ 14). Not only were those numbers not generated by Broadstreet, they were made by an expert in the MCA field, Samson, that was hired to do this work and who had its financial work audited and reviewed by third parties as well. (*Id.*).

45. Investor funds were not diverted but rather deployed on behalf of BSGF by its manager, BSGM, as confirmed by the SEC's own expert. (ECF 84 at 121:22-23; *id.* at 124:25-125:2).

46. Those monies ended up in business lines which were ultimately then sold for $3.6 billion in value, providing a significant exit and opportunity for Broadstreet investors. (ECF 300-1 at ¶ 23).

47. There was no requirement that the money only be kept in one operating account. The money was distributed to affiliated accounts under the name Broadstreet and went to the business lines eventually sold, excluding the monies taken for fees, which was also disclosed as acknowledged in writing by the investors. (ECF 300-3 at ¶ 6).

48. Section 4.01 of the Operating Agreement outlines in sixteen (16) subparts the broad powers and discretion provided to BSGM to manage, own, and control fund assets. (ECF 300-4 at Section 4.01).

49. The Operating Agreement goes on to further describe BSGM's discretion and control. (*Id.* at Section 4.01(c)).

50. Section 4.09 of the Operating Agreement states in relevant part, "[t]he Manager and its Affiliates may purchase an investment that would otherwise be appropriate for the Fund or a Series to own." (ECF 300-4 at Section 4.09).

51. BSGF's PPM also contains many disclosures regarding the manager's discretion and control over fund assets. (ECF 300-2 at 9, 26, 43).

52. The SEC's suggestion that $880 million in funds were diverted is false. The money simply went to affiliated entities, which were in the business lines sold for the benefit of investors

and more importantly as disclosed and agreed to by investors. (ECF 300-3 at ¶ 9). Broadstreet's investors have confirmed the same in multiple places including the CAU. (*Id.*).

53. BSGF investors were provided copies of Operating Agreement and PPM as part of the subscription documents when they initially invested in the BSGF as they have acknowledged same. (*Id.* at ¶ 3).

54. The SEC claims that BSGF's qualified small business stock ("QSBS") subseries never was implemented and that BSGM made misrepresentations regarding the status of the subseries. (ECF 8 at ¶ 248).

55. QSBS was pursued, however. Broadstreet's QSBS entity, Broad Street Global Development Corp. was founded on June 17, 2021, was incorporated in Delaware, and was registered with state and federal tax authorities. (ECF 300-1 at ¶ 18).

56. In October 2024, the QSBS entity was rebranded under the name TCVI Group, Inc., and a major national law firm had been in the process of completing a draft Form S-1 registration statement for the rebranded QSBS entity. (*Id.*).

57. There has been some uncertainty in the last several years as politicians suggested potential changes to the tax code related to QSBS. (ECF 54-2 at ¶ 37).

58. These political winds coupled with the SEC investigation impacted the progress related to the QSBS subseries. (*Id.*).

59. Moreover, under the IRS statutes and rules, QSBS stock has a 5-year holding period before tax benefits can be secured. (*See* Internal Revenue Code, Section 1202).

60. The Series was discontinued in the first quarter of 2025 and QSBS investors were given the option to be redeemed or have their investment rolled over into another business line. (ECF 300-1 at ¶ 19).

61. Those who rolled over are being redeemed along with Broadstreet's other investors in accordance with the redemption. (*Id.* at ¶ 20).

62. The SEC complains that BSGM did not generate financial statements for the fund that were prepared and audited pursuant to GAAP. (ECF 8 at ¶ 252).

63. What the SEC fails to advise this Court is that each and every investor signed a document acknowledging that they would ***not*** be receiving GAAP audited financials and Broadstreet is ***not*** required to have GAAP audits. (*See* ECF 300-3 at ¶ 3; ECF 300-1 at ¶ 21).

64. In reality, a major contributing factor for not receiving such an audit was this: Broadstreet and/or the SEC advised potential auditors that it was under SEC investigation. (ECF 300-1 at ¶ 21).

65. Broadstreet's investors accepted that they would not be receiving GAAP audits. (*See* ECF 300-3 at ¶ 3; ECF 300-1 at ¶ 21).

66. BSGM disclosed to investors that it would use "commercially reasonable efforts" to deliver financial statements to investors. (ECF 300-1 at ¶ 21).

67. These disclosures appeared in both the fund Operating Agreement and the PPM. (ECF 300-4 at Section 9.03; ECF 300-2 at 45; *see also* 54-5 at 14-19; 54-1 at ¶ 46).

68. The PPM also states that the "[f]inancial information contained in all reports to the Members will be prepared on an accrual basis of accounting . . . The Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion employing such firms and professionals at its discretion." (ECF 300-2 at 45).

69. BSGM kept and maintained separate records for each Series. (*See* Declaration of Lee Robinson executed on January 28, 2025 and filed under seal by the SEC on January 30, 2025 at ¶ 55).

70. Mr. Robinson relies on the BSGF Monthly Schedules to describe the various Series and notes they are too massive to attach. (*Id.*).

71. The SEC claims that Broadstreet acted as an investment adviser but represented otherwise to its investors. (ECF 8 at ¶ 250).

72. Broadstreet's investors disagree that Broadstreet represented to them that Broadstreet was their investment adviser. (Ex. 3 at ¶¶ 12, 13).

73. The investors' statements of disagreement are consistent with the PPM (ECF 300-2 at 1) and the disclaimers provided to investors (ECF 299-5 at 1).

[signature pages follow]

Dated: July 2, 2026

Respectfully submitted,

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**

By: ***Thomas Scot Wolinetz***
Thomas S. Wolinetz, Esq.
Florida Bar No. 1001160
Irwin Weltz (PHV)
1 Old Country Road, Suite 275
Carle Place, New York 11514
Telephone: (212) 202-3176
Facsimile: (516) 855-8776
twolinetz@weltz.law
irwin@weltz.law

**GALLIVAN WHITE & BOYD P.A.**

By: ***Ioannis (Ian) G. Conits***
Ioannis (Ian) G. Conits (PHV)
55 Beattie Pl., Suite 1200
Greenville, South Carolina 29601
Telephone: 864-271-5432
iconits@gwblawfirm.com

**LETT LAW FIRM**

By: ***Ariel Lett***
Ariel Lett, Esq.
Florida Bar No. 115513
6303 Blue Lagoon Dr., Suite 400
Miami, FL 33126
Telephone: 305-912-5388
alett@lettlawfirm.com

*Attorneys for Broadstreet Inc. and David Feingold*

**BERKELEY LAW P.A.**

By: ***Lorne E. Berkeley***
Lorne E. Berkeley, Esq.
Florida Bar No. 146099
10600 Griffin Road, Suite 104
Cooper City, Florida 33328
Telephone: (954) 719-3484
Lorne@BerkeleyLawFL.com

*Attorneys for Broadstreet Global Management LLC, Joseph B. Baldassarra, and Steven B. Baldassarra*

**LOMAX LEGAL PLLC**

By: ***Brianna P. Hathaway***
Brianna P. Hathaway, Esq.
Florida Bar No. 1019219
396 Alhambra Circle, Suite 202
Coral Gables, FL 33134
Telephone: 305.582.6506
Brianna@LomaxLegal.com

*Attorneys for Broadstreet Global Management LLC and for Relief Defendants, JosephBenjamin, Inc. and Just a Nice Day, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 2, 2026, I filed this document through the CM/ECF system, which will cause a copy of this document to be served by Notice of Electronic Filing on all counsel and parties of record.

***Brianna P. Hathaway***
Brianna P. Hathaway, Esq.