**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Securities and Exchange Commission,

      Plaintiff,

v.                                Case No. 1:25-cv-20436-DPG

David J. Feingold, *et al.*,

      Defendants.

                                    /

## THE L3 FUNDS' EMERGENCY LIMITED MOTION TO INTERVENE

Non-parties L3 Capital Income Fund, LLC ("L3 Income Fund") and L3 Capital Special Opportunity Fund, LLC ("L3 Special Opportunity Fund") (collectively, "L3 Funds"), pursuant to Fed. R. Civ. P. 24, move to intervene to prevent the transfer of assets, and distribution of related funds, in which they assert an interest, and in support state:[1]

> ***BASIS FOR EXIGENCY**. On August 12, 2026, Broadstreet gave the L3 Funds notice, for the first time, that it intends to sell the L3 Projects (defined below) to D.R. Horton on August 14, 2026. The L3 Funds had previously been assured by the SEC, the Monitor, and Broadstreet that disputed assets were not subject to liquidation or distribution. Now, the L3 Funds must immediately intervene to halt the sale and ensure that adequate protections are in place for the L3 Funds' and their investors' rights. The L3 Funds seek relief no later than today, August 13, 2026.*

## INTRODUCTION

Defendant David Feingold misappropriated millions of dollars in investor funds from the L3 Funds, hijacked their assets, and delivered those assets to Broadstreet and himself.[2] On August

---

[1] The L3 Funds (1) Proposed Complaint in Intervention, (2) Emergency Motion for Relief, and (3) proposed Order granting this motion are attached as **Exhibit 1, 2, and 3**.

[2] As used here, "Broadstreet" refers to the collection of entities that including Broadstreet, Inc., Broad Street Global Management, LLC, Broad Street Global Fund, LLC, Broadstreet New York, Inc., and others relating to the same venture.

ACTIVE 727360661v4

14, 2026, Broadstreet stated that it intends to sell four of those projects: (1) Hyatt Street Holdings LLC; (2) Gap Creek Group LLC; (3) Woodruff 101 Development LLC; and (4) Standing Springs Land Development, LLC (collectively, "L3 Projects"). Though the Monitor told Broadstreet in April 2026 that Broadstreet needed to notify the L3 Funds and their investors of this impending sale, Broadstreet conspicuously failed to do so until August 12, 2026, just two days before the sale is scheduled to take place. The L3 Funds request emergency relief permitting them to intervene for the limited purpose of ensuring that the L3 Projects are not sold, and their proceeds are not distributed, without protecting the L3 Funds and their nearly 100 individual investors.

## BACKGROUND

**I.      The L3 Funds Have Direct, Identifiable Interests in the L3 Projects.**

The L3 Funds are two investment funds that represent the interests of nearly 100 individual investors. L3 Capital Management, LLC ("L3 Management"), through Richard Cardinale, wholly manages both of the L3 Funds. Defendant David Feingold is a former fiduciary of the L3 Funds and, through that position, orchestrated an extreme and overt fraud on their investors by, among other things, diverting their interest in the L3 Projects to Broadstreet.

The L3 Income Fund provided nearly 100 individual investors with the opportunity to invest in various alternative investment opportunities including infrastructure and real estate development projects. To do so, the L3 Income Fund loans capital to its investment vehicles, which invest the funds and repay the loan (principal and interest) when they receive returns. Under the loan agreement between the L3 Income Fund and its investment vehicles, the L3 Income Fund is entitled to a security interest on all assets and funds belonging to its borrowers. Between May 2020 and August 2021, at Feingold's advice and direction, the L3 Income Fund loaned two of its investment vehicles, Alternative Global Two, LLC ("AG2") and Alternative Global Four, LLC

2

("AG4"), more than ***$16.7 million*** to invest in infrastructure and real estate development projects, including the L3 Projects, operated by Blackstream Development, LLC ("Blackstream"), a South Carolina developer. In exchange, Feingold represented that AG2 and AG4 would receive majority membership interests in the relevant Blackstream projects, including the L3 Projects. AG2 and AG4 did, in fact, transfer the funds to Blackstream.

Based on Feingold's advice and recommendations, Cardinale created the L3 Special Opportunity Fund to provide investors with the opportunity to invest in an infrastructure and land banking deal to purchase two outparcels of land in Gaffney, South Carolina adjacent to a planned D.R. Horton housing development (collectively, "Gaffney Outparcels"). Between April 2021 and December 2021, at Feingold's advice and direction, the L3 Special Opportunity Fund transferred more than $15.2 million in investor capital to an account Feingold identified as "Blackstream Outparcel Partners" for the purchase and development of the Gaffney Outparcels. Just as before, in exchange, Feingold represented that the L3 Special Opportunity Fund would receive a majority membership interest in Hyatt Street, the special purpose vehicle that would own and develop the Gaffney Outparcels.

## II.      Feingold Misdirected the L3 Funds' Rights to Broadstreet.

Instead of investing the L3 Income Fund's loaned capital for AG2 and AG4, Feingold diverted the funds and invested them on behalf of Alternative Global Partners, an unauthorized and undisclosed partnership with Broadstreet.[3] Neither the L3 Income Fund nor any of its

---

[3] Alternative Global Partners is identified in its Amened Partnership Agreement as a partnership between Alternative Global Management, LLC ("AGM") and Broadstreet Global Management, LLC ("BSG Management"). AGM was created to jointly administer the affairs of the L3 Income Fund's investment vehicles and hold any excess profits earned above the amounts paid to the L3 Income Fund. AGM is not in privity with the L3 Income Fund, nor does it (now or ever) own or manage the investment vehicles. Feingold has, however, alleged elsewhere that AGM is the 100%

3

investment vehicles are partners of Alternative Global Partners, and in fact did not know Alternative Global Partners existed, much less that it owned an interest in the assets purchased with the L3 Income Fund's loaned capital. Then, on November 11, 2021, Feingold purportedly executed an agreement with Broadstreet to terminate Alternative Global Partners and transfer ownership and control of its assets to Broadstreet ("Termination Agreement"). The Termination Agreement acknowledges that AG2 and AG4 funded the L3 Projects. The L3 Income Fund and its investment vehicles received no consideration for funding the L3 Projects or for the transfer of ownership and control of the L3 Projects to Broadstreet.[4] This event was not revealed until the Monitor disclosed the Termination Agreement to the L3 Income Fund in May 2025.

Instead of investing the L3 Special Opportunity Fund as agreed, Feingold directed the funds to an account—which he identified as "Blackstream Outparcel Partners"—held by Ryda Holdings Partners, LLC ("Ryda"). According to the IRS, Ryda, formed in February 2021, was "conceived and designed" by Feingold and, while the entity itself is wholly owned and managed by Feingold's son, Ryan Feingold, Feingold himself is the 50% beneficial owner of its bank account. The IRS reports that Ryda received more than $14.3 million in 2021 from the L3 Special Opportunity Fund. Feingold diverted the assets and invested them on behalf of himself. The full extent of the truth was not revealed until the IRS filed documents exposing it in June 2026.

## III.   Feingold Now Owns or Controls the L3 Projects Through Broadstreet.

Cardinale discovered that Feingold had been covertly working with Broadstreet to solicit investors by portraying the L3 Funds' investments as their own. When Cardinale demanded an

---

member of each of the L3 Income Fund's investment vehicles. *See Feingold v. Cardinale et. al.*, 1:22-cv-20375-RKA [ECF No. 376, ¶¶ 103, 168, 169, 204, & 205] (S.D. Fla. June 18, 2026).

[4] The Termination Agreement provides a guaranteed "return of its initial capital plus at least a forty percent return" to AGM, not to the L3 Income Fund, AG2, or AG4.

ACTIVE 727360661v4

explanation, Feingold demanded a buyout and threatened to "ruin[ ]" Cardinale if he refused to accept his buyout demands, specifically representing that he "knew [his] way around a courtroom," based on his experience as a licensed Florida attorney. After Cardinale refused Feingold's buyout demands, Feingold resigned as a member and manager of the L3 Income Fund's investment vehicles, including AG2 and AG4. The same day, Michael Dazzo—one of Feingold's co-conspirators and a Senior Managing Director of Broadstreet—represented that Feingold's goal was to force Cardinale to "allow[ ] Broad Street" to "take the fund." Less than six months later, Feingold became the CEO of Broadstreet, Inc. ("BSI").

**IV.     Broadstreet Filed an Interpleader Admitting it Holds the L3 Funds' Assets.**

In January 2023, Feingold and Broadstreet incorporated a new entity, Broadstreet New York, Inc. ("BSNY"). Just eight days later, it filed an interpleader complaint in New York County against the L3 Income Fund. *Broadstreet New York, Inc. v. L3 Capital Income Fund, LLC*, No. 650218/2023 (N.Y. Cnty.) ("Interpleader"). In it, BSNY identifies itself as an "affiliate" of BSI and alleges that "over the next five years, substantial sums of money will come into [Broadstreet's] possession, some of which should be distributed to … the L3 [Income Fund] and ultimately to [its] investors or members." BSNY never disclosed how Broadstreet came to possess, manage, or control assets that the L3 Income Fund owns. The L3 Income Fund and its investment vehicles, including AG2 and AG4, successfully moved to intervene in the Interpleader.

**V.     The L3 Funds Did Not Previously Seek Intervention Because There Was No Imminent Threat of Liquidation.**

In May 2025, the Monitor disclosed the existence of the alleged Termination Agreement and, contemporaneously with the same, filed the *Monitor's Second Status Report* [ECF No. 118] ("Second Status Report"). In the Second Status Report, the Monitor reported that:

5

ACTIVE 727360661v4

(1)     Broadstreet "repeatedly assured [the Monitor] … verbally and in writing … that the infrastructure assets … were assets owned and controlled by" Broadstreet;

(2)     Broadstreet failed to inform the Monitor that there was any dispute over, among others, the L3 Projects;

(3)     the "Monitor's independent review" uncovered "a potential significant dispute … regarding the ownership of certain infrastructure assets," including the L3 Projects;

(4)     Feingold is the 1/3 owner of Contender Development, LLC ("Contender"), an affiliate of Blackstream, and Contender is now listed as a minority member on many of the infrastructure assets, potentially including the L3 Projects;

(5)     Feingold represented Cardinale provided "verbal approval" for the Termination Agreement; and

(6)     Broadstreet's books and records include a myriad of identified "Alternative Entities," including Alternative Global Partners, Alternative North American Partners, and Alt Global Five, LLC that they claim are Broadstreet assets.

*Id.*, ¶¶ 10–20, 24–25, 29, & 32.

Upon receipt of the Termination Agreement and the Second Status Report, the L3 Funds and their investment vehicles prepared to intervene in this action. The SEC and the Monitor represented that Broadstreet promised that all disputed assets were set aside and protected from liquidation or distribution. Additionally, Broadstreet agreed to engage in a mediation to resolve all disputes between the L3 Funds and Broadstreet. Based on both of these occurrences, the L3 Funds did not move to intervene.

Mediation reached an impasse in January 2026. In April 2026, a Broadstreet principal represented under oath that "Broadstreet has already set these disputed projects aside" and "there is no 'imminent threat' of liquidation" of the disputed projects.[5] *Siriani et al. v. Feingold et al.*

---

[5]  In other places Broadstreet added language indicating that the assets would not be sold to redeem investors, but their statement that the disputed assets had been set aside was wholly unqualified.

6

("Class Action"), No. 9:26-cv-80119-RKA [ECF No. 97-29 ("Baldassarra Dec."), ¶ 6] (S.D. Fla. Apr. 20, 2026). The L3 Funds accepted this representation, coupled with the prior express statements of the SEC and the Monitor (all based on Broadstreet), that there was no immediate threat of irreparable harm from the imminent liquidation or distribution of the disputed projects, including the L3 Projects, without protections for the L3 Funds' and their investors' interests.

**VI.     The L3 Funds Learned About Broadstreet's Intent to Liquidate the L3 Projects on August 12, 2026, Two Days Before the Intended Sale.**

On August 12, 2026 at 11:52 am, Broadstreet filed a notice in the Class Action indicating that it intends to sell the L3 Projects on August 14, 2026, just two days after the notice was filed ("Notice of Sale"). None of the terms of the sale, the costs associated with the sale, or any other meaningful information related to the sale was provided. According to the Notice of Sale, Broadstreet only provided notice because, at a meeting on April 24, 2026, the Monitor specifically requested Broadstreet do so. The L3 Funds had no knowledge of the impending sale before the Notice of Sale, providing them with almost no time to contemplate how best to proceed and ensure that their rights—and the rights of the nearly 100 individual investors they represent—are protected. Upon determining that intervention was necessary, the L3 Funds contacted the SEC and informed it that they sought to intervene only to protect the L3 Projects, or any proceeds derived from their sale, from improper transfer, distribution, or encumbrance. And, of course, this "sale" comes after the SEC had filed for the appointment of a receiver.

After understanding the nature of the L3 Funds' limited request and their need for immediate action, the SEC responded that

---

No party was ever placed on notice that what Broadstreet actually meant it was not going to sell the assets to pay Peter, but it would sell them to pay Paul. It would be unreasonable to construe Broadstreet's declarations as anything other than an unqualified statement under oath that the disputed assets were set aside and not subjected to sale.

[t]he SEC understands that the movants are seeking to intervene to protect their interests in certain assets and are not seeking to litigate the merits of the claims and defenses asserted in this case or to participate in discovery about the merits of those claims and defenses. On that basis the SEC does not take a position on the relief requested.

## MEMORANDUM OF LAW

"The determination of whether the proposed intervenor's complaint states a cause of action is controlled by the general rules on testing a pleading; the factual allegations of the complaint are assumed to be true ... and the pleading is construed liberally in support of the pleader." *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881 (11th Cir. 2003) (quoting *Pin v. Texaco, Inc.,* 793 F.2d 1448, 1450 (5th Cir. 1986)); *see also Cent. St., S.E. & S.W. Areas Health  & Welfare Fund v. Old Sec. Life Ins. Co.*, 600 F.2d 671, 679 (7th Cir. 1979) ("All nonconclusory allegations supporting a motion to intervene are taken as true, absent sham, frivolity, or other objections."). The L3 Funds seek to intervene to protect their interests in the L3 Projects. They should be permitted to do so because (i) 15 U.S.C. § 78u(g) ("Section 21(g)") does not prohibit the L3 Funds' intervention; (ii) the L3 Funds are entitled to intervene; and (iii) alternatively, the L3 Funds should be permitted to permissively intervene.

## I.       Section 21(g) Does Not Prohibit Intervention.[6]

Under Section 21(g), "[n]o action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission." While there is a split of authority on whether Section 21(g) applies to a motion to intervene, the Eleventh Circuit has not resolved the

---

[6] The SEC does not oppose the L3 Funds' intervention. Accordingly, the L3 Funds would suggest that this analysis of Section 21(g) is not necessary. But in an abundance of caution, the L3 Funds address Section 21(g).

question and "***there is no persuasive authority which suggests that section 21(g) ... bars intervention in all SEC enforcement actions.***" *SEC v. BKCoin Mgmt., LLC*, No. 23-CV-20719, 2024 WL 2874857, at *4 (S.D. Fla. May 17, 2024) (Goodman, J.), *report and recommendation adopted by* 2024 WL 3013632 (S.D. Fla. June 14, 2024) (quoting *SEC v. Callahan,* 2 F. Supp. 3d 427, 437 (E.D.N.Y. 2014)). In *BKCoin Mgmt*, Judge Goodman agreed with the majority position that there is "no support for the proposition that Congress, by including only words 'coordinate' and 'consolidate' in the language of Section 21(g), meant for that provision to apply to all possible interventions in SEC enforcement actions." 2024 WL 2874857, at *5 (citations omitted, emphasis in original). "[T]he plain language of § 21(g) bars only ***consolidation***. It makes no mention of ***intervention,*** and the Federal Rules of Civil Procedure contain no exception to intervention for SEC actions." *Id.* (citations omitted, emphasis in original).

If the circumstances did not sufficiently justify intervention, or if Section 21(g) facially prevented intervention of all kinds, the SEC would surely oppose the L3 Funds' request to intervene regardless of the nature of their request. But, instead, the SEC does not oppose the L3 Funds' intervention precisely because the nature of its request is appropriate and outside the scope of Section 21(g). The L3 Funds, just like the intervenor in *BKCoin Mgmt.*, "seek[ ] to intervene to protect their interests in certain assets and are not seeking to litigate the merits of the claims and defenses asserted in this case or to participate in discovery about the merits of those claims and defenses." *See id.*, at *6 (permitting intervention by intervenor that did not "seek to intervene in order to recover damages from the parties against whom the SEC seeks relief"). The Court should thus conclude, to the extent it requires any analysis of Section 21(g), that Section 21(g) does not prohibit the L3 Funds' intervention.

ACTIVE 727360661v4

## II.    The L3 Funds are Entitled to Intervene.

Under Fed. R. Civ. P. 24(a)(2),

> [o]n timely motion, the court must permit anyone to intervene who … claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

Fed. R. Civ. P. 24(a)(2). A movant is entitled to intervene as a matter of right under Rule 24(a)(2) if it establishes the following four elements: (a) the motion is timely; (b) the movant "has an interest relating to the property or transaction that is the subject of the action"; (c) the movant "is so situated that disposition of the action, as a practical matter, may impede or impair [the movant's] ability to protect that interest"; and (d) the movant's "interest is represented inadequately by the existing parties to the suit." *BKCoin Mgmt*, 2024 WL 2874857, at *6 (quoting *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989)). "This test is a flexible and discretionary one, and courts generally look at all four factors as a whole rather than focusing narrowly on any one of the criteria." *SEC v. Xia*, No. 21-cv-5350, 2024 WL 964676, at *6 (E.D.N.Y. Mar. 4, 2024) (cleaned up). The L3 Funds satisfy each of these four factors.

### A.    The Emergency Motion is Timely Because the L3 Funds Acted Immediately Upon Learning of an Imminent Threat to Their Rights in the L3 Projects.

"Timeliness is not a word of exactitude or of precisely measurable dimensions," but rather an analysis that "must have accommodating flexibility toward both the court and the litigants … to regulate intervention in the interest of justice." *Ga. v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002) (citing *Chiles*, 865 F.2d at 1213). Courts in the Eleventh Circuit consider four timeliness factors:

(1)    the length of time during which the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene;

10

(2)      the extent of prejudice to the existing parties as a result of the proposed intervenor's failure to move for intervention as soon as it knew or reasonably should have known of its interest;

(3)      the extent of prejudice to the proposed intervenor if the motion is denied; and

(4)      the existence of unusual circumstances militating either for or against a determination that their motion was timely.

*Ga.*, 302 F.3d at 1259 (quoting *Chiles*, 865 F.2d at 1213). It is error to deny a motion to intervene as untimely without sufficiently considering all four factors. *Walker v. Jim Dandy Co.*, 747 F.2d 1360, 1366 (11th Cir. 1984) ("Because the district court denied, as untimely, Pruitt's motion to intervene without considering all four of the factors …, we hold that the district court clearly abused its discretion.").

### 1.      The L3 Funds Acted Timely to Enforce Their Rights.

"Courts [ ] discourage premature intervention [because it] wastes judicial resources." *John Doe No. 1 v. Glickman*, 256 F.3d 371, 376 (5th Cir. 2001). The timeliness clock is thus not calculated based on when the lawsuit was filed, but based on when the intervenor learned that its interests "would no longer be protected by the existing parties to the lawsuit." *Id.* (quoting *Edwards v. City of Houston*, 78 F.3d 983, 1000 (5th Cir. 1996)). Here, the L3 Funds were repeatedly reassured that their rights were protected and had no reason to know that anything was amiss until August 12, 2026, when they received the Notice of Sale indicating that the L3 Projects would be sold on August 14, 2026, just two days later. Indeed, just several months earlier, a Broadstreet principal confirmed under oath that "Broadstreet has already set these disputed projects aside" and "there is no 'imminent threat' of liquidation" of the disputed projects. The L3 Funds acted immediately to protect their rights, filing approximately twenty-four hours after the Notice of Sale was filed in the Class Action.

ACTIVE 727360661v4

2.      No Party is Prejudiced by the L3 Funds' Timing.

"Prejudice to the parties from the ***intervention*** itself should not influence the determination of timeliness. Instead, only prejudice resulting from the ***delay in filing the motion*** is relevant." *United States v. Coffee Cnty. Bd. of Educ.*, 134 F.R.D. 304, 308 (S.D. Ga. 1990) (emphasis in original). No party is prejudiced by the L3 Funds' timing. Again, they had no reason to know that their rights in the L3 Projects were not being protected; indeed, they had repeatedly been assured of the exact opposite. When the L3 Funds learned of an imminent threat to their rights on August 12, 2026, they immediately filed to protect those rights.

The SEC, in indicating it does not oppose the L3 Funds' motion, confirms it is not prejudiced. Broadstreet, by contrast, will likely argue that filing shortly before the sale closing prejudices Broadstreet. But again, the question is not whether the L3 Funds' motion substantively prejudices Broadstreet, but rather whether the L3 Funds prejudiced Broadstreet by any delay in their filing. The L3 Funds learned of an imminent threat to their rights in the L3 Projects on August 12, 2026; prior to that date, they had been repeatedly informed by the SEC, the Monitor, and statements under oath by Broadstreet itself that the disputed assets, including the L3 Projects, were under no threat of liquidation. The L3 Funds did not delay in any way, thereby obviating any concern of prejudice. That ends the inquiry.

3.      The L3 Funds Will be Prejudiced if Intervention is Denied.

The L3 Funds and their investors would be significantly prejudiced if intervention is delayed. First, the L3 Funds collaborated with the SEC and the Monitor when they requested the L3 Funds delay seeking intervention in favor of confirmation that the disputed assets were protected and, at the Monitor's urging, engaged in mediation with Broadstreet concerning the L3 Projects. Now, the L3 Funds learn at the eleventh hour that the L3 Projects are unprotected and

12

that they may lose their rights and interests in them forever if the Court does not permit them to intervene and assert their rights. Such harm vastly outweighs any potential harm to Broadstreet.

4.   Broadstreet's Intentional Delay in Serving the Notice of Sale is Precisely the Sort of Unusual Circumstance that Tilts the Scale.

Courts have previously concluded that delayed filings may be timely when the impetus for the intervention motion did not arise until later in the case. For example, in *SEC v. Xia*, the Eastern District of New York concluded that a secured creditor's motion to intervene was timely even though it was filed sixteen months after the case was filed because the need for the motion did not arise until it discovered "significant diminution of property value" in the secured property three months before the case was filed. 2024 WL 964676, at *7. The Eleventh Circuit applies the same principle to the sale and distribution of disputed assets, holding a motion to intervene timely as to "issues relating to the future sale and distribution of the frozen assets" even when filed late in the case, because "[t]imeliness presents no automatic barrier to intervention in post-judgment proceedings where substantial problems in formulating relief remain to be resolved." *FTC v. Am. Legal Distribs., Inc.*, 890 F.2d 363, 365–66 (11th Cir. 1989). Here, like in *Xia*, the L3 Funds had no knowledge of facts that would have justified intervening until August 12, 2026, and filed this motion immediately upon learning the truth.

Indeed, here, the question of timeliness should be raised with Broadstreet, not the L3 Funds. The Notice of Sale confirms that, on April 24, 2026, the Monitor informed Broadstreet that it would have to give the L3 Funds notice of their intent to sell the L3 Projects to D.R. Horton. Instead of promptly doing so, Broadstreet sat on the information for more than three months. It was Broadstreet's choice, not the L3 Funds' choice, to provide the Notice of Sale just two days before the closing date. Any harm is a self-inflicted wound caused by their intentional decision to delay notice until the eve of closing that ought not be considered by this Court. *See, e.g.*, *Familias*

*Unidas por la Justicia, AFL-CIO v. U.S. Dep't of Labor*, 795 F. Supp. 3d 1325, 1332 (W.D. Wash. 2025) (explaining in the preliminary injunction context that "[a] 'largely self-inflicted [harm] severely undermines [a party's] claim for equitable relief.'" (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020))); *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (preliminary injunction not warranted where the "moving parties have not shown that they availed themselves of opportunities to avoid the injuries of which they now complain").

### B.      The L3 Funds Have an Interest in the Subject Matter of this Case.

An intervenor must have a direct, substantial, and legally protectable interest in the case. *Hawes v. Gleicher*, 745 F.3d 1337, 1339 n.5 (11th Cir. 2014) (quoting *Mt. Hawley Ins. Co. v. Sandy Lake Props., Inc.,* 425 F.3d 1308, 1311 (11th Cir. 2005)). "To decide if a movant has a legally protectable interest, a court must be flexible, with focus on the particular facts and circumstances of the case." *Retina-X Studios, LLC v. ADVAA, LLC*, 303 F.R.D. 642, 653 (M.D. Fla. 2014) (citing *Huff v. Comm'r of IRS*, 743 F.3d 790, 796 (11th Cir. 2014)).

The L3 Income Fund asserts that its investment vehicles rightfully own the L3 Projects and that, consequently, the L3 Income Fund is entitled to a security interest on its investment vehicles' interests in the L3 Projects. Such asserted secured creditor rights are among the legally protected property interests that justify intervention. The L3 Special Opportunity Fund is a proper member of Hyatt Street whose rights were improperly diverted by Broadstreet and Feingold. These alleged ownership and secured creditor rights are precisely the sort of legally protectable property interests that courts have repeatedly concluded permit intervention. *See, e.g.*, *Xia*, 2024 WL 964676, at *10 (finding a secured creditor had an "undeniable" interest in ensuring its security interests were "respected" when their collateral was in the case and could theoretically be distributed to

14

investors); *Retina-X Studios*, 303 F.R.D. at 653 (finding the movant had an interest justifying intervention when the movant alleged an interest in the trademark in dispute).

### C. Failing to Grant Intervention Will Practically Impair or Impede the L3 Funds' Rights in the L3 Projects.

A movant's asserted interest and the effect that disposition will have on that interest "are closely related issues." *Chiles*, 865 F.2d at 1214. "For this factor, '[a]ll that is required under Rule 24(a)(2) is that the would-be intervener be practically disadvantaged by his exclusion from the proceedings.'" *In re Terra Invest, LLC*, No. 21-mc-23332, 2022 WL 19406162, at *4 (S.D. Fla. June 9, 2022) (quoting *Huff*, 743 F.3d at 800). "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Huff*, 743 F.3d at 800 (quoting *Cascade Nat. Gas Corp. v. El Paso Nat. Gas Corp.*, 386 U.S. 129, 134 n.3 (1967)). Such impairment can arise in a variety of ways, such as by the "diminution in strength, value, quality, or quantity" of the movant's interest, *Xia*, 2024 WL 964676, at *11, or by any potential *stare decisis* effect or "practical disadvantage" that orders in the case may supply. *Chiles*, 865 F.2d at 1214 (citing *Atlantis Development Corp. v. United States,* 379 F.2d 818, 829 (5th Cir. 1967)); *see, e.g.*, *Shenzhenshi Haitiecheng Science and Technology Co., Ltd. v. Rearden LLC*, No. 15-cv-00797, 2016 WL 5930289, at *5 (N.D. Cal. Oct. 11, 2016) (granting intervention when intervenor claimed a protectable property interest in property that would have been practically impaired by ongoing property dispute).

Here, the issue is simple. Today, the L3 Projects are sitting in Broadstreet, where the L3 Funds were repeatedly assured they had been segregated and could not be liquidated at this time. Now, they may be sold to D.R. Horton on two days' notice and without notice to or approval from the L3 Funds on any of the terms of such sale. Moreover, if such sale proceeds without procedures in place to protect the proceeds from use or distribution by Broadstreet, those specific funds, traced

ACTIVE 727360661v4

to those specific disputed assets, will be transferred away, commingled, or otherwise rendered unable to be treated as a simple, segregated *res* for which the Court may provide equitable relief.

### D.        The L3 Funds are not Adequately Represented by any Existing Party.

The inadequate representation requirement is "minimal" and generally satisfied "unless it is clear that [the existing parties] will provide adequate representation." *Terra Inv.*, 2022 WL 19406162, at *4 (quoting *Huff*, 743 F.3d at 800). No party to this case is tasked with representing interests identical to the L3 Funds' interests. The L3 Funds seek to protect their ownership interests in the L3 Projects. While others (e.g., the SEC and the Monitor) previously made representations about the safety of the L3 Funds' assets, there is no one except the L3 Funds prepared to intercede on their behalf and protect the interests of their investors.

## III.    <u>Alternatively, the L3 Funds are Permitted to Intervene.</u>

"On timely motion, the court *may* permit anyone to intervene who … has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "A party seeking to intervene under Rule 24(b)(2) must show that: (1) his application to intervene is timely; and (2) his claim or defense and the main action have a question of law or fact in common." *Chiles*, 865 F.2d at 1213. Because the L3 Funds have already addressed the first factor in their analysis of timeliness above, the L3 Funds only address the second factor here.

The common question of law or fact requirement is liberally construed. *Stallworth v. Monsanto Co.*, 558 F.2d 257, 269 (5th Cir. 1977).[7] "Permissive intervention may be permitted when the intervenor has an economic interest in the outcome of the suit."[8] *United States v. Lauer*,

---

[7] Pre-1981 Fifth Circuit opinions are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).
[8] *See also In re Cochise College Park, Inc.*, 703 F.2d 1339, 1346 (9th Cir. 1983) (affirming intervention of movants challenging a trustee's right to use, appropriate, or disburse assets in his custody); *Ala. v. U.S. Army Corps of Eng'rs*, 229 F.R.D. 669, 675 (N.D. Ala. 2005) (permitting

16

242 F.R.D. 184, 186 (D. Conn. 2007) (holding that movant, "[a]s holder of title to the property and of any surplus from its sale," had a sufficient economic interest in the outcome of a foreclosure action to permit his intervention "to protect his right to receive the net proceeds of the sale of the property, and also to assert his position on how the property should be sold").

The L3 Funds assert rights in the L3 Projects. The L3 Projects are in this case, and Broadstreet is attempting to, as part of this case, sell the L3 Projects with the Monitor's approval. While the SEC's lawsuit itself does not specifically raise or address whether Broadstreet is entitled to the L3 Projects, the process of identifying investments, placing them in the right series, and ensuring proper distributions to investors necessarily overlaps with understanding who has the right to own and control the L3 Projects. Because the L3 Funds' investors funded those purchases, it will likely be difficult to place these assets in a proper series because, again, Broadstreet's investors were not the ones who paid for the interests that Broadstreet hijacked from the L3 Funds.

## CONCLUSION

The L3 Funds are entitled to the L3 Projects and both Feingold and Broadstreet know it. Instead of giving the L3 Funds what they are entitled to, Broadstreet and Feingold chose bad-faith tactics to sneak a sale of the assets at the eleventh hour without disclosing any information to, or obtaining approval from, the L3 Funds. This Court should not permit Broadstreet's and Feingold's tactics to win the day, thereby allowing it to abscond with millions in benefits derived from the money Broadstreet and Feingold stole from the L3 Funds' investors.

---

intervention in an action challenge the Corps management of water reservoirs by a movant asserting interests in the "appropriate operation of the Corps' reservoirs" and an "economic stake in the outcome" of the litigation); *SEC v. Kings Real Est. Inv. Tr.*, 222 F.R.D. 660 (D. Kan. 2004) (permitting intervention by an investor to protest inclusion of his assets in a receivership estate).

18

**WHEREFORE**, the L3 Funds request the Court grant this motion, treat its attachments (Complaint in Intervention and Emergency Motion for Injunctive and Equitable Relief) as timely filed, and grant such other and further relief as the Court deems just and proper.

ACTIVE 727360661v4

## CERTIFICATE OF CONFERRAL

On August 12, 2026, Counsel for the L3 Funds conferred with Counsel for the SEC. Counsel for the SEC stated that "[t]he SEC understands that the movants are seeking to intervene to protect their interests in certain assets and are not seeking to litigate the merits of the claims and defenses asserted in this case or to participate in discovery about the merits of those claims and defenses. On that basis the SEC does not take a position on the relief requested." The same day, Counsel for the L3 Funds contacted counsel for Broadstreet and Feingold via email requesting their position by noon on August 13, 2026, given the exigency. Broadstreet and Feingold oppose the requested relief and indicated that will be filing some type of motion to strike. Nonetheless, the parties conferred on August 13, 2026, where their positions were again confirmed.

ACTIVE 727360661v4

Date: August 13, 2026                           Respectfully Submitted,

                                                /s/ Avi Benayoun
                                                Avi Benayoun

**STUMPHAUZER KOLAYA**          **GREENBERG TRAURIG, P.A.**
**& SLOMAN, PLLC**              401 East Las Olas Blvd, Suite 2000
2 South Biscayne Boulevard, Suite 1600    Fort Lauderdale, Florida 33301
Miami, Florida 33131            T. 954.765.0500
T: (305) 614-1400; F: (305) 614-1425    Avi Benayoun
                                Fla Bar No 0151696
/s/ Ryan K. Stumphauzer        benayouna@gtlaw.com
Ryan K. Stumphauzer             John L. McManus
Fla. Bar No. 12176              Fla. Bar No. 0119423
rstumphauzer@skslegal.com       mcmanusj@gtlaw.com
Timothy A. Kolaya               Zachary R. Needell
Fla. Bar No. 056140             Fla Bar No 1011742
tkolaya@skslegal.com            zachary.needell@gtlaw.com

*Counsel for the L3 Income Fund*    **DWYER LAW, P.A.**
                                201 South Biscayne Blvd, Suite 1300
                                Miami, Florida 33131
                                T. 305.704.7225
                                Jared E. Dwyer
                                Fla Bar No 104082
                                jdwyer@jdwyerlaw.com

                                *Counsel for the L3 Special Opportunity Fund*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 13, 2026, I filed the foregoing with the Clerk of

Court by using the CM/ECF system which will send an electronic copy to all counsel of record.

                                /s/ Avi Benayoun
                                Avi Benayoun


After reviewing the facts and researching applicable legal principles, I certify that this

motion in fact presents a true emergency (as opposed to a matter that may need only expedited

treatment) and requires an immediate ruling because the Court would not be able to provide

20

ACTIVE 727360661v4

21

meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand

that an unwarranted certification may lead to sanctions.

/s/ Avi Benayoun
Avi Benayoun

21

ACTIVE 727360661v4