**Received** 05/01/26

**Filed** 05/01/26

David J. Feingold,

Petitioner

v.

Commissioner of Internal Revenue

Respondent

Docket No. 19354-24
Document No. 89

# First Amendment to Answer

**Received**
04/02/26 04:08 pm

**Lodged**
04/02/26

David J. Feingold,

Petitioner

v.

Commissioner of Internal Revenue

Respondent

Electronically Filed
Docket No. 19354-24
Document No. 77

# First Amendment to Answer

**UNITED STATES TAX COURT**

| | |
|---|---|
| DAVID J. FEINGOLD, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Docket No. 19354-24 |
| | ) |
| COMMISSIONER OF INTERNAL | ) |
| REVENUE, | ) Filed Electronically |
| | ) |
| Respondent. | ) Hon. Judge Jenkins |

**AMENDMENT TO ANSWER**

RESPONDENT, in amendment to answer to the Petition filed in the above-captioned case, alleges as follows:

10. FURTHER ANSWERING the petition and in support of Respondent's determination that payments totaling $2,773,028.00 and $3,885,143.00 received by MCA Venture I, LLC should be includible in Petitioner's gross income under I.R.C. § 61 and the assignment of income doctrine for the tax years 2020 and 2021, respectively, Respondent alleges:

a. MCA Venture I, LLC is a Delaware limited liability company that was formed in 2020.

b. MCA Venture I, LLC was conceived and designed by Mr. Feingold.

c. In 2020 and 2021, MCA Venture I, LLC was nominally owned by

Mr. Feingold's wife, Lorena Feingold, and his son, Nicholas Feingold.

d. Nicholas Feingold held the title of Vice President of MCA Venture I, LLC during the tax years 2020 and 2021.

e. Nicholas Feingold was 20 years old in 2020.

f. MCA Venture I, LLC was a Subchapter C Corporation for federal tax purposes during the tax years 2020 and 2021.

g. In 2020, the principal place of business of MCA Venture I, LLC was 4440 PGA Boulevard, Suite 600, Palm Beach Gardens, Florida 33410, which was the same business address as Mr. Feingold's office for Feingold Morgan Sanchez, LLC and Feingold, LLC.

Samson Horus, LLC

h. In 2020 and 2021, Mr. Feingold was a co-owner of Samson Horus, LLC.

i. Samson Horus, LLC is a commercial lending company specializing in merchant cash advance loans to businesses.

j. In 2020 and 2021, Mr. Feingold managed the merchant cash advance portfolios at Samson Horus, LLC.

k. During tax year 2020, Mr. Feingold directed Samson Horus, LLC to pay $1,813,028.00 to MCA Venture I, LLC.

l. During tax year 2020, MCA Venture I, LLC received $1,813,028.00 from Samson Horus, LLC.

m. The $1,813,028.00 was paid in connection with Mr. Feingold's personal services, namely, oversight and management of the merchant cash advance portfolios at Samson Horus, LLC in 2020.

n. The management fees of $1,813,028.00 were earned by Mr. Feingold in 2020.

o. MCA Venture I, LLC did not earn the $1,813,028.00 it received from Samson Horus, LLC during tax year 2020.

p. During tax year 2021, Mr. Feingold directed Samson Horus, LLC to pay $3,885,143.00 to MCA Venture I, LLC.

q. During tax year 2021, MCA Venture I, LLC received $3,885,143.00 from Samson Horus, LLC.

r. The $3,885,143.00 was paid in connection with Mr. Feingold's personal services, namely, oversight and management of the merchant cash advance portfolios at Samson Horus, LLC.

s. The management fees of $3,885,143.00 were earned by Mr.

Feingold in 2021.

t. MCA Venture I, LLC did not earn the $3,885,143.00 it received from Samson Horus, LLC for tax year 2021.

u. Samson Horus, LLC was legally required to file, but did not file, an information return reporting all income paid to Mr. Feingold, Feingold Morgan Sanchez, LLC, Feingold, LLC, MCA Venture I, LLC, and E Consulting Global Group, LLC for the tax years 2020 and 2021.

v. MCA Venture I, LLC did not render services to Samson Horus, LLC during tax year 2021.

Alternative Global Management, LLC

w. Alternative Global Management, LLC is a Delaware limited liability company formed in 2019.

x. Alternative Global Management, LLC was conceived and designed by Mr. Feingold.

y. Alternative Global Management, LLC was a partnership for federal tax purposes during the tax years 2020 and 2021.

z. Mr. Feingold was a managing member of Alternative Global Management, LLC during the tax years 2020 and 2021.

aa. As a managing member of Alternative Global Management, LLC, Mr. Feingold was responsible for:

i. Managing the books and records;

ii. Allocating and disbursing funds;

iii. Approving payments of fees and expenses; and

iv. Generally managing the day-to-day operations.

bb. Mr. Feingold owned, managed, and controlled Alternative Global Management, LLC in 2020 and 2021.

cc. During tax year 2020, Mr. Feingold directed Alternative Global Management, LLC to pay $960,000.00 to MCA Venture I, LLC.

dd. During tax year 2020, MCA Venture I, LLC received $960,000.00 from Alternative Global Management, LLC.

ee. The $960,000.00 was paid in connection with fees and/or commissions earned by Mr. Feingold in 2020.

ff. MCA Venture I, LLC did not earn the $960,000.00 it received from Alternative Global Management, LLC for tax year 2020.

gg. MCA Venture I, LLC did not render services to Alternative Global Management, LLC during tax year 2020.

hh. Alternative Global Management, LLC was legally required to file,

but did not file, an information return reporting all income paid to MCA Venture I, LLC in 2020 and 2021.

ii. Mr. Feingold was not an agent or employee of MCA Venture I, LLC during the tax years 2020 and 2021.

jj. In 2020 and 2021, Mr. Feingold controlled the funds in the MCA Venture I, LLC bank account.

kk. In 2020 and 2021, Mr. Feingold had access to the funds in the MCA Venture I, LLC bank account.

ll. In 2020 and 2021, the funds in the MCA Venture I, LLC bank account were held for the benefit of Mr. Feingold.

mm. In 2020 and 2021, the funds in the MCA Venture I, LLC bank account were used for the benefit of Mr. Feingold.

nn. In 2020 and 2021, Mr. Feingold controlled the funds in the Alternative Global Management, LLC bank account.

oo. In 2020 and 2021, Mr. Feingold had access to the funds in the Alternative Global Management, LLC bank account.

pp. In 2020 and 2021, the funds in the Alternative Global Management, LLC bank account were held for the benefit of Mr. Feingold.

qq. In 2020 and 2021, the funds in the Alternative Global Management, LLC bank account were used for the benefit of Mr. Feingold.

rr. For tax year 2020, amounts totaling $2,773,028.00, paid by Samson Horus, LLC and Alternative Global Management, LLC, are includible in gross income to Mr. Feingold under I.R.C. § 61 and the assignment of income doctrine. *Helvering v. Horst*, 311 U.S. 112 (1940); *Lucas v. Earl*, 281 U.S. 111 (1930).

ss. For tax year 2021, amounts totaling $3,885,143.00 paid by Samson Horus, LLC are includible in gross income to Mr. Feingold under I.R.C. § 61 and the assignment of income doctrine. *Helvering v. Horst*, 311 U.S. 112 (1940); *Lucas v. Earl*, 281 U.S. 111 (1930).

11. FURTHER ANSWERING the petition in the alternative to paragraph 10, and in support of Respondent's determination that MCA Venture I, LLC is an alter ego of Petitioner for the tax years 2020 and 2021, Respondent alleges:

a. Respondent incorporates by reference the allegations in paragraph 10 as if fully restated.

b. MCA Venture I, LLC did not engage in bona fide business during the tax years 2020 and 2021.

c. Mr. Feingold personally and solely managed and controlled essentially all significant aspects of the operations and activities of MCA Venture I, LLC during the tax years 2020 and 2021.

d. Mr. Feingold authorized the transfer of $2,773,028.00 and $3,885,143.00 that he earned to MCA Venture I, LLC during the tax years 2020 and 2021.

e. Mr. Feingold treated MCA Venture I, LLC as his alter ego.

f. For Federal income tax purposes for the tax years 2020 and 2021, all income and expenses of MCA Venture I, LLC should be charged to Mr. Feingold personally.

12. FURTHER ANSWERING the petition and in support of Respondent's determination that payments totaling $2,222,000.00 received by E Consulting Global Group, LLC should be includible in Petitioner's gross income under I.R.C. § 61 and the assignment of income doctrine for tax year 2020, Respondent alleges:

a. E Consulting Global Group, LLC is a Delaware limited liability company formed in 2020.

b. E Consulting Global Group, LLC was conceived and designed by Mr. Feingold.

c. In 2020, E Consulting Global Group, LLC was nominally owned

by Mr. Feingold's wife, Lorena Feingold, and his son, Ryan Feingold.

d. Ryan Feingold was 25 years old in 2020.

e. E Consulting Global Group, LLC was a partnership for federal tax purposes during tax year 2020.

f. During tax year 2020, Mr. Feingold was not an agent or employee of E Consulting Global Group, LLC.

g. In 2020 and 2021, Mr. Feingold was a managing member of Alternative Global Management, LLC.

h. As a managing member of Alternative Global Management, LLC, Mr. Feingold was responsible for:

    i. Managing the books and records;

    ii. Allocating and disbursing funds;

    iii. Approving payments of fees and expenses; and

    iv. Generally managing the day-to-day operations.

i. Mr. Feingold owned, managed, and controlled Alternative Global Management, LLC in 2020 and 2021.

j. During tax year 2020, Mr. Feingold directed Alternative Global Management, LLC to pay $2,222,000.00 to E Consulting Global

Group, LLC.

k. During tax year 2020, E Consulting Global Group, LLC received $2,222,000.00 from Alternative Global Management, LLC.

l. The $2,222,000.00 paid to E Consulting Global Group, LLC related to fees, commissions, and/or compensation for personal services earned by Mr. Feingold in 2020.

m. E Consulting Global Group, LLC did not earn the $2,222,000.00 it received from Alternative Global Management, LLC in 2020.

n. E Consulting Global Group, LLC did not render services to Alternative Global Management, LLC in 2020.

o. The $2,222,000.00 E Consulting Group, LLC received from Alternative Global Management, LLC was earned by Mr. Feingold in 2020.

p. In 2020, Mr. Feingold controlled the funds in the E Consulting Global Group, LLC bank account.

q. In 2020, Mr. Feingold had access to the funds in the E Consulting Global Group, LLC bank account.

r. In 2020, the funds in the E Consulting Global Group, LLC bank account were held for the benefit of Mr. Feingold.

s. In 2020, the funds in the E Consulting Global Group, LLC bank account were used for the benefit of Mr. Feingold.

t. For tax year 2020, amounts totaling $2,222,000.00 paid by Alternative Global Management, LLC are includible in gross income to Mr. Feingold under I.R.C. § 61 and the assignment of income doctrine. *Helvering v. Horst*, 311 U.S. 112 (1940); *Lucas v. Earl*, 281 U.S. 111 (1930).

13. FURTHER ANSWERING the petition in the alternative to paragraph 12, and in support of Respondent's determination that E Consulting Global Group, LLC is an alter ego of Petitioner for tax year 2020, Respondent alleges:

a. Respondent incorporates by reference the allegations in paragraph 12 as if fully restated.

b. E Consulting Global Group, LLC did not engage in bona fide business during tax year 2020.

c. Mr. Feingold personally and solely managed and controlled essentially all significant aspects of the operations and activities of E Consulting Global Group, LLC during tax year 2020.

d. Mr. Feingold authorized the transfer of $2,222,000.00 that he earned to E Consulting Global Group, LLC during tax year 2020.

e. Mr. Feingold treated E Consulting Global Group, LLC as his alter ego.

f. For Federal income tax purposes for tax year 2020, all income and expenses of E Consulting Global Group, LLC should be charged to Mr. Feingold personally.

14. FURTHER ANSWERING the petition and in support of Respondent's determination that payments totaling $17,357,740.57 received by Ryda Holdings Partners, LLC should be includible in Petitioner's gross income under I.R.C. § 61 and the assignment of income doctrine for tax year 2021, Respondent alleges:

a. Ryda Holdings Partners, LLC ("Ryda") is a limited liability company organized in the State of Delaware.

b. Ryda was formed on February 11, 2021.

c. Ryda was conceived and designed by Mr. Feingold.

d. "Ryda" is a combination of the first two letters of the names Ryan and David.

e. Ryan Feingold is Mr. Feingold's son.

f. Ryan Feingold was 26 years old in 2021.

g. During tax year 2021, Ryan Feingold held the title of President of Ryda.

h. During tax year 2021, Ryan Feingold was nominally the manager of Ryda.

i. During tax year 2021, Mr. Feingold was not an agent or employee of Ryda.

j. In 2021, the principal place of business of Ryda was 4440 PGA Boulevard, Suite 600, Palm Beach Gardens, Florida 33410, which was the same business address as Mr. Feingold's office for Feingold Morgan Sanchez, LLC and Feingold, LLC.

k. On February 22, 2021, a business checking account in the name of Ryda Holdings Partners, LLC ("Ryda bank account") was opened at South State Bank.

l. In 2021, Ryan Feingold was the sole signatory of the Ryda bank account.

m. In 2021, Mr. Feingold was a 50% beneficial owner of the Ryda bank account.

n. In 2021, Broadstreet Global Management, LLC paid Ryda $2,414,534.55.

o. In 2021, Ryda received $2,414,534.55 from Broadstreet Global Management, LLC.

p. The payments totaling $2,414,534.55 related to fees, commissions, and/or compensation for personal services earned by Mr. Feingold in 2021.

q. Ryda did not earn the $2,414,534.55 it received from Broadstreet Global Management, LLC for tax year 2021.

r. Ryda did not render services to Broadstreet Global Management, LLC during tax year 2021.

s. Broadstreet Global Management, LLC was legally required to file, but did not file, an information return reporting all income paid to Ryda for tax year 2021.

t. In 2021, Broadstreet Global Holdings, LLC paid Ryda $629,206.02.

u. In 2021, Ryda received $629,206.02 from Broadstreet Global Holdings, LLC.

v. The payments totaling $629,206.02 related to fees, commissions, and/or compensation for personal services earned by Mr. Feingold in 2021.

w. Ryda did not earn the $629,206.02 it received from Broadstreet Global Holdings, LLC for tax year 2021.

x. Ryda did not render services to Broadstreet Global Holdings, LLC for during tax year 2021.

y. Broadstreet Global Holdings, LLC was legally required to file, but did not file, an information return reporting all income paid to Ryda for tax year 2021.

z. In 2021, L3 Capital paid Ryda $14,314,000.00.

aa. In 2021, Ryda received $14,314,000.00 from L3 Capital.

bb. The payments totaling $14,314,000.00 related to fees, commissions, and/or compensation for personal services earned by Mr. Feingold in 2021.

cc. Ryda did not earn the $14,314,000.00 it received from L3 Capital for tax year 2021.

dd. L3 Capital was legally required to file, but did not file, an information return reporting all income paid to Ryda for tax year 2021.

ee. Ryda did not render services to L3 Capital during tax year 2021.

ff. In 2021, Mr. Feingold controlled the funds in the Ryda bank account.

gg. In 2021, Mr. Feingold had access to the funds in the Ryda bank

account.

hh. When asked by the Securities and Exchange Commission if he had access to the Ryda bank account, Mr. Feingold testified, "I have access to Ryda if I call my son…."

ii. In 2021, the funds in the Ryda bank account were held for the benefit of Mr. Feingold.

jj. In 2021, the funds in the Ryda bank account were used for the benefit of Mr. Feingold.

kk. From the opening of the Ryda bank account on February 22, 2021, to December 31, 2021, the Ryda bank account received wire transfers totaling $17,357,740.57.

ll. When questioned by the Securities and Exchange Commission about the source of funds for the $17,357,740.57, Mr. Feingold testified that the source of funds was his fees, commissions, or money owed to him related to the "pre-IPO business and forward payment contracts."

mm. Ryda did not earn the $17,357,740.57 it received in 2021.

nn. Mr. Feingold was the true earner of the $17,357,740.57 received by Ryda in tax year 2021.

oo. The $17,357,740.57 paid to Ryda is includible in gross income to Mr. Feingold under I.R.C. § 61 and the assignment of income doctrine. *Helvering v. Horst*, 311 U.S. 112 (1940); *Lucas v. Earl*, 281 U.S. 111 (1930).

15. FURTHER ANSWERING the petition in the alternative to paragraph 14, and in support of Respondent's determination that Ryda Holdings Partners, LLC is an alter ego of Petitioner for tax year 2021, Respondent alleges:

a. Respondent incorporates by reference the allegations in paragraph 14 as if fully restated.

b. Ryda Holdings Partners, LLC did not engage in bona fide business during tax year 2021.

c. Mr. Feingold personally and solely managed and controlled essentially all significant aspects of the operations and activities of Ryda Holdings Partners, LLC during tax year 2021.

d. Mr. Feingold authorized the transfer of $17,357,740.57 that he earned to Ryda Holdings Partners, LLC during tax year 2021.

e. Mr. Feingold treated Ryda Holdings Partners, LLC as his alter ego.

f. For Federal income tax purposes for tax year 2021, all income and expenses of Ryda Holdings Partners, LLC should be charged to

Mr. Feingold personally.

16. FURTHER ANSWERING the petition and in support of Respondent's determination that Petitioner has unreported income of $4,132,000.00 from the diversion or conversion of investor funds for tax year 2020, Respondent alleges:

a. In 2020, Mr. Feingold created an investment opportunity to fund the purchase and acquisition of a Marriott TownePlace Suites, located at 1021 Carrington Mill Boulevard, Morrisville, North Carolina 27560 (the "Raleigh Hotel Project").

b. Mr. Feingold formed or directed the formation of Raleigh Investment I, LLC to fund the Raleigh Hotel Project.

c. In or about January 2020, Mr. Feingold participated in the drafting of offering materials, including a Private Placement Memorandum, Operating Agreement, and investment summary for an investment in Raleigh Investment I, LLC.

d. In 2020, Raleigh Investment I, LLC raised $8,700,000.00 from 58 investors.

e. In 2020, Raleigh Investment I, LLC invested $4,568,000.00 of the $8,700,000.00 raised into a merchant cash advance portfolio with Samson Horus, LLC ("Raleigh Portfolio").

f. Mr. Feingold was a co-owner of Samson Horus, LLC in 2020.

g. Samson Horus, LLC is a commercial lending company that specializes in merchant cash advance loans to businesses.

h. In 2020, Mr. Feingold was the Raleigh Portfolio's point of contact at Samson Horus, LLC, giving him authority to direct funds going in and out of the Raleigh Portfolio.

i. Raleigh Investment I, LLC failed to acquire the Raleigh Hotel Project in 2020.

j. Mr. Feingold knew Raleigh Investment I, LLC failed to acquire the Raleigh Hotel Project in 2020.

k. Mr. Feingold represented to investors that the Raleigh Hotel Project was acquired in 2020.

l. Mr. Feingold directed his son, Ryan Feingold, to draft false progress reports regarding the Raleigh Hotel Project in 2020.

m. The information contained in the false progress reports came from Mr. Feingold.

n. Mr. Feingold authorized the sending of three false progress reports to investors on the Raleigh Hotel Project in 2020.

o. Mr. Feingold did not inform the investors that the Raleigh Hotel

Project was never acquired in 2020.

p. During tax year 2020, $4,132,000.00 of the $8,700,000.00 raised through Raleigh Investment I, LLC was diverted and misappropriated by Mr. Feingold.

q. Mr. Feingold never intended to repay the diverted or converted funds to the investors.

r. Mr. Feingold exercised dominion and control over the $4,132,000.00 diverted or converted in 2020.

s. To date, the $4,132,000.00 diverted or converted by Mr. Feingold in 2020 has not been repaid to investors.

t. The diversion or conversion of $4,132,000.00 is includible in gross income to Mr. Feingold under I.R.C. § 61 for tax year 2020. *James v. United States*, 366 U.S. 213 (1961).

17. FURTHER ANSWERING the petition and in support of Respondent's determination that Petitioner is liable for increased deficiencies for the tax years 2020 and 2021, claims for which are hereby made pursuant to the provisions of I.R.C. § 6214(a), Respondent alleges:

a. Respondent incorporates by reference the allegations in paragraphs 10, 11, 12, 13, 14, 15, and 16 including all subparagraphs, as if

fully restated.

b. As a result of additional unreported income totaling $9,127,028.00 for tax year 2020, Petitioner is liable for an increased deficiency in the amount of $3,743,709.00 and a section 6663 fraud penalty in the amount of $2,807,781.75, or in the alternative, a section 6662(a) accuracy related penalty in the amount of $748,741.80 for tax year 2020.

c. As a result of additional unreported income totaling $21,242,883.00 for tax year 2021, Petitioner is liable for an increased deficiency in the amount of $9,620,418.00 and a section 6663 fraud penalty in the amount of $7,215,313.50, or in the alternative, a section 6662(a) accuracy related penalty in the amount of $1,924.083.60 for tax year 2021.

d. Attached hereto as **Exhibit A** is a Form 5278, Statement – Income Tax Changes, which details the computation of the increase in deficiency and section 6663(a) fraud penalty, or in the alternative, section 6662(a) accuracy-related penalty for the tax years 2020 and 2021.

18. FURTHER ANSWERING the petition, and in support of

Respondent's determination that all or part of the underpayments of tax required to be shown on Petitioner's income tax returns for the tax years 2020 and 2021 are due to fraud, claims for which are hereby made pursuant to the provisions of I.R.C. § 6214(a), Respondent alleges:

a. Respondent incorporates by reference the allegations in paragraphs 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17 including all subparagraphs, as if fully restated.

b. In 2020 and 2021, Mr. Feingold used deceptive schemes and materially false statements to raise money from investors in various private equity funds that he formed and structured.

c. Mr. Feingold structured the L3 Capital Income Fund, LLC ("L3 Income Fund') and the Broadstreet Global Fund, LLC.

d. Under each private equity fund, Mr. Feingold structured a series of limited liability companies as investment vehicles to invest monies raised in various business opportunities, including real estate development, merchant cash advance, and debt settlement among others.

e. To manage the private equity funds, Mr. Feingold formed a separate limited liability company as the designated manager. The

designated manager served as an investment adviser to allocate and deploy the funds in the sole discretion of the manager.

f. For example, in connection with the L3 Income Fund, Mr. Feingold formed a series of six limited liability companies called Alternative Global One, LLC through Alternative Global Six, LLC (collectively, "AG 1-6").

g. AG 1-6 served as the investment vehicles of the L3 Income Fund.

h. In 2020 and 2021, Mr. Feingold was one of three managing members of AG 1-6.

i. As a manager of AG 1-6, Mr. Feingold was responsible for:

   i. Researching and analyzing potential investments;

   ii. Presenting investment opportunities;

   iii. Allocating and disbursing funds to the investment companies;

   iv. Approving payments AG 1-6's ordinary fees and expenses;

   v. Managing receipts and payments to AG 1-6;

   vi. Monitoring investment progress;

   vii. Preparing quarterly reports; and

   viii. Generally managing the day-to-day operations of AG 1-6.

j. Mr. Feingold had direct or indirect ownership interests in AG 1-6.

k. Mr. Feingold did not disclose to investors that he had an ownership interest in AG 1-6.

l. Mr. Feingold did not disclose to investors that he would receive ongoing fees for the management of AG 1-6.

m. Each of the AG 1-6 companies invested in a different line of business.

n. A visual representation of the L3 Income Fund structure is below:




o. Mr. Feingold had direct or indirect ownership interests in the businesses that AG 1-6 invested in.

p. Investors were not informed that the businesses that AG 1-6 invested in were directly or indirectly owned by Mr. Feingold.

q. Mr. Feingold engaged in a multi-faceted fraud in connection with the L3 Income Fund.

r. Mr. Feingold fraudulently offered and paid inflated returns to investors that were not supported by actual profits.

s. Mr. Feingold managed the funds in a way that was inconsistent with what was told to investors.

t. The investors were told that the funds would follow certain structures and practices to protect their investments, but the funds were commingled and subjected to cross-liabilities.

u. Mr. Feingold made false and misleading statements to induce investors to invest with his private equity funds.

v. Mr. Feingold made false statements about the fund's recordkeeping practices and financial statements.

w. Mr. Feingold misled the investors about the profitability of the investments.

x. Mr. Feingold diverted investors' money through investment companies that he owned or had an ownership interest in to strip

the money out of the investment while claiming the investment failed.

y. Mr. Feingold told investors the distributions they received were interest earned on their investments.

z. The distributions the investors received were their principal, not interest.

aa. Mr. Feingold knew he was paying the investors back with their own money.

bb. Mr. Feingold took the assets purchased with the investors' funds and transferred them to an entirely different company without the investors' knowledge or consent.

cc. Mr. Feingold stole, hijacked, diverted, commingled, and/or wrongfully concealed approximately $150 million of investor funds and assets through an ongoing conspiracy of fraudulent and deceptive acts.

dd. Mr. Feingold orchestrated a complicated investment structure and ongoing deceptive scheme to allow himself and his co-conspirators – including Michael Dazzo and Steven Baldassara – to improperly seize control over investor funds and assets.

ee. Mr. Feingold directed and/or authorized payments to himself and/or companies that he owned and controlled in 2020 and 2021.

ff. Mr. Feingold and his associates siphoned away $24.6 million from the L3 Income Fund.

gg. Mr. Feingold and his associates took 30% of the L3 Income Fund's money allocated for investments before the money ever made it to the investment.

hh. For example, of the $27.7 million that the L3 Income Fund distributed to AG 2 and AG 4 to make investments, only $19.6 million ever made it to the investments. Mr. Feingold and his associates took 30% or $8.1 million before the money was ever invested.

ii. Mr. Feingold did not disclose the 30% fees to the L3 investors.

jj. Mr. Feingold and his associates used Alternative Global Management, LLC ("AGM") to collect money from the L3 investments.

kk. AGM collected approximately $41 million from the L3 Capital Income Fund's investments.

ll. Between 2020 and 2021, Mr. Feingold directed and/or authorized

payments to himself and/or companies that he owned and controlled in excess of $14 million from the L3 Income Fund's assets.

mm. Specifically, Mr. Feingold received this money through distributions to the following entities under his control: Ryda Holdings Partners, LLC, MCA Venture I, LLC, E Consulting Global Group, LLC, Feingold, LLC, and Feingold Morgan Sanchez, LLC.

nn. For the tax years 2020 and 2021, Mr. Feingold estimated his gross income was between $5 million to $15 million a year.

oo. Mr. Feingold took discretion with the timing and allocation of his income each year. Mr. Feingold's income fluctuated "depending on what [he] take[s] because a lot of the business transactions that [he does], although earnings are available for [him] to take, [he doesn't] take that compensation."

pp. Mr. Feingold knowingly and intentionally deferred income with the intent to evade tax.

qq. During the tax years 2020 and 2021, Mr. Feingold claims that he oversaw approximately 100 different businesses that comprised

approximately 200 different corporations.

rr. Mr. Feingold claims that he held the positions of primary owner, if not the majority owner, of many of these businesses and entities.

ss. Because of Mr. Feingold's direct or indirect ownership, management, and/or control of various businesses, including the private equity funds that he structured and managed, Mr. Feingold controlled how much money was paid to him, when the money was paid to him, and where the money was paid to, i.e. whether to his closely-held companies or to an entity that he set up nominally owned by his family members in 2020 and 2021.

tt. Mr. Feingold created or directed the creation of several entities (partnerships, corporations, and limited liability companies) owned by his wife and/or children.

uu. The use of numerous entities was designed to conceal the diversion or conversion of income, funds, and assets which would have resulted in taxable income to Mr. Feingold during the tax years at issue.

vv. In 2021, Ryda Holding Partners, LLC was directly or indirectly owned, managed, and/or controlled by Mr. Feingold.

ww. Ryda Holding Partners, LLC was an alter ego of Mr. Feingold for tax year 2021.

xx. In 2020 and 2021, E Consulting Global Group, LLC was directly or indirectly owned, managed, and/or controlled by Mr. Feingold.

yy. E Consulting Global Group, LLC was an alter ego of Mr. Feingold for the tax years 2020 and 2021.

zz. In 2020 and 2021, MCA Venture I, LLC was directly or indirectly owned, managed, and/or controlled by Mr. Feingold.

aaa. MCA Venture I, LLC was an alter ego of Mr. Feingold for the tax years 2020 and 2021.

bbb. Mr. Feingold fraudulently and with intent to evade tax, used MCA Venture I, LLC to conceal income, assets, and/or funds from the Internal Revenue Service.

ccc. Mr. Feingold fraudulently and with intent to evade tax, used Ryda Holdings Partners, LLC to conceal income, assets, and/or funds from the Internal Revenue Service.

ddd. Mr. Feingold fraudulently and with intent to evade tax, used E Consulting Global Group, LLC to conceal income, assets, and/or funds from the Internal Revenue Service.

eee. In 2020 and 2021, Mr. Feingold was the partner in charge of JDS Partners ("JDS").

fff. JDS is an acronym that stands for Joseph (Baldassara), David (Feingold), and Stephen (Baldassara).

ggg. Mr. Feingold fraudulently and with intent to evade tax, used JDS to conceal income, assets, and/or funds from the Internal Revenue Service.

hhh. Mr. Feingold fraudulently and with intent to evade tax, failed to disclose the funds diverted to Ryda Holding Partners, LLC from the Internal Revenue Service.

iii. Mr. Feingold fraudulently and with intent to evade tax, failed to disclose the funds diverted to E Consulting Global Group, LLC from the Internal Revenue Service.

jjj. Mr. Feingold fraudulently and with intent to evade tax, failed to disclose the funds diverted to MCA Venture I, LLC from the Internal Revenue Service.

kkk. Mr. Feingold directed millions of dollars in earned fees, commissions, and/or compensation for personal services deposited in the bank accounts held in the name of entities that were not

traceable to him during the tax years 2020 and 2021, including Ryda Holdings Partners, LLC, E Consulting Global Group, LLC, and MCA Venture I, LLC.

lll. Mr. Feingold kept different books and records for internal accounting purposes and tax reporting purposes.

mmm. Mr. Feingold manipulated the books and records submitted to the Internal Revenue Service to grossly understate his income for the tax years 2020 and 2021.

nnn. Mr. Feingold consciously and knowingly failed to file required information tax returns for one or more entities under his control, including Alternative Global Management, LLC, Samson Horus, LLC, Broadstreet Global Management, LLC, and Broadstreet Global Holdings, LLC to evade accurate detection by the Internal Revenue Service.

ooo. Mr. Feingold devised a scheme to defer income indefinitely by treating compensation, fees, and/or commissions earned as a loan.

ppp. With respect to the fees earned by Mr. Feingold and his businesses in 2020 and 2021, Mr. Feingold instructed his CPA to adjust the books based on the theory that "no management fee is

earned, it is simply collected and held in the bank. Hence all of the money coming in is either return of principal or a liability (cash held against any defaults/losses), hence all money in the bank is not an asset and all money received is not fee income, it is a return of principal."

qqq. Mr. Feingold fraudulently and with the intent to evade tax understated the income tax liabilities on his income tax returns for the tax years 2020 and 2021.

rrr. All or part of the deficiencies in income tax and underpayments for the tax years 2020 and 2021 are due to fraud with the intent to evade tax.

19. FURTHER ANSWERING the petition in the alternative to paragraph 18, and in support of the determination that Petitioner is liable for an increased 20-percent penalty under the provisions of I.R.C. § 6662(a) for the tax years 2020 and 2021, claims for which are hereby made pursuant to the provisions of I.R.C. § 6214(a), Respondent alleges:

a. Respondent incorporates by reference the allegations in paragraphs 10, 11, 12, 13, 14, 15, 16, 17, and 18 including all subparagraphs, as if fully restated.

b. If the Court determines that Petitioner is not liable for the penalty for fraud, Petitioner is liable for the penalty provided by I.R.C. § 6662(b)(1) since at least a part of the underpayment of tax for the tax years 2020 and 2021 is due to negligence or intentional disregard of rules and regulations.

c. If the Court determines that Petitioner is not liable for the penalty for fraud, Petitioner is liable for the penalty provided by I.R.C. § 6662(b)(2) since at least a part of the underpayment of tax for the tax years 2020 and 2021 is due to substantial understatement of income tax.

20. After the filing of the petition in this case on December 10, 2024, counsel for respondent Huiwen Audrey Xi made an initial determination to assert the increased penalty under I.R.C. § 6663(a) pursuant to section 6214(a) in this Amendment to Answer so that the Court may determine this amount. In accordance with I.R.C. § 6751(b)(1), this determination was personally approved, in writing, by Ms. Xi's immediate supervisor, Sandreea L. Woods, by virtue of Ms. Wood's signature on this pleading.

21. In the alternative to the increased penalty under I.R.C. § 6663(a), after the filing of the petition in this case on December 10, 2024, counsel for respondent

Huiwen Audrey Xi made an initial determination to assert the increased penalty under I.R.C. § 6662(a), pursuant to section 6214(a) in this Amendment to Answer so that the Court may determine this amount. In accordance with I.R.C. § 6751(b)(1), this determination was personally approved, in writing, by Ms. Xi's immediate supervisor, Sandreea L. Woods, by virtue of Ms. Wood's signature on this pleading.

WHEREFORE, it is prayed:

(1) That the relief sought in the petition be denied;

(2) That respondent's determination, as set forth in the notice of deficiency, as modified in this amendment to answer and made pursuant to the provisions of I.R.C. § 6214(a), be in all respects approved;

(3) That the penalty for the tax years 2020 and 2021, under the provisions of I.R.C. § 6663(a), as set forth in the notice of deficiency, as modified in this amendment to answer and made pursuant to the provisions of I.R.C. § 6214(a), be in all respects approved; and

(4) That, in the alternative to the penalty under I.R.C. § 6663(a), the Court determine that there is due a 20-percent penalty under the provisions of I.R.C. 6662(a), as set forth in the notice of deficiency, as modified in this amendment to answer and made pursuant to the provisions of I.R.C. § 6214(a), be in all respects

approved.

KENNETH J. KIES
Acting Chief Counsel
Internal Revenue Service

Date: April 2, 2026 By: ______________________

HUIWEN A. XI
Senior Counsel
(Litigation & Advisory)
Tax Court Bar No. XH0001
401 West Peachtree St., N.W.
Suite 1400, Stop 1000-D
Atlanta, GA 30308-5510
Telephone: (470) 639-2204
Huiwen.a.xi@irscounsel.treas.gov

Date: April 2, 2026 By: ______________________

SANDREEA L. WOODS
Associate Area Counsel
(Litigation & Advisory)
Tax Court Bar No. WS0450
401 West Peachtree St., N.W.
Suite 1400, Stop 1000-D
Atlanta, GA 30308-5510
Telephone: (470) 639-2206
Sandreea.L.Woods@irscounsel.treas.gov

OF COUNSEL:
JOSEPH W. SPIRES
Division Counsel
(Litigation & Advisory)
ROBERT W. DILLARD
Principal Area Counsel
(Litigation & Advisory: Area 3)

**Received** 06/22/26 09:06 pm

**Filed** 06/22/26

David J. Feingold,

Petitioner

v.

Commissioner of Internal Revenue

Respondent

Electronically Filed
Docket No. 19354-24
Document No. 93

# Response to Motion for Reconsideration of Order

**IUNITED STATES TAX COURT**

| | | |
|---|---|---|
| DAVID J. FEINGOLD,<br><br>Petitioner,<br><br>v.<br><br>COMMISSIONER OF INTERNAL REVENUE,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Docket No. 19354-24<br><br>Hon. Judge Jenkins<br><br>Filed Electronically |

**RESPONDENT'S RESPONSE TO PETITIONER'S MOTION FOR RECONSIDERATION OF THE ORDER DATED MAY 1, 2026**

PURSUANT TO the Court's Order dated June 1, 2026, Respondent respectfully submits the following response in opposition to the Motion by Petitioner for Reconsideration of the Order of the Court Dated May 1, 2026 ("Motion for Reconsideration"). This motion is another example of Petitioner's bad-faith attempts to relitigate issues already decided by this Court, serving no purpose other than to cause delay and unnecessarily consume respondent and the Court's time and resources. *See*, *e.g.*, Doc. 48 & 74. Like his many other motions, this motion should be denied because there are no circumstances under which this Motion for Reconsideration should be granted, in fact or in law.

IN SUPPORT THEREOF, Respondent states as follows:

Docket No. 19354-24

**BACKGROUND**

1. The issues in this singular case, for purposes of the Motion for Leave to File an Amendment to Answer, involve primarily whether Petitioner, David J. Feingold, has substantial unreported income, including, but not limited to, unreported constructive dividend income, unreported interest income, unreported ordinary dividend income, unreported qualified dividend income, and unreported capital gains, and whether the civil fraud penalty or, in the alternative, the substantial understatement penalty and/or negligence penalty apply for the tax years 2020 and 2021.

2. On April 2, 2026, Respondent filed his Motion for Leave to File First Amendment to Answer ("Motion for Leave") (Doc. 76) and lodged his First Amendment to Answer (Doc. 77). In the Motion for Leave, Respondent stated that, in preparing this case for trial, Respondent's counsel became aware of a Securities and Exchange Commission investigation in which Petitioner, David J. Feingold, testified that an entity named Ryda Holdings Partners, LLC ("Ryda") received in 2021 approximately $17 million of funds owed to Petitioner, David J. Feingold, that were not reported on Mr. Feingold's 2021 tax return. Motion for Leave at 2-3.

3. In addition to the unreported payments to Ryda, Respondent discovered additional facts that further support significant unreported income for the 2020 and

2021 tax years related to substantial income that Petitioner assigned to entities that he formed and controlled. Motion for Leave at 2-3. Respondent contends that various payments to three entities, including Ryda, are includible in Mr. Feingold's gross income under Section 61 and the assignment of income doctrine or, in the alternative, that the entities are an alter ego of Mr. Feingold. *Id*. Further, Respondent contends that Mr. Feingold received unreported income from the diversion and/or conversion of investor funds. *Id*. at 6. Consequently, increased penalties under section 6663 or, in the alternative, section 6662 should apply. *Id*.

4. In support of his Motion for Leave, Respondent noted that Petitioner will not suffer undue prejudice as a result of the proposed amendment because (1) Respondent has the burden of proof; (2) the need for the amendment results from Petitioner's actions; (3) Petitioner has personal knowledge of the underlying facts; (4) Respondent had previously notified Petitioner of the positions in the amendment and the information on which they are based; and (5) because the case is not calendared for trial, Petitioner will have time to prepare. *Id*. at 7-9.

5. On May 1, 2026, the Court granted Respondent's Motion for Leave and filed the First Amendment to Answer. Docs. 88, 89.

6. On May 29, 2026, Petitioner filed a Motion for Reconsideration challenging the Court's Order dated May 1, 2026. Doc. 91.

Docket No. 19354-24

7. On June 1, 2026, the Court issued an Order directing Respondent to file a response on or before June 22, 2026. Doc. 92.

**APPLICABLE LAW**

8. Tax Court Rule 161 allows a party to file a motion for reconsideration of an opinion or findings of fact within 30 days after a written opinion has been served. Rule 161; *Pierce v. Commissioner*, T.C. Memo. 2025-29 at *22.

9. Motions for reconsideration are disfavored and granted only sparingly. The Court will generally deny a motion for reconsideration in the absence of substantial error or unusual circumstances. *Pierce*, T.C. Memo. 2025-29 at *22.

10. Reconsideration is intended to correct substantial error, either of fact or law, and also facilitates the introduction of newly discovered evidence the moving party could not have introduced, by the exercise of due diligence, in the prior proceeding. *Estate of Quick v. Commissioner*, 110 T.C. 440, 441 (1998).

11. "Reconsideration is not the appropriate forum for rehashing previously rejected legal arguments or tendering new legal theories to reach the end result desired by the moving party." *Id*. at 441-42.

12. In his Motion for Reconsideration, Petitioner does not allege discovery of any new evidence that could not have been previously introduced. *See generally*

Motion for Reconsideration. Rather, Petitioner argues that the Court made three mistakes of law. Motion for Reconsideration at 1.

13. The Court should deny Petitioner's Motion for Reconsideration because the motion is premised on numerous mischaracterizations of the Court's Order dated May 1, 2026, and merely seeks to rehash the same arguments that this Court previously considered—and soundly rejected —in its order granting the Motion for Leave.

**ARGUMENT**

14. In his motion, Petitioner asks the Court to reconsider its Order because, according to Petitioner, (i) "the Court has committed mistakes as to the law," (ii) "Respondent's Motion relies on patently false premises," (iii) those mistakes and demonstrably false grounds constitute substantial errors," and (iv) "those mistakes and errors have an impact, at least combined if not individually, that the Court did not adequately consider." Motion for Reconsideration at 7. As further discussed below, this Court did not err, and Respondent's allegations are well-reasoned and factually supported.

15. Simply put, Petitioner mischaracterizes the Court's Order by ignoring the actual legal basis and reasoning underlying the Court's ruling. Instead, Petitioner attempts to manufacture error from ancillary observations that neither controlled nor

affected the Court's decision. While Petitioner may disagree with the Court's decision, this disagreement is insufficient to warrant reconsideration. *See Pierce*, T.C. Memo. 2025-29 at *22 ("A motion for reconsideration is generally denied in the absence of substantial error or unusual circumstances."). Therefore, the Court should deny Petitioner's Motion for Reconsideration.

**A. The Court did not make "mistakes as to the law."**

16. The Court should deny Petitioner's Motion for Reconsideration because Petitioner's various arguments—whether contemplating the purported due process rights of non-parties, the purported lack of jurisdiction due to the closure of the statute of limitations, and/or the purported inadequacy of the mitigation provisions of I.R.C. §§ 1311-1314—all fail on the record before this Court. First, "[a] motion for reconsideration is generally denied in the absence of substantial error or unusual circumstances." *See Pierce*, T.C. Memo. 2025-29 at *22. And here, the Court did not err—nor could it—as the Court's ruling was not based on many of the items that Petitioner now raises for the first time in his Motion for Reconsideration. Rather, the Court's ruling was based on Tax Court Rule 41's liberal attitude toward amendments to pleadings and the well-established caselaw considering factors such as whether there was a reasonable excuse for the delay and whether the amendment would result in unfair surprise, disadvantage, or

prejudice to Petitioner. Thus, in granting Respondent's Motion for Leave, the Court properly considered all the arguments that were timely raised by the parties.[1]

17. Further, to the extent that the Court considered Petitioner's inconsistent arguments regarding the statute of limitations, the Court rightly explained, in dicta, that it was "not persuaded" because "the result would be to determine petitioner's federal income tax liability for the 2020 and 2021 tax years, over which the Court does have jurisdiction and with respect to which the statute of limitations would not have expired."

18. Similarly, as the Court aptly noted, Respondent is not determining the tax liability of the eight non-parties. The only tax liability to be determined in this case is that of the petitioner, David J. Feingold. Consequently, the Court properly granted Respondent's Motion for Leave as this case does not affect the due process rights of any nonparty taxpayers.

19. In summary, this Court appropriately considered all arguments that were timely raised, and Petitioner's remaining arguments fail on the record before this Court. Thus, this Court should deny Petitioner's Motion for Reconsideration.

**B. Respondent has pled sufficient facts with particularity.**

[1] Notably, the Court's Order granting Respondent's Motion for Leave did not decide any factual issues in Respondent's favor. The Court merely allowed Respondent to assert those issues.

20. Petitioner makes the frivolous claim that "this Court appears to take the position that FED. R. CIV. P. 9(b) does not apply to allegations of fraud before the Court." This Court did not take such a position, and any argument suggesting otherwise is an intentional mischaracterization.

21. Further, contrary to Petitioner's false assertions, Respondent's First Amendment to Answer does not rely on generalized accusations or conclusory assertions; it pleads 33 pages of additional facts with specificity, including the actors involved, the representations made, the timing of those representations, and the manner in which they were false or misleading. *See, e.g.*, First Amendment to Answer, ¶ 16 (alleging that Petitioner had unreported income of $4,132,000.00 in the 2020 tax year due to Petitioner's conversion and/or diversion of investor funds to build a non-existent hotel).[2]

22. With respect to Petitioner's allegations that Respondent's position is based on "fabricated conspiratorial theories detached from reality," Respondent respectfully disagrees. For example:

---

[2] Rather than addressing these facts, Petitioner rehashes previously rejected arguments regarding the reporting of income by Feingold, Morgan Sanchez, LLC and Feingold, LLC in 2020 and 2021, which has no relevance to Respondent's Motion for Leave.

Docket No. 19354-24

(a) With respect to the source of funds related to Ryda received in 2021, Petitioner testified:

A So that would lead me to believe that

Page 323

those were payments that would have been owed to me for structuring forward purchase agreements in the pre-IPO business, because I believe that I came onboard with Broadstreet, Incorporated around the summer of 2022, and I recall payments to me after that coming from Broad Street Global Holdings.

Feingold Dep. (Investigative Dep.) Vol. II P. 322:25– P. 323:6.

Petitioner also identified Ryda as one of his personal bank accounts through which he received payments for compensation and/or other remuneration.

Q Off the top of my head, do you know how much you as an individual, David Feingold, have invested in the projects of --

A At least $15 million, if not more.

Q And what account -- if we were going to look at your accounts to -- your bank accounts to see where that 15 million has come over the years --

A Yes.

Q -- which bank accounts would we look at?

A So you will see that -- and don't hold me to this. This is round numbers. You will see from a bank account called RYDA -- RYDA was paid, but

Page 216

then took the payments and put it back in the business. I think RYDA received $7 1/2 million from the business and put in, like, 14 or 15 million. You would see from that entity me putting money into the projects.

Docket No. 19354-24

Feingold Dep. (Investigative Dep.) Vol. I P. 215:14– P. 216:5.

(b) Petitioner mischaracterizes the Anti-Injunction Order attached as Exhibit E to his Motion for Reconsideration. The AAA arbitrator award neither says nor proves what Petitioner asserts, in similar fashion to his interpretation of this Court's Order.

(c) Petitioner testified to the Securities and Exchange Commission that he is the "primary partner in charge" of Samson and he founded Samson.

A For the past five years, I have -- I
oversee approximately 100 different businesses
comprised of probably 200 different corporations. I
hold the positions of primary owner, if not
majority, but primary owner of, let's see,
Broadstreet, Incorporated. I'm chief executing
officer, Contender Development. I'm chairman, also
primary shareholder, Contender Automotive Group.
I'm chairman and also primary shareholder
Greenville Storage Partners; I'm the primary partner

Page 16

in charge. JDS Partners, I'm the primary partner in
charge. Samson Partners, I'm the primary partner in
charge. Blue Lagoon Development, I believe I'm
chairman and a primary owner in that. And all of
those enterprises have projects that comprise 100-
plus businesses with 200-plus corporations.

Feingold Dep. (Investigative Dep.) Vol. I P. 15:16– P. 16:3.

Docket No. 19354-24

A So Feingold, LLC would receive 20 percent of the ISO fee from an organization known as Samson, and I will use that term "Samson" because there is many Samson-named entities that's in merchant cash advance and structured finance.
Q When you use that term "Samson" are you referring to Samson Funding or Samson Horus?
A So right now I believe they operate as Samson Servicing.
Q Okay.
A But previously they operated under the tradename Samson Funding, also under an LLC Samson Funding, also under another LLC Samson Maximus and Samson Horus, so I am referring to all those entities as Samson.

Feingold Dep. (Investigative Dep.) Vol. II P. 304:10-22.

The difference is I founded the organization, the whole Samson organization when it was nothing. It did $11 million in business before I got involved, and they'll tell you that. It was built to 850 million in business last year, and they will tell you -- because they tell me all the time -- "Without you, Dave, it wouldn't have happened."
And I'm not conceited. I'm just telling you that's the way it is. So that fee that I collect is a fee that they automatically collect. They collected it before I got involved with them.

Feingold Dep. (Investigative Dep.) Vol. VI P. 1420:7-16.

(d) Lastly, while Petitioner contends that MCA Venture I and E Consulting Global Group, LLC, were not under his dominion or control, these contentions are undermined by Petitioner's extensive knowledge of the transfers of

income and the income tax reporting of MCA Venture I and E Consulting Global Group, LLC in his motion.[3]

23. In sum, the specific allegations set forth in Respondent's First Amendment to Answer are not "manufactured conclusions" or a "conspiracy rooted in nothing." They are well-grounded facts that are pleaded with specificity and particularity. To the extent Petitioner disputes the accuracy of the allegations, the Court should deny Petitioner's Motion for Reconsideration as reconsideration is not the appropriate forum for asserting such a dispute. *See Estate of Quick*, 110 T.C. at 441 ("Reconsideration under Rule 161 serves the limited purpose of correcting substantial errors of fact or law and allows the introduction of newly discovered evidence that the moving party could not have introduced, by the exercise of due diligence, in the prior proceeding."). Rather, this Court's rules provide Petitioner the opportunity to deny Respondent's allegations through a reply to the First Amendment to Answer. *See* T.C. Rule 37. Petitioner may also seek discovery, *see* T.C. Rules 70-74, and challenge the allegations at trial, where Respondent will bear the burden of proving the allegations. *See generally* T.C. Rule 142.

[3] Petitioner refers to E Consulting Global Group, LLC as "EcoConsulting" in the Motion for Reconsideration.

Docket No. 19354-24

24. With respect to Rule 33(b), Respondent notes that the factual and legal positions taken in Petitioner's Motion for Reconsideration are not "well-grounded in fact and warranted by existing law," and the motion appears to be presented to "cause unnecessary delay." *See* T.C. Rule 33(b). [4]

25. Notwithstanding Petitioner's colorful rendition of facts and arguments in his Motion for Reconsideration, Respondent is committed to determining Petitioner's individual income tax liabilities for the tax years 2020 and 2021 in accordance with the correct and impartial interpretation and application of the Internal Revenue Code.

**CONCLUSION**

26. For the above reasons, Respondent respectfully requests this Court to deny Petitioner's Motion for Reconsideration and specify that the reply to Respondent's First Amendment to Answer be due **within three (3) days** of this Court's ruling on this motion, as the original 45-day deadline to file a reply to the First Amendment to Answer would have been due on June 15, 2026.

[4] Whenever it appears to the Court that the taxpayer's position is frivolous or groundless, the Court may impose a penalty of up to $25,000 against a taxpayer. I.R.C. § 6673(a)(1)(B). And whenever it appears to the Court that any attorney or other person admitted to practice before the Tax Court has multiplied the proceedings unreasonably and vexatiously, the Court may require that person to personally pay the excess costs, expenses, and attorneys' fees caused by that conduct. I.R.C. § 6673(a)(2)(A).

Docket No. 19354-24

WHEREFORE, Respondent respectfully requests that the Motion for Reconsideration be denied.

AUDREY M. MORRIS
Deputy Chief Counsel (Operations)
Internal Revenue Service

Date: 6/22/2026

By: ____________________________
HUIWEN A. XI
Senior Counsel
(Litigation & Advisory)
Tax Court Bar No. XH0001
Office of Chief Counsel
401 West Peachtree St., N.W.
Suite 1400, Stop 1000-D
Atlanta, GA 30308-5510
Telephone: (470) 639-2204
Huiwen.a.xi@irscounsel.treas.gov

OF COUNSEL:
ROBERT W. DILLARD
Principal Area Counsel
(Litigation and Advisory: Area 3)
SANDREEA L. WOODS
Associate Area Counsel (Atlanta, Group 2)
(Litigation and Advisory)