# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-20436-GAYLES/SHAW-WILDER**

SECURITIES AND EXCHANGE
COMMISSION,

*Plaintiff,*

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT
LLC, and BROAD STREET INC.,

*Defendants, and*

JOSEPHBENJAMIN, INC.,
JUST A NICE DAY, INC.,

*Relief Defendants.*

_______________________________________/

**PLAINTIFF SEC'S EXPEDITED RENEWED MOTION**
**AND MEMORANDUM OF LAW FOR APPOINTMENT OF A RECEIVER**

**UNREDACTED VERSION FILED UNDER SEAL**

## Table of Contents


I. Preliminary statement ..... 1

II. Recent investor harm and failures to comply with the Monitor Order ..... 4

A. Investors are suffering ongoing harm despite the Monitor Order ..... 4

1. Defendants proposed a redemption transaction. ..... 5

2. Defendants will not honor the cash redemption option. ..... 7

3. Defendants are reducing investors' accounts. ..... 12

4. Defendants have stopped dividend payments and not redeemed investors. ..... 15

5. Defendants are seeking to enrich themselves to the detriment of investors. ..... 16

B. Defendants have shown that the existing Monitor Order is not enough to protect investors. ..... 16

III. Facts supporting the underlying fraud alleged ..... 19

A. The SEC previously established a factual basis for the underlying alleged fraud. ..... 19

[redacted] 1

IV. A receiver is appropriate and necessary ..... 28

A. Legal Standard ..... 28

B. A receiver is appropriate under *First Financial*. ..... 29

C. A receiver is appropriate under *Netsphere* or *Starbucks* factors ..... 31

1. The *Netsphere* factors favor a receivership. ..... 31

2. The *Starbucks* factors favor a receivership. ..... 33

D. The Court should appoint a receiver over BSG Management and BSG Fund. ..... 36

V. Conclusion ..... 37

**Index of Exhibits**

| Exhibit Number | Description | Temporarily Sealed |
|---|---|---|
| 1 | Redemption Notice | Yes |
| 2 | AAYU Emails to Monitor | Yes |
| 3 | Redemption Notice (Revised) | Yes |
| 4 | Email from Kathy Pierce to Monitor and SEC re Broad Street Investment | No |
| 5 | Email from Greg Gartner to Monitor and SEC re Broadstreet Global Fund - Redemption Objection | No |
| 6 | Email from Kerry Clem to Monitor and SEC Re - Clem, Kerry - Broadstreet Global – Redemption Request | No |
| 7 | Soulpower Acquisition Corp. Form 8K and attached press release dated November 24, 2025 | No |
| 8 | Declaration of Bharvin Patel with exhibits | No |
| 9 | Declaration of Bill Knoblauch with exhibits | No |
| 10 | Declaration of Mayank Patel with exhibits | No |
| 11 | Declaration of Narendra Shah with exhibits | No |
| 12 | Declaration of Tatyana Levy with exhibits | No |
| 13 | Declaration of Michael Patel with exhibits | No |
| 14 | Supplemental Declaration of Melissa Davis dated August 5, 2026 | Yes |
| 15 | Private Placement Memorandum Supplement Number - Tennessee Supplement | Yes |
| 16 | BSG Investor Update Letter – July 27, 2026 | No |
| 17 | Broadstreet Quarterly Report - Q1 2025 | Yes |
| 18 | Email regarding Monitorship dated August 6, 2025 | Yes |
| 19 | Email from Danielle Medina to David Feingold re: End of year write offs | No |
| 20 | Excerpts of the Investigative Testimony of Danielle Medina | No |
| 21 | BSI - Preparation of Financial Statements - Q2 2025 | Yes |
| 22 | BSG 2024 Reviewed Financial Statements | Yes |
| 23 | Soulpower Acquisition Corp. Form 8-K and attached press release dated July 30, 2026 | No |

## I. PRELIMINARY STATEMENT

Appointing the Monitor to serve as receiver over Broad Street Global Fund, LLC ("BSG Fund" or "Fund") and Defendant Broad Street Global Management LLC ("BSG Management"), which manages the Fund, is necessary to prevent imminent and irreparable harm to Defendants' victims.

While the SEC has had increasing concerns about Defendants' lack of compliance with the Monitor Order and the resulting risk of harm to investors, their recent conduct has made clear that Defendants are causing investors irreparable harm and the Monitor Order (ECF 95) does not provide sufficient tools to stop it. Defendants have recently rejected two of the Monitor's critical recommendations that would have protected investors' investments in connection with Defendants' proposal to exit their failed and fraudulent operation of the BSG Fund.

First, Defendants have denied investors' request to be redeemed in cash rather than stock through the planned exit transaction. Denying these requests rejects a recommendation of the Monitor and repudiates Defendants' previous offer in connection with the exit transaction. Nearly 700 investors – representing at least $148 million of the total investor principal invested in the Fund – accepted that offer. But Defendants have now stated that they will not return any investors' cash and will purport to redeem all investors with illiquid stock in new public company that cannot be sold for up to 42 months. This stock is not just illiquid, it also faces a vastly different risk profile because the new company plans to generate revenue in things like purported mining operations in foreign countries. In other words, Defendants previously accepted the Monitor's recommendation and agreed to redeem investors in cash if they elected that option, and hundreds of investors want their money back. But Defendants are now rejecting the Monitor's recommendation, keeping investors' money, and forcing them to take illiquid stock in a company exposed to risks these investors never knew about.

Second, and most recently, Defendants have rejected the Monitor's recommendation that, when calculating redemption amounts for the exit transaction, Defendants should not reduce those amounts by dividend distributions previously paid to investors. In other words, Defendants previously touted investor returns as profits to solicit even more investments. But Defendants now indicate they will retroactively characterize those profit payments as returns of capital—effectively transforming investors' investments into interest-free loans. Since Defendants made statements, in a June 19, 2026 Investor Update, about potential reductions, the Monitor has tried to get a straight answer from Defendants about them. *See* ECF 312 ¶¶ 9-36. REDACTED [redacted] 1

While Defendants' rejections of the Monitor's recommendations are recent and will result in irreparable harm, Defendants have long been uncooperative with the Monitor and out of compliance with the Monitor Order. Almost from the start, Defendants were not completely truthful or forthcoming with the Monitor and have disregarded provisions of the Monitor Order

without obtaining Court approval. Then, in the fall of last year, Defendants threatened to sue the Monitor for over $500 million for alleged bad faith. On March 2, 2026, the Monitor reported that "since the filing of the last status report, dated October 30, 2025, the Monitorship Entities have determined to treat the Monitor as if he were an adversary, and not, as he is, an agent of this Court." ECF 239 ¶ 6. These baseless attacks on the Monitor are a symptom of Defendants' tactic to respond to any allegation of misconduct: deny everything, attack everyone, and insist that they, not their investors, are the real victims.

The harm to investors that Defendants will cause by refusing to redeem investors with cash and retroactively treating investments like interest-free loans is a continuation of Defendants' fraud because these acts are designed to coverup the natural and foreseeable consequences of the fraud alleged in the Complaint. Defendants' operation of the Fund was never sustainable because Defendants fraudulently promised and paid returns in amounts that, unbeknownst to investors, far exceeded profits earned by the Fund. Defendants also misled investors by presenting investment options in different "Series" that Defendants told investors would be kept separate.

Because the Fund lacked sufficient profits to pay returns, Defendants needed a continuous stream of new investor funds to continue operating this way. But the Court's January 31, 2025 Order (and later Orders) prevented them from raising new investor funds. ECF 18 at 2, ECF 88 at 1-2, ECF 95 at 9. Without new investor funds to pay promised investor returns, Defendants quickly sought a variety of exit transactions with constantly evolving terms. In this latest iteration of the exit transaction, Defendants have stopped paying returns, plan to keep investors' money, retroactively reduce their accounts, and purport to redeem them with stock in a new company that may be unable to be sold for more than three years.

All of this is the natural result of a Fund that promised and paid returns it could not afford to pay. But the Fund does have some remaining assets according to the Monitor and Defendants. Because Defendants have proven that they cannot wind down the Fund without increasing victim harm, the Court should convert the Monitor to a receiver to liquidate the Fund's assets and distribute them to investors. Given the Monitor's work on this case, appointing the Monitor to serve as the receiver would be efficient and conserve resources.

This brief first shows in Section II evidence that investors are being harmed and details Defendants' efforts to mislead the Monitor and the Court and failures to abide by the Monitor Order. Section III recites the evidence supporting the underlying fraud. Section IV provides legal standards courts have applied to requests for receivers, shows that the evidence here satisfies those standards, and sets forth the SEC's specific request for a receiver over BSG Management and BSG Fund.

**Expedited Treatment Requested**

The SEC requests an expedited ruling on this Motion under Local Rule 7.1(d)(2). In conferring with Defendants on the relief sought in this Motion pursuant to Local Rule 7.1(a)(3), the parties agreed upon the following schedule with respect to this Motion. Defendants' Opposition due by August 27, 2026, the SEC's reply due by September 10, 2026, and an evidentiary hearing at the Court's earliest availability thereafter. An expedited hearing and ruling is necessary to protect investors from the imminent and irreparable harm as discussed herein.

## II. RECENT INVESTOR HARM AND FAILURES TO COMPLY WITH THE MONITOR ORDER

### A. Investors are suffering ongoing harm despite the Monitor Order.

The SEC brought this case and filed motions for preliminary relief, including a motion for appointment of a receiver, to protect BSG Fund's investors and to protect the investing public

from future harm. ECF 13, "Receiver Motion;" ECF 9, "TRO Motion." As a compromise, the parties agreed to the Order Granting Stipulated Motion to Appoint a Monitor and Other Additional Relief. ECF 95 ("Monitor Order"). As Defendants have acknowledged, "the Monitorship was primarily set up for the purpose of the protection of investors." ECF 175 at 10.

The Monitor is empowered to review books and records, make requests, and issue reports regarding his assessment of the ongoing operations of the Monitorship Entities and the SEC's allegations. ECF 95 ¶¶ 6-13. The Monitor likewise makes recommendations to the Monitorship Entities, who are then obligated, within 30 days, "to provide the Monitor and the SEC with evidence that the Monitor's recommendations have been implemented, or that the Monitor's recommendations have been otherwise sufficiently addressed…." *Id.* ¶ 17. The Monitor Order prohibited Defendants from soliciting new investments and protected existing investors by requiring Defendants to stop transferring investor assets to themselves and preventing them from transferring assets outside the Court's jurisdiction. *Id.* ¶ 26. The Order also required Defendants to "transfer all assets purchased with BSG Fund investor monies to an entity or entities owned by the appropriate series of the BSG Fund." *Id.* ¶ 24.

In the fall of 2025, Defendants presented a new iteration of an exit transaction to the Monitor, the "Redemption Transaction," through which Defendants intended to redeem all investors. ECF 165 ¶¶ 48-56. As explained in this section, the Monitor made recommendations that would protect investors, but Defendants recently overhauled the terms of the Redemption Transaction in ways that reject the Monitor's recommendations. This about-face will cause investors irreparable harm.

**1. Defendants proposed a redemption transaction.**

Defendants provided investors a "Broadstreet Global Fund Redemption Notice"

("Redemption Notice") initially dated November 14, 2025.[1] Ex. 1.[2] The Redemption Notice informed investors that "you will no longer be an investor in" the BSG Fund, no further distributions would be made, and investors would be redeemed out of the BSG Fund in cash or stock in a new company. *Id.* at 3-4. Investors were told that they "will be given two choices, and you must make a selection." *Id.* at 3.

"Choice A" offered investors a ***cash redemption*** option "for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you….[Y]ou will be paid within 180 days of your redemption election." *Id.* at 4. Although the Redemption Notice stated that investors "must make a selection," (*id.* at 3) it simultaneously treated the cash redemption option as the default for investors that did not respond to the notice (*id.* at 5) ("**Any investor not completing this document will be logged in BSGF's records as having chosen Redemption Choice – A for a cash buyout and will, as a result, receive that cash buyout.**") (emphasis in original). The BSG Fund offered the cash redemption option at the recommendation of the Monitor. *See* ECF 165 ¶¶ 51-52.

"Choice B" offered investors a stock redemption option. Investors that selected this option would be "paid with the payment of restricted common stock in a New York Stock Exchange listed company equal to three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you." Ex. 1 at 4.

---

[1] REDACTED [redacted] 1

[2] As discussed below, the Redemption Notice was later updated, but the date on the document did not change.

BSG Fund stopped paying investors their dividends in November 2025, *see, e.g.*, Ex. 10 ¶ 23, and has kept investors' money. In an investor update, Defendants stated that investors would be redeemed over two months ago, by May 27, 2026. ECF 230-1 at 1.

**2. Defendants will not honor the cash redemption option.**

The Monitor reported that nearly 700 investors elected Choice A, the cash option.[3] ECF 299 ¶ 12. Defendants owed about $148 million in cash to these investors by May 27, 2026. *See id.*; ECF 230-1 at 1. REDACTED [redacted] 2 But nine days after the Monitor filed his Sixth Status Report, Defendants filed an Investor Update that reported purported "obstacles to completing" the cash "redemption by the last week of May" (ECF 261-1 at 1) and stated that "all withdrawals may be modified or paid back in kind" (*id.* at 2). Eight days later, Defendants filed another Investor Update that reported that the "Cash Sales-Process Hits Impasse" (ECF 264-1 at 1-2), proclaimed their "Authority to Complete the Redemption In Kind" (*id.* at 2-3), and in "What This Means for You" stated that "management has elected to complete the Redemption of the small minority of investors remaining who had elected a cash redemption by instead redeeming them in the form of an 'in-kind' redemption, with payment being made in stock" (*id.* at 4).

---

[3] REDACTED [redacted] 2

Refusing investors' requests for their money back violates the explicit terms of the Redemption Transaction, is contrary to the Monitor's recommendation, and is harming investors on an ongoing basis. Defendants have held these investors' BSG Fund investments for over eight months (since announcing the Redemption Transaction) without paying the promised redemption and have stopped making promised dividend payments. Defendants are now telling their investors that rather than returning their cash, Defendants will only give investors illiquid stock in a new company that is very different than what investors were told about how BSG Fund would invest their money.

The new company describes itself as launching a "new economy financial services conglomerate and stablecoin issuer." Ex. 7 at 7 (November 24, 2025, Soulpower Acquisition Corp. Press Release attached to Form 8-K). Soulpower Acquisition Corp. states that it has entered a business combination agreement with SWB LLC ("SWB") and that SWB has numerous binding agreements in place, including for a British Virgin Islands banking license. *Id.* at 8. Soulpower Acquisition Corp. claims SWB also has agreements in place to own real world assets, including those they are acquiring from the BSG Fund as well as "slate mines," "mineral rights in connection with a major oil and gas discovery in Louisiana," undeveloped land in Mexico, a South African gold mine, and a U.S. gold and silver mine. *Id.* These ventures are materially different from what Defendants originally pitched to investors.

Refusing to return investors' cash is contrary to multiple representations that Defendants, and those acting on behalf of Defendants, have made to investors. Ex 8 (B. Patel Decl.) ¶¶ 14-15, 23, 26, 29; Ex. 9 (B. Knoblauch Decl.) ¶¶ 5-7, 15, 17-19; Ex. 10 (Dr. M. Patel Decl.) ¶¶ 23, 25-26; Ex. 11 (N. Shah Decl.) ¶¶ 18, 21-28; Ex. 12 (T. Levy Decl.) ¶¶ 7, 9-10, 13, 17-23, 26; Ex. 13 (M. Patel Decl.) ¶¶ 5, 16, 23, 29. These six declarations from investors are attached to this

Motion and provide important context for the necessity of the relief sought in this Motion. These investors provide information about their concerns about their investment, promises made by Defendants' representatives and not kept, and the meaningful hardship Defendants' fraud has caused those investors. Some additional investor communications the SEC has received appear as Exhibits 4-6 to this Motion, and additional investor communications are a part of Exhibit B to the Monitor's Seventh Status Report. ECF 280.

REDACTED [redacted]

[redacted] [redacted]

[redacted] [redacted] 3

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

Defendants made similar statements to the Court about investors' rights and ability to get their money back. Steven Baldassarra stated in a declaration: "Investors are able to redeem the entire amount of their original investment if and when they redeem their investments. BSG Fund has operated this way since its inception." ECF 54-2 ¶ 16. When trying to argue that investors have not been harmed, Defendants' counsel told the Court that if any investor was not "fully satisfied" the answer from Broad Street is "Here is your money back. You're probably not the right investor for us." ECF 84 at 64:6-10.

Given the foregoing, and as noted above, the Monitor had recommended that the BSG Fund include a cash redemption option, and the Monitorship Entities had agreed to do so. *See* ECF 165 ¶¶ 51-52. To justify Defendants' rejection of the Monitor's recommendation and their repudiation of the offer to investors, Defendants have asserted that the BSG Fund's Operating Agreement permits them to redeem investors "in kind."[4] *See* ECF 264-1 at 2-3. Setting aside the fact that Defendants offered a cash redemption that they should not be permitted to retract now no matter what the Operating Agreement allows, the Operating Agreement does not allow them to redeem investors "in kind" with whatever assets Defendants choose.[5]

REDACTED [redacted] 5

---

[4] Consistent with their tactics to deny everything, attack everyone, and make themselves the victims, BSG Management is attacking their victims and reframing itself as the victim by suing five investors who sent demand letters for their cash, seeking a ruling about "in kind" distributions to investors in *Broad Street Global Management LLC v. Schulman* et al., 26-cv-23989-GAYLES/SHAW-WILDER (filed June 6, 2026). In a July 27, 2026, Investor Update, BSG Management also tried to minimize and isolate victims, stating that it will "hold steadfast against the minority that seek to avoid their contractual obligations." Ex. 16 at 2.

[5] REDACTED [redacted] 4

REDACTED [redacted]

REDACTED [redacted]

5

[redacted]

[redacted]

Numerous investors have contacted the SEC and the Monitor to indicate that they are being harmed by not receiving their cash back and have stated that they do not believe that the stock is an in-kind distribution to which they agreed. *See* Ex 8 (B. Patel Decl.) ¶ 32; Ex. 9 (B.

Knoblauch Decl.) ¶ 20; Ex. 10 (Dr. M. Patel Decl.) ¶ 26; Ex. 12 (T. Levy Decl.) ¶ 25; *see also* Exs. 4-6; ECF 280-2 (Ex. B to Monitor's Seventh Status Report).

**3. Defendants are reducing investors' accounts.**

REDACTED [redacted] 6 [redacted]

REDACTED [redacted]

REDACTED [redacted] 6

[redacted]

REDACTED

[redacted]

REDACTED [redacted]

[redacted]

[redacted]

[redacted] 6

[redacted]

Indeed, investors have confirmed that they believed they were getting preferred or fixed returns on their investments. Ex 8 (B. Patel Decl.) ¶¶ 10, 18; Ex. 9 (B. Knoblauch Decl.) ¶¶ 8-10; Ex. 10 (Dr. M. Patel Decl.) ¶¶ 9, 12-14; Ex. 11 (N. Shah Decl.) ¶¶ 13-16; Ex. 12 (T. Levy Decl.)

---

[6] REDACTED [redacted] 7

¶¶ 6, 8, 10; Ex. 13 (M. Patel Decl.) ¶¶ 5, 9, 12, 13

**4. Defendants have stopped dividend payments and have not redeemed investors.**

The investors who elected to receive stock are also being harmed. Defendants announced the Redemption Transaction in November 2025 and in later updates to investors promised that they would be redeemed with the restricted stock by May 27, 2026. While keeping investors' money and not paying dividends, Defendants have distributed no stock to investors, effectively granting themselves an interest-free loan on hundreds of millions of dollars of investors' money for eight months and counting.

Since November 2025, these investors have received neither dividend payments nor stock in the new entity. Previously, in the May 14, 2026, Investor Update, Defendants had stated only that "we expect our asset transfer portion of the transaction to be completed by the last week in May, in line with the original timeline announced." ECF 261-1 at 1. On May 22 they reported that "last week we signed the bill of sale transaction document with our purchasing counterparty in the stock-based transaction referenced in the Investor Updates" but provided no details or estimate of when the stock from the other side of the transaction would be arriving or, more importantly, when investors would receive the stock Defendants told them they would get in May. ECF 264-1 at 1. As of a July 27, 2026 Investor Update, Defendants estimate that process *may* be completed "within the next couple of months" although that is simply their "best estimate based on information recently conveyed to us." Ex. 16 at 2-3; Ex. 23 at 5 of 8 (July 30, 2026 SOUL Form 8-K and attached press release noting that the "proposed business combination among Soulpower, Pubco, and SWB LLC remains subject to the satisfaction or waiver of applicable closing conditions, including approval of the transaction by Soulpower's shareholders").

**5. Defendants are seeking to enrich themselves to the detriment of investors.**

In the Redemption Notice, Defendants described Option B as "a public entity that is purchasing 21 of our infrastructure projects." Ex. 1 at 1. The number of projects being sold to the public entity later increased to 38. ECF 239 ¶¶ 33-34, 49. REDACTED [redacted] 8
[redacted] 9
. Thus, through the Redemption Transaction, Defendants appear to be retaining the remaining projects funded by investors for themselves.

**B. Defendants have shown that the existing Monitor Order is not enough to protect investors.**

The Monitorship has been in place for over a year. During that time, Defendants have shown they cannot be trusted to manage these entities and be entrusted with investor funds any longer. On top of the harm Defendants will cause and their rejection of recommendations of the Monitor, described above in Section II.A, Defendants have shown they cannot be trusted because they have not been forthright with the Monitor. While much of this conduct began months ago, this conduct, combined with the recent events outlined above, has reached the point where the Monitor Order is insufficient and appointment of a receiver is necessary.

*First,* Defendants misled the Monitor about the Fund's ownership of assets. The Monitor explained that while Defendants repeatedly assured the Monitor, orally and in writing, that the Fund's infrastructure assets "were assets owned and controlled by BSG Fund," ECF 118 ¶ 11, this was misleading at best. The Monitor explained that "only through the Monitor's independent review of the voluminous files," he discovered that various claimants asserted ownership in

assets Defendants asserted were BSG Fund assets. *Id.* ¶ 14.

*Second,* Defendants misled the Monitor about the profitability of the Fund's MCA portfolios. The profitability of these portfolios is relevant to the Fund's ability to pay investor dividends. To measure profitability, the Monitor focused on funds that Defendants were receiving from Samson Funding ("Samson"), the merchant cash advance company through which the MCA Series invested, on a cash in versus cash out basis. The Monitor advised the Court that Defendant Feingold had represented to him that all incoming funds from historic MCA portfolios are "profits." ECF 135 ¶ 62. The Monitor had requested information to verify that representation, and had initially concluded that "based on this timeframe of records, it appears that currently all incoming funds from Samson to BSG Fund, are indeed, profits." *Id.* ¶¶ 63, 65. The Monitor then had to file a supplement retracting those statements because, as the Monitor explained, Defendants were not "truthful with the Monitor" when they responded to his request for evidence to support Feingold's claims to the Monitor that the MCA portfolios were profitable on a cash basis:

> As was previously reported, the Monitorship Entities also were not truthful with the Monitor about the "profitability" of the MCA/Samson series. *See* Supplement to Monitor's Third Status Report, ECF No. 140. The Monitorship Entities' failure to provide an accounting, failure to be candid with the Monitor about MCA's profitability, and failure to provide the Monitor with full access to books and records, has frustrated the Monitor's ability to ensure that the Monitorship Entities are not currently engaging in conduct complained about by the SEC—namely, misuse of investor funds or misstating/inflating profits. *See* Compl. ¶¶ 3; 153.

ECF 181 at 4 of 22.

*Third,* Defendants also misrepresented their termination of the MCA series to the Monitor. Defendants told him that "The MCA Series investors were given the option to fully redeem or to roll over into a new infrastructure Series, called BSG15." ECF 135 ¶ 45. But

investors were not affirmatively provided any choice or specific update to inform them their investment was changing. REDACTED [redacted] 10

[redacted] 11

[redacted]

What Defendants told the Monitor is inconsistent with what investors experienced. As investor Bharvin Patel explains:

> In early 2025, I heard only - after the fact - that Broadstreet was no longer offering the MCA series. I was informed that I had been rolled over into BSG15, which was an infrastructure series. I was not given any choice in the matter, and I was not told before it happened. [A representative for Broadstreet] told me that I would keep receiving the same dividends as my MCA investment.

Ex. 8, Bharvin Patel Declaration ¶ 24.

REDACTED [redacted] 12

[redacted] 13

---

[7] REDACTED [redacted] 10

REDACTED [redacted] 13

REDACTED [redacted] 14

REDACTED [redacted] 15

## III. <u>FACTS SUPPORTING THE UNDERLYING FRAUD ALLEGED</u>

REDACTED [redacted] 16

REDACTED [redacted]

[redacted]

[redacted]

REDACTED [redacted]

16

[redacted]

[redacted]

REDACTED [redacted]

[redacted]

REDACTED [redacted]

[redacted] 16

REDACTED [redacted]

[redacted] 16

[redacted]

[redacted]

[redacted]

8 REDACTED [redacted] 17

REDACTED [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] REDACTED [redacted]

REDACTED

[redacted] 18

[redacted]

[9] REDACTED [redacted]

REDACTED [redacted]

REDACTED [redacted] 18

[redacted] 19

REDACTED [redacted] 19

REDACTED [redacted]

---

[redacted]

REDACTED [redacted]

[redacted]

[redacted] 19
[redacted]

[redacted]

[redacted]

[redacted]

[redacted] 19

## IV. A RECEIVER IS APPROPRIATE AND NECESSARY.

### A. Legal Standard

Courts in this district evaluate a request for appointment of a receiver in an SEC enforcement action under the standard set forth in *SEC v. First Financial Grp. of Texas*, 645 F.2d 429, 434 (5th Cir. 1981).[12] Under this standard, which is based on Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act, a receiver is appropriate upon a showing by the SEC that there is a reasonable likelihood that the defendant is engaged in or about to engage in practices that violate the federal securities laws. *First Financial*, 645 F.2d at 434. "The latter showing is usually made with proof of past substantive violations that indicate a reasonable likelihood of future substantive violations." *Id.*; *see also SEC v. Lauer*, 2015 WL 11004892, at *5 (S.D. Fla. Nov. 24, 2015) ("The appointment of a Receiver is a well-established equitable remedy available to the SEC in civil enforcement proceedings. The appointment of a Receiver is particularly appropriate in cases, such as this one, where the defendant defrauded members of the investing public.") (citing *First Financial*, 645 F.2d at 438); *SEC v. Hilton*, 2012 WL 12869520, at *2 (S.D. Fla. Oct. 2, 2012) (quoting *First Financial*, 645 F.2d at 438).

While *First Financial* is controlling for the SEC's request for appointment of a receiver here, the SEC acknowledges that courts have imposed different legal standards in other circuits or where a party seeks an injunction rather than a receiver. For instance, the Fifth Circuit has recently held that *First Financial* does not control when the SEC has not obtained an injunction

[12] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (Eleventh Circuit bound by decisions of the former Fifth Circuit rendered prior to October 1, 1981).

when it moves for a receivership. *SEC v. Barton*, 79 F.4th 573, 578-79 (5th Cir. 2023). In that situation, the Fifth Circuit applies "*Netsphere* factors," under which "a receivership is appropriate where there's 1) a clear necessity to protect the defrauded investors' interest in property, 2) legal and less drastic equitable remedies are inadequate, and 3) the benefits of receivership outweigh the burdens on the affected parties." *SEC v. Barton*, 135 F.4th 206, 217 (5th Cir. 2025) (quoting *SEC v. Barton*, 79 F.4th 573, 578-79 (5th Cir. 2023) (citing *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)).

Separately, *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1575 (2024), sets the standard for injunctive relief. This standard should not apply to the SEC's motion for appointment of a receiver because that requested relief is not injunctive relief. *See SEC v. Complete Bus. Solutions Grp.*, 44 F.4th 1326, 1333 (11th Cir. 2022) (for appellate jurisdictional purposes, quoting Supreme Court precedent "which makes clear that an order appointing a receiver can't be construed as 'embrac[ing] within its terms an injunction or the necessary equivalent of an injunction.'" (quoting *Highland Ave. & B.R. Co. v. Columbian Equip. Co.*, 168 U.S. 627, 629, 631-32 (1898)).

In this section, the SEC first shows that a receiver is appropriate under *First Financial*. Next, while consideration of the *Netsphere* and *Starbucks* factors are not necessary, the SEC shows that appointment of a receiver is nevertheless appropriate when applying those factors to the evidence here.

### B. A receiver is appropriate under *First Financial*.

A receiver is appropriate under *First Financial* because, as shown in the TRO Motion at 32-50, together with the additional facts provided above in Section III, the SEC has established a reasonable likelihood that Defendants engaged in multiple violations of the federal securities laws and that they are continuing to cover up their fraudulent scheme and are harming investors.

*See First Financial*, 645 F.2d at 434, 438. Under *First Financial*, Defendants' past substantive violations indicate a reasonable likelihood that Defendants are engaged in or are about to engage in more federal securities law violations. *First Financial*, 645 F.2d at 434.

Moreover, as described above in Section II.A of this brief, Defendants are continuing to harm investors and, as described above in Section II.B, Defendants cannot be trusted to comply with the Monitor Order. Thus, the status quo is untenable and the Court should exercise its equitable powers to appoint a receiver over BSG Management and the BSG Fund because a "Receiver is appropriate to protect the public interest when it is obvious that those in control of an entity who have inflicted serious detriment in the past must be ousted." *Lauer*, 2015 WL 11004892, at *5 (citing *SEC v. Bowler,* 427 F.2d 190, 198 (4th Cir. 1970)).

Given their misconduct, Feingold and the Baldassarras should not remain in control of BSG Management, the sole manager of the BSG Fund that remains responsible for managing their victims' investments. In the alternative, the Court could remove control of BSG Fund from BSG Management and place that control into a receivership estate and allow Defendants to manage whatever other affairs BSG Management may have.

Federal courts routinely enlist receivers to effect the remedial purposes of the securities laws. *See, e.g.*, *First Financial*, 645 F.2d at 438 ("the appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings"); *see generally* Section 21(d)(5) of the Securities Exchange Act of 1934, 15 U.S.C. §78u(d)(5) ("In any action . . . brought . . . by the Commission under any provision of the securities laws, the Commission may seek, and any Federal Court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."). Appointing a receiver is "particularly necessary" where, as here, "the corporate defendant, through its management, has defrauded

members of the investing public[.]" *First Financial*, 645 F.2d at 438. "[I]n such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest. . . ." *Id.*; *see also SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 878 (S.D. Fla. 1974).

### C. A receiver is appropriate under *Netsphere* or *Starbucks* factors.

Appointment of a receiver is appropriate under *First Financial* for the reasons above. Even if the Court were to apply the *Netsphere* or *Starbucks* factors, appointment of a receiver is also appropriate under those standards.

#### 1. The *Netsphere* factors favor a receivership.

Applying the *Netsphere* factors, "a receivership is appropriate where there's 1) a clear necessity to protect the defrauded investors' interest in property, 2) legal and less drastic equitable remedies are inadequate, and 3) the benefits of receivership outweigh the burdens on the affected parties." *Barton*, 135 F.4th at 217.

##### a. First *Netsphere* factor – clear necessity to protect defrauded investors' interest in property

When considering the first factor, the court in *Barton* explained that "a receivership may be justified 'to prevent the threatened diversion of assets through fraud or mismanagement[,]' 'to prevent the corporation from dissipating corporate assets[,]' and 'to pay defrauded investors.'" *Barton,* 135 F.4th at 218 (quoting *Netsphere*, 703 F.3d at 305).

For the same reasons set forth in the TRO Motion at 32-50, together with the additional facts provided above in Section III about Defendants' scheme to fraudulently promise and pay inflated returns, the SEC has established that Defendants defrauded investors.

For the reasons in Section II, above, without a receiver Defendants' actions threaten to divert and dissipate investors' assets that remain through "fraud or mismanagement." To continue their fraud and evade responsibility for it, Defendants are withholding investors' assets to use them in an exit transaction that would leave investors with illiquid stock in a new company that they never requested nor agreed to accept. Also to continue to evade responsibility, Defendants are threatening to retroactively transform investments into interest-free loans—an act that would divert nearly $500 million away from investors.

A receiver would have to put *investors' interests* first in liquidating whatever is remaining of the BSG Fund assets and, with the Court's supervision, distribute proceeds equitably. The first *Netsphere* factor therefore favors a receiver because the appointment of a receiver would prevent diversion and dissipation of assets to pay defrauded investors through fraud or mismanagement. *See Barton,* 135 F.4th at 218 (quoting *Netsphere*, 703 F.3d at 305).

**b. Second *Netsphere* factor – legal and less drastic remedies are inadequate**

Allowing Defendants to continue to control investor assets creates a high risk of asset diversion or dissipation for the reasons above. A monitorship is a less drastic remedy, but as described in Section II.A, above, Defendants have proven incapable following the Monitor's recommendations and the Monitor Order. More broadly, as described in Section II.B, above, Defendants have proven incapable of meaningful cooperation with the Monitor that any monitorship order would require. Defendants have thus proven that there is no less drastic remedy that would protect investors' interests in their remaining assets.

**c. Third *Netsphere* factor – the benefits of receivership outweigh the burdens on the affected parties**

The potential harm to investors in the absence of a receiver, as outlined above, is that Defendants will dissipate BSG Fund's assets and, at best, leave investors with illiquid stock in an

unproven SPAC that many investors never agreed to—which is something the Monitor recommended Defendants <u>not</u> do. REDACTED [redacted] 20

Preventing this investor harm far outweighs any burden on Defendants. The only work left to do is to liquidate assets and distribute proceeds. Defendants have no specialized skill necessary for that work and have demonstrated their inability to accomplish the task fairly, timely, or within the expectations they created. Defendants do not stand to lose any time or expense if a receiver relieves them of their obligation to manage the Fund. Any loss of compensation for doing this work can be offset by the individual Defendants devoting their time to legitimate business ventures. Whatever investment interests Defendants have in the BSG Fund will be protected by the receiver, and there should be no assets owned by BSG Management, which was only created to manage BSG Fund. Thus, there should be no material and legitimate harm to any interest in BSG Management owned by the individual Defendants caused by a receivership.

**2. The *Starbucks* factors favor a receivership.**

Appointment of a receiver is also appropriate if the Court considers the evidence under the *Starbucks* factors that are used to determine whether to impose temporary or preliminary injunctive relief. When *Starbucks* does apply, to obtain a temporary or preliminary injunction order the SEC must establish that: (i) it is likely to succeed on the merits; (ii) it or other interested persons are likely to suffer irreparable harm in the absence of preliminary relief; (iii)

the balance of the equities tip in favor of the injunction; and (iv) the injunction is in the public interest. *See Starbucks*, 144 S. Ct. at 1575; *see also SEC v. Chappell*, 107 F.4th 114, 126 (3d Cir. 2024) (applying the same elements for an asset freeze in an SEC case).

**a. First *Starbucks* factor – the SEC is likely to establish that Defendants violated federal securities laws.**

To establish a likelihood of success on the merits, the Commission "must demonstrate that it can win[,] … which requires a showing significantly better than negligible but not necessarily more likely than not" that Defendants violated the applicable federal securities laws. *Chappell*, 107 F.4th at 130. For the same reasons set forth in the TRO Motion at 32-50, together with the additional facts provided above in Section III, the SEC has established that Defendants violated federal securities laws.

**b. Second *Starbucks* factor – Investors are likely to suffer irreparable harm in the absence of a receivership.**

According to Defendants' statements in their notices to investors, the only work remaining to do for the BSG Fund is to liquidate assets and distribute them. As explained above in Section II, Defendants are managing this process in a way that has already created investor harm and will continue to do so in the multiple ways discussed above. Defendants stopped paying promised returns last November and have locked up investors' money for an exit transaction that is already late and may never happen. Even if completed, Defendants' current proposal means investors' money will be locked up for *another* three-and-one-half years in illiquid investments exposed to risks they never considered or accepted. In addition to the above, at a hearing for appointment of a receiver, the SEC will introduce evidence, including testimony from the Monitor, that will explain to the Court why these acts would cause irreparable harm.

The irreparable harm factor also favors a receiver for the same reasons the first *Netsphere* factor favors a receiver: there is a clear necessity to protect defrauded investors' in property. *See supra* Section IV.C.1.a.

If appointed, a receiver would have to put *investors' interests* first in liquidating whatever is remaining of the BSG Fund assets and, with the Court's supervision, distribute proceeds equitably. Appointment of a receiver would ensure an *equitable* distribution and therefore prevent irreparable harm. As explained above in Section IV.B., federal courts routinely enlist receivers to prevent that harm.

**c. Third *Starbucks* factor – The balance of equities**

The SEC can establish the third factor necessary for preliminary relief by showing that the potential harm to the SEC and investors without the relief sought outweighs potential injury to Defendants with the relief in place. *See Chappell*, 107 F.4th at 138-39 (quoting *Issa v. Sch. Dist. Of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)); *see also id.* at 139 (The Court should "also consider the possibility of harm to other interested persons from the grant or denial" of the asset freeze. (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2019)). This factor overlaps with the third *Netsphere* factor. For the same reasons that the benefits of a receivership outweigh the burdens described above in Section IV.C.1.c, the balance of equities also favors a receivership.

**d. Fourth factor – Public interest**

The SEC can establish the final factor by showing that the appointment of a receiver is in the public interest. As a general proposition, "[i]t is in the public interest to protect against fraud and to make victims of fraud whole, while preventing wrongdoers from benefiting from their deceit." *SEC v. Asset Recovery and Mgmt. Trust, S.A.*, 340 F. Supp. 2d 1305, 1311 (M.D. Ala. 2004). Moreover, in enacting the securities laws, Congress expressed the importance of those

laws in protecting investors. *See, e.g.*, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] (granting the Commission the power to create rules, relating to the purchase and sale of securities, which it deems "necessary or appropriate in the public interest or for the protection of investors"). In other words, enforcing the federal securities laws to stop and prevent fraud is in the public interest.

Finally, the public interest favors the relief requested because where, as here, "a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Chappell*, 107 F.4th at 139 (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

**D. The Court should appoint a receiver over BSG Management and BSG Fund.**

For the reasons above, the SEC has satisfied any applicable legal standard for appointment of a receiver over BSG Management, the sole manager of BSG Fund with the power to manage the investments made by Defendants' victims. The receivership estate should also include BSG Fund to ensure the receiver can manage the affairs of BSG Fund. The Court's power to appoint a receiver includes the power to expand the receivership over non-defendant entities like BSG Fund. *See SEC v. Complete Bus. Solutions Grp., Inc.*, No. 23-10228, 2024 WL 4100564, at *1 (11th Cir. Sept. 6, 2024) (affirming district court order expanding receivership over various non-defendant entities).

The SEC has submitted a proposed order for appointment of a receiver with this motion. As reflected in the proposed order, the Court should empower the receiver to administer and manage BSG Management's business affairs, funds, tangible assets, choses in action, and any other property of the BSG Fund, marshal and safeguard their assets, and to take whatever actions are necessary for the protection of investors. Courts in this district have entered similar orders

appointing receivers in recent Commission cases involving violations of the antifraud provisions of the federal securities laws. *See SEC v. Complete Bus. Solutions Grp., Inc.*, No. 20-CIV-81205, 2020 WL 9209280 (S.D. Fla. July 31, 2020); *see also id.* at DE 141; *SEC v. Kapoor*, No. 23-24903-CIV, DE 28 (S.D. Fla. Jan. 12, 2024); *SEC v. Royal Benghal Logistics, Inc.*, No. 23-61179-CIV, DE 11 (S.D. Fla. June 21, 2023); *SEC v. BKCoin Mgmt., LLC*, No. 23-20719-CIV, DE 8 (S.D. Fla. Feb. 24, 2023).

Finally, given the Monitor's work on this case, appointing the Monitor to serve as the receiver would serve efficiency. Defendants agreed to the Monitor's appointment, *see* ECF 94 Joint Stipulated Motion to Appoint a Monitor, Adjourn the April 22, 2025, Hearing, and For Other Relief at 4 ("the parties have agreed to the appointment of Jeffrey Schneider as monitor"), and his credentials and experience that supported that appointment also support his appointment as a receiver. In the alternative, the SEC will make recommendations of well-qualified candidates to serve as a receiver if the Court prefers alternative options.

## V. CONCLUSION

For all these reasons, the Court should grant the Motion and appoint Jeffrey Schneider as the receiver over BSG Management and the BSG Fund.

**Certificate of Conferral**

Pursuant to Local Rule 7.1(a)(3), counsel for the SEC has conferred with Defendants about the relief sought in this Motion; Defendants oppose the relief sought herein.

Respectfully submitted,

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION**

By: */s Terry R. Miller*

Terry R. Miller
S.D. Fla. Bar No. A5503312

(303) 844-1041
millerte@sec.gov

Jacqueline M. Moessner
S.D. Fla. Bar No. A5503301
(303) 844-1031
moessnerj@sec.gov

Zachary T. Carlyle
S.D. Fla. Bar No. A5502167
(303) 844-1084
Carlylez@sec.gov

Attorneys for Plaintiff United States Securities and Exchange Commission
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000