**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:25-CV-20436-GAYLES/SHAW-WILDER**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT, LLC, and
BROAD STREET, INC.,

Defendants, and

JOSEPHBENJAMIN, INC., and
JUST A NICE DAY, INC.,

Relief Defendants.

**DEFENDANTS AND RELIEF DEFENDANTS' RESPONSE IN OPPOSITION TO SEC'S *SECOND* EXPEDITED RENEWED MOTION AND MEMORANDUM OF LAW FOR APPOINTMENT OF A RECEIVER AND REQUEST FOR EVIDENTIARY HEARING**

# INTRODUCTION

The SEC's Renewed Motion for Appointment of a Receiver ("Motion") places one question before this Court: Should a sixteen-month monitorship be converted to a receivership? The answer is no and this is not a close call. Indeed, the following is all true:

1. The two instances of "recent conduct" upon which the Motion is based are misrepresented by the SEC.
2. Defendants' actual recent conduct is an affirmation of the Monitorship, not a basis to do away with it.
3. The SEC misrepresents the applicable legal standard to this Court (coincidentally the actual legal standard that applies is less favorable to it).
4. The SEC fails to show that the Monitorship is inadequate.
5. The Monitor did not recommend a receivership.
6. The SEC's Motion improperly seeks to circumvent *Broad Street Global Management LLC v. Schulman et al.*, No. 1:26-cv-23998-GAYLES-SHAW-WILDER ("*Schulman* Case").
7. The Motion reasserts the same stale, easily refutable accusations the SEC raised when the SEC moved for a TRO, asset freeze and a receiver in January 2025, for which the SEC acknowledged – after abandoning that application for a TRO, asset freeze and a receiver – the Monitorship is sufficient.

This Monitorship has by no means been perfect. Defendants have disagreed with the Monitor at times. The Monitor has disagreed with Defendants. But that is ok. The Monitorship order contemplates disagreement. It requires Defendants and the Monitor to work together to "sufficiently address" their differences, which they have done and continue to do.

A receiver is not necessary. The Monitorship has been in place for sixteen months and is functioning. Moreover, the appointment of a receiver will cause significant harm to Broadstreet and its investors. Such appointment would trigger defaults to loan agreements (resulting in, at best, pennies on the dollar) and could destroy the SOUL stock deal, ***which 94% of Broadstreet's investor value/redemption consideration voted for and supports.***

At a hearing earlier this month, the Monitor said this about Defendants: "They know their business better than I do." The Monitor is right. Defendants should be permitted to continue to run their business under the Monitorship and manage their legal defense.

## ARGUMENT

### I. The SEC's claim of "recent conduct" concerning the redemption is inaccurate and does not warrant a receivership.

As an initial matter, it is undisputed that the Monitor recommended that the Monitorship Entities provide a cash option for investors to redeem. The Monitorship Entities did not agree with the recommendation (and still do not) but nevertheless worked to implement same.

For brief background, as part of the offering material for investment in Broadstreet Global Fund LLC ("BSGF"),[1] investors were provided a Confidential Private Placement Memorandum from Broadstreet ("PPM") and Operating Agreement. (*See* Declaration of Steven Baldassarra attached as **Exhibit 1** ¶ 4**)**.[2] Each investor signed subscription agreements confirming they were accredited investors, that they understood the investment was speculative and involved a high

---

[1] BSGF, Broad Street Global Management, LLC ("BSGM"), Broad Street, Inc. ("BSI"), and their affiliated and related entities (collectively, "Broadstreet").

[2] The Limited Liability Company Agreement of Broadstreet Global Fund LLC was amended and restated on May 26, 2022 and again in September 2023. (*Id.* n.1). The Limited Liability Company Agreement of Broadstreet Global Fund LLC and the aforementioned amendments and restatements are collectively referred to herein as the "Operating Agreement".

degree of risk, and that the investment should only be made with the "risk capital" segment of their investment portfolio. (*Id.* at 5). The Operating Agreement and PPM, which investors agreed to carefully review as part of their decision to invest in BSGF, are attached as **Exhibits 2 and 3** and contain the following provisions:

1. The Manager may, in its sole discretion, make distributions in cash or ***in kind***, or in a combination thereof, in connection with a withdrawal of funds . . . (Ex. 2, § 6.05) (emphasis added).

2. The Manager may, in its sole discretion, terminate all or any part of the Capital Account of any Member at any time for any reason or no reason. (*Id.*, § 6.03).

3. The Manager may at any time suspend or restrict the right of any Member to withdraw capital or receive a distribution of the amount being withdrawn from the Company or any Series if, in the Manager's judgment, such suspension or restriction would be in the best interests of the Company or such Series." (*Id.*, § 6.07(b)).

4. Situations in which such a suspension might occur include, but are not limited to: . . . (ii) when disruptions in investment markets make pricing and/or liquidation of some or all Company or Series assets difficult or would result in losses if the Company or a Series attempted such liquidations. (*Id.*).

5. "[A]ll withdrawals may be modified or paid back ***in kind*** if the Manager so determines it to be in the best interest of the Fund, a determination committed to the sole and absolute discretion of the Manager." (Ex. 3 at 11) (emphasis added).

On November 14, 2025, after receiving approval from the Monitor, Broadstreet sent the Redemption Notice. (ECF 322-1; Ex. 1 ¶ 7). The Redemption Notice was issued "pursuant to Article VI of [the Operating Agreement]." (ECF 322-1, Broadstreet Global Fund Redemption Notice at 3). The SEC did not object to any part of the Redemption Notice, ***including Redemption Choice - B (the SOUL stock option)***, as the Redemption Notice itself confirms. (ECF 322-1 at 2 ("The SEC takes no position on the adequacy of the Redemption Notice or the merits of the

Proposed Redemption Transaction")). The SEC was given pre-approval notice and took no action. The Monitor approved such transaction which Broadstreet thereafter deployed.

On December 5, 2025, Broadstreet shared the correspondence attached as **Exhibit 4**. Therein, Broadstreet noted that the overwhelming majority of Broadstreet's investors selected the stock option. (*Id.*). Between February 2, 2026 and May 14, 2026, Broadstreet provided six detailed investor updates concerning the redemption process and, among other things, repeatedly reemphasizing the Manager retained - and retains - the discretion to determine how best to complete the Redemption. (Ex. 1 ¶¶ 8-12).

On May 22, 2026, Broadstreet provided an additional update. (ECF 264-1). Such update, among other things, announced the BSGM's decision to redeem the remaining 6% of investor value in kind – along with the 94% of investor value that had already voted for stock – and explained in great detail why. (Ex. 1 ¶ 14).

On June 2, 2026, the Monitor filed his Seventh Status Report. (ECF 269). Therein, the Monitor stated the following as to his recommendation concerning the redemption:

> The Monitor is not suggesting for a moment that the Monitorship Entities cannot disagree with a Monitor recommendation or, after trying for six months to comply with one, cannot then change course and disregard it, but the Monitorship Order seems to require the Monitorship Entities to seek relief from the Court before doing so. (ECF 269 ¶ 42).

The Monitor then stated:

> [A]fter receiving a copy of the draft Report for redaction purposes, counsel of record for Defendants Broadstreet, Inc. and David Feingold advised the Monitor that the Defendants and Relief Defendants would be filing a motion with the Court. (*Id.*).

Indeed, on June 2, 2026, undersigned counsel advised the Monitor that Broadstreet would seek relief from the Court and further stated that such relief would be sought by not later than Saturday, June 6, 2026, with the caveat that the form of the request for relief may change as the Broadstreet

and their counsel continued to work on the filing. Around this time, Broadstreet began to receive demand letters for cash from a small minority of investors threatening separate litigation. (Ex. 1 ¶ 15).

The next day, on June 3, 2026, undersigned counsel advised the Monitor that Broadstreet intended to file a simple declaratory judgment in this District for a determination regarding the contractual dispute – between the small minority of Broadstreet's investors who voted for cash (on one hand) and Broadstreet's management (on the other) – and would check related case for Judge Gayles and Judge Altman. There was a reason for proceeding this way. Ultimately, no matter how framed, on any motion concerning this specific dispute, the Court will have to decide a contractual dispute between Broadstreet and a small minority of its investors. Broadstreet was concerned with putting this before this Court in this SEC enforcement case without Broadstreet's cash investor adversaries on this issue (those investors seeking to be redeemed in cash) present. Broadstreet has always and still does strongly believe its position will prevail on this issue. If Broadstreet did, however, prevail on a motion filed in this SEC enforcement action, there would be basic due process issues (investors not present, no pleading addresses this issue etc.) concerning the validity of such an order. An SEC enforcement is just not an appropriate proceeding to litigate such dispute.

The Monitor did not oppose Broadstreet's proposed course of action in seeking relief from the Court by way of a declaratory judgment action. On Saturday, June 6, 2026, Broadstreet filed the declaratory judgment action – the *Schulman* Case – and, that same day, undersigned counsel provided a copy of such complaint to the Monitor.

A little over a week later, on June 15, 2026, during a Microsoft Teams call with David Feingold and undersigned counsel, the Monitor stated as follows concerning the decision to redeem in kind the small minority of investors who voted for cash:

> **It is your business decision to make**. What I said in the report, well, I said two things. Number one, I don't know to what extent a motion is required because the cash component of the redemption came from a recommendation. What I seem to be, what I am saying, what I seem to think, I didn't draft the monitor order. I don't know that you all drafted the monitor order. I've read in briefing that you all have said the SEC did, but I certainly didn't draft it. I'm just reading it and section three, my humble opinion, for what it's worth, maybe the SEC is going to disagree, maybe the judge is going to disagree, talks about compliance with recommendations, and the way I read it, Dave [Feingold], I could be wrong, is that if I make a recommendation, I don't want to refer to myself in third person, that the entities have to implement it or sufficiently address it. So the conversation I had with Ian [Conits] and Tommy [Wolinetz] [counsel for BSI and David Feingold] a couple of weeks back was, I think you just need to file a motion to get relief from that. You guys, you're going a slightly different route, which is ultimately going to get you to the same place. You filed, you know, I saw you filed the action against the investors to tee up the de[claratory] judgment claim for res judicata, collateral estoppel, preclusive effect. **All of that makes perfect sense to me.** You're ultimately going to get, I imagine, in front of Judge Gayles, who is going to make a decision on paragraph three of the monitor [order]. I think you're going to get there.

(*See* Transcript from June 15, 2026 Microsoft Teams Call attached as **Exhibit 5** at 4-5) (emphasis added).

The truth is Defendants worked with the Monitor to "sufficiently address" his recommendation under the Monitor Order as required (ECF 95 ¶ 17) and did so by filing the *Schulman* Case. The Monitor agrees. (Id. at 4-5). The issue is pending before Judge Gayles and Magistrate Judge Shaw-Wilder in the *Schulman* Case. This "recent conduct" by Defendants is an ***affirmation of the Monitorship***, ***<u>not</u>*** a reason to do away with it. The SEC characterization that such aforementioned conduct somehow violated the Monitorship is disingenuous at best and certainly not grounds for a receiver. It is an affirmation of a properly working monitorship.

## II. Defendants are not reducing investors' accounts.

The SEC also claims that Defendants are "retroactively reducing their [investor] accounts by amounts they previously received as dividends or 'preferred returns.'" (Motion at 12). This claim is false. Here is what actually happened. Broadstreet provided the Monitor access to Juniper

account statements. (*See* ECF 312 ¶ 8). The Monitor and his forensic team reviewed what they were provided access to. (*Id.* at ¶¶ 8, 37). [redacted] This "recent conduct" is yet another ***affirmation of the Monitorship***, ***not*** a reason to do away with it. He made a recommendation, Broadstreet complied and had to review thousands of entries in the computer system and revise them accordingly. Again, an example of the Monitorship ultimately working yet the SEC characterizing otherwise.

**III. The SEC misrepresents the legal standard.**

In addition to the SEC's misrepresentation of the very "recent conduct" upon which the Motion is based, the SEC also misrepresents the legal standard applicable here. Indeed, the Motion states that *SEC v. First Financial Grp. of Texas*, 645 F.2d 429 (5th Cir. 1981) is controlling for the SEC's request for appointment of a receiver here. (Motion at 28). This too is not true.

The SEC cites to *First Financial* for the proposition that the standard for appointment of a receiver "is appropriate upon the showing by the SEC that there is a reasonable likelihood that the defendant is engaged in or about to engage in practices that violate the federal securities laws." (ECF 322, at 28) (citing *First Financial*, 645 F.2d at 434). But that standard is applicable only for "injunctive relief," not for the substantially more extreme remedy of receivership. *See First Financial*, 645 F.2d at 434 ("[T]he test laid down for ***injunctive relief*** is whether or not 'a proper showing' has been made by the SEC that there is a reasonable likelihood that the defendant is

engaged or about to engage in practices that violate the federal securities laws.") (emphasis added).[3]

*First Financial* is a Fifth Circuit case. The Fifth Circuit has held that *First Financial* does ***not*** control when the SEC has not first obtained an injunction before moving for receivership. *See SEC v. Barton*, 79 F.4th 573, 578-79 (5th Cir. 2023). In *Barton*, the SEC argued, based on *First Financial*, that the district court may appoint a receiver on a prima facie showing of fraud and mismanagement, and the defendant opposed the motion, arguing that the district court must instead find that a receivership is appropriate under the factors in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).

The *Barton* court explained that there is a crucial distinction between *First Financial* and the receivership order in *Barton*. *Id.* at 578. In *First Financial,* the SEC had already obtained injunctive relief, so the receivership was "proper as an adjunct to injunctive relief for a securities fraud." *Id.* (citations and internal quotations omitted). However, in *Barton*, "the SEC did not obtain a preliminary injunction before seeking a receivership, so *First Financial* is inapposite." *Id.* The *Barton* court concluded that where, as here, the SEC moves for receivership before first obtaining an injunction, "*First Financial* does not control and instead, the *Netsphere* factors must be met for a receivership to be justified: 1) [there is] a ***clear necessity*** to protect a party's interest in property, 2) ***legal and less drastic equitable remedies are inadequate***, and 3) the benefits of receivership outweigh the burdens on the affected parties." *Id.* at 578-79 (emphasis added) (citing *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)). Finally, "[e]ven if a reasonable basis exists for

---

[3] *See also, e.g., Keybank National Association v. Fleetway Leasing Co.*, 781 Fed.Appx. 119, 122 (3d Cir. 2019) (citing 1 Clark on Receivers § 58) ("explaining why '[t]he appointment of a receiver is more drastic than the issuing of an injunction.'").

believing there are benefits to the court and the parties to imposing a receivership … resort to that remedy may be inappropriate." *Netsphere*, 703 F.3d at 306. The SEC has not come close to meeting its burden.

Indeed, a district court's appointment of a receiver is an extraordinary equitable remedy. *U.S. v. Bradley*, 644 F.3d 1213, 1310 (11th Cir. 2011)).[4] "[T]he imposition of a receivership on a corporation is a drastic measure, the detrimental business effects of which should be carefully considered." *SEC v. Spence & Greene Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980);[5] *see also Maxwell v. Enterprise Wall Paper Mfg. Co.*, 131 F.2d 400, 402-403 (3d Cir. 1942) ("Likewise, it has been judicially noted almost innumerable times that the appointment of a receiver is an extraordinary, a drastic and … an 'heroic' remedy. ***It is not to be resorted to if milder measures will give the plaintiff … adequate protection for his rights***." (emphasis added)). The remedy of receivership "should be employed with the utmost caution and is justified only where there is a ***clear necessity*** to protect a party's interest in property, legal and ***less drastic equitable remedies are inadequate***, and the benefits of receivership outweighed the burdens on the affected parties." *SEC v. Complete Bus. Sols. Grp., Inc.*, No. 20-CV-81205, 2020 WL 9209279 (S.D.Fla. Dec. 16, 2020) (quoting *Netsphere, Inc.*, 703 F.3d at 305) (emphasis added).[6] "Receivership is a remedy of

---

[4] In *Bradley,* the Eleventh Circuit held that the district court's appointment of a receiver to collect criminal fines, special assessments, and restitution from defendants convicted of fraud was an abuse of discretion because ***adequate legal remedies existed*** to obtain satisfaction of the judgments. *See id.* at 1310-11.

[5] The Eleventh Circuit is bound by decisions of the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[6] *See also, e.g., Cutler v. 65 Sec. Plan*, 831 F.Supp. 1008, 1019 (E.D.N.Y. 1993) (denying receivership as inappropriate; reasoning that "because receivership interferes with an individual's property rights by ousting him from control, the appointment of a receiver is an extraordinary remedy that should ***only*** be utilized when there is a ***clear necessity*** to protect a party's interest in

last resort; ***a receiver should not be appointed if a less drastic remedy exists***." *Bracco v. Lackner*, 462 F.Supp. 436, 456 (N.D.Cal. 1978) (citing 75 C.J.S. Receivers s.9 (1952)) (emphasis added).

Where *Netsphere* applies—as it does here—a district court's failure to address the *Netsphere* factors may result in remand, establishing that the district court is required to consider each factor. *See Barton*, 79 F.4th at 579-80 ("[The district court's] order does not address whether legal and less drastic equitable remedies are inadequate or whether the benefits of the receivership outweigh the burdens on the affected parties. … accordingly, we will vacate the appointment of the receiver and remand so that the district court may consider whether to appoint a new receivership under the *Netsphere* factors.").

**IV. The SEC has not shown that the Monitorship is inadequate.**

In *SEC v. Republic Nat. Life Ins. Co.*, the district court denied the SEC's motion for appointment of a receiver because, among other things, ***there was no factual basis for assuming the current remedy was inadequate***. 378 F.Supp. 430, 438 (S.D.N.Y. 1974). Prior to the filing of the SEC enforcement action, the Texas Commissioner of Insurance issued an order placing the defendant in a state of supervision pursuant to a Texas insurance code statute. *Id.*, at 434.[7] The SEC case allegedly presented "an outrageous example of massive and serious violations of the

property.") (emphasis added); *Gordon v. Washington*, 295 U.S. 30, 39, 55 S.Ct. 584, 589, 79 L.Ed. 1282 (1935) (appointment of receiver appropriate ***only*** where there is a threatened loss or injury to property which ***only*** receivership would avoid); *Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961) (receivership is a "drastic remedy" to be imposed "***only where no lesser relief will be effective***"; further noting that "[i]t would ordinarily be presumed that a 'watchdog' over all expenditures should be sufficient to safeguard [a] corporate treasury.") (internal citation omitted) (emphasis added).

[7] The court explained that the supervision procedure was created by the Texas Legislature in 1967 as a threshold remedy which would be more appropriate to resolve the less serious cases of insolvency than receivership. *Id.* The legislature concluded that receivership was too drastic a remedy for many cases and often caused more harm than good. *Id.*

securities laws … involving numerous sham transactions designed to artificially inflate the reported income and assets of Realty and of Republic." *Id.* In filing a motion for receivership, the SEC argued that a "provisional caretaker type of receiver is necessary to oust incumbent management and to oversee the correction of Republic's filings with the Commission which are alleged to be false, fraudulent, or misleading. *Id.*, at 437. Yet, in denying the SEC's motion for receivership, the district court noted that "***[t]here is no factual basis for assuming that the Texas supervision is sham or inadequate***." *Id.*, at 438.[8]

As explained in Sections I and II above, the SEC's claims of "recent conduct" – which serve as the basis for its Motion – actually support the Monitorship. The Monitorship is functioning and adequate. There is no need to do away with it and replace it with the drastic receivership remedy the SEC is requesting.

**V. The SEC's Motion improperly seeks to circumvent the *Schulman* Case.**

In working with the Monitor to sufficiently address his recommendation concerning the cash redemption, Broadstreet filed the *Schulman* Case. The *Schulman* Case is a parallel proceeding before Judge Gayles and Magistrate Judge Shaw-Wilder already addressing the very conduct the SEC ultimately seeks to restrain in its renewed receivership motion—redeeming a small number of complaining investors in kind. *See Schulman* Case (ECF 1 ¶ 32 ("BSGM therefore seeks and is entitled to a declaration that Broadstreet may redeem Defendants in kind.")). As the Monitor himself stated, this case was filed to:

> [T]ee up the de[claratory] judgment claim for res judicata, collateral estoppel, preclusive effect. All of that makes perfect sense to me. You're ultimately going to

---

[8] In other words, in denying the receivership, the court found, in essence, that the legal or ***less drastic equitable remedy of supervision***—which is akin to the monitorship in this case—**was *<u>not</u>* *inadequate*.** *See Netsphere*, 703 F.3d at 305.

> get, I imagine, in front of Judge Gales, who is going to make a decision on paragraph three of the monitor [order]. I think you're going to get there.

(Ex. 5 at 5).

Indeed, the Monitorship Entities thought through this before they acted. A problem with just filing a motion in this case on the cash redemption issue is the obvious: (1) the cash redemption issue is a legal contractual dispute between a small number of investors and Broadstreet; and (2) such dispute is not part of the pleadings in this case and those investors are not parties to this case. Thus, if Broadstreet had filed a motion on the issue in this case, with no pleading on the issue and its adversaries not present, that, of course, would call into question the validity of any order issued on such motion. Officers of the Court are supposed to avoid putting the Court in that situation. Defendants have therefore avoided doing that. The SEC, however, through this Motion, unabashedly seeks to put the Court in that very situation.

In addition to misrepresenting Defendants "recent conduct" concerning the redemption, by requesting appointment of a receiver in this action based on the premise that Defendants' offering only in-kind redemptions is improper, the SEC's Motion improperly seeks to bypass the jurisdiction of this Court in the *Schulman* Case, which was filed *before* the SEC's Motion. The well-established first-filed rule counsels against the SEC's ability, through a receivership motion here, to usurp the *Schulman* Court's determination of the redemption dispute. "The first-filed rule provides that when parties have instituted competing or parallel litigation in separate courts, the court initially seized of the controversy should hear the case." *Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.*, 713 F.3d 71, 78 (11th Cir. 2013). The Eleventh Circuit has firmly established that "[w]here two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th

Cir. 2005). The first-filed rule "is grounded in principles of comity and sound judicial administration," and it "aims to prevent the needless expenditure of judicial resources and to avoid conflicting rulings." *Elliott v. Williams*, 549 F. Supp. 3d 1333, 1338 (S.D. Fla. 2021). "Notably, the first-to-file rule *doesn't* require that 'the parties and issues involved be identical'; it requires only that 'they are sufficiently similar or substantially overlap.'" *Id.*, at 1339 (citations omitted).

To be clear, the first filed ***complaint*** on this issue is the *Schulman* complaint. This Court should not permit a later-filed motion in the present action to be used as a device to evade or predetermine issues already pending before this Court in a separate action, *i.e.*, the *Schulman* Case. Such a result would effectively decide the redemption rights ***legal*** issue without an appropriate legal proceeding. Of equal importance is the SEC ignores that the small minority objecting to the redemption all, as ultra-wealthy, accredited investors, signed specific documents actually approving of in kind redemption.

The declaratory judgment action in *Schulman* is the proper forum to address the redemption dispute and present all documents this small minority of investors signed, which binds them. This is because the overlapping redemption issue arises *only* in the SEC's receivership ***motion*** in this enforcement action, which was filed *after* the *Schulman* case and is *not* a squarely pled issue in the SEC's Complaint. Amazingly, the SEC admits facts underlying the redemption dispute that forms the basis of the Motion are *entirely unrelated* to the allegations of securities fraud that form the basis of the SEC's Complaint. (*See, e.g.,* ECF 334 at 4) ("[The 'recent conduct' is] distinct from the issues addressed in the complaint"). The SEC's receivership request is a transparent attempt to litigate a ***legal*** contractual dispute in this action on the ***equities*** through sleight of hand—effectively depriving Defendants of their right to have that issue, a contract controversy between private parties, adjudicated on the merits in the *Schulman* Case.

Granting the SEC's request for a receivership now would effectively end Broadstreet ***without*** a final determination of either this case or the *Schulman* Case *on the merit*s. This extreme outcome is just not appropriate. The pending declaratory judgment action in *Schulman* is also itself a less drastic "remedy" for resolving the contested redemption dispute issue than requiring recourse to the permanent, disruptive and catastrophic effects of a receivership. For this reason too, receivership is improper. Imagine, the small minority opposing the redemption get to cancel the deal that 94% of the redemption consideration/overwhelming majority of investors approved. That is what the SEC seeks here.

**VI. The rest of the Motion makes stale accusations that are easily refuted.**

As explained above, the SEC's Motion is only based on two claims of "recent conduct," each of which does not warrant a receivership. The Motion should be denied because of this. The SEC, however, also opts to further smear Defendants with false accusations previously asserted long ago. The Court need not engage in this to decide this Motion. Defendants only do so below to protect the record and out of an abundance of caution. These are all arguments raised in the SEC's prior receivership motion that was abandoned more than one year ago but which they now raise again as if those same failing arguments have aged better with time when in fact they have actually spoiled even more.

***A. The SEC's claims that Defendants were not forthright with the Monitor a long time ago are false.***

The SEC admits that the six accusations made in Section II.A of the Motion are from "months ago." (Motion at 16). The passing of many months, of course, confirms even the SEC believes none of these six points are grounds for a receivership. More than that, the SEC's six assertions are false.

*First*, the SEC asserts Defendants' misled the Monitor by purportedly failing to disclose that various claimants asserted ownership in assets Defendants asserted were BSG Fund assets. (Motion at 16-17). Defendants did not mislead the Monitor. This purported incident occurred not long after the Monitorship Order was issued in April 2025, about 16 months ago. When the Monitorship first opened, Broadstreet was tasked with producing a substantial amount of documentation to the Monitor. The Monitor cites to those massive productions. (*See* ECF 103 ¶¶ 14-18, 55 ("The Monitor can confirm that, soon after his appointment, the Monitorship Entities began a rolling production of books and records" and reflecting massive productions and access provided to Monitor)). At that point, the Monitor had not yet requested a listing of outstanding litigations and, in fact, his First Status Report does not reflect any request for outstanding litigations since no such request was made. (*See* ECF 103 ¶ 13). A basic Google search of "David Feingold" shows at least some of those litigations occurring in multiple states. There was never any intent to hide such litigations (or any reason as they have been successful).

In addition, the SEC was well aware of this L3/Cardinale group (and associated litigations) as the SEC had been investigating L3/Cardinale since at least 2024 and had been getting updates from them on such litigations. (*See* Emails attached as **Exhibit 7**). Did the SEC not convey this information to the Monitor? In any event, the Monitor's Second Status Report even notes that he did, in fact, receive such information on outstanding litigations ***from the Monitorship Entities***: "It was only through the Monitor's independent review of the voluminous files to which the Monitorship Entities provided access that the Monitor identified a potentially significant dispute—which includes numerous pending lawsuits in both federal and state courts across Florida, South Carolina, and New York." (*See* ECF 118 ¶ 14). Further, "[i]n response to a specific request by the Monitor, on May 15, 2025, the Monitorship Entities provided a comprehensive list of ongoing

litigation, which is attached hereto as **Exhibit A**." (*Id.* n.4). Of note, the litigation has virtually all to this point been ruled in favor of Defendants. Another point the SEC conveniently omits.

If anything, this purported incident reflects that Broadstreet complied with the Monitor's massive requests for information, provided the information concerning the litigations (even without being asked), and immediately provided a list of ongoing litigations when asked. More than that, claims and assertions made by L3/Cardinale in those litigations had been repeatedly rejected and they were achieving no success. Indeed, as far as the purported seven disputed infrastructure projects, Magistrate Judge Reid would deny ***any discovery*** to Cardinale in a case concerning the same until it could be shown a joint venture agreement existed which to this day has never been done. (*See* Protective Order attached as **Exhibit 8**).

*Second*, the SEC asserts that Broadstreet misled the Monitor about the profitability of the Fund's MCA portfolios. (Motion at 17). Broadstreet made no misrepresentations here, either. (*See* ECF 183-1 ¶¶ 6-35 and exhibits referenced therein refuting in detail the SEC's assertions here and summarized below).

This purported incident began in July 2025. The issue of historical MCA profitability is at the center of the SEC Complaint. The Monitor, and all parties, agreed that the Monitor would not get involved with such historical matters as part of Monitorship.[9]

[9] The Monitor's focus on this historical matter – which took place many months ago – was contrary to his own self-described limitations. (*See* ECF 135 ¶ 76 ("The Monitor conferred with Plaintiff SEC and counsel for the Monitorship Entities, who advised that they agree that the Monitor is not to opine on the merits of the SEC's allegations related to past conduct . . . As such, the Monitor has limited his assessment of the SEC allegations relative to the Monitorship Entities' ongoing operations."); *id.* ¶ 84 ("As the Monitorship Entities have discontinued the MCA Series, this allegation does not seem affect prospective, ongoing operations"). The Monitor simultaneously refused to opine or even take a position on the propriety of the accrual method. (ECF 140 ¶ 16; ECF 165 ¶ 34).

In the Monitor's Third Status Report, he states that "based on this timeframe of records [2023 to then present in 2025], it appears that currently all incoming funds from Samson to BSG Fund are, indeed, profits." This reporting seemingly angered the SEC, already unhappy with the Monitor's earlier favorable Status Reports acknowledging Defendants massive productions of documents and information (ECF 103 ¶¶ 14-18, 55), characterizing Defendants' disclosures as "quite broad" (*id.* ¶¶ 35, 55) and stating the "Monitorship Entities appear to have significant assets" (*id.* 103 ¶ 58). In response, the Monitor told the SEC he was unhappy being a "conduit" for the SEC. (*See* Email Correspondence attached as **Exhibit 9**).

Under fire and at the behest of the SEC, on October 7, 2025, the Monitor filed a Supplement to Monitor's Third Status Report. (ECF 140). In the Supplement, the Monitor basically accuses the Monitorship Entities of misleading him on the profitability of certain MCA portfolios that are at the heart of the dispute with the SEC. Such accusation is inaccurate as refuted by Monitor's own statements below. Indeed, in an email recently produced by the SEC, the Monitor makes clear that the Monitorship Entities were quite clear about what they had produced to the Monitor and that the Monitor was quite clear about what he had received. There was no deceit. In an August 8, 2025 email to the SEC the Monitor states:

> I don't think I made a gratuitous statement about past profits. That certainly wasn't my intent. I repeated what Feingold represented to me ("all incoming funds from the historic MCA portfolios are profits."). I memorialized the subset of data that I received ("As of the filing of this Third Status Report, the Monitorship Entities provided a summary of the total amount of funds [not separated by MCA Series and Infrastructure Series] sent to Samson for investments in MCA portfolios for the years 2023, 2024, and 2025, as well as the total amount of funds received from Samson for the years 2023, 2024, and 2025.") I confirmed a second time what I did *not* receive ("As of the filing of this Third Status Report, the Monitorship Entities have not provided a similar accounting for 2021 and 2022.") And I provided a conclusion based on the data set I was provided ("In other words, based on this timeframe of records, it appears that currently all incoming funds from Samson to BSG Fund are, indeed, profits.")

(Email Correspondence is attached as **Exhibit 10**).

The MCA portfolios being profitable is again confirmed by the SEC's purported expert in her supplemental report. In that regard, the supplemental report is wrong on MCA profitability, which is much greater than Melissa Davis claims it to be based upon Samson's own records (referenced below), as Samson MCA default rates are far lower than the rates in the supplemental report per Samson's auditors and accrual basis is the proper analysis lens (not cash).

Contrary to the SEC's belated assertions, the Monitorship Entities provided an accounting, were truthful about MCA's profitability, and have provided the Monitor with full access to books and records. The SEC's story is pure fantasy and is further evidence that the SEC will do anything possible to evade a trial where even the Monitor recounts Broadstreet's disclosures as "quite broad."

*Third,* the SEC claims Defendants also misrepresented their termination of the MCA series to the Monitor. (Motion at 17-18). This too is wrong. This purported incident occurred in August 2025. The Monitorship Entities did not make any misrepresentation to the Monitor. As an initial matter and as well established in this Court's record, the Fund's offering materials provide broad discretion to the Manager in managing BSGF and its business, operations and assets. There is also nothing in the Fund's offering materials that in any way restricts the Manager from making the decision to close an investment series.

In BSGF's Q-4 Report of 2024 attached as **Exhibit 11**, BSGF advised investors (at page 23) that it was closing the MCA series to new investors. (*Id.* at 23). In the Q-1 Report of 2025 (322-17), the Fund further reiterated that the MCA series had been discontinued and advised that as a result a number of investors chose to redeem their investment either in kind or in cash. (*Id.* at 24). These reports were posted in the Fund's data room. There is nothing hidden about that nor the

fact that every investor also received their monthly account statement showing that MCA no longer existed and all of those materials were made widely available including to the monitor and SEC.

Each Broadstreet investor is required to sign a Subscription Agreement attached as **Exhibit 12**. In that Subscription Agreement, investors expressly agree at Section 5.19 that "The Subscriber acknowledges that the Subscriber is responsible for reading each Account Communication posted to any applicable data room and each Subscriber will be bound by the terms of all posted materials."

> 5.19 Communications in Electronic Format. The Subscriber hereby acknowledges and agrees that the Fund and/or the Manager may deliver and make reports, statements and other communications, including, without limitation, the Offering Documents and this Subscription Document, financial statements, the privacy policy, the Form 1065, Schedule K-1s ("**K-1s**") and other tax related information and documentation ("**Account Communications**"), available to the Subscriber in electronic form, such as e-mail or by posting on a web site (including, without limitation, any electronic dataroom made available to the Subscriber). It is the Subscriber's affirmative obligation to notify the Fund in writing if the Subscriber's e-mail address(es) change(s). The Subscriber may revoke or restrict its consent to electronic delivery of Account Communications at any time by notifying the Fund, in writing, of the Subscriber's intention to do so, and will thereafter receive such Account Communications in paper form. The Subscriber acknowledges that the Subscriber is responsible for reading each Account Communication posted to any applicable data room and each Subscriber will be bound by the terms of all posted materials.

In addition, Section 11.06 of the BSGF's Operating Agreement provides:

> Section 11.06 Electronic Communications. The Company and the Manager may deliver and make reports, statements and other communications, including, without limitation, financial statements, the Form 1065, Schedules K-1 and other tax related information and documentation ("Account Communications"), available to the Members in electronic form, such as e-mail or by posting on a web site (including, without limitation, any electronic dataroom or similar platform made available to the Member). Each Member consents to the electronic delivery of Account Communications. An email or other notice will be sent to each affected Member when a new Account Communication is posted on any website or electronic dataroom. Each Member is responsible for reading each Account Communication posted to such data room and each Member will be bound by the terms of all materials posted in accordance with the terms of this Agreement.

To signify BSGF's complete migration away from MCA, the Fund utilized the notation of BSG15 in its records, which is the name of a portfolio to denote that which was MCA but which now is reflected as infrastructure/real estate related investments. The SEC refers to an email, dated August

6, 2025, from the Monitor to the SEC forwarding an earlier email from the Monitorship Entities to the Monitor responding to the Monitor's questions. (ECF 322-18). The SEC contends the following responses in the earlier email misled the Monitor:

- Are there documents separately sent to investors offering investors a choice to redeem or invest in BSG15? **Yes, the investors always had the right to redeem since the moment they became investors, no additional documents were sent.**
- How were those documents sent and what disclosures were included in them? **The right to redeem existed in the operating agreement, the transactions are disclosed in the quarterly reports.**
- What does the year end 2024 report say? **Please see previously provided report.**

The SEC's assertions are yet again incorrect. In the Monitor's Third Status Report, he states that "The MCA Series investors were given the option to fully redeem or to roll over into a new infrastructure Series, called BSG15. To effectuate the roll over from the MCA Series into BSF15, BSG Fund 'credited over' the MCA Series investors' capital accounts to the BSG15 Series. In other words, no actual funds changed hands (or Series) when the discontinuation occurred." (ECF 135 ¶ 45). These statements of the Monitor are accurate. As it relates to Mr. Bharvin Patel, email communications reflect a separate discussion with him and certain other investors. Further, Patel's declaration submitted by the SEC on this motion is perjury (as explained below). Accordingly, Defendants did not misrepresent their termination of the MCA series to the Monitor. Nor has the Monitor ever suggested this.

*Fourth,* the SEC claims:

> Defendants misled the Monitor about various deals supposedly in progress, and failed to provide sufficient documentation of those deals, which have since failed to materialize. *See* ECF 239 ¶¶ 58, 60. From at least April 30, 2025, Defendants have provided the Monitor with an ever-changing story about various deals and their status. *See* ECF 122 ¶¶ 5, 10; ECF 138 ¶ 42; ECF 165 ¶¶ 48, 56; ECF 239 ¶¶ 45, 47, 51.

(Motion at 18-19).

This purported incident began in April 2025 according to the SEC. The Monitorship Entities did not deceive the Monitor here either. As reflected in the Declaration of David Feingold attached as **Exhibit 13**, there were nine different potential deals under consideration. (*Id.* ¶ 5). Mr. Feingold provides the reasons these deals did not close. Broadstreet kept the Monitor updated through frequent communications and the Court and investors updated through Investor Updates filed on the Court's docket. Like the other items, this one is fabricated and does not support appointing a Receiver.

*Fifth,* the SEC claims:

> [A]s reflected in the Monitor's Ninth Report, filed July 23, 2026, Defendants did not answer the Monitor's questions about their June 19 Investor Update in a clear or satisfactory manner, their answers required significant back and forth, and their ultimate claim is contradicted by their own documents. *See* ECF 312 ¶¶ 9-47.

(Motion at 19).

The cursory review of the communications do not support the SEC's assertion. There was confusion between tax versus redemption issues and the language being used that was ultimately cleared up. There was no deceit. This in no way supports a receiver. In short, reviewing the definition of capital account, versus distribution, versus redemption and in comparison to the language of the Operating Agreement led to discussions which ultimately resolved in Broadstreet following the Monitor's recommendation. Again, spirited discussion amongst the Monitor and Broadstreet is not prohibited.

*Finally*, the SEC claims:

> Defendants have not complied with Paragraph 24 of the Monitor Order, which requires that "Defendants shall transfer all assets purchased with BSG Fund investor monies to an entity or entities owned by the appropriate series of the BSG Fund." ECF 95 ¶ 24. Defendants are out of compliance with this provision and have never asked the Court to modify it or otherwise excuse their failure to comply. *See* ECF 239 ¶ 63 (the Monitor noting that "[g]iven the Monitorship Entities' pending

> redemption of all investors, to be completed by May 27, 2026, compliance with Paragraph 24 does not appear to be immediately pressing.")

(Motion at 19).

This is another red herring. As the SEC itself notes, quoting the Monitor, that "[g]iven the Monitorship Entities' pending redemption of all investors, to be completed by May 27, 2026, compliance with Paragraph 24 does not appear to be immediately pressing." In truth, the Monitorship Entities had been working with the Monitor on this issue. The Monitor represented that he was working with the SEC on this, keeping the SEC updated and conferring on same. Compliance with Paragraph 24 was dropped, however, due to the redemption of investors with the Monitor's approval. (*See* Email Correspondence attached as **Exhibit 14**). Out of the blue the SEC now uses this as a basis to install a receiver. The SEC misrepresents what happened. If anything, the SEC's assertions here merely show the Monitorship Entities' compliance with the process. The fact that the SEC did not insist on the Paragraph 24 segregation prior to the redemption or, more importantly, ***<u>during the redemption process</u>***, only further supports the in-kind distribution of stock here.

***B. The few investor declarations submitted with the Motion are perjurious.***

A small percentage of Broadstreet investors now claim disappointment they are going to receive public company stock instead of cash in connection with the second exit transaction. Among the few are Dr. Mayank Patel (ECF 322-10), Dr. Narendra Shah (ECF 322-11), Bill Knoblauch (ECF 322-9), Michael S. Patel (ECF 322-13), and Bharvin Patel (322-8) (collectively, the "Perjury Investors").

In order to change a deal, that has already been completed many months ago – announced to the public by the SPAC involved with the transaction and specifically stating that the transaction is binding and that the transfer documents, including bills of sale have already been executed and

transferred – the Perjury Investors have now filed intentionally false and fraudulent declarations as a last-ditch effort to try to unwind the documents they signed with Broadstreet. By signing binding documents, as shown below, the Perjury Investors have now signed false documents in an attempt to coordinate with the SEC to supply a false narrative to try to prop up the SEC's floundering case.

Each of the declarations of the Perjury Investors include statements designed to support the SEC's claims in this case, but the effort fails as the declarations are easily proven false. To start, the declarations include a suspicious chorus of similar fabricated statements. For example, a number of Perjury Investors now claim they do not view the publicly traded stock for the second exit as "in kind" or comparable to their Broadstreet investment in BSGF – a private, non-publicly traded LLC – without any specificity or analysis, and ignoring BSGM's significant discretion as manager of BSGF and investment documentation very clearly providing for in-kind distributions under Section 6.05 of the Operating Agreement ("The Manager may, in its sole discretion, make distributions in cash or in kind, or in a combination thereof, in connection with a withdrawal of funds…".). (ECF 322-1, at Item 2, the Operating Agreement).

They also misrepresent in lockstep with the SEC that the SPAC deal is locked-up for 42-months. When, in fact, that is the maximum lock-up period and that based on price and volume parameters that lock-up period could be substantially shorter yet the Perjury Investors intentionally fail to acknowledge that there are circumstances where the lock-up period is shorter. (*See* ECF 322-1, the Redemption Notice at Item 3, the Lock-Up Agreement).

The perjury of these investors is easily proven by the Compliance Acknowledgements that they swore to (below in full), among other documents:

## Compliance Acknowledgement

I, the undersigned do hereby swear and affirm to the following to be used and relied upon by Broadstreet Global Fund, LLC and any of its affiliated entities including but not limited to Broadstreet, Inc. and Broadstreet Global Management (collectively "Broadstreet"):

1) I still meet the definition of an accredited investor as presented in my original subscription documents.
2) My mailing address and contact information has not changed and is accurate and up to date as reflected in my original subscription documents, and in the event it has changed I will promptly notify Broadstreet.
3) I have read the private placement memorandum, series supplements, data room documents, monthly updates and disclosures of Broadstreet, and still consent to all matters contained in those documents.
4) I acknowledge that I am responsible for reviewing the data room on a regular basis and also all updates posted as they may affect deal terms. Updates may not be provided to me by email and thereby I must enter the data room to make sure I have reviewed all information. That is my responsibility. These investments involve risk.
5) I am aware that if I do not log into the data room on a regular basis that I do so at my own risk as many significant and material terms and conditions are contained therein that may affect my investment. Broadstreet does not email me every material document and I should review the data room as a result.
6) I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks.
7) I understand that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects.
8) I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves.
9) I am aware that my investment in Broadstreet provides ownership in the applicable Broadstreet subseries. Individual land is titled in special purpose vehicles owned, managed and/or controlled by Broadstreet. Also, I only have ownership in the subseries for which I have invested and no others.
10) I acknowledge that I have no complaints involving the operation of Broadstreet or any matters involving Broadstreet and the company makes itself readily available to answer my questions.
11) I have always been given the opportunity to ask questions regarding Broadstreet products and operational information. I am a sophisticated investor and it is my obligation to ask questions if I feel I need more information.
12) I make my own investment decisions, neither Broadstreet nor any of its affiliates act as an investment advisor.
13) I have had the opportunity to seek my own legal and accounting advice when making decisions in relation to Broadstreet.
14) I recognize that at anytime I have questions or concerns, I can contact the Compliance Department at compliance@bsgfund.com
15) I understand if there are any material changes in my investment objectives or investment qualifications, I must notify Broadstreet immediately.

**<u>Dr. Mayank Patel</u>**

Dr. Patel's signed Compliance Acknowledgements and subscription documents are attached as **Exhibits 15 and 16**. Dr. Patel is a pediatrician who owns her own medical practice known as Hillside Pediatrics. She represented she is an "accredited investor" under securities regulations and her residence address lists on Zillow for about $1.8 million.

Dr. Patel's declaration includes a series of lies such as she did "not want to take a lot of risk," the investment was "guaranteed" and "SEC Approved," "I was not aware of any management fees being charged in connection with my account," "I am not aware that Broadstreet has ever stated that they could take up to 30% of my investment in fees," and "I understood that under the documents that I signed, we were supposed to receive financial statements from the Fund."

Of course, these assertions contradict the representations made in Dr. Patel's Compliance Acknowledgements she signed, subscription agreements she signed in order to invest, and the risks set forth in the PPM that she acknowledged receiving and understanding, set forth below:

<u>Subscription Agreement</u>

> INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. (Ex. 13 at 1).
>
> You have such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of acquiring an Interest, and you have not relied in connection with this investment upon any representations, warranties or agreements other than those set forth in the Offering Documents. Your financial situation is such that you can afford to bear the economic risk of holding the Interest for an indefinite period of time, and you can afford to suffer the complete loss of your investment in the Interest. (*Id.* at Section 5.5).
>
> The Subscriber is a sophisticated investor and is acquiring the Interest with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks. (*Id.* at Section 5.21).

> PPM
>
> The Interests are a speculative investment and this offering involves substantial risks of loss as described herein. The Interests are suitable only for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to accept and assume the risks involved with the investment program of the Fund. (Ex. 3 at i).
>
> An investment in the Fund is speculative and involves a high degree of risk. Certain of the Fund's investment practices increase the risks to which the Fund is otherwise subject. In addition, there are a number of conflicts of interest in the structure and operation of the Fund. (*Id.* at 1 under "Risk Factors").
>
> An investment in a Series is speculative, involves a high degree of risk, and should only be made with the risk capital segment of an investor's portfolio. The value of Interests of the Fund may depreciate as well as appreciate, and investors may lose all or a substantial portion of their investment. Accordingly, an investment in a Series should only be made by persons who are willing and able to bear the risk of loss of the entire amount invested. (*Id.* at 15).
>
> The Fund may invest in securities rated below investment grade. (*Id.* at 22).

Nor did the documents Dr. Patel signed say that she was "supposed to receive financial statements from the Fund." Instead, the PPM states:

> **Reports**
>
> Financial information contained in all reports to the Members will be prepared on an accrual basis of accounting. The Fund will use commercially reasonable efforts to provide an annual report to Members that will be presented with the tax basis of accounting within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund will use commercially reasonable efforts to provide tax information to Members within one hundred twenty (120) days following the close of each calendar year or as soon thereafter as practicable. The Fund may determine to provide financial information in such other format or method of presentation as it determines in its discretion employing such firms and professionals at its discretion.

(Ex. 3 at 45). Thus, Dr. Patel was not "supposed to receive financial statements," rather, Broadstreet was only required to use "commercially reasonable" efforts. (*See* ECF 54-2 ¶ 61). And, as far as Dr. Patel supposedly not knowing about fees, she swore to the opposite in her Compliance Acknowledgements that:

> 6) I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks.

As far as "SEC approved," the cover page of the PPM states the opposite:

> THESE MEMBERSHIP INTERESTS (THE "INTERESTS") HAVE NOT BEEN REGISTERED OR QUALIFIED FOR SALE UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, AND ARE BEING OFFERED PURSUANT TO EXEMPTIONS THEREFROM. THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") HAS NOT BEEN FILED WITH OR REVIEWED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION AND NEITHER THAT COMMISSION NOR ANY STATE SECURITIES ADMINISTRATOR HAS PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE FUND OR THE ACCURACY OR THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

Dr. Patel's claim that "I do not view the stock they are proposing to redeem us with as comparable to the investments that I had chosen to invest in" is a good example of her just making things up to fit the SEC's manufactured narrative. Of course, Dr. Patel provides no explanation or analysis for her purported preference of a speculative private investment interest in the Fund over publicly traded stock. Indeed, the investor documents that Dr. Patel signed specifically granted the Manager of the fund the sole discretion to do the very deal that she now objects in her perjurious declaration for the SEC.

**Narendra Shah**

Dr. Shah (a scientist) and her spouse are accredited investors from Cosa Mesa, California (with residence showing listing of about $1.7 million on Zillow). At least this investor does not make the ridiculous assertion that she was unaware of the substantial risks of the investment. But she does perjure herself, as well, by claiming that: "[I] always thought that my returns were coming from the success of the business, not from my own principal," and "I have never seen any

management fees reflected on my account statements." As reflected in the Compliance Acknowledgements she signed attached as **Exhibit 17**, these are plainly false statements:

As to management fees Dr. Shah represented and swore:

6) I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks.

As to returns, Dr. Shah represented and swore:

7) I understand that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects.
8) I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves.
9) I am aware that my investment in Broadstreet provides ownership in the applicable Broadstreet subseries. Individual land is titled in special purpose vehicles owned, managed and/or controlled by Broadstreet. Also, I only have ownership in the subseries for which I have invested and no others.

Dr. Shah further claims she "did not want to gamble in the stock market but wanted to invest for a better life." Putting aside that she did invest in pre-IPO stocks with Broadstreet (**Exhibit 18**, subscription agreement for pre-IPO Ripple stock) and voted in favor of the first exit via receiving stock in a public company (**Exhibit 19**), the subscription agreement she signed (**Exhibit 20** incorporating PPM) cautioned her about the speculative nature of her investments and high risks (as shown above). Dr. Shah's declaration is clear perjury.

**<u>Bill Knoblauch</u>**

Mr. Knoblauch's signed Compliance Acknowledgments are attached as **Exhibit 21**. Mr. Knoblauch claims he was told that the Broadstreet investment was "very conservative," "safe" and

"liquid." Of course, these assertions contradict the risks set forth in the Private Placement Memorandum described above.

Mr. Knoblauch further states in his declaration that he never saw any management fees for his investment. Yet, he specifically represented and swore in his signed Compliance Acknowledgements that:

> 6) I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks.

Mr. Knoblauch also claims in his declaration that: "I was under the impression that they were taking my money and using it to buy the land," and "[i]f investor money was being used to pay other investors returns, that would have been important to me." Yet, Mr. Knoblauch swore to in his Compliance Acknowledgements:

> 7) I understand that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects.
>
> 8) I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves.
>
> 9) I am aware that my investment in Broadstreet provides ownership in the applicable Broadstreet subseries. Individual land is titled in special purpose vehicles owned, managed and/or controlled by Broadstreet. Also, I only have ownership in the subseries for which I have invested and no others.

Mr. Knoblauch's declaration is also perjurious.

**<u>Michael S. Patel</u>**

Mr. Patel claims in his declaration that he believed statements that the investment he made was "relatively safe" and "you couldn't lose." He also claims that "I did not understand that I was paying any fees on the investments," and "I never saw any management fees reflected on my

account statements." As shown above, the Compliance Acknowledgements Mr. Patel signed (**Exhibit 22**) and subscription agreement that Mr. Patel signed (*see e.g.* **Exhibit 23**) show his current statements to be perjury. Mr. Patel's declaration is perjurious.

**Bharvin Patel**

Mr. Patel's signed Compliance Acknowledgment is attached as **Exhibit 24**. Notwithstanding his representations in the Compliance Acknowledgement about his awareness of "fees of up to six percent per year for five years," he now claims, "I was not aware that Broadstreet has said it may take up to 30% of my investments in management fees." Like the other declarants, Mr. Patel claims out of the blue and without any analysis or support that he does not view the SPAC stock "as comparable to the MCA investments that I made." Of course, Mr. Patel provides no explanation for his preference of a speculative private investment in the Fund over publicly traded stock. He also misrepresents the lock-up period which may expire earlier than 42-months under certain circumstances.

Mr. Patel's claims of now knowing of his being placed into BSG15 is easily proven as false. Mr. Patel received a confirming email to his email address at bkrp1005@gmail.com attached as **Exhibit 25**, a monthly account statement which stated as such, investor updates which stated as such, and, further Mr. Patel entered the Broadstreet data room and consented to the same. The disclosures which he clicked and accepted stated that if he disagreed with any of the aforementioned, he was to immediately email compliance at Broadstreet and send a certified letter as well. As is consistent with Mr. Patel's perjurious conduct, he made no such objection because he knew, accepted and was put on notice of the same, but he now attempts to manipulate the system and lie in hopes of getting a financial change to the binding documents that he signed.

In his declaration's penultimate paragraph (38), he aimlessly states that he "once found an office number for the BSG Fund and called," which is bizarre since the number for the BSG Fund has been prominent in various materials readily available to its investors.

***C. Thirty-one (31) Broadstreet investors have provided declarations in support of Broadstreet's redemption and in opposition to the receiver appointment.***

Attached as **Exhibit 26** are ***thirty-one (31)*** (non-perjurious) declarations from Broadstreet investors in support of the SOUL stock deal and in opposition of the appointment of a receiver.

***D. The appointment of a receiver will cause substantial harm.***

As explained in the Declaration of Joshua Howard (ECF 54-4 ¶¶ 10-15) submitted in opposition of the SEC first receiver application (which the SEC thereafter abandoned), the appointment of a receiver will cause significant harm. [redacted]

***E. The SEC's analysis of MCA is old news and flawed but, more importantly, for this Motion the SEC has already conceded that a Monitorship is sufficient for its longstanding allegation that Broadstreet offered inflated returns.***

In its initial TRO/Receiver application back in January 2025, the SEC accused Defendants of having offered and paid inflated returns. In that application, the SEC stated, "Defendants offered returns purportedly paid by MCA profits when MCA profits were insufficient to make those payments." (Initial TRO Application at 13). As has been well documented, that TRO application ultimately resulted in a monitorship. In this latest Motion, the SEC is again accusing Defendants of having offered returns purportedly paid by MCA profits when MCA profits were insufficient to make those payments. The result of this same old accusation should still be a monitorship, ***especially when the MCA business has been closed now for nearly two years***.

Moreover, the Motion exceeds the 37-page limit by a whopping fifty or so pages. Indeed, the SEC incorporates its entire factual basis set forth in the sixty-page TRO application it abandoned in February 2025. This should not be permitted. The SEC blatantly attempt to bypass the 37-page limit imposed by L.R. 7.1(c)(2) and this Court's order, which is improper. *See Richert v. Calderin*, No. 24-CV-21901, 2025 WL 263454, at *1 (S.D. Fla. Jan. 22, 2025) ("As other courts in our Circuit have observed, this incorporation-by-reference practice serves only to circumvent the Local Rules and lead the Court through a paper maze of filings." (citations and quotations omitted)).[10] Regardless, the fact, however, that the SEC seeks to circumvent the Rules and this

[10] *See also Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1253 (M.D. Fla. 2012), *aff'd*, 505 F. App'x 928 (11th Cir. 2013) ("incorporation by reference is improper" and allows "the movant to circumvent this Court's page limit requirement").

Court's order to incorporate its abandoned TRO here supports Defendants' position in that the SEC is merely retreading the same claim that ultimately resulted in a monitorship.[11]

Even if the SEC had not made this argument before (it has and that resulted in a monitorship) and did not improperly exceed the page limit by sixty (60) pages, Broadstreet made no misrepresentations to its investors as explained in its pending Motion for Summary Judgment, as well as the Declaration of David Feingold. (ECF 34-1 ¶¶ 37-42). Indeed, among other things, the following are true:

1. Broadstreet's PPM provides "[f]inancial information contained in all reports to the Members will be prepared on an ***accrual basis of accounting***." (Ex. 3 ¶ 49). Broadstreet did that. (Ex. 13 ¶ 6.a.). The SEC nevertheless attempts to substitute the word "cash" in for "accrual" and then declares fraud. This is outrageous.

2. The SEC cannot point to a single document where Broadstreet represents payments would be made from profits.

3. Conversely, Broadstreet can point to documents representing that revenue – not profit – would be used to make payments. (*Id.* ¶ 6.b.).

4. Samson's own audited financials attached as **Exhibit 27** directly refute Melissa Davis's default rate analysis and hence her profitability analysis. (*Id.* ¶ 6.c.).

5. The MCA series has been closed for nearly two years and, as a result of such closing, the portfolios are no longer active with the benefits of spinning and compounding. (*Id.* ¶ 6.d.).

---

[11] To the extent the SEC's prior papers are considered by this Court, Defendants incorporate by reference their response to same (ECF 54).

In sum, the SEC's MCA assertions are easily rebuttable. They are also stale. These assertions were made back in January 2025 and proved insufficient for the appointment of receiver then. The same holds true today.

## CONCLUSION

This Motion is an abuse of power by the SEC. Its sole and obvious purpose is to destroy Broadstreet to obviate the need to actually adjudicate the SEC's claims fair and square on the merits. Our government should be better than this. For all the reasons stated herein, the Motion should be denied.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Defendants request an evidentiary hearing on the Motion. The basis for the request is the SEC is seeking to seize control of Defendants' business. Defendants believe it would be helpful to the Court to hear live testimony, to allow for cross-examination and to receive additional evidence.

**[signature page follows]**

Dated: August 27, 2026

Respectfully submitted,

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**

By: ***Thomas Scot Wolinetz***
Thomas S. Wolinetz
Florida Bar No. 1001160
Irwin Weltz (PHV)
1 Old Country Road, Suite 275
Carle Place, New York 11514
Telephone: (212) 202-3176
Facsimile: (516) 855-8776
twolinetz@weltz.law
irwin@weltz.law

**GALLIVAN WHITE & BOYD P.A.**

By: ***Austin P. Booth***
Ioannis (Ian) G. Conits (PHV)
Austin P. Booth
Florida Bar No. 1049907
55 Beattie Pl., Suite 1200
Greenville, South Carolina 29601
Telephone: 864-271-5432
iconits@gwblawfirm.com
abooth@gwblawfirm.com

**LETT LAW FIRM**

By: ***Ariel Lett***
Ariel Lett
Florida Bar No. 115513
6303 Blue Lagoon Dr., Suite 400
Miami, FL 33126
Telephone: 305-912-5388
alett@lettlawfirm.com

*Attorneys for Broadstreet Inc. and David Feingold*

**BERKELEY LAW P.A.**

By: ***Lorne E. Berkeley***
Lorne E. Berkeley
Florida Bar No. 146099
10600 Griffin Road, Suite 104
Cooper City, Florida 33328
Telephone: (954) 719-3484
Lorne@BerkeleyLawFL.com

*Attorneys for Broadstreet Global Management LLC, Joseph B. Baldassarra, and Steven B. Baldassarra*

**LOMAX LEGAL PLLC**

By: ***Brianna P. Hathaway***
Brianna P. Hathaway
Florida Bar No. 1019219
95 Merrick Way, 3rd Floor
Coral Gables, FL 33134
Telephone: 305.582.6506
Brianna@LomaxLegal.com

*Attorneys for Broadstreet Global Management LLC and for Relief Defendants, JosephBenjamin, Inc. and Just a Nice Day, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 27, 2026, I filed this document through the CM/ECF system, which will cause a copy of this document to be served by Notice of Electronic Filing on all counsel and parties of record.

By: ***Austin P. Booth***
Austin P. Booth