# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-20436-GAYLES/SHAW-WILDER

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT, LLC, and
BROAD STREET, INC.,

Defendants, and

JOSEPHBENJAMIN, INC., and
JUST A NICE DAY, INC.,

Relief Defendants.

**DECLARATION OF STEVEN BALDASSARRA**

I, Steven Baldassarra, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am over the age of eighteen and am a Defendant in the above-captioned action. I have personal knowledge of the facts set forth in this Declaration unless indicated otherwise, and if called as a witness, I could and would testify competently to them. I make this Declaration in support of Defendants and Relief Defendants' Response in Opposition to SEC's ***Second*** Expedited Renewed Motion and Memorandum of Law for Appointment of a Receiver ("Response").

2. I am an owner of Broad Street Global Management, LLC ("BSGM"). BSGM is the Manager of Broadstreet Global Fund LLC ("BSGF"). In my role with BSGM, I am familiar with

the organization, operations, offering documents, investor base, recordkeeping, and business lines of BSGF, BSGM, Broad Street, Inc. ("BSI"), and their affiliated and related entities (collectively, "Broadstreet").

3. I previously submitted a declaration in this matter in opposition to the SEC's application for a temporary restraining order and receiver, which the SEC thereafter abandoned. (ECF 54-2).

4. As part of the offering material for investment in BSGF, investors were provided a Confidential Private Placement Memorandum from Broadstreet ("PPM") and Operating Agreement.[1]

5. Each investor was required to sign subscription agreements confirming they were accredited investors, that they understood the investment was speculative and involved a high degree of risk and that the investment should only be made with the "risk capital" segment of their investment portfolio.

6. The Operating Agreement and PPM of BSGF are attached to the Response as **Exhibits 2 and 3**.

7. On November 14, 2025, after receiving approval from the Monitor, Broadstreet sent the Redemption Notice, which has been filed on the court docket under seal. (ECF 322-1).

8. On February 2, 2026, Broadstreet provided another investor update. (ECF 230-1). Among other things, the letter states:

a. "The investment documents executed by all of the investors and acknowledged in the Compliance Acknowledgement give the Manager

[1] The Limited Liability Company Agreement of Broadstreet Global Fund LLC was amended and restated on May 26, 2022 and again in September 2023. The Limited Liability Company Agreement of Broadstreet Global Fund LLC and the aforementioned amendments and restatements are collectively referred to herein as the "Operating Agreement".

broad discretion in the manner in which decisions are made, redemptions are paid and the overall powers involving management." (ECF 230-1 at n.2).

b. "As you all may recall you executed investment documents when you made your investment with Broadstreet that provide the Manager with broad discretion. Broadstreet has not waived or relinquished any of those broad and discretionary powers and may specifically utilize the same in the future if it deems so necessary. Investors should review all investment documents including the private placement memorandum, operating agreement, compliance acknowledgement and data room for a full description." (*Id.* at n.3).

9. On February 25, 2026, Broadstreet provided another update. (ECF 234-1). Such update stated, among other things, the following:

a. As previously reported, 94% of the Redemption Consideration has already been secured and is binding and to be paid for in Stock. (ECF 234-1 at 1).

b. The remaining 6% of the Redemption Consideration is payable as Cash and is reliant on asset sales of projects not sold for Stock, nor projects that have been set aside due to a litigation dispute, and thereby there are substantial assets remaining available through additional sales that are being procured. Since the last letter, progress has been made as a result of multiple in person and virtual meetings with prospective buyers. (*Id.*).

c. Our goal is to come to definitive timing, structure and terms in March, to then have legal documents drafted in April and to be ready in May. These are our goals. We recognize that with 94% of the Redemption Consideration already accounted for, this last 6% is now our present focus. Although the investment documents do provide optionality in order to achieve complete redemption of all investors as specified in the investment documents (private placement memorandum, operating agreement, etc. . .) to which all investors are bound, our goal presently focuses on the cash redemption rather than optionality. (*Id.* at 2).

d. McKinsey consulting reports that average holding periods stretched to roughly 6.6 years for limited partners in private equity investment to receive a return of their investment and that timing is well above the 2011–2020 norm. This statistic underscores that many sponsors are still holding assets longer than planned and that private equity investors are waiting on average 6.6 years to just receive a return of the original invested amount. Hence, Broadstreet's exit of its investors is well in advance of the norm in a market that has been described as challenging for private equity exits. (*Id.* at 3).

e. As we previously did throughout the course of our relationship with investors, we will communicate on a regular basis to continue with updates. Also, as previously done, we urge you to review all of your investment documents to understand the process summarized above as this letter is not meant to be a replacement to the detail of all of the prior information you received in the investment documents and related reference materials.

10. On March 23, 2026, Broadstreet provided another update. (ECF 245-1). Among other things, the letter states:

> We continue to be optimistic in achieving our goal even though there is presently a great deal of geo-political and financial market turmoil in the world. We do recognize that the overall markets and economy are matters that are outside of our control but again we comfort ourselves in our belief that we own unique assets.
>
> …
>
> As we previously did throughout the course of our relationship with investors, we will communicate on a regular basis to continue with updates. Also, as previously done, we urge you to review all of your investment documents to understand the process summarized above as this letter is not meant to be a replacement to the detail of all of the prior information you received in the investment documents and related reference materials.

(ECF 245-1 at 1-2).

11. On April 28, 2026, Broadstreet provided another update. (ECF 250-1). Such update described "current market conditions and impact on asset sales", "Private Equity Specifics" and "Specific Market Discussion") stated, among other things, the following:

a. Since the November 2025 redemption decision, market conditions for real estate and certain private assets have not recovered. There has been a softening housing market and also there has been a failure of interest rates to fall, though the opposite had been expected for quite some time. (ECF 250-1 at 2).

b. In short, as of the writing of this letter we strive to achieve our goals but we also must be responsible and determine alternatives in the event such deadlines are not met as this question has been raised by our investors and hence we address that topic below. (*Id.* at 5).

c. Under Section 2.05(b) of the Operating Agreement, the Company and any Series may: "…engage in any activity or transaction that may, in the Manager's discretion, be necessary, suitable or proper to achieve the objective [of the Fund

and Series]…" The PPM further provides, in both the "Withdrawals/Manager Decisions" and "Payment" sections (page 12), that:

> **Notwithstanding anything else in any Supplement, side letter or any other form of document,** in the event that the Manager determines it necessary, **all withdrawals may be modified or paid back in kind** if the Manager so determines it to be **in the best interest of the Fund** and such decision is left to the **sole and absolute discretion of the Manager**. (*Id.*).

d. These provisions confirm that the Manager may modify the terms of withdrawals, including substituting in-kind distributions for cash, halting payments, etc. . . , where it determines such action to be necessary and in the best interests of the Fund and its investors. No such decision is being made at this time, but again, since asked this often, the answer is quite simple - - in the event things change, the Manager is authorized to make decisions to adjust to those changes. We certainly would have liked to have all transactions closed as of now, however, we are also realistic as to what it takes to close large business transactions and how many variables are simply not within our control.

Every investor executing these documents acknowledged that they are highly sophisticated, high net worth investors with full understanding of all documents that they signed and further had the opportunity to have all documents reviewed by their own independent investment professionals. We have abided by the documents we have provided to you and will continue to do so.

These clauses are customary in the private investment industry and appropriate and act to protect the investors and the business. In the event that circumstances present themselves wherein the Manager utilizes these provisions, then they will be used exactly in the manner as intended in the agreements signed by all investors and the Manager shall advise you. (*Id.* at 5-6).

12. On May 14, 2026, Broadstreet provided another update. (ECF 261-1). Such update stated, among other things, the following:

a. The remaining 6% of the redemption value had elected cash consideration. As of this date, we have encountered two obstacles to completing that portion of the redemption by the last week of May. First, one of the structures that we expected to utilize was the assumption of certain of our debts by a third party. We have already drafted assumption documents accordingly. Such mechanism would allow us to free up cash proceeds from certain asset sales. The success of that now appears uncertain due to ongoing negotiation disagreements that we hope to amicably resolve. Second, one of our purchasers has attempted to negotiate what we deem to be too large a financial concession. (ECF 261-1 at 1).

b. It is our belief that some of our counterparties believe that by changing deals or asserting pressure upon us, that we must accept them based on the marketplace and our redemption deadlines, however, they are wrong and we are not going to change our negotiation stance. (*Id.*).

c. In the April Update we referenced the challenging environment for private equity, including referencing the gating of redemptions by Blackstone, Blackrock and Blue Owl Capital. Additional news has also arisen that other firms such as Starwood Capital, Apollo Global Management, Carlyle Group, Golub Capital and KKR have all gated redemptions of investors. Gating is common and authorized in our documents as well. (*Id.*).

d. As previously referenced our April Update section entitled "Exercise of Manager discretion under the Fund documents" the Manager was granted broad powers and as such, we are not under pressure to accept what we deem unacceptable negotiations as we have the power to modify any supplement, side letter or any other form of document. If the Manager determines it necessary, all withdrawals may be modified or paid back in kind. Such decisions are left to the sole and absolute discretion of the Manager. (See ppm page 12 under "Withdrawals/Manager Decisions" and "Payment" sections as one of many sections/documents granting the manager broad powers). (*Id.* at 1-2).

e. Since we have dealt with many counterparties in the homebuilding arena, we do not feel compelled to be forced into the cash component deal and if necessary, we will cancel any or all of the cash sales transactions and then resume discussions with other parties who expressed interest in our assets and who are competitors to the present parties. Although we had hoped to complete asset sales to satisfy the cash component of our redemption transaction in a timely manner, we also recognize that if the sales do not yield appropriate proceeds, then we are under no pressure to accept the changes now served upon us by our counterparties and we can have their competitors acquire what we believe to be very valuable assets. (*Id.* at 2).

f. According to Pitchbook, which is a leading source of statistics in the private equity market, the distributions to paid in capital (also known as DPI), which reflects the cash returned to investors relative to the capital they placed in private equity has collapsed from a high of receiving almost 2.5x their investment, to now where investors are not receiving any multiple near that (see chart below). Hence, our ability to redeem the overwhelming majority at a premium and then wait until more rational pricing to redeem the last six percent (a minority) of the total redemption is still dramatically better than the overwhelming majority of private equity firms in the market according to the below. (*Id.*).

13. On May 22, 2026, Broadstreet provided an additional update. (ECF 264-1).

14. This additional update stated, among other things, the following:

a. As previously announced, the results of the Redemption were that approximately 94% of the redemption value of our investors elected to be redeemed in the form of stock payment from a reverse triangular merger transaction. The remaining approximately 6% of the redemption value had elected cash consideration.

b. We are pleased to report that last week we signed the bill of sale transaction document with our purchasing counterparty in the stock-based transaction referenced in the Investor Updates. The remaining 6% cash redemption transaction relied upon the timely . and appropriate liquidation of certain assets. As a result of our Investor Updates, and in particular after the May 14, 2026 investor update, we received a response from investors who had previously elected cash redemption and who now inquired about instead seeking a stock redemption. We had not responded to such requests as we awaited more visibility on our cash liquidation transactions.

c. Now, we can further report that we have reached a stalemate with our purchasers of the assets involving the cash liquidation. Even taking into account those investors who indicated a desire to receive stock instead of cash, that still does not alleviate the amount of sales necessary to fully satisfy the remaining investors who desire to receive cash by next week. By way of example, we have a project for which we received an appraisal for nearly $24 million, but our purchasers have offered a maximum of $12 million. That is simply unacceptable and has resulted in an impasse preventing a larger transaction. Further, even since our last Investor Update communication, there has been continued interest rate volatility and geo-political uncertainty. These are not merely unfortunate market headwinds; they are the specific conditions the Operating Agreement anticipates. As discussed below, Section 6.07(b)(ii) expressly addresses the situation in which market disruptions make the pricing or liquidation of assets difficult or would force losses on the Fund - the precise circumstance confronting us now.

d. First, the choice of redemption method belongs to the Manager. The Operating Agreement that every investor executed as a condition of investment provides, in Section 6.05(a), that the Manager may, in its sole discretion, make distributions in cash or in kind, or in a combination thereof, in connection with a withdrawal or required withdrawal. The Manager likewise may choose, in its sole discretion, which assets to distribute in kind. Section 6.03 further authorizes the Manager, in its sole discretion, to terminate all or any part of a Member's Capital Account, subject to commercially reasonable notice. Section 6.07(b) goes further still, permitting the Manager to at any time suspend or restrict the right of any Member to withdraw capital or receive a distribution where, in the Manager's judgment, doing so would be in the best interests of the Company or such Series. Section 6.07(b) does not leave that judgment at large;

it expressly identifies the very circumstances present here. Among the situations in which the Manager may suspend or restrict withdrawals, the Operating Agreement specifies the case in which disruptions in investment markets make pricing and/or liquidation of some or all Company or Series assets difficult or would result in losses if the Company or a Series attempted such liquidations (Section 6.07(b)(ii)). That is precisely our situation: with interest-rate volatility and heightened geopolitical uncertainty narrowing the field of buyers, the only offers available would have required liquidating assets at roughly half of their value – a result the Operating Agreement contemplates the Manager need not, and should not, accept. The Private Placement Memorandum is to the same effect, and indeed states the point in its strongest form: notwithstanding any supplement, side letter, or other document, "all withdrawals may be modified or paid back in kind if the Manager so determines it to be in the best interest of the Fund," a determination committed to "the sole and absolute discretion of the Manager."

e. Second, that discretion is exercised consistent with our obligations and judgment as to the best interests of the Fund. That is the very standard Section 6.07(6) sets, and it is the determination we have made here: faced with offers at roughly half of value, a forced sale of assets at distressed prices is something we cannot and will not accept, because it would not be in the best interests of the Fund. A large transaction simply cannot be done under such circumstances. This is not a matter of preference but of the framework the Operating Agreement establishes. The market disruptions described above are exactly the conditions Section 6.07(6 )(ii) addresses, and the Operating Agreement separately provides, in Section 5.08, that the values assigned to a Series' assets by the Manager in accordance with the Fund's Valuation Policy are "final and conclusive as to all of the Members." Selling at a price the Manager has determined to be roughly half of fair value would disregard that valuation and impose precisely the losses Section 6.07(6 )(ii) is designed to avoid. More than that, such pricing has put us at an impasse on a larger transaction.

f. It is worth recalling how the cash option came to exist in the first place. Our original plan was to redeem investors in kind. The cash alternative was added in the course of the monitorship as a recommendation, and we accepted it at the time under the pressure of disagreement with the Monitor and worked cooperatively to offer investors a choice between cash and stock. A recommendation, however, is by its nature advice that the recipient remains free to accept, decline, or revisit as circumstances change. Our agreement to offer a cash option last fall, made in a spirit of cooperation, was not a permanent surrender of the discretion the Investor Documents reserve to the Manager. When the asset sales necessary to fund that option failed to materialize on acceptable terms, the Manager retained - and retains - the discretion to determine how best to complete the Redemption. The Court made abundantly clear that it is BSGF that is to make the business decisions. Extensive and detailed documents were drafted by some of the largest law firms specializing

in private equity which included terms signed by all participants, represented in writing to be highly sophisticated investors, for situations that might arise such as this.

g. Yes, some investors (a small minority of the total redemption) may not be pleased with our decisions, and that is an unfortunate by-product of dealing with such a large number of investors. But in the end, the bottom line is that all decisions have been made in direct compliance with all of our Investor Documents. There is a reason why those documents exist and that is, to define our relationship and clarify our rights.

15. Soon thereafter, Broadstreet started to receive demand letters for cash from some of the small minority of investors who voted for cash.

16. After discussing with the Monitor, BSGM opted to file a simple declaratory judgment action in the Southern District of Florida to resolve the contractual dispute with a small minority of its investors (*Broad Street Global Management LLC v. Schulman et al.*, No. 1:26-cv-23998-GAYLES-SHAW-WILDER) ("Schulman Case"). The Schulman Case is pending.

[redacted]

18. I have reviewed the Response and the documents referenced therein. I can attest that the documents referenced are true and correct copies. I reserve the right to submit additional documents and testimony at the evidentiary hearing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 27, 2026 in Greenville County, South Carolina.

Steven Baldassarra