**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-20436-GAYLES/SHAW-WILDER**

SECURITIES AND EXCHANGE
COMMISSION,

*Plaintiff,*

v.

DAVID J. FEINGOLD,
JOSEPH B. BALDASSARRA,
STEVEN S. BALDASSARRA,
BROAD STREET GLOBAL MANAGEMENT
LLC, and BROAD STREET INC.,

*Defendants, and*

JOSEPHBENJAMIN, INC.,
JUST A NICE DAY, INC.,

*Relief Defendants.*

---

**PLAINTIFF SEC'S REPLY IN SUPPORT OF ITS EXPEDITED RENEWED MOTION AND MEMORANDUM OF LAW FOR APPOINTMENT OF A RECEIVER (ECF 322)**

**Table of Contents**

I. Preliminary statement ........ 1

II. Argument ........ 1

A. Investors are suffering harm and will suffer additional harm unless a receiver is appointed. ........ 1

1. Defendants are harming investors every day by keeping investors' money without paying for it. ........ 2

2. Defendants will inflict more harm if they "redeem" all investors with illiquid stock in a new company. ........ 2

3. The Monitor Order is not enough to prevent investor harm. ........ 6

4. Defendants have not cooperated with the Monitor. ........ 7

B. Appointment of a receiver is appropriate and necessary under any applicable legal standard. ........ 9

C. Investor declarations confirm investor harm. ........ 12

D. Defendants ignore credit losses and double count revenue to help create the illusion of profits to pay inflated returns. ........ 15

III. Conclusion ........ 17

## I. PRELIMINARY STATEMENT

BSG Management is in disarray. It stopped dividend payments to investors after it stopped taking new investor funds. It cannot redeem with cash what Defendants call a "small minority" of investors. It promised to redeem all investors months ago with illiquid shares in a new company but cannot explain the delay or when it will actually redeem them. It reduced the equity balance of thousands of investors' positions—amounts the Fund owes to investors—before being confronted and forced to reverse course. These facts are not in dispute.

Defendants offer no justification for continuing to hold investors' money, now for ten months and counting, without paying for it. Defendants' response does not attempt to justify their repudiation of their promise to investors and the Monitor from November 2025. Instead, Defendants continue to blame their own victims, emphasizing their lawsuit against their own investors who simply asked for their money back. If that weren't enough to show that Defendants do not prioritize their investors' interests, Defendants have provided no reason they recently reduced investors' account balances before reversing course when confronted and therefore have given no assurances that they would not do that or something similar again. There is likewise no assurance that the Monitor can detect all of Defendants' efforts to take investors' money. Defendants' attempts to recast their neglect of investors' interests with empty excuses and attacks on the Monitor and their own investors who asked for their money back confirms that BSG Management cannot be trusted to manage the Fund.

## II. ARGUMENT

### A. Investors are suffering harm and will suffer additional harm unless a receiver is appointed.

The SEC's renewed motion for a receiver (ECF 322, "Motion") showed that investors are harmed by Defendants' mismanagement and that the Monitor Order is inadequate to protect

them. Defendants' response (ECF 379, "Response") does not dispute that BSG Management is withholding investor funds and preparing to redeem investors with illiquid stock, without saying when. Defendants intend to do this even to investors who rejected this option. Instead, they argue that the Court cannot help these investors because Defendants sued a handful of the investors who asked for their money back.

**1. Defendants are harming investors every day by keeping investors' money without paying for it.**

The Motion shows that Defendants are continuously harming investors by holding their money—about $1 billion[1]—while refusing to pay dividends or interest of any kind for ten months and counting. Motion at 15. Defendants avoided paying at least *$100 million* in dividends, and that amount continues to climb. Defendants do not dispute this. To illustrate the magnitude of the benefit to Defendants at investors' expense, had Defendants just invested the $1 billion in Treasury bills, they would have generated roughly $40 million in interest since they stopped paying dividends. This gap is investor harm and it widens daily.

**2. Defendants will inflict more harm if they "redeem" all investors with illiquid stock in a new company.**

The Motion also showed that Defendants are refusing to redeem in cash and instead are preparing to "redeem" investors with illiquid stock, both against the recommendation of the Monitor and investors' requests. Motion at 7-12. Defendants do not deny this. Nor do Defendants dispute that repudiation of the cash redemption option is contrary to their own statements (a) to investors, Motion at 8-9, and (b) to this Court, *id.* at 10. Defendants'

---

[1] *See* Davis Supp. ¶ 19; *see also* ECF 317 (9th report) ¶ 38(ii), [redacted]

repudiation of their agreement with the Monitor to honor a cash redemption offer underscores that the Monitor Order is not working and the need to appoint a receiver instead.

Nor does the Response dispute the analysis in the Motion or by the Monitor showing that the Operating Agreement limits the type of asset that can be used for redemption to assets of the "applicable Series." Motion at 10-11. Instead, Defendants argue that they have sufficiently addressed the Monitor's recommendation *by suing investors* in a separate lawsuit, the "*Schulman* Case."[2] Response at 2-6. This tactic does not prevent the Court from assessing investor harm and, contrary to the Response, the Monitor does not agree that it addresses his recommendation.

**i. Defendants' new *Schulman* Case does not prevent this Court from appointing a receiver.**

The issue Defendants have tried to sever from this case by filing the *Schulman* case concerns the scope of BSG Management's power over redemptions under the Operating Agreement. Defendants first invoked the issue of redeeming investors in kind in this case when they proposed redeeming all investors in stock in October 2025 and had discussion with the Monitor related to that subject. ECF 165 ¶¶ 48-52. The Defendants then invoked their claimed authority under the Operating Agreement over redemptions to justify to the Monitor their repudiation his recommendation to offer a cash redemption option. After receiving a negative response on this issue in the Monitor's June 2, 2026 Report, Defendants sued their investors in *Schulman* and now invoke the first-filed rule in an attempt to have that issue resolved without the Monitor or the SEC. Defendants cannot avoid the appointment of a receiver by filing collateral declaratory judgment actions like *Schulman* for at least three reasons.

---

[2] *Broad Street Global Management LLC v. Steven Schulman et al.*, 26-cv-23998 GAYLES/SHAW-WILDER (S.D. Fla. June 6, 2026)

***Initially***, the first-filed rule does not apply because the SEC is not a party to *Schulman*. The rule requires substantial overlap. *Stanton v. Berkley Assurance Co.*, 2020 WL 6781524, at *1 (S.D. Fla. July 17, 2020). *Schulman* cannot be consolidated into this enforcement action, and the SEC cannot be added as a party to *Schulman*. 15 U.S.C. §78u(g). There is therefore no substantial overlap in parties and the first-filed rule does not apply here.

***Second***, even if the first-filed rule applied, this SEC enforcement action is the true first-filed action. Indeed, Defendants concede that they filed *Schulman in response to* a dispute with the Monitor in this case. Response at 4-5. The SEC alleged a multi-faceted fraud in January 2025, including that Defendants promised and paid inflated returns to investors. The SEC also secured the Monitor Order, which cut off the flow of new investor funds that could fuel Defendants' scheme. ECF 95 ¶ 26a. When Defendants could no longer make dividend payments to investors, Defendants attempted to force investors out with illiquid stock in a new company.

The Monitor recommended, and Defendants agreed to, a cash redemption option, which they then offered investors. ECF 165 ¶¶ 51-52. Defendants later repudiated this promise, citing the Operating Agreement as authority to redeem investors with illiquid stock instead. Motion at 10-12. On June 2, 2026, the Monitor set forth his analysis of the Operating Agreement, ECF 317 ¶¶ 23-39, concluding that the Operating Agreement "[redacted] None of Defendants' cited cases support

the tactic of filing a declaratory judgment action to sever an issue because it was raised in a pending lawsuit.

***Third***, even if this enforcement action is somehow viewed as the second-filed case, *Schulman* is an anticipatory filing motivated by forum-shopping. "At its discretion, a district court may refuse to enforce the first-to-file rule where forum shopping motivated the first-filed action or the first-filed action constitutes an improper anticipatory filing made under threat of an imminent suit." *Chaban Wellness LLC v. Sundesa, LLC*, 2015 WL 4538804, at *2 (S.D. Fla. July 27, 2015). Defendants filed *Schulman* immediately after the Monitor's report and quickly moved for assignment to a different judge. *Schulman*, ECF 7 (S.D. Fla. June 10, 2026).

The Court has discretion to stay *Schulman*, a declaratory judgment action. A stay to avoid "piecemeal litigation" and to bar "attempts at forum shopping" is appropriate because "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 280-281, 288 (1995).

**ii. The Monitor did not "agree" that Defendants addressed his recommendation by filing a new case.**

Defendants assert the "Monitor agrees" they "sufficiently address[ed]" the Monitor's recommendation by filing *Schulman*. Response at 6. That assertion is based on a selectively quoted transcript of a June 15 call. But even that quote from the Monitor does not say he believes that filing *Schulman* was a substitute for the motion the Monitor expected. *Id.*

More importantly, Defendants did not submit the full transcript of that call to the SEC or the Court. The full transcript, which the SEC obtained from the Monitor after Defendants filed the Response, makes clear that the Monitor does not agree that *Schulman* addressed his recommendation because, in the Monitor's view, Defendants needed to comply with the

recommendation or file a motion *in this case* for relief. Ex. 1 attached to this Reply at 21:14 [redacted]

Thus, far from an "***affirmation of the Monitorship***," (Motion at 6, emphasis in original), Defendants' selective quotation further shows they cannot be trusted to work with the Monitor. The SEC expects that the Monitor will explain at the hearing on the Motion that Defendants have not satisfied his recommendation to offer a cash redemption by suing investors in *Schulman*. The SEC also expects the Monitor to explain that investors who asked to be redeemed in cash will be harmed if BSG Management refuses and, instead, redeems them with the new stock.

**3. The Monitor Order is not enough to prevent investor harm.**

The Motion showed that the Monitor Order is not enough to prevent investor harm. Motion at 16. Defendants' Response offers no explanation of how the Monitor Order prevents them from withholding investor money without paying for it and, as explained above, Defendants have simply ignored a key recommendation of the Monitor after agreeing to it, and they attempted to *evade* a Monitor's recommendation by filing a new lawsuit.

Instead, Defendants argue that the Monitor Order prevented them from reducing investors' accounts and tout their reversal as proof that the Monitor Order is enough. Response at 6-7. That Defendants reversed course only after detection and a renewed receiver motion offers no comfort the Monitor Order is enough to protect investors. Remarkably, Defendants never explain why they even considered reducing account balances, Motion at 13, or why they

purported to shift the burden to investors to identify errors. Defendants likewise offer no explanation as to why they provided an assurance to the Monitor that they were not doing what their records reflected they did thousands of times, or any remorse for the fact that they did. This inexplicable conduct cannot be reconciled with normal business operations or with acting in investors' best interests.

**4. Defendants have not cooperated with the Monitor.**

The bulk of the Response (at 14-22) attempts to excuse the misconduct towards the Monitor described in the Motion (at 16-19). These excuses fail to show that the Monitor Order is sufficient to protect investors.

*First*, the Motion established that Defendants told the Monitor that assets for sale "were assets owned and controlled by BSG Fund," Motion at 16 (quoting ECF 118 ¶ 11), and that the Monitor later discovered that was not accurate. *Id.* (citing ECF 118 ¶ 14). The Response does not explain why they made these misleading statements to the Monitor. Instead, Defendants essentially blame the Monitor for not discovering the discrepancy in the voluminous information they provided him. Response at 15-16. As with the account-reduction issue, the Monitor's ability to catch this misstatement does not prove the Monitorship is sufficient.

*Second*, the Motion explained that the Monitor had to retract statements about the profitability of the Fund's MCA portfolios because, according to the Monitor, Defendants were not "truthful with the Monitor." Motion at 17. The Monitor retracted those statements in a supplemental report filed on October 7, 2025, after he "finally received" accurate information from Defendants on October 3, 2025, which "now tells a very different story" than the accounting Defendants had previously provided the Monitor. ECF 140 ¶ 14. In response, Defendants quote a statement from the Monitor in an email dated August 8, 2025—two months ***before*** he "finally received" accurate information on October 3 that told the Monitor "a very

different story." Response at 17. Thus, rather than confronting the Monitor's clear explanation of how Defendants misled him, Defendants quote a statement he made at a time he was misled.

*Third*, the Motion showed that Defendants misled the Monitor into reporting that MCA investors "were given the option to fully redeem" or roll over into a new series. Motion at 17 (quoting ECF 135 ¶ 45). The inaccurate statement is based on interviews with Defendants. ECF 135 ¶¶ 44-45. Evidence that the statement is not accurate includes Defendants' admissions in the email exchange attached to the Motion as Exhibit 18 and an investor's declaration submitted with the Motion. In response, Defendants miscast the Motion's contention. The Response asserts that the SEC contended that Exhibit 18 contained the inaccurate statement. Response at 20. That is wrong: the statement in the report was inaccurate, and the admissions in Exhibit 18 prove that the statement in the report was inaccurate.

As to the investor's declaration, Defendants accuse their own investor of "perjury" and attach an email from Joseph Baldassarra dated May 7, 2025, stating that "we are moving the MCA subseries…." Response Exhibit 25. But the rollover occurred in late 2024, ECF 135 ¶ 15, months before this May 2025 email, so the email could not have given notice. In fact, the investor *did* ask to be redeemed in late 2024 but was lulled into waiting by a Broadstreet representative, ECF 322-8 ¶¶ 21-24, and *still* does not have his money back, *id.* ¶¶ 26-34.

*Fourth*, the Motion showed that Defendants misled the Monitor about various deals and failed to provide sufficient documentation of those deals. Motion at 18-19 (citing various Monitor reports). In response, Defendants do not cite any specific documentation they provided that refutes the Monitor's reports. Response at 20-21. They instead blame vague market conditions not tied to any specific deal. ECF 379-13 ¶ 5.

*Fifth*, the Motion showed that the Monitor could not get clear answers from Defendants about their announcement to inexplicably reduce investor accounts. Motion at 19. Contrary to the Response (at 21), the breakdown in communication reported by the Monitor was not a "spirited discussion." The Monitor's report is clear that Defendants were evasive and obstructed his access to information (ECF 317 ¶ 3i, ¶¶ 10-36) before they finally relented and reversed the reductions.

*Finally*, the Motion showed that Defendants are still out of compliance with Paragraph 24 of the Monitor Order, which required Defendants to put assets into entities owned by the appropriate Fund series. Motion at 19. In response, Defendants do not dispute non-compliance and have never sought relief from this Court's Order. The Response argues compliance with this provision "was dropped" with the Monitor's approval, citing an email (Exhibit 14 to the Response) where the Monitor explains an effort to comply with Paragraph 24 that was never completed. But that email does not come close to stating that the Monitor approves of Defendants' failure to comply. Paragraph 24 is a Court Order. It is not a suggestion. Neither Defendants nor the Monitor can "drop" that Court Order on their own. Defendants' casual contempt for the Court's Order is further proof they cannot be trusted to comply with any Court orders short of an appointment of a receiver.

**B. Appointment of a receiver is appropriate and necessary under any applicable legal standard.**

The Motion showed that the standard for appointment of a receiver in this enforcement action is governed by *SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 434 (5th Cir. 1981), which is controlling authority in this Circuit.[3] Motion at 28. Under *First Financial*, a receiver is appropriate upon a showing by the SEC that there is a reasonable likelihood that the defendant is

[3] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (Eleventh Circuit bound by decisions of the former Fifth Circuit rendered prior to October 1, 1981).

engaged in or about to engage in practices that violate the federal securities laws. 645 F.2d at 434. Defendants do not dispute that the appointment of a receiver is appropriate under this standard. *See* Motion at 29-31.

The Motion acknowledged that Courts apply different standards in other circuits and circumstances and showed that the appointment of a receiver would be appropriate under any of these standards, including the "*Netsphere* factors" used in *SEC v. Barton*, 135 F.4th 206, 217 (5th Cir. 2023).[4] Motion at 28-29. In Response, Defendants urge the Court to apply the *Netsphere* factors. Response at 7-10. As the SEC showed in the Motion (at 31-36), the Court need not determine which standard applies because the appointment of a receiver is necessary and appropriate under either standard.

Under the *Netsphere* factors, "a receivership is appropriate where there's 1) a clear necessity to protect the defrauded investors' interest in property, 2) legal and less drastic equitable remedies are inadequate, and 3) the benefits of receivership outweigh the burdens on the affected parties." *Barton*, 135 F.4th at 217 (quotations omitted). The Motion shows that each of these factors favors appointment of a receiver. Motion at 31-33.

As to the first factor—the necessity to protect defrauded investors' interest in property—the Motion showed that, without a receiver, Defendants' actions threaten to divert and dissipate investors' assets through fraud and mismanagement. Motion at 31-33. Defendants do not squarely confront this factor in the Response when addressing the *Netsphere* factors. Response at 7-11. To the extent that the arguments in other sections of the Response relate to this factor, those arguments fail for the reasons addressed in other sections of this Reply.

---

[4] The Motion also showed that a receiver would be appropriate under the *Starbucks* factors, Motion at 33-36, and Defendants likewise do not dispute this showing in the Response.

The Response only squarely challenges the second factor—whether legal and less drastic equitable remedies are inadequate. Response at 9-11. Defendants argue that their recent conduct, described above, shows that the Monitorship is "functioning and adequate." Response at 11. This argument fails for the reasons above in Section II.A. Defendants are harming investors and will harm them more if left in control of the Fund. They have misled the Monitor too many times and flouted the Court's Orders too many times to be trusted to operate under the status quo.

The Response also briefly addresses what Defendants speculate would be harm caused by a receivership, Response at 31, which appears related to the third factor—whether the benefits of a receivership outweigh the burdens on the affected parties. Defendants do not dispute the showing in the Motion that Defendants will not suffer harm from a receivership. Motion at 33. Indeed, appointment of a receiver would not prevent Defendants from earning a living managing other investments; it would only preclude their continued mismanagement of the Fund.

Instead, Defendants cite speculative harm to the Fund. They first claim this action caused vague difficulties with negotiations and a decrease in "projects" with no details or evidence that links the decrease to this case. Response at 31 (citing ECF 379-13 ¶ 7). Defendants' only argument about harm that might be caused is that appointment of a receiver would "potentially" [redacted]

By contrast, the harm to investors without a receiver is clear, immediate, and ongoing: Defendants are withholding their money and refusing to redeem investors who asked for their

money. The benefits of appointing a receiver far outweigh any alleged burdens to Defendants, who have failed to identify any real harm to themselves or the Fund.

**C. Investor declarations confirm investor harm.**

The SEC submitted investor declarations that illustrate how Defendants' refusal to return their money is contrary to Defendants' representations to them and shows how the harm described above affects real people. Motion at 8, 11. The declarations recount what investors were told, what they understood, and what happened to their money. Attached as Exhibit 2 to this Reply is an additional investor declaration received by the SEC after the Motion was filed.

Consistent with Defendants' attack-everyone intimidation strategy, Defendants respond to these investors with claims that the declarations are "perjurious" and that investors "filed intentionally false and fraudulent declarations." Response at 22-23. This mirrors Defendants bullying they tried to use with the Monitor and with other victims who have spoken up, which includes lawsuits like *Schulman* and even a defamation suit against an investor who accused BSG Management of fraud where BSG Management attempted to intimidate investors by filing photos of an investor's home and publishing the investor's address with their complaint.[5]

Defendants' accusations of perjury are wrong. Defendants first challenge investors' testimony that they did not view illiquid stock in a new company as the type of asset the Fund manager could use to redeem investors. Defendants premise their perjury accusations on their contractual argument about Section 6.05 of the Operating Agreement. Response at 23. Defendants are wrong that Section 6.05 provides limitless power for the reasons above, in the Motion (at 9-12), and in the Monitor's report, ECF 280 ¶¶ 23-39. The manager does not have the power to redeem investors with anything it wants, like a bags of rocks, for the same reason the

[5] The case caption is *Broad Street Global Mgmt. LLC, v. Deepika Reddy*, No. 2026-17336-CA01 (Fla. Cir. Ct. Miami-Dade Cty. Aug. 26, 2026).

manager lacks the power to redeem investors with illiquid stock in a new company—neither are assets of the applicable Series. *See id.* The Monitor's reports confirm investors' views are reasonable and therefore cannot possibly be "perjury." Indeed, even Defendant Feingold, in writing to investors in connection with the Redemption Notice, described [redacted] ECF 330-1 at 1 (sealed version of Exhibit 1 to the Motion, ECF 322-1)

Defendants next challenge as "lockstep" testimony that the stock "deal is locked-up for 42-months" because, per Defendants, the lock-up period might be shorter than 42-months. Response at 23. The "lockstep" characterization is wrong and not based on an even cursory reading of the declarations. Moreover, the investors' views of liquidity are accurate:

| | |
|---|---|
| Bharvin Patel, ECF 322-8 ¶¶ 26, 32 | "They offered either stock … which was to be locked-up for 42 months or a cash redemption…. I do not view stock that I cannot sell for at least another 3.5 years as comparable…." |
| Bill Knoblauch, ECF 322-9 ¶¶ 18-20 | "I was supposed to receive my cash and shares by May 27, 2026…. I did not agree to place my money into a risky SPAC and to not have access to it for four years. I do not view that as 'in-kind.'" |
| Dr. Mayank Patel, ECF 322-10 ¶ 25 | "cannot be sold for years" |
| Narendra Shah, ECF 322-11, ¶¶ 1, 29 | "I am 76 years old….My wife and I need this money for our requirement and we need it now, not years from now." |
| Tatyana Levy, ECF 322-12 ¶ 26 | "I also understand that I *may* not be able to sell the shares for years" (emphasis added) |
| Michael S. Patel, ECF 322-13 ¶ 23 | "locked-up for a minimum of 42 months" |

Defendants also accuse investors of perjury for testifying that they expected to be paid dividends from the success of a business, not from principal or other investor money. Response at 27-28 (quoting but not citing Mr. Shah's declaration)[6] and 29 (quoting but not citing Mr.

[6] Defendants also inaccurately use "she" and "her" to refer to Mr. Shah.

Knoblauch's declaration). Remarkably, Defendants do not deny that they used investor money to pay dividends and, instead, argue these investors are lying about their expectations because Defendants claim that they disclosed these Ponzi-like payments.

The SEC agrees that Defendants made Ponzi-like payments; but disagrees that they adequately disclosed them to investors. For instance, Defendants never disclosed that the scheme will collapse without sufficient profit or how close the scheme is to collapsing. *See, e.g.*, *SEC v. SG Ltd*., 265 F.3d 42, 52-53 (1st Cir. 2001) (disclosure that new investor money constituted the sole source of the company's financial income was not enough because it did not include the fact that "the supply of new participants would inevitably be exhausted, causing the scheme to implode and all existing participants to lose their money."); *see also SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 443 (E.D.N.Y. 2016) ("[T]hose who have the greatest risk of loss are those who enter the pyramid [scheme] when the market is closest to saturation .... The disclosure which would be necessary to inform a new investor of his prospects for success or failure would have to change almost daily ....") (quotation omitted).

Next, Defendants' accusations that testimony is "perjury" because Defendants claim it conflicts with disclosures are not correct. Response at 23-31. Defendants claim that some declarants falsely testified that they did not see fees actually charged, Response at 25 (Dr. Patel); 27-28 (Shah); 29 (Knoblauch); and 29-30 (M. Patel), but Defendants cite a disclosure that only says fees *may* be charged. *Id.* Defendants claim that some testimony about expected risk is false, Response at 25 (M. Patel); 28 (Shah); and 28-29 (Knoblauch), but that expected risk derived from statements made by Broadstreet representatives or by a broker at a firm that has a placement agreement with Broadstreet, and Defendants cite no evidence that those representations were not made. Defendants claim that one witness falsely testified that he

expected financial statements, *id.* at 25 (Dr. Patel),[7] but only cite a disclosure that reasonable efforts will be made to obtain financial statements, which is not inconsistent.

Finally, after wrongly attacking declarants for presenting "lockstep" testimony, Defendants cite a set of ***identical*** declarations from investors who claim to be happy with what they believe is their investment and who elected to receive stock, not cash.[8] Response at 31. Even if credited, and assuming those investors know the whole story, this testimony does not negate that investors are receiving no payments, cash-electing investors are harmed, and share-electing investors have no timeline for delivery.

### D. Defendants ignore credit losses and double count revenue to help create the illusion of profits to pay inflated returns.

The Motion showed that Defendants fraudulently offered and paid inflated returns with investor funds because MCA profits were far from sufficient to cover those payments. Motion at 20-22. The Motion also showed that Defendants' explanation that they used accrual accounting fails because the MCA portfolios were not profitable even if revenue was booked on an accrual basis—so long as it is done correctly. Motion at 22-27. The fundamental problem with Defendants' accounting method is that they treat *all* amounts owed as earned revenue while ignoring the known collections risk, and this method results in double counting of revenue every time it is reported. Motion at 23-26. The second problem is that Defendants had access to all the information necessary to estimate credit losses but ignored it. *Id.* at 26-27.

In response, Defendants do not dispute that they ignore credit losses, double count revenue, or even that they had information necessary to estimate and account for credit losses when booking revenue. They first argue that the SEC "attempts to substitute the word 'cash' in

---

[7] Defendants inaccurately use "she" and "her" to refer to Dr. Patel.

[8] From the face of the declarations submitted by Defendants it is very difficult in many cases to even identify what investors have submitted these declarations.

[sic] for 'accrual' and then declares fraud. This is outrageous." Response at 33. This argument again miscasts the SEC's point. The MCA portfolios were not profitable under either type of accounting, as explained in the Motion. The SEC never argued that use of accrual accounting here was wrong; what the SEC contends and the evidence shows is that Defendants are overstating profits because they are not employing accrual accounting properly.

Defendants' next argument, that the SEC does not cite a document where Defendants represent payments would be made from actual profits (Response at 33,) is wrong. Those representations are in the following exhibits: Ex. 24 to ECF 12 at 5, 8; Ex. 48 to ECF 12 at 17; *see also* TRO Motion, ECF 9 at 10-12. Defendants also never disclosed the risk to investors that the scheme would collapse if they stopped receiving new investments.

Finally, rather than analyze the merchant deals in the Fund's MCA portfolios, Defendants cite Feingold's mischaracterization of receivables that, he claims, are "written off." Response at 33 (citing ECF 379-13 ¶ 15(c)).[9] [redacted]

[redacted]

[9] The Response cites "¶ 6.c." but paragraph 6 does not have subparts and does not concern MCA portfolios. The SEC assumes the Response refers to paragraph 15(c) of ECF 379-13.

[redacted]

Accordingly, Defendants failed to dispute that the Fund's MCA portfolio lacked sufficient profits to pay investor returns.

## III. CONCLUSION

For all these reasons, and those in the Motion, the Court should grant the Motion.

10 [redacted]

Dated: September 10, 2026

Respectfully submitted,

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION**

By: */s Terry R. Miller*

Terry R. Miller
S.D. Fla. Bar No. A5503312
(303) 844-1041
millerte@sec.gov

Jacqueline M. Moessner
S.D. Fla. Bar No. A5503301
(303) 844-1031
moessnerj@sec.gov

Zachary T. Carlyle
S.D. Fla. Bar No. A5502167
(303) 844-1084
Carlylez@sec.gov

Attorneys for Plaintiff United States Securities and Exchange Commission
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000